1   COOLEY LLP
    MICHAEL G. RHODES (116127)
2   (rhodesmg@cooley.com)
    MATTHEW D. BROWN (196972)
3   (brownmd@cooley.com)
    JEFFREY M. GUTKIN (216083)
4   (jgutkin@cooley.com)
    101 California Street, 5th Floor
5   San Francisco, CA  94111-5800
    Telephone:    (415) 693-2000
6   Facsimile:    (415) 693-2222

7   Attorneys for Defendant
    FACEBOOK, INC.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12

13   In re: Facebook Internet Tracking Litigation | Case No. 5:12-md-02314 EJD

14                                                  **DEFENDANT FACEBOOK, INC.'S MOTION
                                                    TO DISMISS PLAINTIFFS' CORRECTED
15                                                  FIRST AMENDED CONSOLIDATED CLASS
                                                    ACTION COMPLAINT (FED. R. CIV. P.
16                                                  12(b)(1) & 12(b)(6))**

17

18                                                  **DATE:**         September 21, 2012
                                                    **TIME:**         9:00 a.m.
19                                                  **COURTROOM:**    4
                                                    **JUDGE:**        Edward J. Davila
20                                                  **TRIAL DATE:**   None Set

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 3

    A.  The Operation of "Cookies" and Plaintiffs' Claims ................................ 3

    B.  Facebook's Terms and Privacy Policy ..................................................... 5

    C.  The Plaintiffs and the Putative Class ....................................................... 5

III.  LEGAL STANDARDS ........................................................................................ 6

IV.  ARGUMENT ....................................................................................................... 7

    A.  Plaintiffs Lack Article III Standing .......................................................... 7

        1.  Plaintiffs Fail to Allege Injury in Fact ........................................ 7

        2.  Plaintiff Davis's Litigation Costs Do Not Establish Standing ................... 9

        3.  Plaintiffs Fail to Plead Injury to Any Statutory Right Capable of Conferring Article III Standing ................................................. 10

    B.  Plaintiffs Have Failed to Plead Claims Alleging Fraud with Particularity ........... 11

    C.  Plaintiffs Fail to State a Claim under the Wiretap Act (Count I) ......................... 12

        1.  Plaintiffs Fail to Allege an "Interception" of the "Contents of an Electronic Communication" Using a "Device" ....................... 12

        2.  Plaintiffs' Wiretap Act Claim Fails Because They Allege That Facebook Either Was, or Received Consent From, a Party to Any Allegedly "Intercepted" "Communication" ................................ 14

    D.  Plaintiffs Fail to State a Claim for Violation of Penal Code § 631 (Count X) .................................................................................. 16

        1.  Section 631 Does Not Apply to Electronic Communications ................... 17

        2.  Plaintiffs Concede That Facebook Is a Party to the Communication ....... 17

        3.  Plaintiffs Fail to Allege That Facebook Made Any Intentional, Unauthorized Connection with a Telephone Wire, Line, or Cable .......... 18

        4.  Plaintiffs Fail to Allege That Facebook Read or Learned the Contents or Meaning of Any Messages Without Consent ..................... 19

        5.  Plaintiffs Fail to Allege That Facebook Used Any Information Improperly Obtained ............................................................... 19

    E.  Plaintiffs Fail to State a Claim under the SCA (Count II) ................................. 20

    F.  Plaintiffs Fail to State a Claim for Violation of the CFAA (Count III) ............... 21

    G.  Plaintiffs Fail to State a Claim under Penal Code § 502 (Count IX) ................... 23

        1.  Plaintiffs Fail to Allege That Facebook Acted "Without Permission" ......................................................................... 24

1

2
**Page**

3
       2.    Facebook's Alleged Failure to Delete Cookies Was Not Unlawful

4
          "Access" under Section 502 ........................................................................ 25

5
       3.    Facebook's Cookies Are Not "Contaminants" ......................................... 26

       4.    Plaintiffs Fail to Allege Any "Damage or Loss" ..................................... 27

6
  H.    Plaintiffs' Claim under the UCL Should Be Dismissed (Count VIII) ................. 27

7
       1.    Plaintiffs Lack standing under the UCL ..................................................... 27

8
       2.    Plaintiffs Fail to State a Claim under the UCL's "Fraud" Prong ............. 28

       3.    Plaintiffs Fail to State a Claim under the UCL's "Unlawful" Prong ........ 28

9
       4.    Plaintiffs Fail to State a Claim under the UCL's "Unfair" Prong ............. 28

10
  I.     Plaintiffs Fail to State a Claim under the CLRA (Count XI) ................................ 30

11
  J.     Plaintiffs Fail to State a Claim for Conversion (Count VI) .................................. 30

12
  K.    Plaintiffs Fail to State a Claim for Trespass to Chattels (Count VII) ................... 32

13
  L.    Plaintiffs Fail to State a Claim for Invasion of Privacy or Intrusion Upon
       Seclusion (Counts IV & V) .................................................................................. 33

14
       1.    Plaintiffs Fail to Allege an Actionable Intrusion ..................................... 33

15
       2.    Plaintiffs Fail to Allege a Highly Offensive Intrusion ............................. 34

16
V.    CONCLUSION ............................................................................................................. 35

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3   CASES

4   *Archer v. United Rentals, Inc.*,
5       195 Cal. App. 4th 807 (2011) ............................................... 27

6   *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................... 6

7
8   *B.U.S.A. Corp. v. Ecogloves, Inc.*,
    No. 05 Civ. 9988(JSR), 2009 WL 3076042 (S.D.N.Y. Sept. 28, 2009) ............... 22

9   *Bank of New York v. Fremont Gen. Corp.*,
10      523 F.3d 902 (9th Cir. 2008) ............................................... 31

11  *Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................... 6, 18

12
13  *Belton v. Comcast Cable Holdings, LLC*,
    151 Cal. App. 4th 1224 (2007) ............................................. 29

14  *Berryman v. Merit Prop. Mgmt., Inc.*,
15      152 Cal. App. 4th 1544 (2007) ............................................. 28

16  *Bunnell v. Motion Picture Ass'n of Am.*,
    567 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................. 12, 13

17
18  *Chance v. Avenue A, Inc.*,
    165 F. Supp. 2d 1153 (W.D. Wash. 2001) ................................. 8, 16

19  *Chang Bee Yang v. Sun Trust Mortg., Inc.*,
    No. 1:10-CV-01541 AWI SKO, 2011 WL 3875520 (E.D. Cal. Aug. 31, 2011) .......... 29

20
21  *Chrisman v. City of Los Angeles*,
    155 Cal. App. 4th 29 (2007) ............................................... 25

22  *Claridge v. RockYou, Inc.*,
23      785 F. Supp. 2d 855 (N.D. Cal. 2011) ................................. 17, 24

24  *Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) ....................................... 14

25  *Creative Computing v. Getloaded.com LLC*,
26      386 F.3d 930 (9th Cir. 2004) ......................................... 22, 23

27  *Crowley v. Cybersource Corp.*,
28      166 F. Supp. 2d 1263 (N.D. Cal. 2001) ..................................... 21

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-iii-

**DEF. FACEBOOK'S MOTION TO DISMISS
CASE NO. 5:12-MD-02314 EJD**

*Daugherty v. Am. Honda Motor Co.*,
  144 Cal. App. 4th 824 (2007) ................................................................................. 29

*Drum v. San Fernando Valley Bar Ass'n*,
  182 Cal. App. 4th 247 (2010) ................................................................................. 29

*Edwards v. First Am. Corp.*,
  610 F.3d 514 (9th Cir. 2010)................................................................................... 10

*Facebook, Inc. v. Power Ventures, Inc.*,
  No. C08-05780 JW, 2010 U.S. Dist. LEXIS 93517 (N.D. Cal. July 20, 2010)...................... 26

*Ferrington v. McAfee, Inc.*,
  No. 10-cv-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010)................................... 30

*Folgelstrom v. Lamps Plus, Inc.*,
  195 Cal. App. 4th 986 (2011) ............................................................................ 31, 35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)................................................................................................. 7

*Gaos v. Google Inc.*,
  No. 5:10-CV-4809 EJD, 2012 WL 1094646 (N.D. Cal. Mar. 29, 2012)........................... 7, 10

*Hernandez v. Hillsides, Inc.*,
  47 Cal. 4th 272 (2009) ..................................................................................... 34, 35

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  7 Cal. 4th 1 (1994) ............................................................................................... 33

*In re Actimmune Mktg. Litig.*,
  No. C 08-02376, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009)............................... 11, 28, 30

*In re Apple & AT & TM Antitrust Litig.*,
  596 F. Supp. 2d 1288 (N.D. Cal. 2008) .................................................................... 23

*In re Apple & ATTM Antitrust Litig.*,
  No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270 (N.D. Cal. July 8, 2010)...................... 27

*In re DoubleClick Inc. Privacy Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001)............................................................... passim

*In re Facebook Privacy Litig.*,
  791 F. Supp. 2d 705 (N.D. Cal. 2011) .............................................................. passim

*In re Intuit Privacy Litig.*,
  138 F. Supp. 2d 1272 (C.D. Cal. 2001) .................................................................... 23

*In re iPhone Application Litig.*,
  No. 11-md-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ....................... passim

*In re iPhone Application Litig.*,
   No. 11-MD-02250-LHK, 2012 WL 2126351 (N.D. Cal. June 12, 2012)...................... passim

*In re JetBlue Airways Corp. Privacy Litig.*,
   379 F. Supp. 2d 299 (E.D.N.Y. 2005) ................................................................. 8

*In re Pharmatrak, Inc. Privacy Litig.*,
   329 F.3d 9 (1st Cir. 2003) ............................................................................. 3

*In re Toys 'R' Us, Inc. Privacy Litig.*,
   No. 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001)............................... 16, 20, 21

*Intel Corp. v. Hamidi*,
   30 Cal. 4th 1342 (2003) ................................................................................ 32

*Jessup-Morgan v. Am. Online, Inc.*,
   20 F. Supp. 2d 1105 (E.D. Mich. 1998).............................................................. 14

*Jewel v. Nat'l Sec. Agency*,
   673 F.3d 902 (9th Cir. 2011)........................................................................... 10

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009).......................................................................... 6, 11

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002)........................................................................... 12, 13, 17

*Kremen v. Cohen*,
   337 F.3d 1024 (9th Cir. 2003).......................................................................... 31

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .................................................................................. 27, 28

*LaCourt v. Specific Media*,
   No. SACV-10-1256-GW (JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) .......... passim

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003).......................................................................... 7

*Low v. LinkedIn Corp.*,
   No. 11-cv-01468-LHK, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011)...................... 8, 31, 32

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009).......................................................................... 21, 23

*Marsh v. Zaazoom Solutions, LLC*,
   No. C-11-05226-YGR, 2012 WL 952226 (N.D. Cal. Mar. 20, 2012)........................ 13

*Marshall v. Milberg LLP*,
   No. 07 Civ. 6950 (LAP), 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009)..................... 10

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012)................................................................................................ 28

*McKell v. Wash. Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ...................................................................................... 30, 31

*Med. Lab. Mgmt. Consultants v. ABC, Inc.*,
    306 F.3d 806 (9th Cir. 2002)......................................................................................... 33, 35

*Mortensen v. Bresnan Commc'n*,
    No. CV 10-13-BLG_RFC, 2010 U.S. Dist. LEXIS 131419 (D. Mont. Dec. 13, 2010) ......... 34

*Murphy v. Kenneth Cole Prods., Inc.*,
    40 Cal. 4th 1094 (2007) ...................................................................................................... 17

*Native Village of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ................................................................................. 9

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001)................................................................................................. 6

*Netscape Commc'ns Corp. v. ValueClick, Inc.*,
    684 F. Supp. 2d 678 (E.D. Va. 2009)................................................................................... 2

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976)............................................................................................................. 9

