Paul R. Kiesel (SBN 119854)
*kiesel@kiesel-law.com*
**KIESEL LAW LLP**
8648 Wilshire Blvd.
Beverly Hills, CA  90211-2910
Telephone: (310) 854-4444
Facsimile:  (310) 854-0812
*Liaison Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK INTERNET TRACKING LITIGATION | Case No.: 5:12-MD-02314-EJD<br><br>**PLAINTIFFS' NOTICE OF RECENT UNITED STATES SUPREME COURT AUTHORITY RELEVANT TO MOTION TO DISMISS PLAINTIFFS' CORRECTED FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; PLAINTIFFS' REQUEST FOR LEAVE**<br><br>Judge: The Honorable Edward J. Davila<br>Court Room: 4 |

This notice is submitted pursuant to Local Rule 7-3(d)(2).  On July 2, 2012, Defendant Facebook, Inc. ("Facebook") filed a Motion to Dismiss Plaintiffs' Corrected First Amended Consolidated Class Action Complaint ("Motion") [Dkt. 44].  On October, 5, 2012, this Court heard argument on Facebook's Motion and took the matter under submission [Transcript, Dkt. 60].  On October 10, 2013, Defendant Facebook filed a notice of new authority and requested leave to have the new authority considered when ruling on the Motion [Dkt. 69].  Plaintiffs subsequently filed separate notices of new authority and similarly requested leave to have the new authority considered on October 11, 2013 [Dkt. 70], March 21, 2014 [Dkt. 73], and May 12, 2014 [Dkt. 76].

Yesterday, June 25, 2014, the United States Supreme Court issued an opinion resolving appeals in two related cases (*Riley v. California*, No. 13-132, and *United States v. Wurie*, No. 13-212).  The Court unanimously ruled that law enforcement generally may not, without a warrant, search digital information on a smart phone seized incident to an arrest of an individual because of the expectation of privacy in such information.  In so holding, the Court noted: "Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different.  An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests and concerns – perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD."  Slip Op. at 19.  This discussion relates to Defendant Facebook's argument in the Motion that web browsing history does not concern the "meaning" of any communication, see Motion at 14, and "users do not have a reasonable expectation of privacy" in Internet browsing history, see Motion at 34.  A copy of the Court's slip opinion is attached to this Notice as **Exhibit A**

Plaintiffs provide this decision as supplemental authority for the Court's consideration when deciding the Motion.


Dated: June 26, 2014                                    Respectfully Submitted,


                                                       **KIESEL LAW LLP**


                                                       By: ____/s/ *Paul R. Kiesel*_____
                                                       Paul R. Kiesel (SBN 119854)
                                                       *kiesel@kiesel-law.com*
                                                       8648 Wilshire Blvd.
                                                       Beverly Hills, CA  90211-2910
                                                       Telephone: (310) 854-4444
                                                       Facsimile:  (310) 854-0812

                                                       *Liaison Counsel*

**BARTIMUS, FRICKLETON, ROBERTSON & GOZA, P.C.**

By: ___/s/ Jim Frickleton_____
James P. Frickleton
*jimf@bflawfirm.com*
11150 Overbrook Road, Suite 200
Leawood, KS  66211
Telephone: (913) 266-2300
Facsimile:  (913) 266-2366

Stephen G. Grygiel
*sggrygiel@yahoo.com*
88 E. Bergen Place
Red Bank, NJ  07701
Telephone: (407) 505-9463
Facsimile: (732) 268-7367

*Plaintiffs' Executive Committee*

**KAPLAN, FOX & KILSHEIMER LLP**

By: ___/s/ David A. Straite_____
David A. Straite (admitted *pro hac vice*)
*dstraite@kaplanfox.com*
850 Third Avenue
New York, NY  10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7714

*Plaintiffs' Steering Committee*

# Exhibit A

Case5:12-md-02314-EJD   Document77   Filed06/26/14   Page5 of 43

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RILEY *v.* CALIFORNIA

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE

No. 13–132.   Argued April 29, 2014—Decided June 25, 2014*

In No. 13–132, petitioner Riley was stopped for a traffic violation, which eventually led to his arrest on weapons charges.  An officer searching Riley incident to the arrest seized a cell phone from Riley's pants pocket.  The officer accessed information on the phone and noticed the repeated use of a term associated with a street gang.  At the police station two hours later, a detective specializing in gangs further examined the phone's digital contents.  Based in part on photographs and videos that the detective found, the State charged Riley in connection with a shooting that had occurred a few weeks earlier and sought an enhanced sentence based on Riley's gang membership.  Riley moved to suppress all evidence that the police had obtained from his cell phone.  The trial court denied the motion, and Riley was convicted.  The California Court of Appeal affirmed.

In No. 13–212, respondent Wurie was arrested after police observed him participate in an apparent drug sale.  At the police station, the officers seized a cell phone from Wurie's person and noticed that the phone was receiving multiple calls from a source identified as "my house" on its external screen.  The officers opened the phone, accessed its call log, determined the number associated with the "my house" label, and traced that number to what they suspected was Wurie's apartment.  They secured a search warrant and found drugs, a firearm and ammunition, and cash in the ensuing search.  Wurie was then charged with drug and firearm offenses.  He moved to suppress the evidence obtained from the search of the apartment.  The District Court denied the motion, and Wurie was convicted.  The

————————

*Together with No. 13–212, *United States* v. *Wurie,* on certiorari to the United States Court of Appeals for the First Circuit.

First Circuit reversed the denial of the motion to suppress and vacated the relevant convictions.

*Held*: The police generally may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested. Pp. 5–28.

(a) A warrantless search is reasonable only if it falls within a specific exception to the Fourth Amendment's warrant requirement. See *Kentucky* v. *King*, 563 U. S. ___, ___. The well-established exception at issue here applies when a warrantless search is conducted incident to a lawful arrest.

Three related precedents govern the extent to which officers may search property found on or near an arrestee. *Chimel* v. *California*, 395 U. S. 752, requires that a search incident to arrest be limited to the area within the arrestee's immediate control, where it is justified by the interests in officer safety and in preventing evidence destruction. In *United States* v. *Robinson*, 414 U. S. 218, the Court applied the *Chimel* analysis to a search of a cigarette pack found on the arrestee's person. It held that the risks identified in *Chimel* are present in all custodial arrests, 414 U. S., at 235, even when there is no specific concern about the loss of evidence or the threat to officers in a particular case, *id.,* at 236. The trilogy concludes with *Arizona* v. *Gant*, 556 U. S. 332, which permits searches of a car where the arrestee is unsecured and within reaching distance of the passenger compartment, or where it is reasonable to believe that evidence of the crime of arrest might be found in the vehicle, *id.,* at 343. Pp. 5–8.

(b) The Court declines to extend *Robinson*'s categorical rule to searches of data stored on cell phones. Absent more precise guidance from the founding era, the Court generally determines whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S. 295, 300. That balance of interests supported the search incident to arrest exception in *Robinson*. But a search of digital information on a cell phone does not further the government interests identified in *Chimel*, and implicates substantially greater individual privacy interests than a brief physical search. Pp. 8–22.