*People v. Stipo*,
    195 Cal. App. 4th 664 (2011) ............................................................................................ 34

*People v. Suite*,
    101 Cal. App. 3d 680 (1980)......................................................................................... 16, 18

*Rogers v. Ulrich*,
    52 Cal. App. 3d 894 (1975)................................................................................................ 17

*Ruiz v. Gap, Inc.*,
    No. 07-5739 SC, 2009 WL 250481 (N.D. Cal. Feb. 3, 2009) ........................................... 27

*S. Bay Chevrolet v. GMAC*,
    72 Cal. App. 4th 861 (1999) .............................................................................................. 29

*Sacramento Cnty. Deputy Sheriffs' Ass'n v. Cnty. of Sacramento*,
    51 Cal. App. 4th 1468 (1996) ....................................................................................... 33, 34

*Sevidal v. Target Corp.*,
    189 Cal. App. 4th 905 (2010) ............................................................................................ 12

*Shulman v. Group W Prods., Inc.*,
    18 Cal. 4th 200 (1998) ....................................................................................................... 33

*SolarBridge Techs., Inc. v. Ozkaynak*,
   No. C 10-cv-03769-EJD, 2012 U.S. Dist. LEXIS 54583 (N.D. Cal. Apr. 18, 2012) ............. 24

*Stearns v. Select Comfort Retail Corp.*,
   No. 08-2746 JF (PVT), 2009 WL 4723366 (N.D. Cal. Dec. 4, 2009) .................................... 29

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ...................................................................................................... 6, 9

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................................ 10

*Susan S. v. Israels*,
   55 Cal. App. 4th 1290 (1997) ........................................................................................ 33

*Tavernetti v. Super. Ct.*,
   22 Cal. 3d 187 (1978) ..................................................................................................... 16

*United States v. Forrester*,
   512 F.3d 500 (9th Cir. 2008) .......................................................................................... 34

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) .......................................................................................... 23

*Vertkin v. Vertkin*,
   No. 07-4471 SC, 2007 WL 4287512 (N.D. Cal. Dec. 6, 2007) ............................................ 33

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..................................................................................... 6, 11

*Warden v. Kahn*,
   99 Cal. App. 3d 805 (1979) ............................................................................................ 17

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................................................................ 10

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ........................................................................................... 6

**STATUTES**

Computer Fraud and Abuse Act,
   18 U.S.C. §§ 1030 .................................................................................................... 22, 23

Federal Wiretap Act,
   18 U.S.C. § 2510 ............................................................................................................. 12
   18 U.S.C. § 2511 ........................................................................................................ 13, 14

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Stored Communications Act,
    18 U.S.C. § 2701 ........................................................................................... 14
    18 U.S.C. § 2702 ........................................................................................... 14
    18 U.S.C. § 2710 ........................................................................................... 12

California Computer Crime Law,
    Cal Penal Code § 502 ............................................................................. passim

California Legal Remedies Act,
    § 1750 ............................................................................................................... 2
    § 1761(d) ........................................................................................................ 30
    § 1780(a) ........................................................................................................ 30

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200
    Cal. Bus. & Prof. Code § 17200 ............................................................... 1, 2

California Wiretap Act, Cal. Penal Code § 631
    Cal. Penal Code§ 631 ............................................................... 16, 17, 18, 19

Other Statutes
    Cal. Civil Code § 1798.80 ....................................................................... 29, 30
    Cal. Penal Code § 629 ................................................................................. 17
    Cal. Penal Code § 630 ................................................................................. 17

**OTHER AUTHORITIES**

Cal. Const., Art. I, § 1 ......................................................................................... 33

Federal Rules of Civil Procedure
    9(b) ............................................................................................................ passim
    12(b)(1) ......................................................................................................... 1, 6
    12(b)(6) ......................................................................................................... 1, 6

U.S . Const., Art. III ...................................................................................... passim

1   **NOTICE OF MOTION AND MOTION TO DISMISS**

2   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE that on September 21, 2012 at 9:00 a.m. or as soon thereafter as

4   this Motion may be heard in the above-entitled court, located at 280 South First Street, San Jose,

5   California, in Courtroom 4, 5th Floor, Defendant Facebook, Inc. ("Facebook") will move to

6   dismiss the Corrected First Amended Consolidated Class Action Complaint ("Complaint" or

7   "Compl.") filed by Plaintiffs.  Facebook's Motion is made pursuant to Federal Rules of Civil

8   Procedure 12(b)(1) and 12(b)(6) and is based on this Notice of Motion and Motion, the

9   accompanying Memorandum of Points and Authorities, the Declarations of Sandeep Solanki and

10  Kyle C. Wong, the Request for Judicial Notice, and all pleadings and papers on file in this matter,

11  and upon such matters as may be presented to the Court at the time of hearing or otherwise.

12                      **STATEMENT OF RELIEF SOUGHT**

13         Facebook seeks an order pursuant to Federal Rules of Civil Procedure 12(b)(1) and

14  12(b)(6) dismissing with prejudice Plaintiffs' Complaint and each of the eleven Claims for Relief

15  alleged therein for lack of standing and failure to state a claim upon which relief can be granted.

16                   **STATEMENT OF ISSUES TO BE DECIDED**

17         1.     Have Plaintiffs adequately alleged standing under Article III of the United States

18  Constitution and California's Unfair Competition Law, Cal. Bus. & Profs. Code § 17200 *et seq*.,

19  where they have not alleged any specific, concrete harm fairly traceable to Facebook's conduct?

20         2.     Do Plaintiffs' vague allegations of fraud meet Rule 9(b)'s heightened pleading

21  standards where they fail to identify any alleged misstatement upon which they relied?

22         3.     Do any of the asserted claims against Facebook state a claim, where in each case,

23  Plaintiffs fail to adequately allege the necessary elements?

24                   **MEMORANDUM OF POINTS AND AUTHORITIES**

25  **I.     INTRODUCTION**

26         Facebook is a free social networking website that enables people to connect and share

27  with their friends, families, and communities.  Once Facebook Users ("User") register, they can

28  become "Friends" with other Users and share virtually anything with them through Facebook.

Plaintiffs' Complaint arises from Facebook's alleged use of so-called "browser cookies" or "HTTP cookies."  These cookies provide a method for storing information on computers to improve a website's functionality, security, and user experience, and for well over a decade they have been a "ubiquitous" and integral part of everyday usage for Internet users.  *See Netscape Commc'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 678, 682 (E.D. Va. 2009).  Here, Plaintiffs claim that these cookies can be used to track the Internet activities of Facebook Users when they are logged out of Facebook and visit third-party websites that have integrated Facebook features, which enable Users to share content with their Facebook Friends.  According to the Complaint, websites with these features trigger cookies that send Facebook the User's browsing activity when that User is logged out, allegedly without the User's consent.

Plaintiffs' Complaint fails as a matter of law.  Plaintiffs lack Article III standing because they have not specified what, if any, personal information Facebook collected without their consent, much less how they were injured by the alleged collection of their browsing activity.  The Complaint instead relies on vague, generalized allegations that say virtually nothing about the named Plaintiffs themselves or how Facebook allegedly harmed them.  As courts have found time and again, such non-specific allegations of harm do not establish standing under Article III.

Plaintiffs' Complaint also fails to meet the heightened pleading standard that governs their claims sounding in fraud, namely their Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, Computer Crime Law ("§ 502"), and Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, claims.  Plaintiffs allege in conclusory terms that Facebook engaged in fraudulent conduct, but their highly generalized claims fall well short of Rule 9(b)'s mandate.

Finally, the Complaint should be dismissed for failure to state any claim upon which relief can be granted.  First, Facebook disclosed in its Privacy Policy—which Users must acknowledge upon registration and which is accessible from virtually all Facebook pages—that Facebook uses cookies to collect information about Users' activity on third-party sites.  This disclosure alone nullifies any claim that Facebook used cookies without Users' consent, as Plaintiffs tacitly acknowledge throughout their Complaint.  While Plaintiffs assert that Facebook promised to (but failed to) delete cookies after Users logged out, that alleged representation appears in a single

entry in Facebook's extensive online Help Center.  Critically, no Plaintiff alleges that they even saw, much less relied on, that representation.  It is therefore beside the point.

Plaintiffs' individual claims are defective for several, additional reasons, such as:

**Federal Wiretap Act, 18 U.S.C. § 2510 ("Wiretap Act"):**  Plaintiffs do not adequately allege facts establishing that there was an "interception" of the "contents" of a "communication" using a "device," and Plaintiffs' allegations show that Facebook acted with the consent of Users or other parties to any alleged communications, or was a party to any alleged communication.

**Stored Communications Act, 18 U.S.C. § 2701 ("SCA"):**  Plaintiffs do not allege that Facebook accessed a "facility" through which an "electronic communication service" is provided, took information from "electronic storage," or did either without or in excess of authorization.

**Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"):**  Plaintiffs fail to allege that they suffered any impairment to property or lost business or revenue from Facebook's conduct, or even that Facebook accessed any computer without authorization.[1]

## II.  STATEMENT OF FACTS[2]

### A.    The Operation of "Cookies" and Plaintiffs' Claims

When a User creates a Facebook account, Facebook allegedly saves certain cookies in the User's Internet browser (*e.g.*, Internet Explorer or Safari) with a unique ID number.  (¶¶ 42-55.[3]) A cookie is a small text file a server creates and sends to a browser (¶ 38), which "the browser software is expected to save and to send back whenever the browser makes additional requests of the [same] server (such as when the user visits additional webpages at the same or related sites)." *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 14 (1st Cir. 2003) (footnote omitted).  Cookies can store only a limited amount of data and do not themselves collect any information.  (¶ 40.)

"Cookies are widely used on the internet by reputable websites to promote convenience and customization," *Pharmatrak*, 329 F.3d at 14, including Facebook, which uses cookies to

---

[1] Plaintiffs' tacked-on assortment of state-law claims also fail, for reasons discussed below.

[2] By discussing the Complaint's factual allegations and documents incorporated by reference, Facebook does not thereby make any admissions.

[3] All paragraph references are to the Complaint unless otherwise noted.

enable Users, *inter alia*, to share content with each other, including content on third-party websites.  Indeed, cookies allow Facebook to offer an array of features for sharing content; it is through these features—in particular "social plug-ins" such as the "Like" button[4]—that Plaintiffs allege Facebook collects browsing activity information.  (¶¶ 15, 17.)

Plaintiffs allege that Facebook collects information about a logged-in User's browsing activity each time she visits a website with Facebook features, such as the Like button.  (¶¶ 15, 84.)  This occurs when the information contained in such User's cookies allegedly is "sent back" to Facebook.[5]  (¶ 60.)  The transmittal of this information is necessary, for example, for the User to see "social" content—content that her Friends have shared on the website.  (¶ 60 (if a User visits CNN.com they may see what articles her Friends recommend on that site).)

The process is largely the same when a logged-out Facebook User visits a site like CNN.com.  The User's browser sends a request to CNN's server to display the requested webpage, and the server responds by sending the information and code necessary to display the requested webpage, which may include features such as the Like button.  (¶¶ 60, 73-74.)  CNN's server, however, does not actually have the information to display the Like button.  (¶ 61.)  Thus, the CNN webpage causes the User's browser to send a request to Facebook's servers in order to display the Like button.  (¶ 77.)  This request from the User's browser to Facebook must include the URL being visited and other technical information so that Facebook's servers know where to display the Like button; it allegedly may also include information from Facebook cookies stored on the User's browser.  (¶¶ 78, 82.)  Thus, Plaintiffs admit that, as a result of their own actions (requesting a particular URL), their browsers communicate directly with Facebook.  (¶¶ 77, 78.)