(1) The digital data stored on cell phones does not present either *Chimel* risk. Pp. 10–15.

(i) Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape. Officers may examine the phone's physical aspects to ensure that it will not be used as a weapon, but the data on the phone can endanger no one. To the extent that a search of cell phone data

Syllabus

might warn officers of an impending danger, *e.g.,* that the arrestee's confederates are headed to the scene, such a concern is better addressed through consideration of case-specific exceptions to the warrant requirement, such as exigent circumstances. See, *e.g., Warden, Md. Penitentiary* v. *Hayden,* 387 U. S. 294, 298–299. Pp. 10–12.

(ii) The United States and California raise concerns about the destruction of evidence, arguing that, even if the cell phone is physically secure, information on the cell phone remains vulnerable to remote wiping and data encryption. As an initial matter, those broad concerns are distinct from *Chimel*'s focus on a defendant who responds to arrest by trying to conceal or destroy evidence within his reach. The briefing also gives little indication that either problem is prevalent or that the opportunity to perform a search incident to arrest would be an effective solution. And, at least as to remote wiping, law enforcement currently has some technologies of its own for combatting the loss of evidence. Finally, law enforcement's remaining concerns in a particular case might be addressed by responding in a targeted manner to urgent threats of remote wiping, see *Missouri* v. *McNeely,* 569 U. S. ___, ___, or by taking action to disable a phone's locking mechanism in order to secure the scene, see *Illinois* v. *McArthur,* 531 U. S. 326, 331–333. Pp. 12–15.

(2) A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but more substantial privacy interests are at stake when digital data is involved. Pp. 15–22.

(i) Cell phones differ in both a quantitative and a qualitative sense from other objects that might be carried on an arrestee's person. Notably, modern cell phones have an immense storage capacity. Before cell phones, a search of a person was limited by physical realities and generally constituted only a narrow intrusion on privacy. But cell phones can store millions of pages of text, thousands of pictures, or hundreds of videos. This has several interrelated privacy consequences. First, a cell phone collects in one place many distinct types of information that reveal much more in combination than any isolated record. Second, the phone's capacity allows even just one type of information to convey far more than previously possible. Third, data on the phone can date back for years. In addition, an element of pervasiveness characterizes cell phones but not physical records. A decade ago officers might have occasionally stumbled across a highly personal item such as a diary, but today many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives. Pp. 17–21.

(ii) The scope of the privacy interests at stake is further complicated by the fact that the data viewed on many modern cell phones may in fact be stored on a remote server.  Thus, a search may extend well beyond papers and effects in the physical proximity of an arrestee, a concern that the United States recognizes but cannot definitively foreclose.  Pp. 21–22.

(c) Fallback options offered by the United States and California are flawed and contravene this Court's general preference to provide clear guidance to law enforcement through categorical rules.  See *Michigan* v. *Summers*, 452 U. S. 692, 705, n. 19.  One possible rule is to import the *Gant* standard from the vehicle context and allow a warrantless search of an arrestee's cell phone whenever it is reasonable to believe that the phone contains evidence of the crime of arrest.  That proposal is not appropriate in this context, and would prove no practical limit at all when it comes to cell phone searches.  Another possible rule is to restrict the scope of a cell phone search to information relevant to the crime, the arrestee's identity, or officer safety.  That proposal would again impose few meaningful constraints on officers.  Finally, California suggests an analogue rule, under which officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart.  That proposal would allow law enforcement to search a broad range of items contained on a phone even though people would be unlikely to carry such a variety of information in physical form, and would launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records.  Pp. 22–25.

(d) It is true that this decision will have some impact on the ability of law enforcement to combat crime.  But the Court's holding is not that the information on a cell phone is immune from search; it is that a warrant is generally required before a search.  The warrant requirement is an important component of the Court's Fourth Amendment jurisprudence, and warrants may be obtained with increasing efficiency.  In addition, although the search incident to arrest exception does not apply to cell phones, the continued availability of the exigent circumstances exception may give law enforcement a justification for a warrantless search in particular cases.  Pp. 25–27.

No. 13–132, reversed and remanded; No. 13–212, 728 F. 3d 1, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  ALITO, J., filed an opinion concurring in part and concurring in the judgment.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 13–132 and 13–212

————

## DAVID LEON RILEY, PETITIONER

13–132          *v.*

### CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALI-
FORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE

## UNITED STATES, PETITIONER

13–212          *v.*

### BRIMA WURIE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 25, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

These two cases raise a common question: whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested.

### I

#### A

In the first case, petitioner David Riley was stopped by a police officer for driving with expired registration tags. In the course of the stop, the officer also learned that Riley's license had been suspended. The officer impounded Riley's car, pursuant to department policy, and another

officer conducted an inventory search of the car. Riley was arrested for possession of concealed and loaded firearms when that search turned up two handguns under the car's hood. See Cal. Penal Code Ann. §§12025(a)(1), 12031(a)(1) (West 2009).

An officer searched Riley incident to the arrest and found items associated with the "Bloods" street gang. He also seized a cell phone from Riley's pants pocket. According to Riley's uncontradicted assertion, the phone was a "smart phone," a cell phone with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity. The officer accessed information on the phone and noticed that some words (presumably in text messages or a contacts list) were preceded by the letters "CK"—a label that, he believed, stood for "Crip Killers," a slang term for members of the Bloods gang.

At the police station about two hours after the arrest, a detective specializing in gangs further examined the contents of the phone. The detective testified that he "went through" Riley's phone "looking for evidence, because . . . gang members will often video themselves with guns or take pictures of themselves with the guns." App. in No. 13–132, p. 20. Although there was "a lot of stuff" on the phone, particular files that "caught [the detective's] eye" included videos of young men sparring while someone yelled encouragement using the moniker "Blood." *Id.,* at 11–13. The police also found photographs of Riley standing in front of a car they suspected had been involved in a shooting a few weeks earlier.

Riley was ultimately charged, in connection with that earlier shooting, with firing at an occupied vehicle, assault with a semiautomatic firearm, and attempted murder. The State alleged that Riley had committed those crimes for the benefit of a criminal street gang, an aggravating factor that carries an enhanced sentence. Compare Cal.

Penal Code Ann. §246 (2008) with §186.22(b)(4)(B) (2014). Prior to trial, Riley moved to suppress all evidence that the police had obtained from his cell phone. He contended that the searches of his phone violated the Fourth Amendment, because they had been performed without a warrant and were not otherwise justified by exigent circumstances. The trial court rejected that argument. App. in No. 13–132, at 24, 26. At Riley's trial, police officers testified about the photographs and videos found on the phone, and some of the photographs were admitted into evidence. Riley was convicted on all three counts and received an enhanced sentence of 15 years to life in prison.