---

[4] The Like button has a thumbs-up symbol next to the word "Like," and Users may click it in order to share their affinity for particular content with their Facebook Friends.  (¶ 60.)  If the Like button appears on a third-party website and is clicked on by a logged-in User, her Like statement will be displayed to her Friends on Facebook, and potentially on the third-party site itself.  (*Id.*)

[5] When an individual wants to visit a website, she types into her web browser the website's unique Uniform Resource Locator ("URL").  (¶ 58.)  The browser then sends a "GET request" to the server to display the website.  (¶ 59.)  Essentially, the URL tells the individual's browser the location of servers from which to "GET," or request, the content (text, images, links, etc.) necessary to display the website the individual wants to visit.  *See, e.g., In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 501 (S.D.N.Y. 2001).

Plaintiffs claim that upon logout, however, Facebook should have deleted cookies from Users' browser, so that information about the Users' activity was not sent to Facebook.  (*Id.*)

## B.   Facebook's Terms and Privacy Policy

Plaintiffs admit that all Facebook Users consent to Facebook installing cookies on each User's computer and to Facebook's collection of browsing data.  (¶ 16.)[6]  Plaintiffs further admit that all Users must acknowledge that they have read Facebook's Privacy Policy (now called the Data Use Policy) when registering for the site.  (¶ 16.)   Since the start of the proposed class period, that Policy—which is linked at the bottom of virtually every page on Facebook—stated:

> **Cookie Information.** We use "cookies" (small pieces of data we store for an extended period of time on your computer…) to make Facebook easier to use, to make our advertising better, and to protect both you and Facebook. For example, we use them to store your login ID (but never your password) to make it easier for you to login whenever you come back to Facebook. We also use them to confirm that you are logged into Facebook, and to know when you are interacting with Facebook Platform applications and websites, our widgets and Share buttons, and our advertisements. You can remove or block cookies using the settings in your browser, but in some cases that may impact your ability to use Facebook.

(Declaration of Sandeep Solanki ("Solanki Declaration"), filed herewith, Ex. C § 2.)[7]

## C.   The Plaintiffs and the Putative Class

According to the Complaint, each named Plaintiff is a registered Facebook User who, during the proposed Class Period, visited third-party websites with "Facebook integrated content" after logging out of Facebook.  (¶¶ 103-06.)  Plaintiffs allege in conclusory fashion that Facebook "intercepted [their] electronic communications and tracked [their] internet use post-logout" without their consent.  (*Id.*)  Plaintiffs' claim that they did not consent to this alleged conduct is based exclusively on a single entry in Facebook's Help Center, in which Plaintiffs claim Facebook promised to delete cookies after Users logged out.  (¶¶ 16, 103-06.)   Critically,

---

[6] At registration, Users must agree to the Statement of Rights and Responsibilities ("SRR"). (¶ 16.)  The SRR does not say anything about cookies; it refers Users to the Privacy Policy for information about Facebook's collection and use of data.

[7] The Data Use Policy introduced on September 23, 2011 includes similar language.  (*Id.* Ex. D.) This Court may take judicial notice of both policies.  (*See* Request for Judicial Notice ("RJN"), filed herewith.)

however, Plaintiffs never allege that they relied on, or even knew of, this alleged misrepresentation, which forms the entire basis of their lawsuit. The Complaint also does not identify what, if any, communications or personal information Facebook supposedly collected from Plaintiffs, nor that Facebook actually used any of this information or disclosed it to third parties. While the Complaint opines on the theoretical value of Users' browsing activity, such discussion is abstract and untethered to *anything* that Plaintiffs allege actually happened here. (¶¶ 113-25.) Plaintiffs also do not allege that they suffered any actual harm from the conduct at issue, or that they ever sought to sell, were prevented from selling, or had the chance to sell their information.

Plaintiffs assert a litany of claims seeking to impose liability for the mere use of cookies on the Internet, ranging from federal and state claims for unauthorized wiretapping, to state law claims for fraud and intruding upon Users' seclusion. Plaintiffs seek damages of more than $15 billion and upwards of $1.5 trillion. (¶ 108.)

## III.  LEGAL STANDARDS

Under Rule 12(b)(1), a court must dismiss claims where a plaintiff has failed to establish standing under Article III of the U.S. Constitution. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). A court must also dismiss claims under Rule 12(b)(6) when "there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action" are not sufficient to save a complaint from dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (A plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully.").

When a complaint "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of that claim . . . the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (citation omitted); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

## IV.   ARGUMENT

### A.   Plaintiffs Lack Article III Standing

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). A plaintiff who fails to show that she "personally ha[s] been injured" is prohibited from seeking relief on behalf of herself or any other members of a putative class. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).

#### 1.   Plaintiffs Fail to Allege Injury in Fact

Plaintiffs allege that their personal information was collected when they visited third-party websites, but do not identify a single piece of data collected or any third-party website they actually visited. Moreover, Plaintiffs insist that their personal information has recognized value, but they do not plead a single instance where anyone was willing to pay them for such information, let alone where Facebook's alleged conduct lessened the value of their information or its purported marketability. Such broad pleading fails to satisfy injury-in-fact requirements, as Plaintiffs have not shown that they were harmed *personally*. *See id.*

Courts have only granted standing for data privacy claims where plaintiffs establish that their "injuries are sufficiently particularized." *See, e.g.*, *Gaos v. Google Inc.*, No. 10-CV-4809 EJD, 2012 WL 1094646, at *3 (N.D. Cal. Mar. 29, 2012). In *Gaos*, this Court found standing for an SCA claim based on search terms disclosed in URL headers. But the Court made clear that the plaintiff had standing because she provided specific examples of search queries at issue and "explain[ed] how and by whom [the alleged] disclosure was made." *Id.* Here, however, Plaintiffs have not provided any specific examples as to what data Facebook allegedly collected, what third-party websites they visited, or how this lessened the "value" of their personal information.

Even if Plaintiffs were to allege specific examples, courts have repeatedly held that claims based upon the purported collection of personal data do not create Article III standing,

particularly where plaintiffs cannot establish particularized harm.   For example, in *Low v. LinkedIn Corp.*, the plaintiff claimed a social networking site placed cookies on his web browser, allegedly permitting third parties to view his browser history.   No. 11-cv-01468-LHK, 2011 WL 5509848, at *1-2 (N.D. Cal. Nov. 11, 2011).   Like Plaintiffs here, the *Low* plaintiff theorized that his browsing history was "personal property with market value" that was taken "without compensation."   *Id.* at *4.   The court dismissed the allegations as "too abstract and hypothetical to support Article III standing," finding that plaintiff had "not yet articulated or alleged a particularized and concrete harm . . . ."   *Id.* at *4, *6 (collecting cases).

The court in *LaCourt v. Specific Media, Inc.* also found that cookies allegedly placed on the plaintiffs' browsers without consent cause no cognizable harm.   No. SACV-10-1256-GW (JCGx), 2011 WL 1661532, at *1 (C.D. Cal. Apr. 28, 2011).   The *LaCourt* plaintiffs argued that their personal data had value because it could be bought and sold, citing numerous articles stating a "value exchange" occurs when consumers trade their information for free online services.   The court dismissed the claims, stating that the plaintiffs had not demonstrated how, by "taking and retaining" the plaintiffs' browsing history, the defendant deprived them of economic value.   *Id.* at *4-5 (plaintiffs did "not identify a single individual who was foreclosed from entering a 'value-for-value exchange' [or was harmed under the plaintiffs' other economic theories] as a result of [the defendant's] alleged conduct.").   Numerous other courts have also rejected arguments that collection of personal data gives rise to Article III standing or causes cognizable injury.[8]

The overwhelming weight of authority supports dismissal of the Complaint for lack of standing.   Plaintiffs cannot manufacture injury in lieu of providing particularized allegations by claiming, as they have, that personal information has "massive economic value"; citing journalists

---

[8] *See DoubleClick*, 154 F. Supp. 2d at 525 (holding in cookies case that collected information "has never been considered a[n] economic loss"); *Chance v. Avenue A, Inc.*, 165 F. Supp. 2d 1153, 1159 (W.D. Wash. 2001) ("[T]he transmission of an internet cookie is virtually without economic harm."); *see also In re iPhone Application Litig.*, No. 11-md-02250-LHK, 2011 WL 4403963, at *5-6 (N.D. Cal. Sept. 20, 2011) (dismissing claims for lack of standing); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) (dismissing claim for lack of damages because "there is absolutely no support for the proposition that the personal information of an individual JetBlue passenger had any value for which that passenger could have expected to be compensated").

or academics who call personal information a "currency"; alleging that unspecified "markets exist" for personal data; or claiming that Google gives gift cards to participants in a consumer trends study.  (*See* ¶¶ 112-25.)  None of these allegations, even if true, demonstrate that any of the named Plaintiffs—much less each proposed class member—was personally harmed.

### 2.     Plaintiff Davis's Litigation Costs Do Not Establish Standing

Plaintiffs try to salvage standing by alleging that one (and only one) named Plaintiff, Perrin Davis, incurred out-of-pocket costs.  Part of the expenses incurred, however, was a retainer for a privacy expert hired "*through counsel*" to advise "[Davis] *and counsel*."  This is an expense in furtherance of this litigation, not damages the Plaintiff suffered as a result of Facebook's alleged conduct.[9]  Moreover, Plaintiffs' passive-voice statement that "[t]he expert was paid a retainer of $7,500" (¶ 109) suggests that Ms. Davis's lawyers paid for the expert.  Plaintiffs also reference a subscription fee of $1.99 per month for an online service called "Privacy Watch." (¶ 128.)  Given that these allegations were absent from Ms. Davis's original complaint, it is entirely unclear if she even signed up for this service or retained the expert before filing suit. Moreover, even if Plaintiff Davis actually paid the minimal Privacy Watch fees herself, and did not simply sign up after filing suit in an attempt to create standing, those expenses still are not "fairly traceable" to Facebook's alleged conduct.  *Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 877-78 (N.D. Cal. 2009) ("Article III *does* require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.").[10]  Here, Plaintiffs allege that Ms. Davis paid Privacy Watch out of concern that Facebook ignores its own policies.  But if Ms. Davis feared that Facebook would not abide by its policies, it would be nonsensical to pay for a subscription that reports updates to those allegedly disregarded policies. Whatever Davis's reason, signing up for this service is not traceable to the challenged conduct in

---

[9] If the costs of suing could create injury in fact, no plaintiff would ever lack standing.  *See Steel Co.*, 523 U.S. at 108 (holding that "a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit").

[10] *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (finding no standing where plaintiff's alleged injury was not fairly traceable to defendant's conduct and noting that plaintiff would not "be heard to complain about damage inflicted by its own hand").

1   this suit.[11]

2   ### 3.   Plaintiffs Fail To Plead Injury To Any Statutory Right Capable of Conferring Article III Standing

3

4   Even if Plaintiffs' claims provide a statutory cause of action, this Court cannot grant

5   standing on this basis alone.  The Supreme Court has repeatedly explained that, even where the

6   legislature creates a statutory cause of action, Article III's "requirement remains: the plaintiff still

7   must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class

8   of other possible litigants."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Summers v. Earth Island

9   Inst.*, 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III

10  jurisdiction that cannot be removed by statute.").  Thus, where standing rests on a statutory cause

11  of action, the plaintiff must still plead sufficient facts to show actual injury.  *See, e.g., Jewel v.

12  Nat'l Sec. Agency*, 673 F.3d 902, 910 (9th Cir. 2011) (Article III standing found for ECPA claims

13  where the complaint's "allegations [were] highly specific and la[id] out concrete harms arising

14  from the warrantless searches" and "described in detail the particular electronic communications

15  equipment  .  .  .  where [plaintiff's] personal and private communications were allegedly

16  intercepted").  Nor does *Edwards v. First American Corp.* compel a different outcome.  610 F.3d

17  514, 515 (9th Cir. 2010), *cert. granted in part*, 131 S. Ct. 3022, 180 L. Ed. 2d 843 (2011), *and

18  cert. dismissed as improvidently granted*, No. 10-708, 2012 WL 2427807 (U.S. June 28, 2012).