The California Court of Appeal affirmed. No. D059840 (Cal. App., Feb. 8, 2013), App. to Pet. for Cert. in No. 13–132, pp. 1a–23a. The court relied on the California Supreme Court's decision in *People* v. *Diaz*, 51 Cal. 4th 84, 244 P. 3d 501 (2011), which held that the Fourth Amendment permits a warrantless search of cell phone data incident to an arrest, so long as the cell phone was immediately associated with the arrestee's person. See *id.,* at 93, 244 P. 3d, at 505–506.

The California Supreme Court denied Riley's petition for review, App. to Pet. for Cert. in No. 13–132, at 24a, and we granted certiorari, 571 U. S. ___ (2014).

B

In the second case, a police officer performing routine surveillance observed respondent Brima Wurie make an apparent drug sale from a car. Officers subsequently arrested Wurie and took him to the police station. At the station, the officers seized two cell phones from Wurie's person. The one at issue here was a "flip phone," a kind of phone that is flipped open for use and that generally has a smaller range of features than a smart phone. Five to ten minutes after arriving at the station, the officers noticed that the phone was repeatedly receiving calls from a

source identified as "my house" on the phone's external
screen.  A few minutes later, they opened the phone and
saw a photograph of a woman and a baby set as the
phone's wallpaper.  They pressed one button on the phone
to access its call log, then another button to determine the
phone number associated with the "my house" label.  They
next used an online phone directory to trace that phone
number to an apartment building.

When the officers went to the building, they saw Wurie's
name on a mailbox and observed through a window a
woman who resembled the woman in the photograph on
Wurie's phone.  They secured the apartment while obtain-
ing a search warrant and, upon later executing the war-
rant, found and seized 215 grams of crack cocaine, mari-
juana, drug paraphernalia, a firearm and ammunition, and
cash.

Wurie was charged with distributing crack cocaine,
possessing crack cocaine with intent to distribute, and
being a felon in possession of a firearm and ammunition.
See 18 U. S. C. §922(g); 21 U. S. C. §841(a).  He moved to
suppress the evidence obtained from the search of the
apartment, arguing that it was the fruit of an unconstitu-
tional search of his cell phone.  The District Court denied
the motion.  612 F. Supp. 2d 104 (Mass. 2009).  Wurie was
convicted on all three counts and sentenced to 262 months
in prison.

A divided panel of the First Circuit reversed the denial
of Wurie's motion to suppress and vacated Wurie's convic-
tions for possession with intent to distribute and posses-
sion of a firearm as a felon.  728 F. 3d 1 (2013).  The court
held that cell phones are distinct from other physical
possessions that may be searched incident to arrest with-
out a warrant, because of the amount of personal data cell
phones contain and the negligible threat they pose to law
enforcement interests.  See *id.,* at 8–11.

We granted certiorari.  571 U. S. ___ (2014).

## II

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As the text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). Our cases have determined that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 653 (1995). Such a warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. See *Kentucky* v. *King*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5–6).

The two cases before us concern the reasonableness of a warrantless search incident to a lawful arrest. In 1914, this Court first acknowledged in dictum "the right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime." *Weeks* v. *United States*, 232 U. S. 383, 392. Since that time, it has been well accepted that such a search constitutes an exception to the warrant requirement. Indeed, the label "exception" is something of a

misnomer in this context, as warrantless searches incident
to arrest occur with far greater frequency than searches
conducted pursuant to a warrant. See 3 W. LaFave,
Search and Seizure §5.2(b), p. 132, and n. 15 (5th ed.
2012).

Although the existence of the exception for such searches
has been recognized for a century, its scope has been de-
bated for nearly as long. See *Arizona* v. *Gant*, 556 U. S.
332, 350 (2009) (noting the exception's "checkered his-
tory"). That debate has focused on the extent to which
officers may search property found on or near the arrestee.
Three related precedents set forth the rules governing
such searches:

The first, *Chimel* v. *California*, 395 U. S. 752 (1969), laid
the groundwork for most of the existing search incident to
arrest doctrine. Police officers in that case arrested
Chimel inside his home and proceeded to search his entire
three-bedroom house, including the attic and garage. In
particular rooms, they also looked through the contents of
drawers. *Id.,* at 753–754.

The Court crafted the following rule for assessing the
reasonableness of a search incident to arrest:

"When an arrest is made, it is reasonable for the ar-
resting officer to search the person arrested in order
to remove any weapons that the latter might seek to
use in order to resist arrest or effect his escape. Oth-
erwise, the officer's safety might well be endangered,
and the arrest itself frustrated. In addition, it is en-
tirely reasonable for the arresting officer to search for
and seize any evidence on the arrestee's person in or-
der to prevent its concealment or destruction. . . .
There is ample justification, therefore, for a search of
the arrestee's person and the area 'within his immedi-
ate control'—construing that phrase to mean the area
from within which he might gain possession of a

Opinion of the Court

weapon or destructible evidence." *Id.,* at 762–763.
The extensive warrantless search of Chimel's home did not fit within this exception, because it was not needed to protect officer safety or to preserve evidence. *Id.,* at 763, 768.

Four years later, in *United States* v. *Robinson,* 414 U. S. 218 (1973), the Court applied the *Chimel* analysis in the context of a search of the arrestee's person. A police officer had arrested Robinson for driving with a revoked license. The officer conducted a patdown search and felt an object that he could not identify in Robinson's coat pocket. He removed the object, which turned out to be a crumpled cigarette package, and opened it. Inside were 14 capsules of heroin. *Id.,* at 220, 223.

The Court of Appeals concluded that the search was unreasonable because Robinson was unlikely to have evidence of the crime of arrest on his person, and because it believed that extracting the cigarette package and opening it could not be justified as part of a protective search for weapons. This Court reversed, rejecting the notion that "case-by-case adjudication" was required to determine "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." *Id.,* at 235. As the Court explained, "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Ibid.* Instead, a "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Ibid.*

The Court thus concluded that the search of Robinson

was reasonable even though there was no concern about the loss of evidence, and the arresting officer had no specific concern that Robinson might be armed. *Id.,* at 236. In doing so, the Court did not draw a line between a search of Robinson's person and a further examination of the cigarette pack found during that search. It merely noted that, "[h]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it." *Ibid.* A few years later, the Court clarified that this exception was limited to "personal property . . . immediately associated with the person of the arrestee." *United States* v. *Chadwick*, 433 U. S. 1, 15 (1977) (200-pound, locked footlocker could not be searched incident to arrest), abrogated on other grounds by *California* v. *Acevedo*, 500 U. S. 565 (1991).

The search incident to arrest trilogy concludes with *Gant*, which analyzed searches of an arrestee's vehicle. *Gant*, like *Robinson*, recognized that the *Chimel* concerns for officer safety and evidence preservation underlie the search incident to arrest exception. See 556 U. S., at 338. As a result, the Court concluded that *Chimel* could authorize police to search a vehicle "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U. S.*,* at 343. *Gant* added, however, an independent exception for a warrantless search of a vehicle's passenger compartment "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Ibid.* (quoting *Thornton* v. *United States*, 541 U. S. 615, 632 (2004) (SCALIA, J., concurring in judgment)). That exception stems not from *Chimel*, the Court explained, but from "circumstances unique to the vehicle context." 556 U. S., at 343.