19  As this Court recognized in *Gaos*, standing conferred by statute still requires that "the injury [the

20  plaintiff] suffered was specific to her."  2012 WL 1094646, at *3 (citation omitted).  As explained

21  *supra* § IV(A)(1), Plaintiffs' allegations of harm—broad, vague, and lacking specific application

22  to any Plaintiff—are insufficient to establish injury in fact requirements and, therefore, compel

23  dismissal.

24

25

26  _____

[11] Even if Davis could somehow establish an injury based on her personal expenses, that fact

27  would not save the remaining Plaintiffs, whose claims would have to be dismissed for lack of
    standing.  *See Marshall v. Milberg LLP*, No. 07 Civ. 6950 (LAP), 2009 WL 5177975, at *7-8 &

28  n.12 (S.D.N.Y. Dec. 23, 2009) (dismissing for lack of standing as to some, but not all, plaintiffs).

### B.      Plaintiffs Have Failed to Plead Claims Alleging Fraud with Particularity

Rule 9(b) requires claims sounding in fraud to be pled with particularity.  *Vess*, 317 F.3d at 1106 (citations omitted).  Moreover, where, as here, the plaintiff alleges she was induced to act by the defendant's alleged fraud, she must plead reliance with particularity.  *In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648, at *11-16 (N.D. Cal. Nov. 6, 2009).  This heightened standard applies to all fraud claims, regardless of whether fraud is an enumerated element of the underlying cause of action.  *Vess*, 317 F.3d at 1103.

Here, Plaintiffs' claims under § 502, the UCL, and the CLRA must be pled with particularity because they allege a single course of fraudulent conduct.  *See Kearns*, 567 F.3d at 1125; (*see, e.g.*, ¶¶ 141, 149, 160, 178-82, 188, 196, 213, 218-21).  Plaintiffs, for instance, allege that Facebook made "misrepresentations" that induced Plaintiffs to act.  (¶ 178; *see also* ¶ 182 ("Defendant's acts and practices were fraudulent . . ."); ¶¶ 218-21 (alleging Facebook misrepresented its services).)  Plaintiffs also allege that, as part of this overall "scheme to defraud" users to obtain their information, Facebook misled Plaintiffs.  (*See* ¶¶ 179, 188, 196.)

The Complaint does not, however, provide "'the who, what, when, where, and how' of the misconduct charged."  *Vess*, 317 F.3d at 1106.  For instance, Plaintiffs suggest that Facebook's SRR and Privacy Policy are misleading, but do not identify any language within those documents they allegedly relied upon.  (*See* ¶ 16.)  Indeed, Plaintiffs acknowledge that the Privacy Policy "reflect[s] that users consent to Facebook installing cookies on each user's computer, and . . . consent to these cookies tracking and transmitting data to Facebook regarding each user's web browsing . . . ."  (*Id.*)  And neither the SRR nor the Privacy Policy address Facebook's practices with respect to cookies when Users log out of Facebook.  (*See* Solanki Decl. Exs. A-D.)

Instead, Plaintiffs rely on a single entry in Facebook's Help Center allegedly stating: "'When you log out of Facebook, we remove the cookies that identify your particular account.'" (*See* ¶ 16.)  But Plaintiffs fail to allege that any of them (or any putative class member) actually saw this statement, much less relied on it.  This omission is fatal.  *Kearns*, 567 F.3d at 1126 (dismissing claims under Rule 9(b) where plaintiff failed to allege he was exposed to or relied upon allegedly misleading statements); *Actimmune*, 2009 WL 3740648, at *10 (same); *see also*

1  *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 926 (2010) (holding that individuals who were

2  never exposed to alleged misrepresentations could not have been deceived and thus had no UCL

3  claim).  Without this basic allegation, Plaintiffs' claims under § 502, the UCL, and the CLRA fail

4  to satisfy Rule 9(b).

5     **C.     Plaintiffs Fail to State a Claim under the Wiretap Act (Count I)**

6     Plaintiffs attempt to squeeze their allegations into a Wiretap Act claim by reciting

7  "intercept" (or a variant thereof) more than 30 times in the Complaint.  But Plaintiffs fail to allege

8  the basic elements of a Wiretap Act claim and admit that they authorized the supposed

9  "interception" here.  Mere repetition cannot cure the fundamental defects in Plaintiffs' theory.

10        **1.     Plaintiffs Fail to Allege an "Interception" of the "Contents of an
             Electronic Communication" Using a "Device"**

11

12    Plaintiffs fail to adequately allege that Facebook (1) "intercepted" (2) the contents of an

13  "electronic communication" (3) using a "device"—three necessary elements of a Wiretap Act

14  claim.  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002); *see Bunnell v.*

15  *Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1152-54 (C.D. Cal. 2007).

16    ***Interception.***   The Wiretap Act defines "intercept" to mean the "acquisition of the

17  contents of any wire, electronic, or oral communication through the use of any electronic,

18  mechanical, or other device."  18 U.S.C. § 2510(4).  Because the Wiretap Act was passed before

19  the Internet era and is thus "ill-suited to address modern forms of communication" in the online

20  context, the Ninth Circuit interprets "intercept" narrowly to mean "to stop, seize, or interrupt in

21  progress or course before arrival."  *Konop*, 302 F.3d at 874, 878; *see also id.* at 878 & n.6 (noting

22  that interception must occur "during transmission," which is the "very short" period where an

23  electronic communication "travels across the wires at the speed of light").  In *Bunnell*, for

24  example, the plaintiff alleged that the defendant violated the Wiretap Act by configuring an email

25  program to simultaneously forward copies of the plaintiff's emails to the defendant.  567 F. Supp.

26  2d at 1152-54.  The court dismissed the claim, holding that the program forwarded separate

27  copies of the emails, which was not an interception, even though the defendant "received the

28  forwarded messages [with]in milliseconds" of the original emails.  *Id.*

The Complaint generally describes what happens when a User visits a website like CNN.com, but nowhere do Plaintiffs allege that Facebook "stopped, seized, or interrupted" any communication between Plaintiffs and a third party.  (¶¶ 57-84.)  On the contrary, the Complaint alleges that *different information is sent in two separate communications* to CNN.com and Facebook.  For example, when a user visits CNN.com, the User's browser sends CNN.com (i) a "Get Request" to display the CNN.com webpage and (ii) the information contained in any CNN.com cookies on the User's browser.  (¶¶ 59-61.)  *After* that interaction with CNN.com, the User's browser separately and directly sends Facebook (i) a different "Get Request" for the Facebook Like button image and (ii) the information contained in any Facebook cookies on the User's browser.  (¶¶ 62-69, 77-81.)  Therefore, the Facebook cookies at issue in this litigation do not arise from communications to a third party, let alone communications that Facebook is intercepting.  Rather, information in the cookie is sent *to Facebook* by the User's browser. Plaintiffs' Wiretap Act claim thus fails. *See Konop*, 302 F.3d at 876; *Bunnell*, 567 F. Supp. 2d at 1154; *Marsh v. Zaazoom Solutions, LLC*, No. C-11-05226-YGR, 2012 WL 952226, at *17 (N.D. Cal. Mar. 20, 2012) (dismissing Wiretap Act claim where "Defendants did not stop, seize, or interrupt a communication in progress before arrival to its intended destination").

***Contents of Electronic Communication.***     Similarly, Plaintiffs fail to allege that "contents" of an "electronic communication" were intercepted.[12]   18 U.S.C. § 2510(8). "Contents" is defined to mean "information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).  Plaintiffs vaguely state that "Facebook "used technology to acquire the contents of . . . electronic communications within the meaning of the Wiretap Act" when it "duplicat[ed] its users' communications with websites that use Facebook content (the users' URL requests for information) and associate[ed] it with cookies and other data."  (¶ 142.) But the Complaint never makes clear what communications (or contents thereof) Facebook allegedly intercepted.  Regardless, neither "users' URL requests for information" nor "cookies"— taken separately or together—qualify as the "*contents* of a communication."  (¶ 142); *see also* 18

---

[12] Plaintiffs' claims also do not implicate a "communication" as contemplated by the Wiretap Act.

U.S.C. §§ 2511(3)(a), 2702(a)(1), 2702(a)(2) (emphasis added).  First, a URL, to the extent it is even a "communication," is not "content" because it does not concern the "meaning of that communication."  18 U.S.C. § 2510(8).  Rather, a URL simply identifies the location of a webpage on the Internet, much like, for example, a postal address is not the communication itself, but rather an identification of a location.  Second, a unique User ID number that may be contained within a cookie is not "contents of a communication," but instead constitutes, at most, a User "record," which does not reveal the substance of any communication.  *See, e.g.*, *Jessup-Morgan v. Am. Online, Inc.*, 20 F. Supp. 2d 1105, 1108 (E.D. Mich. 1998) (holding disclosure of an AOL User ID was not the "'content' of electronic communications").  Third, data generated automatically does not qualify; "[r]ather, 'content' is limited to information the user intended to communicate, such as the words spoken in a phone call."  *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2012 WL 2126351, at *14, *20 (N.D. Cal. June 12, 2012) ("*iPhone App. Litig. II*") (holding that geolocation data allegedly intercepted from mobile phones were not the "contents" of communications because they were "generated automatically").  Here, Plaintiffs allege only that Facebook may have received automatically generated data when Users visited third-party sites—not the contents of any communication.  (¶¶ 38-84 (alleging that when a User visits a third-party website with a Like button, her browser automatically sends one request with cookie information to the website and another "automatic request to Facebook from the [User's] browser").)

  *Device*.  Plaintiffs do not allege facts that would establish that any interception of the contents occurred through a "device."  In fact, the Complaint is devoid of any attempt to identify what device Facebook used to allegedly intercept Plaintiffs' communications.  *See Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 140 (E.D.N.Y. 2010) (dismissing Wiretap Act claim where plaintiff "failed to allege the use of a device to intercept the communications").

   **2. Plaintiffs' Wiretap Act Claim Fails Because They Allege That Facebook Either Was, or Received Consent From, a Party to Any Allegedly "Intercepted" "Communication"**

  The Wiretap Act does not impose liability for an alleged interception if the defendant either was a party to the communication or obtained the consent of one of the parties.  18 U.S.C.

§ 2511(2)(d).  Here, assuming there even was an alleged interception, both exceptions apply.

Plaintiffs try to imply that Facebook, through the use of cookies, intercepted communications between Plaintiffs' browsers and third-party websites they visited.  (¶¶ 57-64.) According to their own allegations, however, Plaintiffs' browsers transmitted Facebook cookies *to Facebook* and requested that Facebook send their browser Facebook content (*e.g.*, the Like button) for display on those sites.  (¶ 77.)  In other words, Plaintiffs' own browsers sent the purportedly "intercepted" "communication" to Facebook when Plaintiffs visited third-party websites with Facebook social features.  Facebook was thus a party to the communication and cannot be liable for "intercepting" it under the Wiretap Act.  *See In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 713 (N.D. Cal. 2011) ("Because . . . the communication at issue is one from a user *to* Defendant, Defendant cannot be liable under the Wiretap Act . . . .").

Moreover, Plaintiffs consented to the placement of Facebook cookies on their computers and to the transmission of the data contained therein to Facebook.  The Complaint makes clear that each named Plaintiff "registered for Facebook" and in doing so consented to Facebook's use of cookies on third-party websites integrated with Facebook features.  (*See, e.g.*, ¶¶ 5-8, 16, 49-56.)  For example, Plaintiffs acknowledge that Facebook's Privacy Policy "reflect[s] that users consent to Facebook installing cookies on each user's computer, and . . . consent to these cookies tracking and transmitting data to Facebook regarding each user's web browsing . . . ." (¶ 16; *see also* Solanki Decl. Ex. C § 2 (Privacy Policy states that Facebook uses cookies "to know when you are interacting with Facebook Platform applications and websites, our widgets and Share buttons, and our advertisements")．)  As noted above, the Privacy Policy does not limit Facebook's use of cookies based on whether a User is logged in or not.  Plaintiffs, therefore, cannot now claim that Facebook somehow "wiretapped" them without their knowledge.