## III

These cases require us to decide how the search incident

to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones. See A. Smith, Pew Research Center, Smartphone Ownership—2013 Update (June 5, 2013). Even less sophisticated phones like Wurie's, which have already faded in popularity since Wurie was arrested in 2007, have been around for less than 15 years. Both phones are based on technology nearly inconceivable just a few decades ago, when *Chimel* and *Robinson* were decided.

Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S. 295, 300 (1999). Such a balancing of interests supported the search incident to arrest exception in *Robinson*, and a mechanical application of *Robinson* might well support the warrantless searches at issue here.

But while *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones. On the government interest side, *Robinson* concluded that the two risks identified in *Chimel*—harm to officers and destruction of evidence—are present in all custodial arrests. There are no comparable risks when the search is of digital data. In addition, *Robinson* regarded any privacy interests retained by an individual after arrest as significantly diminished by the fact of the arrest itself. Cell phones, however, place vast quantities of personal information literally in the hands of

individuals.  A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*.

We therefore decline to extend *Robinson* to searches of data on cell phones, and hold instead that officers must generally secure a warrant before conducting such a search.

### A

We first consider each *Chimel* concern in turn.  In doing so, we do not overlook *Robinson*'s admonition that searches of a person incident to arrest, "while based upon the need to disarm and to discover evidence," are reasonable regardless of "the probability in a particular arrest situation that weapons or evidence would in fact be found."  414 U. S., at 235.  Rather than requiring the "case-by-case adjudication" that *Robinson* rejected, *ibid.*, we ask instead whether application of the search incident to arrest doctrine to this particular category of effects would "untether the rule from the justifications underlying the *Chimel* exception," *Gant*, *supra*, at 343.  See also *Knowles* v. *Iowa*, 525 U. S. 113, 119 (1998) (declining to extend *Robinson* to the issuance of citations, "a situation where the concern for officer safety is not present to the same extent and the concern for destruction or loss of evidence is not present at all").

### 1

Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape.  Law enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case.  Once an officer has secured a phone and eliminated any potential physical threats, however, data

Opinion of the Court

on the phone can endanger no one.

Perhaps the same might have been said of the cigarette pack seized from Robinson's pocket. Once an officer gained control of the pack, it was unlikely that Robinson could have accessed the pack's contents. But unknown physical objects may always pose risks, no matter how slight, during the tense atmosphere of a custodial arrest. The officer in *Robinson* testified that he could not identify the objects in the cigarette pack but knew they were not cigarettes. See 414 U. S., at 223, 236, n. 7. Given that, a further search was a reasonable protective measure. No such unknowns exist with respect to digital data. As the First Circuit explained, the officers who searched Wurie's cell phone "knew exactly what they would find therein: data. They also knew that the data could not harm them." 728 F. 3d, at 10.

The United States and California both suggest that a search of cell phone data might help ensure officer safety in more indirect ways, for example by alerting officers that confederates of the arrestee are headed to the scene. There is undoubtedly a strong government interest in warning officers about such possibilities, but neither the United States nor California offers evidence to suggest that their concerns are based on actual experience. The proposed consideration would also represent a broadening of *Chimel*'s concern that an *arrestee himself* might grab a weapon and use it against an officer "to resist arrest or effect his escape." 395 U. S., at 763. And any such threats from outside the arrest scene do not "lurk[] in all custodial arrests." *Chadwick*, 433 U. S., at 14–15. Accordingly, the interest in protecting officer safety does not justify dispensing with the warrant requirement across the board. To the extent dangers to arresting officers may be implicated in a particular way in a particular case, they are better addressed through consideration of case-specific exceptions to the warrant requirement, such as the one for

Opinion of the Court

exigent circumstances.  See, *e.g., Warden, Md. Peniten-*
*tiary* v. *Hayden*, 387 U. S. 294, 298–299 (1967) ("The
Fourth Amendment does not require police officers to
delay in the course of an investigation if to do so would
gravely endanger their lives or the lives of others.").

### 2

The United States and California focus primarily on the
second *Chimel* rationale: preventing the destruction of
evidence.

Both Riley and Wurie concede that officers could have
seized and secured their cell phones to prevent destruction
of evidence while seeking a warrant.  See Brief for Peti-
tioner in No. 13–132, p. 20; Brief for Respondent in No.
13–212, p. 41.  That is a sensible concession.  See *Illinois*
v. *McArthur*, 531 U. S. 326, 331–333 (2001); *Chadwick*,
*supra*, at 13, and n. 8.  And once law enforcement officers
have secured a cell phone, there is no longer any risk that
the arrestee himself will be able to delete incriminating
data from the phone.

The United States and California argue that infor-
mation on a cell phone may nevertheless be vulnerable to
two types of evidence destruction unique to digital data—
remote wiping and data encryption.  Remote wiping occurs
when a phone, connected to a wireless network, receives a
signal that erases stored data.  This can happen when a
third party sends a remote signal or when a phone is
preprogrammed to delete data upon entering or leaving
certain geographic areas (so-called "geofencing").  See
Dept. of Commerce, National Institute of Standards and
Technology, R. Ayers, S. Brothers, & W. Jansen, Guide-
lines on Mobile Device Forensics (Draft) 29, 31 (SP 800–
101 Rev. 1, Sept. 2013) (hereinafter Ayers).  Encryption is
a security feature that some modern cell phones use in
addition to password protection.  When such phones lock,
data becomes protected by sophisticated encryption that

Opinion of the Court

renders a phone all but "unbreakable" unless police know the password. Brief for United States as *Amicus Curiae* in No. 13–132, p. 11.

As an initial matter, these broader concerns about the loss of evidence are distinct from *Chimel*'s focus on a defendant who responds to arrest by trying to conceal or destroy evidence within his reach. See 395 U. S., at 763–764. With respect to remote wiping, the Government's primary concern turns on the actions of third parties who are not present at the scene of arrest. And data encryption is even further afield. There, the Government focuses on the ordinary operation of a phone's security features, apart from *any* active attempt by a defendant or his associates to conceal or destroy evidence upon arrest.

We have also been given little reason to believe that either problem is prevalent. The briefing reveals only a couple of anecdotal examples of remote wiping triggered by an arrest. See Brief for Association of State Criminal Investigative Agencies et al. as *Amici Curiae* in No. 13–132, pp. 9–10; see also Tr. of Oral Arg. in No. 13–132, p. 48. Similarly, the opportunities for officers to search a password-protected phone before data becomes encrypted are quite limited. Law enforcement officers are very unlikely to come upon such a phone in an unlocked state because most phones lock at the touch of a button or, as a default, after some very short period of inactivity. See, *e.g.,* iPhone User Guide for iOS 7.1 Software 10 (2014) (default lock after about one minute). This may explain why the encryption argument was not made until the merits stage in this Court, and has never been considered by the Courts of Appeals.