Moreover, any third-party websites with Facebook content were also parties to any "communications," and, even if interception were found to have occurred, those websites also consented to Facebook's alleged "interception."  Plaintiffs admit that the "intercepted" communication is sent as part of the regular process by which third-party websites obtain Facebook content to display on their site.  (*E.g.*, ¶¶ 60-62.)  Thus, the third-party website plainly

consented to these communications by choosing to display a Like button.  Numerous courts have so held in dismissing similar allegations.  *E.g.*, *In re Toys 'R' Us, Inc. Privacy Litig.*, No. 00-CV-2746, 2001 WL 34517252, at *7 n.16 (N.D. Cal. Oct. 9, 2001) (dismissing claim that placement of cookies violated the Wiretap Act because plaintiffs "pleaded sufficient facts to establish that the operators of [third-party] Web sites provided [defendant] with consent to intercept such communications").[13]   Indeed, CNN.com—the website in Plaintiffs' own example—clearly informs its users that it shares information about browsing activity with sites like Facebook that are integrated with CNN.com.[14]

### D.    Plaintiffs Fail to State a Claim for Violation of Penal Code § 631 (Count X)

Plaintiffs likewise fail to allege a violation of California's wiretap law, Penal Code § 631.  The purpose of California's wiretap law is "to prevent secretly listening to the [c]ontents of private conversations, or eavesdropping."  *People v. Suite*, 101 Cal. App. 3d 680, 687 (1980); *accord* Cal. Penal Code § 630.  To accomplish this goal, § 631 "prescribes criminal penalties for three distinct and mutually independent patterns of conduct: intentional wiretapping, willfully attempting to learn the contents or meaning of a communication in transit over a wire, and attempting to use or communicate information obtained as a result of engaging in either of the previous two activities." *Tavernetti v. Super. Ct.*, 22 Cal. 3d 187, 192 (1978).  Plaintiffs fail to state a claim here because § 631 does not apply to electronic communications and, even if it did,

---

[13] *See, e.g.*, *DoubleClick*, 154 F. Supp. 2d at 504  (dismissing plaintiffs' claim that DoubleClick's placement of cookies on plaintiffs' computers and collection of private information violated the Wiretap Act because "DoubleClick's cookies *only* collect information concerning users' activities on *DoubleClick-affiliated Web sites*" (emphasis in original)); *Chance*, 165 F. Supp. 2d at 1162 ("It is implicit in the web pages' code instructing the user's computer to contact [defendant], either directly or via [a third party] server, that the web pages have consented to [defendant's] interception of the communication between them and the individual user.").

[14] CNN Privacy Statement, http://www.cnn.com/privacy.html (last visited July 2, 2012) ("We, our third party service providers, advertisers or our partners . . . may use cookies . . . .  We . . . or our partners may also use 'web beacons' . . . to monitor the behavior and collect data about the visitors viewing a web page. . . .  Some of our sites contain links to or integrations with other sites such as Facebook, Twitter, LinkedIn, etc.,  whose information practices may be different than ours. . . . [W]e have no control over information that is submitted to, or collected by, these third parties.").  The concurrently-filed request seeks  judicial notice of this document.  (*See* RJN.)

Plaintiffs do not allege facts to survive a motion to dismiss.

### 1.      Section 631 Does Not Apply to Electronic Communications

As an initial matter, § 631 does not apply in this context.  As a criminal statute, § 631 must be strictly construed.  *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011).  The terms "electronic communication," "cookies," "internet," and "computer" are not used anywhere in § 631.[15]  Moreover, § 631's omission of such language contrasts with the chapter directly preceding it, which discusses and explicitly defines "electronic communications."  *See* Cal. Penal Code §§ 629.50-.51.  This omission thus indicates that the legislature intended to convey a different meaning.  *See Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1106-1108 (2007) (reasoning that use of the word "penalty" in one statute but not a related statute indicated the latter statute did not impose a penalty).  Thus, § 631 does not apply to Plaintiffs' allegations.  *See LaCourt*, 2011 WL 1661532, at *7 (noting that § 631's "application to the conduct alleged in the FACC [browser cookies] is far from obvious").

### 2.      Plaintiffs Concede That Facebook Is a Party to the Communication

In any event, Plaintiffs' concession that Facebook was a party to the purportedly intercepted "communications" negates any claim under § 631.  While the Complaint is not a model of clarity, particularly in its discussion of how cookies work, the relevant communication appears to involve "a request to the Facebook server."  (¶ 77.)  As such, Plaintiffs admit that their browsers sent "*a request to Facebook*" directly to deliver content *to be displayed as part of the very webpage that Plaintiffs have requested to view*.  Section 631 does not apply to such situations.  *Warden v. Kahn*, 99 Cal. App. 3d 805, 811 (1979) ("[S]ection 631 . . . has been held to apply only to eavesdropping by a third party and not to recording by a participant to a conversation."); *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 899 (1975) (same).

---

[15] In 1986, Congress amended the Wiretap Act "which previously addressed only wire and oral communications, to address[] the interception of … electronic communications."  *Konop*, 302 F.3d at 874.  The California legislature did not expand § 631 in the same way.

### 3. Plaintiffs Fail to Allege That Facebook Made Any Intentional, Unauthorized Connection with a Telephone Wire, Line, or Cable

To state a claim for wiretapping under § 631, Plaintiffs must plead facts to show that Facebook used a "machine, instrument, or contrivance" to make an "unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument" and, through that connection, to obtain the contents of communications. Cal. Penal Code § 631(a). The Complaint fails to do so.

*First*, the Complaint does not allege how Facebook made a "connection . . . with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system." *Id.* Plaintiffs simply assert that cookies are "implant[ed]" and then recite the statutory elements from § 631(a). (¶ 42.) Indeed, the word "connection" does not appear once in the Complaint. To the extent that Plaintiffs claim that Facebook's cookies are used to make an unauthorized connection, they do not actually describe how any such cookie is a "machine, instrument, or contrivance" capable of connecting to a telephone wire to "eavesdrop" or otherwise acquire the contents of any communications. Such conclusory allegations are insufficient. *See Twombly*, 550 U.S. at 555 (holding that formulaic recitation of the elements of a cause of action will not survive a motion to dismiss).

Courts have rejected similarly ill-pled attempts to apply § 631's "unauthorized connection" requirement to cookies. *LaCourt*, 2011 WL 1661532, at *7 (dismissing § 631 claim against defendant that allegedly used cookies to track and create profiles of web use in part because § 631's application "to the conduct alleged . . . is far from obvious").

*Second*, to state a § 631 claim, an allegedly unauthorized connection must obtain the contents of a communication. *See Suite*, 101 Cal. App. 3d at 686 (finding no unauthorized connection where no "contents" of the communications were obtained). The Complaint, however, does not identify a single communication to or from any named Plaintiff that Facebook allegedly obtained. Nor does the Complaint allege what the contents of that acquired communication supposedly were, or how the allegedly unauthorized connection Facebook made could be used to obtain the contents of that communication. Indeed, if any communication at all occurred, it was between Plaintiffs and Facebook and, therefore, is not actionable under § 631.

***Finally***, as discussed above (*see* § IV(C)(2)), Facebook informed Users about its use of cookies, and the very website Plaintiffs use to show how Facebook allegedly could learn logged-out Users' browsing activity notified visitors that third-party cookies may be used.

### 4.   Plaintiffs Fail to Allege That Facebook Read or Learned the Contents or Meaning of Any Messages Without Consent

The second prong of § 631 forbids anyone who "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a). Plaintiffs, again, fail to allege any such facts.

As described above with respect to the first prong, the Complaint does not identify a single communication, let alone its contents, that Facebook allegedly read or learned from any named Plaintiff. Nor does it contain any actual factual allegation as to how Facebook's cookies allegedly obtained the contents of any communication. Additionally, Plaintiffs do not allege how Facebook's alleged use of cookies was unauthorized given that Facebook disclosed its use of cookies in the Privacy Policy. (*See* § IV(C)(2).) For these independent reasons, the Complaint does not state a claim for violation of the second prong of § 631.

### 5.   Plaintiffs Fail to Allege That Facebook Used Any Information Improperly Obtained

The third "use" or "communicate" prong of § 631 applies only to information that was obtained by the methods outlined in the previous two offenses. Cal. Penal Code § 631(a). As explained above, Plaintiffs have failed to allege that any information was improperly obtained through an unauthorized connection or by reading or learning the contents of a communication while in transit. As such, there is no predicate for a violation of the third prong. Moreover, Plaintiffs have failed to allege that Facebook actually "used" any of the alleged browsing activity information at all. Plaintiffs suggest very generally that Facebook allegedly collects this information "to leverage its access to users' data … to sustain its phenomenal growth" (¶ 13), but Plaintiffs never allege that Facebook ever used the information in such a manner.

### E.      Plaintiffs Fail to State a Claim under the SCA (Count II)

Plaintiffs also assert a claim under the SCA for unauthorized access to stored data. (¶ 149.)  But the Complaint fails to allege that Facebook (1) accessed a "facility" through which an electronic communication service is provided, to take information (2) from "electronic storage" (3) without or exceeding "authorization."  18 U.S.C. §§ 2701(a), 2707(a).

*First*, Plaintiffs fail to allege that Facebook accessed any communications in "electronic storage."  *Id.* § 2701(a).  The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof . . . ."  *Id.* § 2510(17)(A).  Courts have clarified that the SCA "only protects electronic communications stored 'for a limited time' in the 'middle' of a transmission, i.e., when an electronic communication service temporarily stores a communication while waiting to deliver it."  *Toys R Us*, 2001 WL 34517252, at *3 (citation omitted).  Non-temporary data, and particularly data stored on a personal computer, is not in "electronic storage" and thus cannot be the basis for a claim under the SCA.  *Id.*; *iPhone App. Litig. II*, 2012 WL 2126351, at *11 (holding that data was not in electronic storage where it allegedly resided on plaintiffs' "hard drive for up to a one year period").

Plaintiffs allege that Facebook violated the SCA by accessing "persistent cookies" stored on their computers (¶¶ 42, 46, 54-55, 78, 149), making clear that these alleged cookies are neither temporary nor intermediate.  This allegation, as many courts have held, negates an SCA claim. *See DoubleClick*, 154 F. Supp. 2d at 511 ("The cookies' long-term residence on plaintiffs' hard drives places them outside of [the SCA]'s definition of 'electronic storage' and, hence, [the SCA's] protection."); *Toys R Us*, 2001 WL 34517252, at *3 ("[C]ookies placed on hard drives are not in 'electronic storage' for purposes of § 2701."); *iPhone App. Litig. II*, 2012 WL 2126351, at *11 (adopting reasoning of *Toys R Us* and *DoubleClick* and dismissing SCA claim).

*Second*, Plaintiffs' SCA theory fails for the additional, independent reason that they do not allege that Facebook accessed a "facility," as defined by the statute.  18 U.S.C. § 2701(a)(1) (prohibiting unauthorized access to "a facility through which an electronic communication service is provided").  The one purported "facility" that Plaintiffs do allege is their own personal

computers.  (¶ 149.)  But a clear majority of courts have "concluded that an individual's personal computer does not provide an electronic communication service" and therefore is not a "facility" under the SCA.  *E.g.*, *iPhone App. Litig. II*, 2012 WL 2126351, at *15 (collecting cases and concluding that "an individual's computer, laptop, or mobile device" does not "fit[] the statutory definition of a facility through which an electronic communication service is provided.") (internal quotations omitted).[16]  This, too, is fatal to Plaintiffs' SCA claim.[17]

**Finally**, Facebook disclosed to Users that it uses cookies to collect information about Users' activity on Facebook integrated sites.  (*See* § IV(C)(2).)  Plaintiffs fail to allege how Facebook's alleged "access" occurred without or exceeding authorization.