Moreover, in situations in which an arrest might trigger a remote-wipe attempt or an officer discovers an unlocked phone, it is not clear that the ability to conduct a warrantless search would make much of a difference. The need to effect the arrest, secure the scene, and tend to other press-

ing matters means that law enforcement officers may well
not be able to turn their attention to a cell phone right
away.  See Tr. of Oral Arg. in No. 13–132, at 50; see also
Brief for United States as *Amicus Curiae* in No. 13–132, at
19.  Cell phone data would be vulnerable to remote wiping
from the time an individual anticipates arrest to the time
any eventual search of the phone is completed, which
might be at the station house hours later.  Likewise, an
officer who seizes a phone in an unlocked state might not
be able to begin his search in the short time remaining
before the phone locks and data becomes encrypted.

   In any event, as to remote wiping, law enforcement is
not without specific means to address the threat.  Remote
wiping can be fully prevented by disconnecting a phone
from the network.  There are at least two simple ways to
do this: First, law enforcement officers can turn the phone
off or remove its battery.  Second, if they are concerned
about encryption or other potential problems, they can
leave a phone powered on and place it in an enclosure that
isolates the phone from radio waves.  See Ayers 30–31.
Such devices are commonly called "Faraday bags," after
the English scientist Michael Faraday.  They are essen-
tially sandwich bags made of aluminum foil: cheap, light-
weight, and easy to use.  See Brief for Criminal Law Pro-
fessors as *Amici Curiae* 9.  They may not be a complete
answer to the problem, see Ayers 32, but at least for now
they provide a reasonable response.  In fact, a number of
law enforcement agencies around the country already
encourage the use of Faraday bags.  See, *e.g.,* Dept. of
Justice, National Institute of Justice, Electronic Crime
Scene Investigation: A Guide for First Responders 14, 32
(2d ed. Apr. 2008); Brief for Criminal Law Professors as
*Amici Curiae* 4–6.

   To the extent that law enforcement still has specific
concerns about the potential loss of evidence in a particu-
lar case, there remain more targeted ways to address

Opinion of the Court

those concerns.  If "the police are truly confronted with a 'now or never' situation,"—for example, circumstances suggesting that a defendant's phone will be the target of an imminent remote-wipe attempt—they may be able to rely on exigent circumstances to search the phone immediately.  *Missouri* v. *McNeely*, 569 U. S. ___, ___ (2013) (slip op., at 10) (quoting *Roaden* v. *Kentucky*, 413 U. S. 496, 505 (1973); some internal quotation marks omitted).  Or, if officers happen to seize a phone in an unlocked state, they may be able to disable a phone's automatic-lock feature in order to prevent the phone from locking and encrypting data.  See App. to Reply Brief in No. 13–132, p. 3a (diagramming the few necessary steps).  Such a preventive measure could be analyzed under the principles set forth in our decision in *McArthur*, 531 U. S. 326, which approved officers' reasonable steps to secure a scene to preserve evidence while they awaited a warrant.  See *id.,* at 331–333.

## B

The search incident to arrest exception rests not only on the heightened government interests at stake in a volatile arrest situation, but also on an arrestee's reduced privacy interests upon being taken into police custody.  *Robinson* focused primarily on the first of those rationales.  But it also quoted with approval then-Judge Cardozo's account of the historical basis for the search incident to arrest exception: "Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion."  414 U. S., at 232 (quoting *People* v. *Chiagles*, 237 N. Y. 193, 197, 142 N. E. 583, 584 (1923)); see also 414 U. S., at 237 (Powell, J., concurring) ("an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person").  Put simply, a patdown of Robinson's cloth-

ing and an inspection of the cigarette pack found in his pocket constituted only minor additional intrusions compared to the substantial government authority exercised in taking Robinson into custody. See *Chadwick*, 433 U. S., at 16, n. 10 (searches of a person are justified in part by "reduced expectations of privacy caused by the arrest").

The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely. Not every search "is acceptable solely because a person is in custody." *Maryland* v. *King*, 569 U. S. ___, ___ (2013) (slip op., at 26). To the contrary, when "privacy-related concerns are weighty enough" a "search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." *Ibid.* One such example, of course, is *Chimel*. *Chimel* refused to "characteriz[e] the invasion of privacy that results from a top-to-bottom search of a man's house as 'minor.'" 395 U. S., at 766–767, n. 12. Because a search of the arrestee's entire house was a substantial invasion beyond the arrest itself, the Court concluded that a warrant was required.

*Robinson* is the only decision from this Court applying *Chimel* to a search of the contents of an item found on an arrestee's person. In an earlier case, this Court had approved a search of a zipper bag carried by an arrestee, but the Court analyzed only the validity of the arrest itself. See *Draper* v. *United States*, 358 U. S. 307, 310–311 (1959). Lower courts applying *Robinson* and *Chimel*, however, have approved searches of a variety of personal items carried by an arrestee. See, *e.g., United States* v. *Carrion*, 809 F. 2d 1120, 1123, 1128 (CA5 1987) (billfold and address book); *United States* v. *Watson*, 669 F. 2d 1374, 1383–1384 (CA11 1982) (wallet); *United States* v. *Lee*, 501 F. 2d 890, 892 (CADC 1974) (purse).

The United States asserts that a search of all data stored on a cell phone is "materially indistinguishable" from searches of these sorts of physical items. Brief for

Opinion of the Court

United States in No. 13–212, p. 26. That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

1

Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.

One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy. See Kerr, Foreword: Accounting for Technological Change, 36 Harv. J. L. & Pub. Pol'y 403, 404–405 (2013). Most people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read—nor would they have any reason to attempt to do so. And if they did, they would have to drag behind them a trunk of the sort held to require a search warrant in *Chadwick*, *supra*, rather than a container the size of the cigarette package in *Robinson*.

But the possible intrusion on privacy is not physically limited in the same way when it comes to cell phones. The current top-selling smart phone has a standard capacity of 16 gigabytes (and is available with up to 64 gigabytes). Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos. See Kerr, *supra*, at 404; Brief for Center for Democracy & Technology et al. as *Amici Curiae* 7–8. Cell phones couple that capacity with the ability to store many different types of information: Even the most basic phones that sell for less than $20 might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on. See *id.,* at 30; *United States* v. *Flores-Lopez,* 670 F. 3d 803, 806 (CA7 2012). We expect that the gulf between physical practicability and digital capacity will only continue to widen in the future.

The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video— that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.[1]

---

[1] Because the United States and California agree that these cases involve *searches* incident to arrest, these cases do not implicate the

Opinion of the Court

Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception. According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower. See Harris Interactive, 2013 Mobile Consumer Habits Study (June 2013). A decade ago police officers searching an arrestee might have occasionally stumbled across a highly personal item such as a diary. See, *e.g., United States* v. *Frankenberry*, 387 F. 2d 337 (CA2 1967) (*per curiam*). But those discoveries were likely to be few and far between. Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate. See *Ontario* v. *Quon*, 560 U. S. 746, 760 (2010). Allowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case.

Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a stand-

_____

question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances.

ard feature on many smart phones and can reconstruct
someone's specific movements down to the minute, not
only around town but also within a particular building.
See *United States* v. *Jones*, 565 U. S. ___, ___ (2012)
(SOTOMAYOR, J., concurring) (slip op., at 3) ("GPS monitor-
ing generates a precise, comprehensive record of a person's
public movements that reflects a wealth of detail about
her familial, political, professional, religious, and sexual
associations.").

Mobile application software on a cell phone, or "apps,"
offer a range of tools for managing detailed information
about all aspects of a person's life. There are apps for
Democratic Party news and Republican Party news; apps
for alcohol, drug, and gambling addictions; apps for shar-
ing prayer requests; apps for tracking pregnancy symp-
toms; apps for planning your budget; apps for every con-
ceivable hobby or pastime; apps for improving your
romantic life. There are popular apps for buying or selling
just about anything, and the records of such transactions
may be accessible on the phone indefinitely. There are
over a million apps available in each of the two major app
stores; the phrase "there's an app for that" is now part of
the popular lexicon. The average smart phone user has
installed 33 apps, which together can form a revealing
montage of the user's life. See Brief for Electronic Privacy
Information Center as *Amicus Curiae* in No. 13–132, p. 9.

In 1926, Learned Hand observed (in an opinion later
quoted in *Chimel*) that it is "a totally different thing to
search a man's pockets and use against him what they
contain, from ransacking his house for everything which
may incriminate him." *United States* v. *Kirschenblatt*, 16
F. 2d 202, 203 (CA2). If his pockets contain a cell phone,
however, that is no longer true. Indeed, a cell phone
search would typically expose to the government far *more*
than the most exhaustive search of a house: A phone not
only contains in digital form many sensitive records previ-

Opinion of the Court

ously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

### 2

To further complicate the scope of the privacy interests at stake, the data a user views on many modern cell phones may not in fact be stored on the device itself. Treating a cell phone as a container whose contents may be searched incident to an arrest is a bit strained as an initial matter. See *New York* v. *Belton*, 453 U. S. 454, 460, n. 4 (1981) (describing a "container" as "any object capable of holding another object"). But the analogy crumbles entirely when a cell phone is used to access data located elsewhere, at the tap of a screen. That is what cell phones, with increasing frequency, are designed to do by taking advantage of "cloud computing." Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself. Cell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference. See Brief for Electronic Privacy Information Center in No. 13–132, at 12–14, 20. Moreover, the same type of data may be stored locally on the device for one user and in the cloud for another.

The United States concedes that the search incident to arrest exception may not be stretched to cover a search of files accessed remotely—that is, a search of files stored in the cloud. See Brief for United States in No. 13–212, at 43–44. Such a search would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house. But officers searching a phone's data would not typically know whether the information they are viewing was stored locally at the time of the arrest or has been pulled from the cloud.

Opinion of the Court

Although the Government recognizes the problem, its proposed solutions are unclear. It suggests that officers could disconnect a phone from the network before searching the device—the very solution whose feasibility it contested with respect to the threat of remote wiping. Compare Tr. of Oral Arg. in No. 13–132, at 50–51, with Tr. of Oral Arg. in No. 13–212, pp. 13–14. Alternatively, the Government proposes that law enforcement agencies "develop protocols to address" concerns raised by cloud computing. Reply Brief in No. 13–212, pp. 14–15. Probably a good idea, but the Founders did not fight a revolution to gain the right to government agency protocols. The possibility that a search might extend well beyond papers and effects in the physical proximity of an arrestee is yet another reason that the privacy interests here dwarf those in *Robinson*.

## C

Apart from their arguments for a direct extension of *Robinson*, the United States and California offer various fallback options for permitting warrantless cell phone searches under certain circumstances. Each of the proposals is flawed and contravenes our general preference to provide clear guidance to law enforcement through categorical rules. "[I]f police are to have workable rules, the balancing of the competing interests . . . 'must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers.'" *Michigan* v. *Summers*, 452 U. S. 692, 705, n. 19 (1981) (quoting *Dunaway* v. *New York*, 442 U. S. 200, 219–220 (1979) (White, J., concurring)).

The United States first proposes that the *Gant* standard be imported from the vehicle context, allowing a warrantless search of an arrestee's cell phone whenever it is reasonable to believe that the phone contains evidence of the crime of arrest. But *Gant* relied on "circumstances unique

to the vehicle context" to endorse a search solely for the purpose of gathering evidence. 556 U. S., at 343. JUSTICE SCALIA's *Thornton* opinion, on which *Gant* was based, explained that those unique circumstances are "a reduced expectation of privacy" and "heightened law enforcement needs" when it comes to motor vehicles. 541 U. S., at 631; see also *Wyoming* v. *Houghton*, 526 U. S., at 303–304. For reasons that we have explained, cell phone searches bear neither of those characteristics.

At any rate, a *Gant* standard would prove no practical limit at all when it comes to cell phone searches. In the vehicle context, *Gant* generally protects against searches for evidence of past crimes. See 3 W. LaFave, Search and Seizure §7.1(d), at 709, and n. 191. In the cell phone context, however, it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred. Similarly, in the vehicle context *Gant* restricts broad searches resulting from minor crimes such as traffic violations. See *id.,* §7.1(d), at 713, and n. 204. That would not necessarily be true for cell phones. It would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone. Even an individual pulled over for something as basic as speeding might well have locational data dispositive of guilt on his phone. An individual pulled over for reckless driving might have evidence on the phone that shows whether he was texting while driving. The sources of potential pertinent information are virtually unlimited, so applying the *Gant* standard to cell phones would in effect give "police officers unbridled discretion to rummage at will among a person's private effects." 556 U. S., at 345.

The United States also proposes a rule that would restrict the scope of a cell phone search to those areas of the phone where an officer reasonably believes that infor-

mation relevant to the crime, the arrestee's identity, or officer safety will be discovered. See Brief for United States in No. 13–212, at 51–53. This approach would again impose few meaningful constraints on officers. The proposed categories would sweep in a great deal of information, and officers would not always be able to discern in advance what information would be found where.

We also reject the United States' final suggestion that officers should always be able to search a phone's call log, as they did in Wurie's case. The Government relies on *Smith* v. *Maryland*, 442 U. S. 735 (1979), which held that no warrant was required to use a pen register at telephone company premises to identify numbers dialed by a particular caller. The Court in that case, however, concluded that the use of a pen register was not a "search" at all under the Fourth Amendment. See *id.,* at 745–746. There is no dispute here that the officers engaged in a search of Wurie's cell phone. Moreover, call logs typically contain more than just phone numbers; they include any identifying information that an individual might add, such as the label "my house" in Wurie's case.