### F.    Plaintiffs Fail to State a Claim for Violation of the CFAA (Count III)

Plaintiffs bring their CFAA claim under two theories: (1) that Facebook accessed computers without authorization, or exceeded authorized access, to obtain information from Plaintiffs' computers and (2) that Facebook caused the transmission of a code which allegedly caused Plaintiffs' loss.  Neither theory supplies an adequate basis for a CFAA claim.

**First**, neither theory falls into the category of behavior Congress sought to prohibit with the CFAA, a criminal statute which was enacted to punish individuals who "accessed computers to steal information or to disrupt or destroy computer functionality"  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130-31 (9th Cir. 2009) (quoting H.R. Rep. 98-894 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3689, 3694 (July 24, 1984)).  Congress carefully drafted the CFAA to "restrict civil actions . . . to the traditional computer 'hacker' scenario—where the hacker deletes information, infects computers, or crashes networks."  *iPhone App. Litig. II*, 2012 WL 2126351,

---

[16] *See*, *e.g.*, *Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263, 1271 (N.D. Cal. 2001) (stating plaintiffs' argument "that computers of users of electronic communication service . . . are considered facilities" was "destined to failure"); *DoubleClick*, 154 F. Supp. 2d  at 512 (holding that the SCA "makes no mention of individual users' computers, the issue in the instant case"). *But see Toys R Us*, 2001 WL 34517252, at *2 n.7.

[17] Additionally, Plaintiffs fail to allege or identify an "electronic communication service," a requirement to bring an SCA claim, and instead merely recite that their computers "are facilities through which an electronic communication service is provided." (¶ 149.)  Plaintiffs' failure to allege this necessary element constitutes another ground for dismissal.  Under any scenario, however, Facebook falls within the statutory exemptions under 18 U.S.C. § 2701(c).

1    at *20 (citation omitted).  Nothing in the Complaint comes close to alleging the type of activity

2    the law proscribes and Plaintiffs offer no reason for this Court to substantially broaden the reach

3    of the law.  Indeed, courts have rejected nearly identical legal challenges to the routine use of

4    cookies for over a decade.  *See, e.g.*, *DoubleClick*, 154 F. Supp. 2d at 526  (dismissing CFAA

5    claim in light of the "absence of evidence in the legislative or judicial history" that the law was

6    meant to apply to cookies); *LaCourt*, 2011 WL 1661532, at *4 (dismissing CFAA claim alleging

7    collection of personal data by cookies).

8         ***Second,*** Plaintiffs have not pled resulting economic loss.  Under the CFAA, a plaintiff

9    must establish that: (1) the unauthorized access caused "impairment to the integrity or availability

10   of data, a program, a system, or information," (2) resulted in a minimum of $5,000 in *economic*

11   losses to the victim during a one-year period, and (3) that the loss arose directly from the

12   unauthorized access.  18 U.S.C. § 1030(g); *Creative Computing v. Getloaded.com LLC*, 386 F.3d

13   930, 936 (9th Cir. 2004).   Economic loss does not encompass harm that is theoretical or

14   intangible; rather, a loss under the CFAA occurs *only* "[w]hen an individual or firm's money or

15   property are impaired in value, or money or property is lost . . . ."  *Creative Computing*, 386 F.3d

16   at 935.  And courts require that a strong causal link exist between the alleged violation and harm.

17   *Id*. at 935-36.

18        Plaintiffs do not allege that they suffered any impairment to computers or property or lost

19   any business or revenue as a direct result of Facebook's alleged conduct.  As noted above, none

20   of the named Plaintiffs allege they incurred *any* costs or loss associated with remedying any

21   purported CFAA violation.  And even if Plaintiff Davis actually paid for the experts her counsel

22   retained, which seems doubtful, the Complaint nowhere claims that the experts' work was to

23   investigate and respond to the alleged intrusion rather than to prepare for litigation.  *B.U.S.A.*

24   *Corp. v. Ecogloves, Inc.*, No. 05 Civ. 9988(JSR), 2009 WL 3076042, at *7 (S.D.N.Y. Sept. 28,

25   2009) ("Nowhere does the law indicate, and plaintiffs do not attempt to argue, that the cost of

26   hiring an expert witness qualifies as a 'loss' under the CFAA.").  Davis's registration for "Privacy

27   Watch," a service that purportedly alerts her to changes Facebook makes to its Privacy Policy and

28   costs $24 a year, also does not qualify as a loss under the CFAA.  She does not allege how the

monitoring of changes to Facebook's Privacy Policy flows from any alleged CFAA violation.

Moreover, even were the Court to conclude that Davis had suffered some *de minimis* economic loss, Davis has failed to plausibly allege that she, or even the class as a whole,[18] suffered $5,000 in economic damages. *La Court*, 2011 WL 1661532, at *6 ("Plaintiffs at the very least have failed to plausibly allege that they and the putative class – even in the aggregate – have suffered $5,000 in economic damages . . . ."); *In re Intuit Privacy Litig.*, 138 F. Supp. 2d 1272, 1281 (C.D. Cal. 2001) (dismissing CFAA claim, based browser cookies, for the same defect).[19]

**Third,** Plaintiffs have failed to allege that Facebook accessed a computer "without authorization" or "exceeded authorized access" to a computer.   18 U.S.C. §§ 1030(a)(2), 1030(a)(5)(A)-(C).   As explained above (*see* § IV(C)(2)), Plaintiffs acknowledge that they were told of, and consented to, Facebook's use of cookies when they visited third-party websites.[20]

Plaintiffs' CFAA claim should be dismissed.[21]

### G.     Plaintiffs Fail to State a Claim Under Penal Code § 502 (Count IX)

Plaintiffs also assert claims under state law, California Penal Code §§ 502(c)(1),(6)-(8).

---

[18]  As Judge Wu recently noted, aggregation of damages across the class may not satisfy the CFAA.  *LaCourt*, 2011 WL 1661532, at *6 n.4; *see also Creative Computing,* 386 F.3d at 934-35 ("$5,000 floor applies to how much damage or loss there is to the victim over a one-year period, not from a particular intrusion.").  Further, courts that have stated that damages may only be aggregated if they are measurable and common to the class—factors not present here.  *See In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1308 (N.D. Cal. 2008).

[19] Plaintiffs' attempts to claim loss of an abstract right to privacy and disclosure of their personal information are similarly unavailing, as neither constitutes economic loss.  *In re iPhone App. Litig. II*, 2012 WL 2126351, at *18-21 (dismissing CFAA claim where plaintiffs claimed economic loss was collection of personal information); *DoubleClick*, 154 F. Supp. 2d at 525-26 & n.34 (loss of the economic value of demographic information, even "to the extent that some value could be placed on these losses," did not satisfy the CFAA's damage threshold).

[20] Under either of Plaintiffs' theories, Facebook had authorization to access its cookies.  *LVRC Holdings*, 581 F.3d at 1133 (holding that "a person who uses a computer 'without authorization' has no rights, *limited or otherwise*, to access the computer in question.") (emphasis added); *United States v. Nosal*, 676 F.3d 854, 856-57 (9th Cir. 2012) ("exceeds authorized access" applies only to those who are "authorized to access only certain data or files but accesses unauthorized data or files—what is colloquially known as 'hacking'.").

[21]Additionally, to the extent that Plaintiffs attempt to rely on subsection (a)(5)(A) of the CFAA, Plaintiffs have failed to allege that Facebook "caus[ed] damage" to their computers.

Like the CFAA, § 502 prohibits accessing computers without authorization, and "CFAA cases can be instructive" in interpreting § 502. *SolarBridge Techs., Inc. v. Ozkaynak*, No. C 10-cv-03769-EJD, 2012 U.S. Dist. LEXIS 54583, at *3 n.2 (N.D. Cal. Apr. 18, 2012) (quotations omitted). Because § 502 is a penal statute, it must be "strictly construed." *Claridge*, 785 F. Supp. 2d at 863.[22] To state a claim generally under § 502(c), Plaintiffs must allege that (1) Facebook acted "without permission" and (2) they "suffer[ed] damage or loss by reason of [the] violation." Cal. Penal Code § 502(c)(1),(6)-(8)[23]; Cal. Penal Code § 502(e)(1). For claims under §§ 502(c)(1), (6), and (7), Plaintiffs must also allege that Facebook "accessed" Plaintiffs' computers. Cal. Penal Code § 502(c)(1), (6), (7). And for claims under § 502(c)(8), Plaintiffs must also allege that Facebook introduced a "computer contaminant" into Plaintiffs' computers. Cal. Penal Code § 502(c)(8). The Complaint fails to allege any of these requirements.

### 1. Plaintiffs Fail to Allege That Facebook Acted "Without Permission"

Facebook's alleged use of cookies was not "without permission." First, Plaintiffs consented to Facebook's use of cookies to collect information about their visits to websites with Facebook features. (*See* § IV(C)(2).)

Second, even if Facebook's alleged conduct was inconsistent with an entry in its Help Center regarding logged-out Users, this does not satisfy the "without permission" prong of § 502. "While the term 'without permission' is not defined within the language of the statute, the Northern District of California has twice considered the meaning of 'without permission' under § 502 and determined that individuals may only be subjected to liability for acting 'without permission' under § 502 if they 'access[ ] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers.'" *iPhone Application Litig.*, 2011 WL

---

[22] "Indeed, the relatively few cases interpreting the statute largely seek to impose liability against individuals or entities who are alleged to have actually participated in unauthorized 'hacking' or the unlawful disclosure of information." *Id.*

[23] While the text of § 502(c)(8) itself does not require that the introduction of a computer contaminant "without permission," § 502(b)(10) defines "computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network ***without the intent or permission of the owner of the information***." Cal. Penal Code § 502(b)(10) (emphasis added).

4403963, at *12; *see also Facebook Privacy Litig.*, 791 F. Supp. 2d at 716 (dismissing § 502 claims where plaintiffs failed to allege Facebook "circumvented technical barriers").  Plaintiffs here have failed to allege that Facebook overcame any technical or code-based barriers in order to continue to receive information from cookies already set on Plaintiffs' browsers.[24]

*In re Facebook Privacy Litigation* is instructive.  There, the plaintiffs alleged that Facebook configured its website to send advertisers certain information about the URL (or website address) from which the User was navigating when he or she clicked on advertisements on Facebook's website.  791 F. Supp. 2d at 709.  The court dismissed the plaintiffs' claims under §§ 502(c)(1), (6), and (7) because the plaintiffs alleged no technical barriers were overcome.  *Id.* at 716.  Here, Plaintiffs have similarly failed to allege that Facebook overcame any technical barriers in allegedly failing to delete, and continuing to receive information from, certain cookies stored on Plaintiffs' browsers after they logged out of Facebook.

### 2.    Facebook's Alleged Failure to Delete Cookies Was Not Unlawful "Access" under § 502

Sections 502(c)(1), (6), and (7) proscribe unlawful "access" to one's computers.  "Section 502 defines 'access' in terms redolent of 'hacking' or breaking into a computer," that is, "access" does not include exceeding one's authorization to use a computer.  *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 34-35 (2007) (holding that employee exceeding his authorization to use computer system may have been "misconduct" but was not "access" under § 502 because he was "entitled to access those resources," only not in that manner).  Thus, "using a computer network for the purpose that it was designed to serve, even if in a manner that is otherwise

---

[24] The Complaint also alleges that (1) Facebook employees filed a patent application that contemplates a cookie that "bypasses security settings" (¶¶ 28-35) and (2) "Facebook intentionally circumvented web browsing privacy P3P code"—a protocol developed by Microsoft in 2002 for its Internet Explorer browser to, among other things, help manage what information websites obtain from visitors' browsers based on the sites' privacy policies (¶¶ 86-102). Plaintiffs, however, do not allege that Facebook practiced this patent, that Facebook ever circumvented Plaintiffs' own browser settings, that Facebook's collection of information was inconsistent with its Privacy Policy, or that any Plaintiff even used Internet Explorer.  Moreover, because Plaintiffs admit that they allowed Facebook to use these cookies (¶¶ 14-16), Facebook did not circumvent any technological barriers, and Plaintiffs have not alleged otherwise.