Finally, at oral argument California suggested a different limiting principle, under which officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart. See Tr. of Oral Arg. in No. 13–132, at 38–43; see also *Flores-Lopez,* 670 F. 3d, at 807 ("If police are entitled to open a pocket diary to copy the owner's address, they should be entitled to turn on a cell phone to learn its number."). But the fact that a search in the pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement to search a

range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form. In Riley's case, for example, it is implausible that he would have strolled around with video tapes, photo albums, and an address book all crammed into his pockets. But because each of those items has a pre-digital analogue, police under California's proposal would be able to search a phone for all of those items—a significant diminution of privacy.

In addition, an analogue test would launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records. Is an e-mail equivalent to a letter? Is a voicemail equivalent to a phone message slip? It is not clear how officers could make these kinds of decisions before conducting a search, or how courts would apply the proposed rule after the fact. An analogue test would "keep defendants and judges guessing for years to come." *Sykes* v. *United States*, 564 U. S. 1, ___ (2011) (SCALIA, J., dissenting) (slip op., at 7) (discussing the Court's analogue test under the Armed Career Criminal Act).

## IV

We cannot deny that our decision today will have an impact on the ability of law enforcement to combat crime. Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals. Privacy comes at a cost.

Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest. Our cases have historically recognized that the warrant requirement is "an important working part of our machinery of gov-

ernment," not merely "an inconvenience to be somehow 'weighed' against the claims of police efficiency." *Coolidge* v. *New Hampshire*, 403 U. S. 443, 481 (1971). Recent technological advances similar to those discussed here have, in addition, made the process of obtaining a warrant itself more efficient. See *McNeely*, 569 U. S., at ___ (slip op., at 11–12); *id.,* at ___ (ROBERTS, C. J., concurring in part and dissenting in part) (slip op., at 8) (describing jurisdiction where "police officers can e-mail warrant requests to judges' iPads [and] judges have signed such warrants and e-mailed them back to officers in less than 15 minutes").

Moreover, even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone. "One well-recognized exception applies when '"the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky* v. *King*, 563 U. S., at ___ (slip op., at 6) (quoting *Mincey* v. *Arizona,* 437 U. S. 385, 394 (1978)). Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury. 563 U. S., at ___. In *Chadwick*, for example, the Court held that the exception for searches incident to arrest did not justify a search of the trunk at issue, but noted that "if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage." 433 U. S., at 15, n. 9.

In light of the availability of the exigent circumstances exception, there is no reason to believe that law enforcement officers will not be able to address some of the more extreme hypotheticals that have been suggested: a suspect

Opinion of the Court

texting an accomplice who, it is feared, is preparing to detonate a bomb, or a child abductor who may have information about the child's location on his cell phone. The defendants here recognize—indeed, they stress—that such fact-specific threats may justify a warrantless search of cell phone data. See Reply Brief in No. 13–132, at 8–9; Brief for Respondent in No. 13–212, at 30, 41. The critical point is that, unlike the search incident to arrest exception, the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case. See *McNeely*, *supra*, at ___ (slip op., at 6).[2]

\*     \*     \*

Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled "general warrants" and "writs of assistance" of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity. Opposition to such searches was in fact one of the driving forces behind the Revolution itself. In 1761, the patriot James Otis delivered a speech in Boston denouncing the use of writs of assistance. A young John Adams was there, and he would later write that "[e]very man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance." 10 Works of John Adams 247–248 (C. Adams ed. 1856). According to Adams, Otis's speech was "the first scene of the first act of

─────────

[2] In Wurie's case, for example, the dissenting First Circuit judge argued that exigent circumstances could have justified a search of Wurie's phone. See 728 F. 3d 1, 17 (2013) (opinion of Howard, J.) (discussing the repeated unanswered calls from "my house," the suspected location of a drug stash). But the majority concluded that the Government had not made an exigent circumstances argument. See *id.,* at 1. The Government acknowledges the same in this Court. See Brief for United States in No. 13–212, p. 28, n. 8.

Opinion of the Court

opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *Id.,* at 248 (quoted in *Boyd* v. *United States*, 116 U. S. 616, 625 (1886)).

Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life," *Boyd*, *supra*, at 630. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple— get a warrant.

We reverse the judgment of the California Court of Appeal in No. 13–132 and remand the case for further proceedings not inconsistent with this opinion. We affirm the judgment of the First Circuit in No. 13–212.

*It is so ordered.*

Cite as: 573 U. S. ____ (2014)          1

Opinion of ALITO, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 13–132 and 13–212

————

DAVID LEON RILEY, PETITIONER

13–132                 *v.*

CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALI-
FORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE

UNITED STATES, PETITIONER

13–212                 *v.*

BRIMA WURIE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 25, 2014]

JUSTICE ALITO, concurring in part and concurring in the
judgment.

I agree with the Court that law enforcement officers, in
conducting a lawful search incident to arrest, must gener-
ally obtain a warrant before searching information stored
or accessible on a cell phone. I write separately to address
two points.

## I

### A

First, I am not convinced at this time that the ancient
rule on searches incident to arrest is based exclusively (or
even primarily) on the need to protect the safety of arrest-
ing officers and the need to prevent the destruction of
evidence. Cf. *ante*, at 9. This rule antedates the adoption
of the Fourth Amendment by at least a century. See T.
Clancy, The Fourth Amendment: Its History and Interpre-
tation 340 (2008); T. Taylor, Two Studies in Constitutional

Interpretation 28 (1969); Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 764 (1994).  In *Weeks* v. *United States*, 232 U. S. 383, 392 (1914), we held that the Fourth Amendment did not disturb this rule.  See also Taylor, *supra*, at 45; Stuntz, The Substantive Origins of Criminal Procedure, 105 Yale L. J. 393, 401 (1995) ("The power to search incident to arrest—a search of the arrested suspect's person . . .—was well established in the mid-eighteenth century, and nothing in . . . the Fourth Amendment changed that").  And neither in *Weeks* nor in any of the authorities discussing the old common-law rule have I found any suggestion that it was based exclusively or primarily on the need to protect arresting officers or to prevent the destruction of evidence.

On the contrary, when pre-*Weeks* authorities discussed the basis for the rule, what was mentioned was the need to obtain probative evidence.  For example, an 1839 case stated that "it is clear, and beyond doubt, that . . . constables . . . are entitled, upon a lawful arrest by them of one charged with treason or felony, to take and detain property found in his possession which will form material evidence in his prosecution for that crime."  See *Dillon* v. *O'Brien*, 16 Cox Crim. Cas. 245, 249–251 (1887) (citing *Regina*, v. *Frost*, 9 Car. & P. 129, 173 Eng. Rep. 771)).  The court noted that the origins of that rule "deriv[e] from the interest which the State has in a person guilty (or reasonably believed to be guilty) of a crime being brought to justice, and in a prosecution, once commenced, being determined in due course of law."  16 Cox Crim. Cas., at 249–250.  See also *Holker* v. *Hennessey*, 141 Mo. 527, 537–540, 42 S. W. 1090, 1093 (1897).

Two 19th-century treatises that this Court has previously cited in connection with the origin of the search-incident-to-arrest rule, see *Weeks*, *supra*, at 392, suggest the same rationale.  See F. Wharton, Criminal Pleading and Practice §60, p. 45 (8th ed. 1880) ("Those arresting a

Opinion of ALITO, J.

defendant are bound to take from his person any articles which may be of use as proof in the trial of the offense with which the defendant is charged"); J. Bishop, Criminal Procedure §§210–212, p. 127 (2d ed. 1872) (if an arresting officer finds "about the prisoner's person, or otherwise in his possession, either goods or moneys which there is reason to believe are connected with the supposed crime as its fruits, or as the instruments with which it was committed, or as directly furnishing evidence relating to the transaction, he may take the same, and hold them to be disposed of as the court may direct").

What ultimately convinces me that the rule is not closely linked to the need for officer safety and evidence preservation is that these rationales fail to explain the rule's well-recognized scope. It has long been accepted that written items found on the person of an arrestee may be examined and used at trial.* But once these items are

_____

*Cf. *Hill* v. *California*, 401 U. S. 797, 799–802, and n. 1 (1971) (diary); *Marron* v. *United States*, 275 U. S. 192, 193, 198–199 (1927) (ledger and bills); *Gouled* v. *United States*, 255 U. S. 298, 309 (1921), overruled on other grounds, *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 300–301 (1967) (papers); see *United States* v. *Rodriguez*, 995 F. 2d 776, 778 (CA7 1993) (address book); *United States* v. *Armendariz–Mata*, 949 F. 2d 151, 153 (CA5 1991) (notebook); *United States* v. *Molinaro*, 877 F. 2d 1341 (CA7 1989) (wallet); *United States* v. *Richardson*, 764 F. 2d 1514, 1527 (CA11 1985) (wallet and papers); *United States* v. *Watson*, 669 F. 2d 1374, 1383–1384 (CA11 1982) (documents found in a wallet); *United States* v. *Castro*, 596 F. 2d 674, 677 (CA5 1979), cert. denied, 444 U. S. 963 (1979) (paper found in a pocket); *United States* v. *Jeffers*, 520 F. 2d 1256, 1267–1268 (CA7 1975) (three notebooks and meeting minutes); *Bozel* v. *Hudspeth*, 126 F. 2d 585, 587 (CA10 1942) (papers, circulars, advertising matter, "memoranda containing various names and addresses"); *United States* v. *Park Avenue Pharmacy*, 56 F. 2d 753, 755 (CA2 1932) ("numerous prescriptions blanks" and a check book). See also 3 W. LaFave, Search and Seizure §5.2(c), p. 144 (5th ed. 2012) ("Lower courts, in applying Robinson, have deemed evidentiary searches of an arrested person to be virtually unlimited"); W. Cuddihy, Fourth Amendment: Origins and Original Meaning 847–848 (1990) (in the pre-Constitution colonial era, "[a]nyone arrested could expect that not only

taken away from an arrestee (something that obviously must be done before the items are read), there is no risk that the arrestee will destroy them. Nor is there any risk that leaving these items unread will endanger the arresting officers.

The idea that officer safety and the preservation of evidence are the sole reasons for allowing a warrantless search incident to arrest appears to derive from the Court's reasoning in *Chimel* v. *California*, 395 U. S. 752 (1969), a case that involved the lawfulness of a search of the scene of an arrest, not the person of an arrestee. As I have explained, *Chimel*'s reasoning is questionable, see *Arizona* v. *Gant*, 556 U. S. 332, 361–363 (2009) (ALITO, J., dissenting), and I think it is a mistake to allow that reasoning to affect cases like these that concern the search of the person of arrestees.

### B

Despite my view on the point discussed above, I agree that we should not mechanically apply the rule used in the predigital era to the search of a cell phone. Many cell phones now in use are capable of storing and accessing a quantity of information, some highly personal, that no person would ever have had on his person in hard-copy form. This calls for a new balancing of law enforcement and privacy interests.

The Court strikes this balance in favor of privacy interests with respect to all cell phones and all information found in them, and this approach leads to anomalies. For example, the Court's broad holding favors information in digital form over information in hard-copy form. Suppose that two suspects are arrested. Suspect number one has in his pocket a monthly bill for his land-line phone, and

<hr />

his surface clothing but his body, luggage, and saddlebags would be searched").

Opinion of ALITO, J.

the bill lists an incriminating call to a long-distance number.  He also has in his wallet a few snapshots, and one of these is incriminating.  Suspect number two has in his pocket a cell phone, the call log of which shows a call to the same incriminating number.  In addition, a number of photos are stored in the memory of the cell phone, and one of these is incriminating.  Under established law, the police may seize and examine the phone bill and the snapshots in the wallet without obtaining a warrant, but under the Court's holding today, the information stored in the cell phone is out.

While the Court's approach leads to anomalies, I do not see a workable alternative.  Law enforcement officers need clear rules regarding searches incident to arrest, and it would take many cases and many years for the courts to develop more nuanced rules.  And during that time, the nature of the electronic devices that ordinary Americans carry on their persons would continue to change.

## II

This brings me to my second point.  While I agree with the holding of the Court, I would reconsider the question presented here if either Congress or state legislatures, after assessing the legitimate needs of law enforcement and the privacy interests of cell phone owners, enact legislation that draws reasonable distinctions based on categories of information or perhaps other variables.

The regulation of electronic surveillance provides an instructive example.  After this Court held that electronic surveillance constitutes a search even when no property interest is invaded, see *Katz* v. *United States*, 389 U. S. 347, 353–359 (1967), Congress responded by enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211.  See also 18 U. S. C. §2510 *et seq.* Since that time, electronic surveillance has been governed primarily, not by decisions of this Court, but by the stat-

ute, which authorizes but imposes detailed restrictions on electronic surveillance. See *ibid.*

Modern cell phones are of great value for both lawful and unlawful purposes. They can be used in committing many serious crimes, and they present new and difficult law enforcement problems. See Brief for United States in No. 13–212, pp. 2–3. At the same time, because of the role that these devices have come to play in contemporary life, searching their contents implicates very sensitive privacy interests that this Court is poorly positioned to understand and evaluate. Many forms of modern technology are making it easier and easier for both government and private entities to amass a wealth of information about the lives of ordinary Americans, and at the same time, many ordinary Americans are choosing to make public much information that was seldom revealed to outsiders just a few decades ago.

In light of these developments, it would be very unfortunate if privacy protection in the 21st century were left primarily to the federal courts using the blunt instrument of the Fourth Amendment. Legislatures, elected by the people, are in a better position than we are to assess and respond to the changes that have already occurred and those that almost certainly will take place in the future.

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: June 26, 2014                    Respectfully Submitted,

                                        **KIESEL LAW LLP**


                                        By:        /s/ *Paul R. Kiesel*
                                            Paul R. Kiesel
                                             *kiesel@kiesel-law.com*
                                            8648 Wilshire Boulevard
                                            Beverly Hills, California  90211
                                            Tel.: (310) 854-4444
                                            Fax: (310) 854-0812