1   improper, is not the kind of behavior that the legislature sought to prohibit when it enacted

2   Section 502." *Facebook, Inc. v. Power Ventures, Inc.*, No. C08-05780 JW, 2010 U.S. Dist.

3   LEXIS 93517, at *24 (N.D. Cal. July 20, 2010).   Here, Plaintiffs have alleged, at most, that

4   Facebook acted inconsistently with an entry in its Help Center (that no Plaintiff is alleged to have

5   seen) about cookies after log out.   But, Plaintiffs were put on notice of Facebook's use of cookies

6   in the Privacy Policy, so, like the officer in *Chrisman*, any challenged conduct was not the type of

7   conduct that violates § 502.   Accordingly, Plaintiffs' claims under §§ 502(c)(1), (6), and (7)

8   should be dismissed.[25]

9                          **3.      Facebook's Cookies Are Not "Contaminants"**

10      Plaintiffs' § 502(c)(8) fails because they do not adequately allege that Facebook

11   introduced a "computer contaminant" into Plaintiffs' computers.   Cal. Penal Code § 502(c)(8).[26]

12   First, a "contaminant" must "modify, damage, destroy, record, or transmit information *within* a

13   computer, computer system, or computer network."   Cal. Penal Code § 502(b)(10) (emphasis

14   added).   Plaintiffs allege, at most, that the cookies result in Facebook being sent information by a

15   User's browser, not that the cookies had any effect *within* Plaintiffs' computers.   Second, the

16   section "appears to be aimed at 'viruses or worms,' and other malware that usurps the normal

17   operation of the computer or computer system" and there is no allegation that Facebook's cookies

18   meet this definition.   *iPhone App. Litig.*, 2011 WL 4403963, at *13 (stating that "it is not clear to

19   the Court how Section 502(c)(8) applies to" voluntarily downloaded applications that secretly

20   copied and shared plaintiffs' personal information).   Moreover, Plaintiffs admit that cookies are

21   so regularly used that "[w]hen a user contacts a web server . . . the browser checks to see if that

22   server has set any cookies on that client machine" (¶¶ 38-41), making cookies "standard web

23   browser functions," which are not contaminants under the statute.   *See Facebook Privacy Litig.*,

---

24

25   [25] Additionally, Plaintiffs' claim under § 502(c)(6) should be dismissed because Plaintiffs have not alleged that Facebook "provides or assists in providing" access to Plaintiffs' computers.

26   [26] "Computer contaminant" includes "viruses or worms, that are self-replicating or self-
27   propagating and are designed to contaminate other computer programs or computer data,
     consume computer resources, modify, destroy, record, or transmit data, or in some other fashion
28   usurp the normal operation of the computer…." Cal. Penal Code § 502(b)(10).

No. C 10-02389 JW, 2011 U.S. Dist. LEXIS 147345, at *14 (N.D. Cal. Nov. 22, 2011).

### 4. Plaintiffs Fail to Allege Any "Damage or Loss"

Plaintiffs' § 502 claim should also be dismissed because they have not suffered "damage or loss." Cal. Penal Code § 502(e)(1). Here, Plaintiffs have not alleged that they have expended any resources attempting to block Facebook's alleged use of cookies. (*See* § IV(A), (F).) Indeed, Plaintiffs have not alleged that they have suffered any harm whatsoever. *See In re Apple & ATTM Antitrust Litig.*, No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270, at *23-24 (N.D. Cal. July 8, 2010) (loss of access to smart phone for several days is not damage or loss under § 502).

### H. Plaintiffs' Claim under the UCL Should Be Dismissed (Count VIII)

### 1. Plaintiffs Lack Standing under the UCL.

To have standing under California's UCL, the named Plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011). Plaintiffs allege that they suffered economic injury because Facebook's allegedly unauthorized collection of their browsing activity impaired the "value of their personally identifiable information and other data." (*See* ¶ 177.) Yet "[n]umerous courts have held that a plaintiff's 'personal information' does not constitute money or property under the UCL." *iPhone App. Litig.*, 2011 WL 4403963, at *14.[27] Indeed, as explained above, Plaintiffs have failed to allege any economic injury (*see supra* § IV(A), (F)), which is fatal to their UCL claim. *See Kwikset*, 51 Cal. 4th at 322.

Facebook also is free (¶ 14 ("Facebook does not require its members to pay a monetary subscription fee . . . .")), and therefore, Plaintiffs cannot allege that they lost any money or property as a result of Facebook's alleged conduct. *See Facebook Privacy Litig.*, 791 F. Supp. 2d at 715 ("Because Plaintiffs allege that they received Defendant's services for free, as a matter of

---

[27] *See also Facebook Privacy Litig.*, 791 F. Supp. 2d at 714; *Ruiz v. Gap, Inc.*, No. 07-5739 SC, 2009 WL 250481, at *4 (N.D. Cal. Feb. 3, 2009); *Archer v. United Rentals, Inc.*, 195 Cal. App. 4th 807, 816 (2011).

law, Plaintiffs cannot state a UCL claim under their own allegations."); *iPhone App. Litig.*, 2011 WL 4403963, at *14 (same).

### 2.        Plaintiffs Fail to State a Claim under the UCL's "Fraud" Prong.

Plaintiffs' UCL "fraud" claim should be dismissed for additional reasons.  As discussed, the Complaint does not meet Rule 9(b)'s heightened pleading standard.  To allege a claim for fraud under the UCL, Plaintiffs must allege reliance on Facebook's alleged misrepresentations, *Kwikset*, 51 Cal. 4th at 327, but Plaintiffs do not allege that they even saw, much less relied on, the single entry in the Help Center on which they base their claims.  (*See* § II(C).)  Finally, because Plaintiffs consented to the challenged conduct (*see* § IV(C)(2)), there can be no reliance as a matter of law.  *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (no reliance for individuals who learned of allegedly omitted information before making purchase).

### 3.        Plaintiffs Fail to State a Claim under the UCL's "Unlawful" Prong.

Plaintiffs' claim under the UCL's "unlawful" prong fails because Plaintiffs fail to allege a predicate violation.  *See Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007) ("[A] violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong.").  As demonstrated in this motion, Plaintiffs do not have standing to assert any claims, nor does the Complaint state any valid claims for relief.  Plaintiffs' allegation that Facebook's conduct violated the False Advertising Law ("FAL") (¶ 179) fails for the same reason Plaintiffs' claim fails under the UCL "fraud" prong.  *See Kwikset*, 51 Cal. 4th at 327 n.9 (holding that the reliance requirement applies equally to misrepresentations under the FAL and the UCL's unlawful prong as the UCL's fraud prong).

### 4.        Plaintiffs Fail to State a Claim under the UCL's "Unfair" Prong.

Plaintiffs allege that the entry in the Help Center regarding Facebook cookie practices supports a claim under the UCL's "unfair" prong.  (¶ 180.)  But, again, no Plaintiffs claim to even have known of that Help Center entry when visiting third-party sites.  That pleading deficiency is dispositive.  *See Kwikset*, 51 Cal. 4th at 327 n.9 (reliance requirement applies to any UCL claim alleging that defendant "engaged in misrepresentations and deceived consumers"); *Actimmune Mktg. Litig.*, 2009 WL 3740648, at *14 (dismissing UCL unfair prong claim where plaintiffs

failed to adequately allege reliance).

Plaintiffs' claim also fails under any of the three tests California courts have used to assess unfairness under the UCL.  *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838-39 & n.9 (2007) (discussing the three tests).[28]  First, as explained above (*see supra* § IV(A)), Plaintiffs fail to allege injury in fact, let alone a "substantial injury."  *See Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF (PVT), 2009 WL 4723366, at *13 (N.D. Cal. Dec. 4, 2009); *Chang Bee Yang v. Sun Trust Mortg., Inc.*, No. 10-CV-01541 AWI SKO, 2011 WL 3875520, at *7 (E.D. Cal. Aug. 31, 2011) (dismissing unfair prong claim where plaintiffs failed to allege harm).  Second, Plaintiffs have failed to show that Facebook's allegedly unfair conduct was "tethered to specific constitutional, statutory, or regulatory provisions."  *See Drum*, 182 Cal. App. 4th at 257.  Plaintiffs claim that the CLRA, California's constitutional right to privacy, "and California statutes recognizing the need for consumers to obtain material information that enables them [to] safeguard their own privacy interests, including Cal. Civ. Code 1798.80" support their claim.  (¶ 180.)  But Plaintiffs fail to adequately allege that Facebook violated any of these laws or rights.[29]  *Drum*, 182 Cal. App. 4th at 257 (dismissing unfair prong claim because "plaintiff failed to allege any violation or incipient violation of any statutory or regulatory provision"); *see also Belton v. Comcast Cable Holdings*, *LLC*, 151 Cal. App. 4th 1224, 1239-40 (2007).  Finally, Plaintiffs' consent to the alleged activities (see *supra* §§ II(C) and IV(C)(2)) is also fatal to their claim for unfairness.  *See S. Bay Chevrolet*, 72 Cal. App. 4th at 887 (denying unfair prong claim where plaintiff agreed to disputed business practice).

---

[28] Under one test, the consumer injury must be substantial, not outweighed by any countervailing benefits, and not an injury the consumers could reasonably have avoided.  *Daugherty*, 144 Cal. App. 4th at 839.  A second test requires the conduct be contrary to some legislatively declared public policy that is "tethered to specific constitutional, statutory, or regulatory provisions." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010).  A third test requires the plaintiff to show the conduct "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and requires the court to weigh the utility of the defendant's conduct against the harm to the alleged victim.  *S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 886-87 (1999).

[29] Plaintiffs have not only failed to bring a claim under Civil Code § 1798.80 or the California Constitution, they have also failed to allege any facts supporting such a claim.

### I. Plaintiffs Fail to State a Claim under the CLRA (Count XI)

Plaintiffs' CLRA claim should be dismissed for several reasons. First, Plaintiffs lack standing under the CLRA, which exists only for "[a]ny consumer who suffers any damage as a result of" any violation of Section 1770. Cal. Civ. Code § 1780(a). Because, as explained above, Plaintiffs have failed to allege any economic injury, they necessarily have not alleged damage pursuant to the CLRA. *See, e.g.*, *iPhone App. Litig.*, 2011 WL 4403963, at *10.

Second, Plaintiffs are not "consumers" within the meaning of the CLRA. *See* Cal. Civ. Code § 1761(d) (defining "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes"). Plaintiffs do not allege they have made any form of payment to Facebook, and therefore have not acquired anything by "purchase or lease." *See Facebook Privacy Litig.*, 791 F. Supp. 2d at 716-17 (holding plaintiffs were not "consumers" under the CLRA because they did not allege they paid any money to Facebook, despite attempt to argue personal information was money).

Third, Plaintiffs' allegations challenge Facebook's use of cookies (*id.* ¶¶ 38-84) on third-party sites with Facebook features (*id.* ¶¶ 75-77). All of these challenged features are or relate to computer software, but "[s]oftware is neither a 'good' nor a 'service' within the meaning of the CLRA." *iPhone App. Litig.*, 2011 WL 4403963, at *10; *see also Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2010 WL 3910169, at *18-19 (N.D. Cal. Oct. 5, 2010) (same).

Fourth, because Plaintiffs' CLRA claim sounds in fraud—Plaintiffs allege Facebook misrepresented the services it was providing (¶¶ 218-20)—it is subject to Rule 9(b). Accordingly, Plaintiffs must allege, among other elements, "actual causation and reliance" with particularity. *See Actimmune Mktg. Litig.*, 2009 WL 3740648, at *16. As with Plaintiffs' UCL claim, Plaintiffs fail to allege with any specificity that they relied on any misrepresentation. *See id.* at *16.

### J. Plaintiffs Fail to State a Claim for Conversion (Count VI)

Plaintiffs' claim for conversion should also be dismissed. The elements of a claim for conversion in California are: (1) ownership of or right to possess personal property, (2) wrongful interference with the personal property, and (3) damages. *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1491 (2006). "A plaintiff in a conversion action must also prove that it did not

consent to the defendant's exercise of dominion." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008). Plaintiffs allege that Facebook converted their "personally identifiable information and other data, including, but not limited to, their names, account information, browsing histories, and purchasing habits." (¶ 168.)

Plaintiffs' conversion claim fails first, as described in Section IV(A), because Plaintiffs fail to allege any injury or harm. *See McKell*, 142 Cal. App. 4th at 1491 (noting that conversion requires "damages"). Second, Plaintiffs do not allege any convertible property right—that is, an interest (1) that is "capable of precise definition" and (2) "exclusive possession or control" and (3) in which the owner has "established a legitimate claim to exclusivity"—in information gathered about them. *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). For one, "the broad category of information referred to as 'personal information' is [not] an interest capable of precise definition." *iPhone App. Litig. II*, 2012 WL 2126351, at *27. Further, such information is not "capable of exclusive possession or control" because defendants' gathering of information does not prevent plaintiffs from also using that information. *See id.* ("[I]t is difficult to see how [personal information] is capable of exclusive possession or control."); *Low*, 2011 WL 5509848, at *5 (plaintiff "failed to allege how he was foreclosed from capitalizing on the value of his personal data . . . simply because [his] unspecified personal information was purportedly collected by a third party" (quoting *LaCourt*, 2011 WL 1661532, at *5)). Moreover, Plaintiffs cannot establish they have "a legitimate claim to exclusivity" because the use of information gathered about individuals is not a loss to the individual. *See, e.g.*, *DoubleClick*, 154 F. Supp. 2d at 525 ("[A]lthough demographic information is valued highly . . . the value of its collection has never been considered an economic loss to the subject."); *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 994 (2011) ("The fact that the [plaintiff's] address had value to Lamps Plus, such that the retailer paid Experian a license fee for its use, does not mean that its value to plaintiff was diminished in any way."). Finally, as discussed, Plaintiffs' conversion claim fails because Plaintiffs consented to Facebook's use of cookies. *See Bank of New York*, 523 F.3d at 915 (holding consent defeats conversion claim). (*See* § IV(C)(2).)

### K.      Plaintiffs Fail to State a Claim for Trespass to Chattels (Count VII)

Plaintiffs' claim for trespass to chattels fails for reasons similar to those that preclude their conversion claim.  "[T]respass remains as an occasional remedy for minor interferences [with personal property], *resulting in some damage*, but not sufficiently serious or sufficiently important to amount to the greater tort of conversion."  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1351 (2003) (emphasis in original) (internal quotations and citation omitted).  Plaintiffs allege Facebook "interfered with Plaintiffs' use of the following personal property owned by Plaintiffs: (a) Plaintiffs' computers; and (b) Plaintiffs' personally identifiable information."  (¶ 174.)

Plaintiffs' claim for trespass necessarily fails because Plaintiffs have not pled injury in fact, as discussed in Section IV(A) above.  *See, e.g.*, *iPhone App. Litig.*, 2011 WL 4403963, at *10 (denying trespass claimwhere plaintiffs failed to allege injury in fact).  Nor, as with their conversion claim, have Plaintiffs alleged a property right in "personally identifiable information" that may be trespassed upon.  (*See supra* § IV.J.)  Moreover, "[s]hort of dispossession, personal injury, or physical damage . . . , intermeddling is actionable only if the chattel is impaired as to its condition, quality, or value, or . . . the possessor is deprived of the use of the chattel for a substantial time."  *Hamidi*, 30 Cal. 4th at 1357 (internal quotations and citation omitted).  As discussed, Plaintiffs cannot show that they have been dispossessed or deprived of the use of information about them, or of its economic value, for any time at all, much less for a "substantial time."  *See, e.g.*, *Low*, 2011 WL 5509848, at *5; *LaCourt*, 2011 WL 1661532, at *5; *DoubleClick*, 154 F. Supp. 2d at 525.  As to their computers, Plaintiffs must allege some "actual or threatened damage to [the plaintiff's] computer hardware or software [or] interference with its ordinary and intended operation."  *Hamidi*, 30 Cal. 4th at 1352-53.  But the use of cookies is insufficient to impair computer systems.  *See LaCourt*, 2011 WL 1661532, at *7 (use of flash cookies insufficient to allege trespass); *cf. Vertkin v. Vertkin*, No. 07-4471 SC, 2007 WL 4287512, at *3 (N.D. Cal. Dec. 6, 2007) (same as to use of tracking software); *Hamidi*, 30 Cal. 4th at 1353 (same as to sending hundreds of thousands of spam emails).

Finally, Plaintiffs' claim for trespass also fails because, as discussed, Plaintiffs consented to the activity they allege to constitute the trespass.  *See LaCourt*, 2011 WL 1661532, at *7.

**L.      Plaintiffs Fail to State a Claim for Invasion of Privacy or Intrusion upon Seclusion  (Counts IV & V)**

The Complaint includes claims for Invasion of Privacy (¶¶158-62) and Intrusion Upon Seclusion (¶¶163-66).  California does not recognize a separate "invasion of privacy" tort; it is an umbrella term that covers four separate torts, including intrusion upon seclusion.[30]  *See Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 214 & n.4 (1998).[31]  To state a claim for intrusion upon seclusion, Plaintiffs must allege: "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person."  *Id.* at 231.  Because Plaintiffs have failed to allege facts that would establish either of these elements, Plaintiffs' claim for intrusion upon seclusion should be dismissed.

**1.      Plaintiffs Fail to Allege an Actionable Intrusion**

For the first element, Plaintiffs must allege: (a) an actual, subjective expectation of seclusion, and (b) that the expectation was objectively reasonable.  *Med. Lab. Mgmt. Consultants v. ABC, Inc.*, 306 F.3d 806, 812-13 (9th Cir. 2002); *Sacramento Cnty. Deputy Sheriffs' Ass'n v. Cnty. of Sacramento*, 51 Cal. App. 4th 1468, 1487 (1996).  They do not plead any such facts.

Aside from a single conclusory allegation (¶ 160), Plaintiffs fail to allege facts establishing that they had an actual expectation that Facebook would not collect information on the third-party websites they visited.  In determining whether one has a subjective expectation of privacy, "[a] comparison of what precautions he took to safeguard his privacy interest with the precautions he might reasonably have taken, is appropriate."  *Med. Lab. Mgmt*, 306 F.3d at 813

---

[30]  To the extent that Count IV is an attempt to bring a claim under Article I, Section 1 of the California Constitution, it fails because Plaintiffs have not adequately alleged the elements of that claim.  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 66 (1994) (listing elements).  First, Plaintiffs have not alleged a legally protected privacy interest because information about a subset of websites Plaintiffs visited is not the sort of highly personal information required for a protected privacy interest.  *See, e.g.*, *Susan S. v. Israels*, 55 Cal. App. 4th 1290, 1295-98 (1997) (confidential mental health records).  Moreover, for the reasons stated in subsections 1 and 2 following this note, Plaintiffs have not alleged a reasonable expectation of privacy or that the alleged collection was an egregious breach of social norms.

[31]  In *Shulman*, the court stated that California recognizes four categories of the tort of "invasion of privacy": (1) intrusion upon seclusion, (2) public disclosure of private facts, (3) false light in the public eye, and (4) appropriation of name or likeness).  *Id.* at 214 & n.4.

(quoting *Kemp v. Block*, 607 F. Supp. 1262, 1264 (D. Nev. 1985) (stating that to state intrusion claim, plaintiff "must have shown that he sought to preserve his conversation . . . as private")). Here, Plaintiffs do not allege that they tried to block or remove cookies even though Facebook disclosed that it used cookies to collect information about visits to some third-party sites and that users could block or remove cookies if they wanted.  (*See* § II(C).)

Nor can Plaintiffs allege that they had an objectively reasonable expectation of privacy. Facebook's Privacy Policy states that Facebook uses cookies to collect information about Users' activities on some websites with Facebook features—the very conduct complained of here.  (*See* § IV(C)(2).)  *Mortensen v. Bresnan Commc'n*, No. CV 10-13-BLG_RFC, 2010 U.S. Dist. LEXIS 131419, at *14-17 (D. Mont. Dec. 13, 2010) (dismissing intrusion upon seclusion claim where defendant's privacy policy indicated the complained-of monitoring would occur).  Plaintiffs also cannot rely on the single entry in Facebook's Help Center because Plaintiffs have not alleged that they read or were otherwise aware of that entry in the Help Center before they visited third-party sites.

Moreover, courts have held in the context of the Fourth Amendment that users do not have a reasonable expectation of privacy in information about their activity that is provided to others as part of the normal operation of the Internet, as is the case here.  *See People v. Stipo*, 195 Cal. App. 4th 664, 666, 668-69 (2011) ("[S]subscriber has no expectation of privacy in the subscriber information he supplies to his Internet provider"); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("Internet users have no expectation of privacy in the . . . IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information.").

### 2. Plaintiffs Fail to Allege a Highly Offensive Intrusion

Plaintiffs also have not alleged that the supposed intrusion was "highly offensive to a reasonable person."  An intrusion is only highly offensive if it is sufficiently serious and unwarranted as to constitute an egregious breach of social norms.  *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 295 (2009).  In determining whether an alleged intrusion is highly offensive, courts typically consider "the degree of the intrusion, the context, conduct and circumstances

surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Med. Lab. Mgmt.*, 306 F.3d at 819. Again, Plaintiffs' lone conclusory allegation (¶ 166) is insufficient.

*Folgelstrom* is instructive. There, the plaintiffs alleged that the defendant routinely asked its customers for their ZIP codes during purchases but did not tell customers that it would then provide their names, credit card numbers, and ZIP codes to an agency that provided their addresses so the defendant could mail marketing materials. 195 Cal. App. 4th at 989. The court held that the company's actions were not highly offensive because using the plaintiffs' contact information to send marketing materials was "routine commercial behavior." *Id.* at 992-93. The court noted that it "found no case which imposes liability based on the defendant obtaining unwanted access to the plaintiff's private information which did not also allege that the *use* of plaintiff's information was highly offensive." *Id.*

Here, Plaintiffs allege that Facebook failed to delete certain cookies when they logged out, and continued to collect information on the websites they visited. But Plaintiffs fail to allege that Facebook used this information at all, let alone that it was used for an "offensive or improper purpose." While Plaintiffs speculate that it could be used for advertising (¶ 178), the use of personal information to target advertising is nothing but routine commercial behavior. *Folgelstrom*, 195 Cal. App. 4th 993; *see also iPhone App. Litig. II*, 2012 WL 2126351, at *16 (disclosure of personal data and geolocation information without one's knowledge and consent "does not constitute an egregious breach of social norms"). Plaintiffs' intrusion upon seclusion claim should be dismissed.

## V.   CONCLUSION

For these reasons, the Court should grant Facebook's motion to dismiss with prejudice.

Dated: July 2, 2012                                    COOLEY LLP

                                                      */s/ Matthew D. Brown*
                                                      Matthew D. Brown (196972)
                                                      Attorneys for Defendant FACEBOOK, INC.

1276407/SF

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO