# Exhibit GG

Case 5:12-md-02314-EJD   Document 93-33   Filed 12/01/15   Page 2 of 30

JUDGMENT OF THE COURT (Grand Chamber)

6 October 2015 (*)

(Reference for a preliminary ruling — Personal data — Protection of individuals with regard to the processing of such data — Charter of Fundamental Rights of the European Union — Articles 7, 8 and 47 — Directive 95/46/EC — Articles 25 and 28 — Transfer of personal data to third countries — Decision 2000/520/EC — Transfer of personal data to the United States — Inadequate level of protection — Validity — Complaint by an individual whose data has been transferred from the European Union to the United States — Powers of the national supervisory authorities)

In Case C‑362/14,

REQUEST for a preliminary ruling under Article 267 TFEU from the High Court (Ireland), made by decision of 17 July 2014, received at the Court on 25 July 2014, in the proceedings

**Maximillian Schrems**

v

**Data Protection Commissioner,**

joined party:

**Digital Rights Ireland Ltd,**

THE COURT (Grand Chamber),

composed of V. Skouris, President, K. Lenaerts, Vice-President, A. Tizzano, R. Silva de Lapuerta, T. von Danwitz (Rapporteur), S. Rodin and K. Jürimäe, Presidents of Chambers, A. Rosas, E. Juhász, A. Borg Barthet, J. Malenovský, D. Šváby, M. Berger, F. Biltgen and C. Lycourgos, Judges,

Advocate General: Y. Bot,

Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 24 March 2015,

after considering the observations submitted on behalf of:

–    Mr Schrems, by N. Travers, Senior Counsel, P. O'Shea, Barrister-at-Law, G. Rudden, Solicitor, and H. Hofmann, Rechtsanwalt,

–    the Data Protection Commissioner, by P. McDermott, Barrister-at-Law, S. More O'Ferrall and D. Young, Solicitors,

–       Digital Rights Ireland Ltd, by F. Crehan, Barrister-at-Law, and S. McGarr and E. McGarr, Solicitors,

–       Ireland, by A. Joyce, B. Counihan and E. Creedon, acting as Agents, and D. Fennelly, Barrister-at-Law,

–       the Belgian Government, by J.-C. Halleux and C. Pochet, acting as Agents,

–       the Czech Government, by M. Smolek and J. Vláčil, acting as Agents,

–       the Italian Government, by G. Palmieri, acting as Agent, and P. Gentili, avvocato dello Stato,

–       the Austrian Government, by G. Hesse and G. Kunnert, acting as Agents,

–       the Polish Government, by M. Kamejsza, M. Pawlicka and B. Majczyna, acting as Agents,

–       the Slovenian Government, by A. Grum and V. Klemenc, acting as Agents,

–       the United Kingdom Government, by L. Christie and J. Beeko, acting as Agents, and J. Holmes, Barrister,

–       the European Parliament, by D. Moore, A. Caiola and M. Pencheva, acting as Agents,

–       the European Commission, by B. Schima, B. Martenczuk, B. Smulders and J. Vondung, acting as Agents,

–       the European Data Protection Supervisor (EDPS), by C. Docksey, A. Buchta and V. Pérez Asinari, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 23 September 2015,

gives the following

## Judgment

1       This request for a preliminary ruling relates to the interpretation, in the light of Articles 7, 8 and 47 of the Charter of Fundamental Rights of the European Union ('the Charter'), of Articles 25 (6) and 28 of Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ 1995 L 281, p. 31), as amended by Regulation (EC) No 1882/2003 of the European Parliament and of the Council of 29 September 2003 (OJ 2003 L 284, p. 1) ('Directive 95/46'), and, in essence, to the validity of Commission Decision 2000/520/EC of 26 July 2000 pursuant to Directive 95/46 on the adequacy of the protection provided by the safe harbour privacy principles and related frequently asked questions issued by the US Department of Commerce (OJ 2000 L 215, p. 7).

2      The request has been made in proceedings between Mr Schrems and the Data Protection Commissioner ('the Commissioner') concerning the latter's refusal to investigate a complaint made by Mr Schrems regarding the fact that Facebook Ireland Ltd ('Facebook Ireland') transfers the personal data of its users to the United States of America and keeps it on servers located in that country.

### Legal context

*Directive 95/46*

3      Recitals 2, 10, 56, 57, 60, 62 and 63 in the preamble to Directive 95/46 are worded as follows:

'(2)     ... data-processing systems are designed to serve man; … they must, whatever the nationality or residence of natural persons, respect their fundamental rights and freedoms, notably the right to privacy, and contribute to … the well-being of individuals;

…

(10)     … the object of the national laws on the processing of personal data is to protect fundamental rights and freedoms, notably the right to privacy, which is recognised both in Article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms[, signed in Rome on 4 November 1950,] and in the general principles of Community law; …, for that reason, the approximation of those laws must not result in any lessening of the protection they afford but must, on the contrary, seek to ensure a high level of protection in the Community;

…

(56)     … cross-border flows of personal data are necessary to the expansion of international trade; … the protection of individuals guaranteed in the Community by this Directive does not stand in the way of transfers of personal data to third countries which ensure an adequate level of protection; … the adequacy of the level of protection afforded by a third country must be assessed in the light of all the circumstances surrounding the transfer operation or set of transfer operations;

(57)     … on the other hand, the transfer of personal data to a third country which does not ensure an adequate level of protection must be prohibited;

…

(60)     … in any event, transfers to third countries may be effected only in full compliance with the provisions adopted by the Member States pursuant to this Directive, and in particular Article 8 thereof;

…

(62)     … the establishment in Member States of supervisory authorities, exercising their functions with complete independence, is an essential component of the protection of individuals with regard to the processing of personal data;

(63)    … such authorities must have the necessary means to perform their duties, including powers of investigation and intervention, particularly in cases of complaints from individuals, and powers to engage in legal proceedings; ...'

4      Articles 1, 2, 25, 26, 28 and 31 of Directive 95/46 provide:

'*Article 1*

Object of the Directive

1.    In accordance with this Directive, Member States shall protect the fundamental rights and freedoms of natural persons, and in particular their right to privacy with respect to the processing of personal data.

...

*Article 2*

Definitions

For the purposes of this Directive:

(a)    "personal data" shall mean any information relating to an identified or identifiable natural person ("data subject"); an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity;

(b)    "processing of personal data" ("processing") shall mean any operation or set of operations which is performed upon personal data, whether or not by automatic means, such as collection, recording, organisation, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction;

...

(d)    "controller" shall mean the natural or legal person, public authority, agency or any other body which alone or jointly with others determines the purposes and means of the processing of personal data; where the purposes and means of processing are determined by national or Community laws or regulations, the controller or the specific criteria for his nomination may be designated by national or Community law;

...

*Article 25*

Principles

1.    The Member States shall provide that the transfer to a third country of personal data which are undergoing processing or are intended for processing after transfer may take place only if, without prejudice to compliance with the national provisions adopted pursuant to the other

provisions of this Directive, the third country in question ensures an adequate level of protection.

2.     The adequacy of the level of protection afforded by a third country shall be assessed in the light of all the circumstances surrounding a data transfer operation or set of data transfer operations; particular consideration shall be given to the nature of the data, the purpose and duration of the proposed processing operation or operations, the country of origin and country of final destination, the rules of law, both general and sectoral, in force in the third country in question and the professional rules and security measures which are complied with in that country.

3.     The Member States and the Commission shall inform each other of cases where they consider that a third country does not ensure an adequate level of protection within the meaning of paragraph 2.

4.     Where the Commission finds, under the procedure provided for in Article 31(2), that a third country does not ensure an adequate level of protection within the meaning of paragraph 2 of this Article, Member States shall take the measures necessary to prevent any transfer of data of the same type to the third country in question.

5.     At the appropriate time, the Commission shall enter into negotiations with a view to remedying the situation resulting from the finding made pursuant to paragraph 4.

6.     The Commission may find, in accordance with the procedure referred to in Article 31(2), that a third country ensures an adequate level of protection within the meaning of paragraph 2 of this Article, by reason of its domestic law or of the international commitments it has entered into, particularly upon conclusion of the negotiations referred to in paragraph 5, for the protection of the private lives and basic freedoms and rights of individuals.

Member States shall take the measures necessary to comply with the Commission's decision.

*Article 26*

Derogations

1.     By way of derogation from Article 25 and save where otherwise provided by domestic law governing particular cases, Member States shall provide that a transfer or a set of transfers of personal data to a third country which does not ensure an adequate level of protection within the meaning of Article 25(2) may take place on condition that:

(a)     the data subject has given his consent unambiguously to the proposed transfer; or

(b)     the transfer is necessary for the performance of a contract between the data subject and the controller or the implementation of precontractual measures taken in response to the data subject's request; or

(c)     the transfer is necessary for the conclusion or performance of a contract concluded in the interest of the data subject between the controller and a third party; or

(d)     the transfer is necessary or legally required on important public interest grounds, or for the establishment, exercise or defence of legal claims; or

(e)     the transfer is necessary in order to protect the vital interests of the data subject; or

(f)      the transfer is made from a register which according to laws or regulations is intended to provide information to the public and which is open to consultation either by the public in general or by any person who can demonstrate legitimate interest, to the extent that the conditions laid down in law for consultation are fulfilled in the particular case.

2.     Without prejudice to paragraph 1, a Member State may authorise a transfer or a set of transfers of personal data to a third country which does not ensure an adequate level of protection within the meaning of Article 25(2), where the controller adduces adequate safeguards with respect to the protection of the privacy and fundamental rights and freedoms of individuals and as regards the exercise of the corresponding rights; such safeguards may in particular result from appropriate contractual clauses.

3.     The Member State shall inform the Commission and the other Member States of the authorisations it grants pursuant to paragraph 2.

If a Member State or the Commission objects on justified grounds involving the protection of the privacy and fundamental rights and freedoms of individuals, the Commission shall take appropriate measures in accordance with the procedure laid down in Article 31(2).

Member States shall take the necessary measures to comply with the Commission's decision.

...

*Article 28*

Supervisory authority

1.     Each Member State shall provide that one or more public authorities are responsible for monitoring the application within its territory of the provisions adopted by the Member States pursuant to this Directive.

These authorities shall act with complete independence in exercising the functions entrusted to them.

2.     Each Member State shall provide that the supervisory authorities are consulted when drawing up administrative measures or regulations relating to the protection of individuals' rights and freedoms with regard to the processing of personal data.

3.     Each authority shall in particular be endowed with:

–      investigative powers, such as powers of access to data forming the subject-matter of processing operations and powers to collect all the information necessary for the performance of its supervisory duties,

–      effective powers of intervention, such as, for example, that of delivering opinions before processing operations are carried out, in accordance with Article 20, and ensuring appropriate publication of such opinions, of ordering the blocking, erasure or destruction of data, of imposing a temporary or definitive ban on processing, of warning or

admonishing the controller, or that of referring the matter to national parliaments or other political institutions,

–       the power to engage in legal proceedings where the national provisions adopted pursuant to this Directive have been violated or to bring these violations to the attention of the judicial authorities.

Decisions by the supervisory authority which give rise to complaints may be appealed against through the courts.

4.      Each supervisory authority shall hear claims lodged by any person, or by an association representing that person, concerning the protection of his rights and freedoms in regard to the processing of personal data. The person concerned shall be informed of the outcome of the claim.

Each supervisory authority shall, in particular, hear claims for checks on the lawfulness of data processing lodged by any person when the national provisions adopted pursuant to Article 13 of this Directive apply. The person shall at any rate be informed that a check has taken place.

...

6.      Each supervisory authority is competent, whatever the national law applicable to the processing in question, to exercise, on the territory of its own Member State, the powers conferred on it in accordance with paragraph 3. Each authority may be requested to exercise its powers by an authority of another Member State.

...

*Article 31*

...

2.      Where reference is made to this Article, Articles 4 and 7 of [Council] Decision 1999/468/EC [of 28 June 1999 laying down the procedures for the exercise of implementing powers conferred on the Commission (OJ 1999 L 184, p. 23)] shall apply, having regard to the provisions of Article 8 thereof.

...'

*Decision 2000/520*

5       Decision 2000/520 was adopted by the Commission on the basis of Article 25(6) of Directive 95/46.

6       Recitals 2, 5 and 8 in the preamble to that decision are worded as follows:

'(2)      The Commission may find that a third country ensures an adequate level of protection. In that case personal data may be transferred from the Member States without additional guarantees being necessary.

…

(5)     The adequate level of protection for the transfer of data from the Community to the United States recognised by this Decision, should be attained if organisations comply with the safe harbour privacy principles for the protection of personal data transferred from a Member State to the United States (hereinafter "the Principles") and the frequently asked questions (hereinafter "the FAQs") providing guidance for the implementation of the Principles issued by the Government of the United States on 21 July 2000. Furthermore the organisations should publicly disclose their privacy policies and be subject to the jurisdiction of the Federal Trade Commission (FTC) under Section 5 of the Federal Trade Commission Act which prohibits unfair or deceptive acts or practices in or affecting commerce, or that of another statutory body that will effectively ensure compliance with the Principles implemented in accordance with the FAQs.

…

(8)     In the interests of transparency and in order to safeguard the ability of the competent authorities in the Member States to ensure the protection of individuals as regards the processing of their personal data, it is necessary to specify in this Decision the exceptional circumstances in which the suspension of specific data flows should be justified, notwithstanding the finding of adequate protection.'

7      Articles 1 to 4 of Decision 2000/520 provide:

'*Article 1*

1.     For the purposes of Article 25(2) of Directive 95/46/EC, for all the activities falling within the scope of that Directive, the "Safe Harbour Privacy Principles" (hereinafter "the Principles"), as set out in Annex I to this Decision, implemented in accordance with the guidance provided by the frequently asked questions (hereinafter "the FAQs") issued by the US Department of Commerce on 21 July 2000 as set out in Annex II to this Decision are considered to ensure an adequate level of protection for personal data transferred from the Community to organisations established in the United States, having regard to the following documents issued by the US Department of Commerce:

(a)     the safe harbour enforcement overview set out in Annex III;

(b)     a memorandum on damages for breaches of privacy and explicit authorisations in US law set out in Annex IV;

(c)     a letter from the Federal Trade Commission set out in Annex V;

(d)     a letter from the US Department of Transportation set out in Annex VI.

2.     In relation to each transfer of data the following conditions shall be met:

(a)     the organisation receiving the data has unambiguously and publicly disclosed its commitment to comply with the Principles implemented in accordance with the FAQs; and

(b)     the organisation is subject to the statutory powers of a government body in the United States listed in Annex VII to this Decision which is empowered to investigate complaints and to obtain relief against unfair or deceptive practices as well as redress for individuals,

irrespective of their country of residence or nationality, in case of non-compliance with the Principles implemented in accordance with the FAQs.

3.     The conditions set out in paragraph 2 are considered to be met for each organisation that self-certifies its adherence to the Principles implemented in accordance with the FAQs from the date on which the organisation notifies to the US Department of Commerce (or its designee) the public disclosure of the commitment referred to in paragraph 2(a) and the identity of the government body referred to in paragraph 2(b).

*Article 2*

This Decision concerns only the adequacy of protection provided in the United States under the Principles implemented in accordance with the FAQs with a view to meeting the requirements of Article 25(1) of Directive 95/46/EC and does not affect the application of other provisions of that Directive that pertain to the processing of personal data within the Member States, in particular Article 4 thereof.

*Article 3*

1.     Without prejudice to their powers to take action to ensure compliance with national provisions adopted pursuant to provisions other than Article 25 of Directive 95/46/EC, the competent authorities in Member States may exercise their existing powers to suspend data flows to an organisation that has self-certified its adherence to the Principles implemented in accordance with the FAQs in order to protect individuals with regard to the processing of their personal data in cases where:

(a)     the government body in the United States referred to in Annex VII to this Decision or an independent recourse mechanism within the meaning of letter (a) of the Enforcement Principle set out in Annex I to this Decision has determined that the organisation is violating the Principles implemented in accordance with the FAQs; or

(b)     there is a substantial likelihood that the Principles are being violated; there is a reasonable basis for believing that the enforcement mechanism concerned is not taking or will not take adequate and timely steps to settle the case at issue; the continuing transfer would create an imminent risk of grave harm to data subjects; and the competent authorities in the Member State have made reasonable efforts under the circumstances to provide the organisation with notice and an opportunity to respond.

The suspension shall cease as soon as compliance with the Principles implemented in accordance with the FAQs is assured and the competent authorities concerned in the Community are notified thereof.

2.     Member States shall inform the Commission without delay when measures are adopted on the basis of paragraph 1.

3.     The Member States and the Commission shall also inform each other of cases where the action of bodies responsible for ensuring compliance with the Principles implemented in accordance with the FAQs in the United States fails to secure such compliance.

4.     If the information collected under paragraphs 1, 2 and 3 provides evidence that any body responsible for ensuring compliance with the Principles implemented in accordance with the

FAQs in the United States is not effectively fulfilling its role, the Commission shall inform the US Department of Commerce and, if necessary, present draft measures in accordance with the procedure referred to in Article 31 of Directive 95/46/EC with a view to reversing or suspending the present Decision or limiting its scope.

*Article 4*

1.   This Decision may be adapted at any time in the light of experience with its implementation and/or if the level of protection provided by the Principles and the FAQs is overtaken by the requirements of US legislation.

The Commission shall in any case evaluate the implementation of the present Decision on the basis of available information three years after its notification to the Member States and report any pertinent findings to the Committee established under Article 31 of Directive 95/46/EC, including any evidence that could affect the evaluation that the provisions set out in Article 1 of this Decision provide adequate protection within the meaning of Article 25 of Directive 95/46/EC and any evidence that the present Decision is being implemented in a discriminatory way.

2.   The Commission shall, if necessary, present draft measures in accordance with the procedure referred to in Article 31 of Directive 95/46/EC.'

8    Annex I to Decision 2000/520 is worded as follows:

'Safe Harbour Privacy Principles

issued by the US Department of Commerce on 21 July 2000

... the Department of Commerce is issuing this document and Frequently Asked Questions ("the Principles") under its statutory authority to foster, promote, and develop international commerce. The Principles were developed in consultation with industry and the general public to facilitate trade and commerce between the United States and European Union. They are intended for use solely by US organisations receiving personal data from the European Union for the purpose of qualifying for the safe harbour and the presumption of "adequacy" it creates. Because the Principles were solely designed to serve this specific purpose, their adoption for other purposes may be inappropriate. …

Decisions by organisations to qualify for the safe harbour are entirely voluntary, and organisations may qualify for the safe harbour in different ways. ...

Adherence to these Principles may be limited: (a) to the extent necessary to meet national security, public interest, or law enforcement requirements; (b) by statute, government regulation, or case-law that create conflicting obligations or explicit authorisations, provided that, in exercising any such authorisation, an organisation can demonstrate that its non-compliance with the Principles is limited to the extent necessary to meet the overriding legitimate interests furthered by such authorisation; or (c) if the effect of the Directive [or] Member State law is to allow exceptions or derogations, provided such exceptions or derogations are applied in comparable contexts. Consistent with the goal of enhancing privacy protection, organisations should strive to implement these Principles fully and transparently, including indicating in their privacy policies where exceptions to the Principles permitted by (b)

above will apply on a regular basis. For the same reason, where the option is allowable under the Principles and/or US law, organisations are expected to opt for the higher protection where possible.

...'

9       Annex II to Decision 2000/520 reads as follows:

'Frequently Asked Questions (FAQs)

...

FAQ 6 — Self-Certification

Q:     *How does an organisation self-certify that it adheres to the Safe Harbour Principles?*

A:     Safe harbour benefits are assured from the date on which an organisation self-certifies to the Department of Commerce (or its designee) its adherence to the Principles in accordance with the guidance set forth below.

        To self-certify for the safe harbour, organisations can provide to the Department of Commerce (or its designee) a letter, signed by a corporate officer on behalf of the organisation that is joining the safe harbour, that contains at least the following information:

        1.     name of organisation, mailing address, e-mail address, telephone and fax numbers;

        2.     description of the activities of the organisation with respect to personal information received from the [European Union]; and

        3.     description of the organisation's privacy policy for such personal information, including: (a) where the privacy policy is available for viewing by the public, (b) its effective date of implementation, (c) a contact office for the handling of complaints, access requests, and any other issues arising under the safe harbour, (d) the specific statutory body that has jurisdiction to hear any claims against the organisation regarding possible unfair or deceptive practices and violations of laws or regulations governing privacy (and that is listed in the annex to the Principles), (e) name of any privacy programmes in which the organisation is a member, (f) method of verification (e.g. in-house, third party) ..., and (g) the independent recourse mechanism that is available to investigate unresolved complaints.

        Where the organisation wishes its safe harbour benefits to cover human resources information transferred from the [European Union] for use in the context of the employment relationship, it may do so where there is a statutory body with jurisdiction to hear claims against the organisation arising out of human resources information that is listed in the annex to the Principles. ...

        The Department (or its designee) will maintain a list of all organisations that file such letters, thereby assuring the availability of safe harbour benefits, and will update such list on the basis of annual letters and notifications received pursuant to FAQ 11. ...

...

FAQ 11 — Dispute Resolution and Enforcement

Q:   *How should the dispute resolution requirements of the Enforcement Principle be implemented, and how will an organisation's persistent failure to comply with the Principles be handled?*

A:   The Enforcement Principle sets out the requirements for safe harbour enforcement. How to meet the requirements of point (b) of the Principle is set out in the FAQ on verification (FAQ 7). This FAQ 11 addresses points (a) and (c), both of which require independent recourse mechanisms. These mechanisms may take different forms, but they must meet the Enforcement Principle's requirements. Organisations may satisfy the requirements through the following: (1) compliance with private sector developed privacy programmes that incorporate the Safe Harbour Principles into their rules and that include effective enforcement mechanisms of the type described in the Enforcement Principle; (2) compliance with legal or regulatory supervisory authorities that provide for handling of individual complaints and dispute resolution; or (3) commitment to cooperate with data protection authorities located in the European Union or their authorised representatives. This list is intended to be illustrative and not limiting. The private sector may design other mechanisms to provide enforcement, so long as they meet the requirements of the Enforcement Principle and the FAQs. Please note that the Enforcement Principle's requirements are additional to the requirements set forth in paragraph 3 of the introduction to the Principles that self-regulatory efforts must be enforceable under Article 5 of the Federal Trade Commission Act or similar statute.

Recourse Mechanisms

Consumers should be encouraged to raise any complaints they may have with the relevant organisation before proceeding to independent recourse mechanisms. ...

...

FTC Action

The FTC has committed to reviewing on a priority basis referrals received from privacy self-regulatory organisations, such as BBBOnline and TRUSTe, and EU Member States alleging non-compliance with the Safe Harbour Principles to determine whether Section 5 of the FTC Act prohibiting unfair or deceptive acts or practices in commerce has been violated. ...

…'

10     Annex IV to Decision 2000/520 states:

'Damages for Breaches of Privacy, Legal Authorisations and Mergers and Takeovers in US Law

This responds to the request by the European Commission for clarification of US law with respect to (a) claims for damages for breaches of privacy, (b) "explicit authorisations" in US law for the use of personal information in a manner inconsistent with the safe harbour

principles, and (c) the effect of mergers and takeovers on obligations undertaken pursuant to the safe harbour principles.

...

B.    Explicit Legal Authorisations

The safe harbour principles contain an exception where statute, regulation or case-law create "conflicting obligations or explicit authorisations, provided that, in exercising any such authorisation, an organisation can demonstrate that its non-compliance with the principles is limited to the extent necessary to meet the overriding legitimate interests further[ed] by such authorisation". Clearly, where US law imposes a conflicting obligation, US organisations whether in the safe harbour or not must comply with the law. As for explicit authorisations, while the safe harbour principles are intended to bridge the differences between the US and European regimes for privacy protection, we owe deference to the legislative prerogatives of our elected lawmakers. The limited exception from strict adherence to the safe harbour principles seeks to strike a balance to accommodate the legitimate interests on each side.

The exception is limited to cases where there is an explicit authorisation. Therefore, as a threshold matter, the relevant statute, regulation or court decision must affirmatively authorise the particular conduct by safe harbour organisations ... In other words, the exception would not apply where the law is silent. In addition, the exception would apply only if the explicit authorisation conflicts with adherence to the safe harbour principles. Even then, the exception "is limited to the extent necessary to meet the overriding legitimate interests furthered by such authorisation". By way of illustration, where the law simply authorises a company to provide personal information to government authorities, the exception would not apply. Conversely, where the law specifically authorises the company to provide personal information to government agencies without the individual's consent, this would constitute an "explicit authorisation" to act in a manner that conflicts with the safe harbour principles. Alternatively, specific exceptions from affirmative requirements to provide notice and consent would fall within the exception (since it would be the equivalent of a specific authorisation to disclose the information without notice and consent). For example, a statute which authorises doctors to provide their patients' medical records to health officials without the patients' prior consent might permit an exception from the notice and choice principles. This authorisation would not permit a doctor to provide the same medical records to health maintenance organisations or commercial pharmaceutical research laboratories, which would be beyond the scope of the purposes authorised by the law and therefore beyond the scope of the exception ... The legal authority in question can be a "stand alone" authorisation to do specific things with personal information, but, as the examples below illustrate, it is likely to be an exception to a broader law which proscribes the collection, use, or disclosure of personal information.

...'

*Communication COM(2013) 846 final*

11   On 27 November 2013 the Commission adopted the communication to the European Parliament and the Council entitled 'Rebuilding Trust in EU-US Data Flows' (COM(2013) 846 final) ('Communication COM(2013) 846 final'). The communication was accompanied by the 'Report on the Findings by the EU Co-chairs of the ad hoc EU-US Working Group on Data Protection', also dated 27 November 2013. That report was drawn up, as stated in point 1

thereof, in cooperation with the United States after the existence in that country of a number of surveillance programmes involving the large-scale collection and processing of personal data had been revealed. The report contained inter alia a detailed analysis of United States law as regards, in particular, the legal bases authorising the existence of surveillance programmes and the collection and processing of personal data by United States authorities.

12    In point 1 of Communication COM(2013) 846 final, the Commission stated that '[c]ommercial exchanges are addressed by Decision [2000/520]', adding that '[t]his Decision provides a legal basis for transfers of personal data from the [European Union] to companies established in the [United States] which have adhered to the Safe Harbour Privacy Principles'. In addition, the Commission underlined in point 1 the increasing relevance of personal data flows, owing in particular to the development of the digital economy which has indeed 'led to exponential growth in the quantity, quality, diversity and nature of data processing activities'.

13    In point 2 of that communication, the Commission observed that 'concerns about the level of protection of personal data of [Union] citizens transferred to the [United States] under the Safe Harbour scheme have grown' and that '[t]he voluntary and declaratory nature of the scheme has sharpened focus on its transparency and enforcement'.

14    It further stated in point 2 that '[t]he personal data of [Union] citizens sent to the [United States] under the Safe Harbour may be accessed and further processed by US authorities in a way incompatible with the grounds on which the data was originally collected in the [European Union] and the purposes for which it was transferred to the [United States]' and that '[a] majority of the US internet companies that appear to be more directly concerned by [the surveillance] programmes are certified under the Safe Harbour scheme'.

15    In point 3.2 of Communication COM(2013) 846 final, the Commission noted a number of weaknesses in the application of Decision 2000/520. It stated, first, that some certified United States companies did not comply with the principles referred to in Article 1(1) of Decision 2000/520 ('the safe harbour principles') and that improvements had to be made to that decision regarding 'structural shortcomings related to transparency and enforcement, the substantive Safe Harbour principles and the operation of the national security exception'. It observed, secondly, that 'Safe Harbour also acts as a conduit for the transfer of the personal data of EU citizens from the [European Union] to the [United States] by companies required to surrender data to US intelligence agencies under the US intelligence collection programmes'.

16    The Commission concluded in point 3.2 that whilst, '[g]iven the weaknesses identified, the current implementation of Safe Harbour cannot be maintained, ... its revocation would[, however,] adversely affect the interests of member companies in the [European Union] and in the [United States]'. Finally, the Commission added in that point that it would 'engage with the US authorities to discuss the shortcomings identified'.

*Communication COM(2013) 847 final*

17    On the same date, 27 November 2013, the Commission adopted the communication to the European Parliament and the Council on the Functioning of the Safe Harbour from the Perspective of EU Citizens and Companies Established in the [European Union] (COM(2013) 847 final) ('Communication COM(2013) 847 final'). As is clear from point 1 thereof, that communication was based inter alia on information received in the ad hoc EU-US Working

Group and followed two Commission assessment reports published in 2002 and 2004 respectively.

18    Point 1 of Communication COM(2013) 847 final explains that the functioning of Decision 2000/520 'relies on commitments and self-certification of adhering companies', adding that '[s] igning up to these arrangements is voluntary, but the rules are binding for those who sign up'.

19    In addition, it is apparent from point 2.2 of Communication COM(2013) 847 final that, as at 26 September 2013, 3 246 companies, falling within many industry and services sectors, were certified. Those companies mainly provided services in the EU internal market, in particular in the internet sector, and some of them were EU companies which had subsidiaries in the United States. Some of those companies processed the data of their employees in Europe which was transferred to the United States for human resource purposes.

20    The Commission stated in point 2.2 that '[a]ny gap in transparency or in enforcement on the US side results in responsibility being shifted to European data protection authorities and to the companies which use the scheme'.

21    It is apparent, in particular, from points 3 to 5 and 8 of Communication COM(2013) 847 final that, in practice, a significant number of certified companies did not comply, or did not comply fully, with the safe harbour principles.

22    In addition, the Commission stated in point 7 of Communication COM(2013) 847 final that 'all companies involved in the PRISM programme [a large-scale intelligence collection programme], and which grant access to US authorities to data stored and processed in the [United States], appear to be Safe Harbour certified' and that '[t]his has made the Safe Harbour scheme one of the conduits through which access is given to US intelligence authorities to collecting personal data initially processed in the [European Union]'. In that regard, the Commission noted in point 7.1 of that communication that 'a number of legal bases under US law allow large-scale collection and processing of personal data that is stored or otherwise processed [by] companies based in the [United States]' and that '[t]he large-scale nature of these programmes may result in data transferred under Safe Harbour being accessed and further processed by US authorities beyond what is strictly necessary and proportionate to the protection of national security as foreseen under the exception provided in [Decision 2000/520]'.

23    In point 7.2 of Communication COM(2013) 847 final, headed 'Limitations and redress possibilities', the Commission noted that 'safeguards that are provided under US law are mostly available to US citizens or legal residents' and that, '[m]oreover, there are no opportunities for either EU or US data subjects to obtain access, rectification or erasure of data, or administrative or judicial redress with regard to collection and further processing of their personal data taking place under the US surveillance programmes'.

24    According to point 8 of Communication COM(2013) 847 final, the certified companies included '[w]eb companies such as Google, Facebook, Microsoft, Apple, Yahoo', which had 'hundreds of millions of clients in Europe' and transferred personal data to the United States for processing.

25    The Commission concluded in point 8 that 'the large-scale access by intelligence agencies to data transferred to the [United States] by Safe Harbour certified companies raises additional

serious questions regarding the continuity of data protection rights of Europeans when their data is transferred to the [United States]'.

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

26    Mr Schrems, an Austrian national residing in Austria, has been a user of the Facebook social network ('Facebook') since 2008.

27    Any person residing in the European Union who wishes to use Facebook is required to conclude, at the time of his registration, a contract with Facebook Ireland, a subsidiary of Facebook Inc. which is itself established in the United States. Some or all of the personal data of Facebook Ireland's users who reside in the European Union is transferred to servers belonging to Facebook Inc. that are located in the United States, where it undergoes processing.

28    On 25 June 2013 Mr Schrems made a complaint to the Commissioner by which he in essence asked the latter to exercise his statutory powers by prohibiting Facebook Ireland from transferring his personal data to the United States. He contended in his complaint that the law and practice in force in that country did not ensure adequate protection of the personal data held in its territory against the surveillance activities that were engaged in there by the public authorities. Mr Schrems referred in this regard to the revelations made by Edward Snowden concerning the activities of the United States intelligence services, in particular those of the National Security Agency ('the NSA').

29    Since the Commissioner took the view that he was not required to investigate the matters raised by Mr Schrems in the complaint, he rejected it as unfounded. The Commissioner considered that there was no evidence that Mr Schrems' personal data had been accessed by the NSA. He added that the allegations raised by Mr Schrems in his complaint could not be profitably put forward since any question of the adequacy of data protection in the United States had to be determined in accordance with Decision 2000/520 and the Commission had found in that decision that the United States ensured an adequate level of protection.

30    Mr Schrems brought an action before the High Court challenging the decision at issue in the main proceedings. After considering the evidence adduced by the parties to the main proceedings, the High Court found that the electronic surveillance and interception of personal data transferred from the European Union to the United States serve necessary and indispensable objectives in the public interest. However, it added that the revelations made by Edward Snowden had demonstrated a 'significant over-reach' on the part of the NSA and other federal agencies.

31    According to the High Court, Union citizens have no effective right to be heard. Oversight of the intelligence services' actions is carried out within the framework of an *ex parte* and secret procedure. Once the personal data has been transferred to the United States, it is capable of being accessed by the NSA and other federal agencies, such as the Federal Bureau of Investigation (FBI), in the course of the indiscriminate surveillance and interception carried out by them on a large scale.

32    The High Court stated that Irish law precludes the transfer of personal data outside national territory save where the third country ensures an adequate level of protection for privacy and fundamental rights and freedoms. The importance of the rights to privacy and to inviolability of

the dwelling, which are guaranteed by the Irish Constitution, requires that any interference with those rights be proportionate and in accordance with the law.

33    The High Court held that the mass and undifferentiated accessing of personal data is clearly contrary to the principle of proportionality and the fundamental values protected by the Irish Constitution. In order for interception of electronic communications to be regarded as consistent with the Irish Constitution, it would be necessary to demonstrate that the interception is targeted, that the surveillance of certain persons or groups of persons is objectively justified in the interests of national security or the suppression of crime and that there are appropriate and verifiable safeguards. Thus, according to the High Court, if the main proceedings were to be disposed of on the basis of Irish law alone, it would then have to be found that, given the existence of a serious doubt as to whether the United States ensures an adequate level of protection of personal data, the Commissioner should have proceeded to investigate the matters raised by Mr Schrems in his complaint and that the Commissioner was wrong in rejecting the complaint.

34    However, the High Court considers that this case concerns the implementation of EU law as referred to in Article 51 of the Charter and that the legality of the decision at issue in the main proceedings must therefore be assessed in the light of EU law. According to the High Court, Decision 2000/520 does not satisfy the requirements flowing both from Articles 7 and 8 of the Charter and from the principles set out by the Court of Justice in the judgment in *Digital Rights Ireland and Others* (C-293/12 and C-594/12, EU:C:2014:238). The right to respect for private life, guaranteed by Article 7 of the Charter and by the core values common to the traditions of the Member States, would be rendered meaningless if the State authorities were authorised to access electronic communications on a casual and generalised basis without any objective justification based on considerations of national security or the prevention of crime that are specific to the individual concerned and without those practices being accompanied by appropriate and verifiable safeguards.

35    The High Court further observes that in his action Mr Schrems in reality raises the legality of the safe harbour regime which was established by Decision 2000/520 and gives rise to the decision at issue in the main proceedings. Thus, even though Mr Schrems has not formally contested the validity of either Directive 95/46 or Decision 2000/520, the question is raised, according to the High Court, as to whether, on account of Article 25(6) of Directive 95/46, the Commissioner was bound by the Commission's finding in Decision 2000/520 that the United States ensures an adequate level of protection or whether Article 8 of the Charter authorised the Commissioner to break free, if appropriate, from such a finding.

36    In those circumstances the High Court decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1)    Whether in the course of determining a complaint which has been made to an independent office holder who has been vested by statute with the functions of administering and enforcing data protection legislation that personal data is being transferred to another third country (in this case, the United States of America) the laws and practices of which, it is claimed, do not contain adequate protections for the data subject, that office holder is absolutely bound by the Community finding to the contrary contained in [Decision 2000/520] having regard to Article 7, Article 8 and Article 47 of [the Charter], the provisions of Article 25(6) of Directive [95/46] notwithstanding?

(2)   Or, alternatively, may and/or must the office holder conduct his or her own investigation of the matter in the light of factual developments in the meantime since that Commission decision was first published?'

### Consideration of the questions referred

37   By its questions, which it is appropriate to examine together, the referring court asks, in essence, whether and to what extent Article 25(6) of Directive 95/46, read in the light of Articles 7, 8 and 47 of the Charter, must be interpreted as meaning that a decision adopted pursuant to that provision, such as Decision 2000/520, by which the Commission finds that a third country ensures an adequate level of protection, prevents a supervisory authority of a Member State, within the meaning of Article 28 of that directive, from being able to examine the claim of a person concerning the protection of his rights and freedoms in regard to the processing of personal data relating to him which has been transferred from a Member State to that third country when that person contends that the law and practices in force in the third country do not ensure an adequate level of protection.

*The powers of the national supervisory authorities, within the meaning of Article 28 of Directive 95/46, when the Commission has adopted a decision pursuant to Article 25(6) of that directive*

38   It should be recalled first of all that the provisions of Directive 95/46, inasmuch as they govern the processing of personal data liable to infringe fundamental freedoms, in particular the right to respect for private life, must necessarily be interpreted in the light of the fundamental rights guaranteed by the Charter (see judgments in *Österreichischer Rundfunk and Others*, C‑465/00, C‑138/01 and C‑139/01, EU:C:2003:294, paragraph 68; *Google Spain and Google*, C‑131/12, EU:C:2014:317, paragraph 68; and *Ryneš*, C‑212/13, EU:C:2014:2428, paragraph 29).

39   It is apparent from Article 1 of Directive 95/46 and recitals 2 and 10 in its preamble that that directive seeks to ensure not only effective and complete protection of the fundamental rights and freedoms of natural persons, in particular the fundamental right to respect for private life with regard to the processing of personal data, but also a high level of protection of those fundamental rights and freedoms. The importance of both the fundamental right to respect for private life, guaranteed by Article 7 of the Charter, and the fundamental right to the protection of personal data, guaranteed by Article 8 thereof, is, moreover, emphasised in the case-law of the Court (see judgments in *Rijkeboer*, C‑553/07, EU:C:2009:293, paragraph 47; *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraph 53; and *Google Spain and Google*, C‑131/12, EU:C:2014:317, paragraphs 53, 66, 74 and the case-law cited).

40   As regards the powers available to the national supervisory authorities in respect of transfers of personal data to third countries, it should be noted that Article 28(1) of Directive 95/46 requires Member States to set up one or more public authorities responsible for monitoring, with complete independence, compliance with EU rules on the protection of individuals with regard to the processing of such data. In addition, that requirement derives from the primary law of the European Union, in particular Article 8(3) of the Charter and Article 16(2) TFEU (see, to this effect, judgments in *Commission* v *Austria*, C‑614/10, EU:C:2012:631, paragraph 36, and *Commission* v *Hungary*, C‑288/12, EU:C:2014:237, paragraph 47).

41    The guarantee of the independence of national supervisory authorities is intended to ensure the effectiveness and reliability of the monitoring of compliance with the provisions concerning protection of individuals with regard to the processing of personal data and must be interpreted in the light of that aim. It was established in order to strengthen the protection of individuals and bodies affected by the decisions of those authorities. The establishment in Member States of independent supervisory authorities is therefore, as stated in recital 62 in the preamble to Directive 95/46, an essential component of the protection of individuals with regard to the processing of personal data (see judgments in *Commission* v *Germany*, C‑518/07, EU:C:2010:125, paragraph 25, and *Commission* v *Hungary*, C‑288/12, EU:C:2014:237, paragraph 48 and the case-law cited).

42    In order to guarantee that protection, the national supervisory authorities must, in particular, ensure a fair balance between, on the one hand, observance of the fundamental right to privacy and, on the other hand, the interests requiring free movement of personal data (see, to this effect, judgments in *Commission* v *Germany*, C‑518/07, EU:C:2010:125, paragraph 24, and *Commission* v *Hungary*, C‑288/12, EU:C:2014:237, paragraph 51).

43    The national supervisory authorities have a wide range of powers for that purpose. Those powers, listed on a non-exhaustive basis in Article 28(3) of Directive 95/46, constitute necessary means to perform their duties, as stated in recital 63 in the preamble to the directive. Thus, those authorities possess, in particular, investigative powers, such as the power to collect all the information necessary for the performance of their supervisory duties, effective powers of intervention, such as that of imposing a temporary or definitive ban on processing of data, and the power to engage in legal proceedings.

44    It is, admittedly, apparent from Article 28(1) and (6) of Directive 95/46 that the powers of the national supervisory authorities concern processing of personal data carried out on the territory of their own Member State, so that they do not have powers on the basis of Article 28 in respect of processing of such data carried out in a third country.

45    However, the operation consisting in having personal data transferred from a Member State to a third country constitutes, in itself, processing of personal data within the meaning of Article 2 (b) of Directive 95/46 (see, to this effect, judgment in *Parliament* v *Council and Commission*, C‑317/04 and C‑318/04, EU:C:2006:346, paragraph 56) carried out in a Member State. That provision defines 'processing of personal data' as 'any operation or set of operations which is performed upon personal data, whether or not by automatic means' and mentions, by way of example, 'disclosure by transmission, dissemination or otherwise making available'.

46    Recital 60 in the preamble to Directive 95/46 states that transfers of personal data to third countries may be effected only in full compliance with the provisions adopted by the Member States pursuant to the directive. In that regard, Chapter IV of the directive, in which Articles 25 and 26 appear, has set up a regime intended to ensure that the Member States oversee transfers of personal data to third countries. That regime is complementary to the general regime set up by Chapter II of the directive laying down the general rules on the lawfulness of the processing of personal data (see, to this effect, judgment in *Lindqvist*, C‑101/01, EU:C:2003:596, paragraph 63).

47    As, in accordance with Article 8(3) of the Charter and Article 28 of Directive 95/46, the national supervisory authorities are responsible for monitoring compliance with the EU rules concerning the protection of individuals with regard to the processing of personal data, each of

them is therefore vested with the power to check whether a transfer of personal data from its own Member State to a third country complies with the requirements laid down by Directive 95/46.

48      Whilst acknowledging, in recital 56 in its preamble, that transfers of personal data from the Member States to third countries are necessary for the expansion of international trade, Directive 95/46 lays down as a principle, in Article 25(1), that such transfers may take place only if the third country ensures an adequate level of protection.

49      Furthermore, recital 57 states that transfers of personal data to third countries not ensuring an adequate level of protection must be prohibited.

50      In order to control transfers of personal data to third countries according to the level of protection accorded to it in each of those countries, Article 25 of Directive 95/46 imposes a series of obligations on the Member States and the Commission. It is apparent, in particular, from that article that the finding that a third country does or does not ensure an adequate level of protection may, as the Advocate General has observed in point 86 of his Opinion, be made either by the Member States or by the Commission.

51      The Commission may adopt, on the basis of Article 25(6) of Directive 95/46, a decision finding that a third country ensures an adequate level of protection. In accordance with the second subparagraph of that provision, such a decision is addressed to the Member States, who must take the measures necessary to comply with it. Pursuant to the fourth paragraph of Article 288 TFEU, it is binding on all the Member States to which it is addressed and is therefore binding on all their organs (see, to this effect, judgments in *Albako Margarinefabrik*, 249/85, EU:C:1987:245, paragraph 17, and *Mediaset*, C‑69/13, EU:C:2014:71, paragraph 23) in so far as it has the effect of authorising transfers of personal data from the Member States to the third country covered by it.

52      Thus, until such time as the Commission decision is declared invalid by the Court, the Member States and their organs, which include their independent supervisory authorities, admittedly cannot adopt measures contrary to that decision, such as acts intended to determine with binding effect that the third country covered by it does not ensure an adequate level of protection. Measures of the EU institutions are in principle presumed to be lawful and accordingly produce legal effects until such time as they are withdrawn, annulled in an action for annulment or declared invalid following a reference for a preliminary ruling or a plea of illegality (judgment in *Commission* v *Greece*, C‑475/01, EU:C:2004:585, paragraph 18 and the case-law cited).

53      However, a Commission decision adopted pursuant to Article 25(6) of Directive 95/46, such as Decision 2000/520, cannot prevent persons whose personal data has been or could be transferred to a third country from lodging with the national supervisory authorities a claim, within the meaning of Article 28(4) of that directive, concerning the protection of their rights and freedoms in regard to the processing of that data. Likewise, as the Advocate General has observed in particular in points 61, 93 and 116 of his Opinion, a decision of that nature cannot eliminate or reduce the powers expressly accorded to the national supervisory authorities by Article 8(3) of the Charter and Article 28 of the directive.

54      Neither Article 8(3) of the Charter nor Article 28 of Directive 95/46 excludes from the national supervisory authorities' sphere of competence the oversight of transfers of personal data to third

countries which have been the subject of a Commission decision pursuant to Article 25(6) of Directive 95/46.

55    In particular, the first subparagraph of Article 28(4) of Directive 95/46, under which the national supervisory authorities are to hear 'claims lodged by any person … concerning the protection of his rights and freedoms in regard to the processing of personal data', does not provide for any exception in this regard where the Commission has adopted a decision pursuant to Article 25(6) of that directive.

56    Furthermore, it would be contrary to the system set up by Directive 95/46 and to the objective of Articles 25 and 28 thereof for a Commission decision adopted pursuant to Article 25(6) to have the effect of preventing a national supervisory authority from examining a person's claim concerning the protection of his rights and freedoms in regard to the processing of his personal data which has been or could be transferred from a Member State to the third country covered by that decision.

57    On the contrary, Article 28 of Directive 95/46 applies, by its very nature, to any processing of personal data. Thus, even if the Commission has adopted a decision pursuant to Article 25(6) of that directive, the national supervisory authorities, when hearing a claim lodged by a person concerning the protection of his rights and freedoms in regard to the processing of personal data relating to him, must be able to examine, with complete independence, whether the transfer of that data complies with the requirements laid down by the directive.

58    If that were not so, persons whose personal data has been or could be transferred to the third country concerned would be denied the right, guaranteed by Article 8(1) and (3) of the Charter, to lodge with the national supervisory authorities a claim for the purpose of protecting their fundamental rights (see, by analogy, judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraph 68).

59    A claim, within the meaning of Article 28(4) of Directive 95/46, by which a person whose personal data has been or could be transferred to a third country contends, as in the main proceedings, that, notwithstanding what the Commission has found in a decision adopted pursuant to Article 25(6) of that directive, the law and practices of that country do not ensure an adequate level of protection must be understood as concerning, in essence, whether that decision is compatible with the protection of the privacy and of the fundamental rights and freedoms of individuals.

60    In this connection, the Court's settled case-law should be recalled according to which the European Union is a union based on the rule of law in which all acts of its institutions are subject to review of their compatibility with, in particular, the Treaties, general principles of law and fundamental rights (see, to this effect, judgments in *Commission and Others* v *Kadi*, C‑584/10 P, C‑593/10 P and C‑595/10 P, EU:C:2013:518, paragraph 66; *Inuit Tapiriit Kanatami and Others* v *Parliament and Council*, C‑583/11 P, EU:C:2013:625, paragraph 91; and *Telefónica* v *Commission*, C‑274/12 P, EU:C:2013:852, paragraph 56). Commission decisions adopted pursuant to Article 25(6) of Directive 95/46 cannot therefore escape such review.

61    That said, the Court alone has jurisdiction to declare that an EU act, such as a Commission decision adopted pursuant to Article 25(6) of Directive 95/46, is invalid, the exclusivity of that jurisdiction having the purpose of guaranteeing legal certainty by ensuring that EU law is

applied uniformly (see judgments in *Melki and Abdeli*, C‑188/10 and C‑189/10, EU:C:2010:363, paragraph 54, and *CIVAD*, C‑533/10, EU:C:2012:347, paragraph 40).

62    Whilst the national courts are admittedly entitled to consider the validity of an EU act, such as a Commission decision adopted pursuant to Article 25(6) of Directive 95/46, they are not, however, endowed with the power to declare such an act invalid themselves (see, to this effect, judgments in *Foto-Frost*, 314/85, EU:C:1987:452, paragraphs 15 to 20, and *IATA and ELFAA*, C‑344/04, EU:C:2006:10, paragraph 27). A fortiori, when the national supervisory authorities examine a claim, within the meaning of Article 28(4) of that directive, concerning the compatibility of a Commission decision adopted pursuant to Article 25(6) of the directive with the protection of the privacy and of the fundamental rights and freedoms of individuals, they are not entitled to declare that decision invalid themselves.

63    Having regard to those considerations, where a person whose personal data has been or could be transferred to a third country which has been the subject of a Commission decision pursuant to Article 25(6) of Directive 95/46 lodges with a national supervisory authority a claim concerning the protection of his rights and freedoms in regard to the processing of that data and contests, in bringing the claim, as in the main proceedings, the compatibility of that decision with the protection of the privacy and of the fundamental rights and freedoms of individuals, it is incumbent upon the national supervisory authority to examine the claim with all due diligence.

64    In a situation where the national supervisory authority comes to the conclusion that the arguments put forward in support of such a claim are unfounded and therefore rejects it, the person who lodged the claim must, as is apparent from the second subparagraph of Article 28(3) of Directive 95/46, read in the light of Article 47 of the Charter, have access to judicial remedies enabling him to challenge such a decision adversely affecting him before the national courts. Having regard to the case-law cited in paragraphs 61 and 62 of the present judgment, those courts must stay proceedings and make a reference to the Court for a preliminary ruling on validity where they consider that one or more grounds for invalidity put forward by the parties or, as the case may be, raised by them of their own motion are well founded (see, to this effect, judgment in *T & L Sugars and Sidul Açúcares* v *Commission*, C‑456/13 P, EU:C:2015:284, paragraph 48 and the case-law cited).

65    In the converse situation, where the national supervisory authority considers that the objections advanced by the person who has lodged with it a claim concerning the protection of his rights and freedoms in regard to the processing of his personal data are well founded, that authority must, in accordance with the third indent of the first subparagraph of Article 28(3) of Directive 95/46, read in the light in particular of Article 8(3) of the Charter, be able to engage in legal proceedings. It is incumbent upon the national legislature to provide for legal remedies enabling the national supervisory authority concerned to put forward the objections which it considers well founded before the national courts in order for them, if they share its doubts as to the validity of the Commission decision, to make a reference for a preliminary ruling for the purpose of examination of the decision's validity.

66    Having regard to the foregoing considerations, the answer to the questions referred is that Article 25(6) of Directive 95/46, read in the light of Articles 7, 8 and 47 of the Charter, must be interpreted as meaning that a decision adopted pursuant to that provision, such as Decision 2000/520, by which the Commission finds that a third country ensures an adequate level of protection, does not prevent a supervisory authority of a Member State, within the meaning of

Article 28 of that directive, from examining the claim of a person concerning the protection of his rights and freedoms in regard to the processing of personal data relating to him which has been transferred from a Member State to that third country when that person contends that the law and practices in force in the third country do not ensure an adequate level of protection.

*The validity of Decision 2000/520*

67     As is apparent from the referring court's explanations relating to the questions submitted, Mr Schrems contends in the main proceedings that United States law and practice do not ensure an adequate level of protection within the meaning of Article 25 of Directive 95/46. As the Advocate General has observed in points 123 and 124 of his Opinion, Mr Schrems expresses doubts, which the referring court indeed seems essentially to share, concerning the validity of Decision 2000/520. In such circumstances, having regard to what has been held in paragraphs 60 to 63 of the present judgment, and in order to give the referring court a full answer, it should be examined whether that decision complies with the requirements stemming from Directive 95/46 read in the light of the Charter.

The requirements stemming from Article 25(6) of Directive 95/46

68     As has already been pointed out in paragraphs 48 and 49 of the present judgment, Article 25(1) of Directive 95/46 prohibits transfers of personal data to a third country not ensuring an adequate level of protection.

69     However, for the purpose of overseeing such transfers, the first subparagraph of Article 25(6) of Directive 95/46 provides that the Commission 'may find … that a third country ensures an adequate level of protection within the meaning of paragraph 2 of this Article, by reason of its domestic law or of the international commitments it has entered into …, for the protection of the private lives and basic freedoms and rights of individuals'.

70     It is true that neither Article 25(2) of Directive 95/46 nor any other provision of the directive contains a definition of the concept of an adequate level of protection. In particular, Article 25 (2) does no more than state that the adequacy of the level of protection afforded by a third country 'shall be assessed in the light of all the circumstances surrounding a data transfer operation or set of data transfer operations' and lists, on a non-exhaustive basis, the circumstances to which consideration must be given when carrying out such an assessment.

71     However, first, as is apparent from the very wording of Article 25(6) of Directive 95/46, that provision requires that a third country 'ensures' an adequate level of protection by reason of its domestic law or its international commitments. Secondly, according to the same provision, the adequacy of the protection ensured by the third country is assessed 'for the protection of the private lives and basic freedoms and rights of individuals'.

72     Thus, Article 25(6) of Directive 95/46 implements the express obligation laid down in Article 8 (1) of the Charter to protect personal data and, as the Advocate General has observed in point 139 of his Opinion, is intended to ensure that the high level of that protection continues where personal data is transferred to a third country.

73     The word 'adequate' in Article 25(6) of Directive 95/46 admittedly signifies that a third country cannot be required to ensure a level of protection identical to that guaranteed in the EU legal order. However, as the Advocate General has observed in point 141 of his Opinion, the

term 'adequate level of protection' must be understood as requiring the third country in fact to ensure, by reason of its domestic law or its international commitments, a level of protection of fundamental rights and freedoms that is essentially equivalent to that guaranteed within the European Union by virtue of Directive 95/46 read in the light of the Charter. If there were no such requirement, the objective referred to in the previous paragraph of the present judgment would be disregarded. Furthermore, the high level of protection guaranteed by Directive 95/46 read in the light of the Charter could easily be circumvented by transfers of personal data from the European Union to third countries for the purpose of being processed in those countries.

74    It is clear from the express wording of Article 25(6) of Directive 95/46 that it is the legal order of the third country covered by the Commission decision that must ensure an adequate level of protection. Even though the means to which that third country has recourse, in this connection, for the purpose of ensuring such a level of protection may differ from those employed within the European Union in order to ensure that the requirements stemming from Directive 95/46 read in the light of the Charter are complied with, those means must nevertheless prove, in practice, effective in order to ensure protection essentially equivalent to that guaranteed within the European Union.

75    Accordingly, when examining the level of protection afforded by a third country, the Commission is obliged to assess the content of the applicable rules in that country resulting from its domestic law or international commitments and the practice designed to ensure compliance with those rules, since it must, under Article 25(2) of Directive 95/46, take account of all the circumstances surrounding a transfer of personal data to a third country.

76    Also, in the light of the fact that the level of protection ensured by a third country is liable to change, it is incumbent upon the Commission, after it has adopted a decision pursuant to Article 25(6) of Directive 95/46, to check periodically whether the finding relating to the adequacy of the level of protection ensured by the third country in question is still factually and legally justified. Such a check is required, in any event, when evidence gives rise to a doubt in that regard.

77    Moreover, as the Advocate General has stated in points 134 and 135 of his Opinion, when the validity of a Commission decision adopted pursuant to Article 25(6) of Directive 95/46 is examined, account must also be taken of the circumstances that have arisen after that decision's adoption.

78    In this regard, it must be stated that, in view of, first, the important role played by the protection of personal data in the light of the fundamental right to respect for private life and, secondly, the large number of persons whose fundamental rights are liable to be infringed where personal data is transferred to a third country not ensuring an adequate level of protection, the Commission's discretion as to the adequacy of the level of protection ensured by a third country is reduced, with the result that review of the requirements stemming from Article 25 of Directive 95/46, read in the light of the Charter, should be strict (see, by analogy, judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraphs 47 and 48).

Article 1 of Decision 2000/520

79    The Commission found in Article 1(1) of Decision 2000/520 that the principles set out in Annex I thereto, implemented in accordance with the guidance provided by the FAQs set out in Annex II, ensure an adequate level of protection for personal data transferred from the European

Union to organisations established in the United States. It is apparent from that provision that both those principles and the FAQs were issued by the United States Department of Commerce.

80 An organisation adheres to the safe harbour principles on the basis of a system of self-certification, as is apparent from Article 1(2) and (3) of Decision 2000/520, read in conjunction with FAQ 6 set out in Annex II thereto.

81 Whilst recourse by a third country to a system of self-certification is not in itself contrary to the requirement laid down in Article 25(6) of Directive 95/46 that the third country concerned must ensure an adequate level of protection 'by reason of its domestic law or … international commitments', the reliability of such a system, in the light of that requirement, is founded essentially on the establishment of effective detection and supervision mechanisms enabling any infringements of the rules ensuring the protection of fundamental rights, in particular the right to respect for private life and the right to protection of personal data, to be identified and punished in practice.

82 In the present instance, by virtue of the second paragraph of Annex I to Decision 2000/520, the safe harbour principles are 'intended for use solely by US organisations receiving personal data from the European Union for the purpose of qualifying for the safe harbour and the presumption of "adequacy" it creates'. Those principles are therefore applicable solely to self-certified United States organisations receiving personal data from the European Union, and United States public authorities are not required to comply with them.

83 Moreover, Decision 2000/520, pursuant to Article 2 thereof, 'concerns only the adequacy of protection provided in the United States under the [safe harbour principles] implemented in accordance with the FAQs with a view to meeting the requirements of Article 25(1) of Directive [95/46]', without, however, containing sufficient findings regarding the measures by which the United States ensures an adequate level of protection, within the meaning of Article 25(6) of that directive, by reason of its domestic law or its international commitments.

84 In addition, under the fourth paragraph of Annex I to Decision 2000/520, the applicability of the safe harbour principles may be limited, in particular, 'to the extent necessary to meet national security, public interest, or law enforcement requirements' and 'by statute, government regulation, or case-law that create conflicting obligations or explicit authorisations, provided that, in exercising any such authorisation, an organisation can demonstrate that its non-compliance with the Principles is limited to the extent necessary to meet the overriding legitimate interests furthered by such authorisation'.

85 In this connection, Decision 2000/520 states in Part B of Annex IV, with regard to the limits to which the safe harbour principles' applicability is subject, that, '[c]learly, where US law imposes a conflicting obligation, US organisations whether in the safe harbour or not must comply with the law'.

86 Thus, Decision 2000/520 lays down that 'national security, public interest, or law enforcement requirements' have primacy over the safe harbour principles, primacy pursuant to which self-certified United States organisations receiving personal data from the European Union are bound to disregard those principles without limitation where they conflict with those requirements and therefore prove incompatible with them.

87    In the light of the general nature of the derogation set out in the fourth paragraph of Annex I to Decision 2000/520, that decision thus enables interference, founded on national security and public interest requirements or on domestic legislation of the United States, with the fundamental rights of the persons whose personal data is or could be transferred from the European Union to the United States. To establish the existence of an interference with the fundamental right to respect for private life, it does not matter whether the information in question relating to private life is sensitive or whether the persons concerned have suffered any adverse consequences on account of that interference (judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraph 33 and the case-law cited).

88    In addition, Decision 2000/520 does not contain any finding regarding the existence, in the United States, of rules adopted by the State intended to limit any interference with the fundamental rights of the persons whose data is transferred from the European Union to the United States, interference which the State entities of that country would be authorised to engage in when they pursue legitimate objectives, such as national security.

89    Nor does Decision 2000/520 refer to the existence of effective legal protection against interference of that kind. As the Advocate General has observed in points 204 to 206 of his Opinion, procedures before the Federal Trade Commission — the powers of which, described in particular in FAQ 11 set out in Annex II to that decision, are limited to commercial disputes — and the private dispute resolution mechanisms concern compliance by the United States undertakings with the safe harbour principles and cannot be applied in disputes relating to the legality of interference with fundamental rights that results from measures originating from the State.

90    Moreover, the foregoing analysis of Decision 2000/520 is borne out by the Commission's own assessment of the situation resulting from the implementation of that decision. Particularly in points 2 and 3.2 of Communication COM(2013) 846 final and in points 7.1, 7.2 and 8 of Communication COM(2013) 847 final, the content of which is set out in paragraphs 13 to 16 and paragraphs 22, 23 and 25 of the present judgment respectively, the Commission found that the United States authorities were able to access the personal data transferred from the Member States to the United States and process it in a way incompatible, in particular, with the purposes for which it was transferred, beyond what was strictly necessary and proportionate to the protection of national security. Also, the Commission noted that the data subjects had no administrative or judicial means of redress enabling, in particular, the data relating to them to be accessed and, as the case may be, rectified or erased.

91    As regards the level of protection of fundamental rights and freedoms that is guaranteed within the European Union, EU legislation involving interference with the fundamental rights guaranteed by Articles 7 and 8 of the Charter must, according to the Court's settled case-law, lay down clear and precise rules governing the scope and application of a measure and imposing minimum safeguards, so that the persons whose personal data is concerned have sufficient guarantees enabling their data to be effectively protected against the risk of abuse and against any unlawful access and use of that data. The need for such safeguards is all the greater where personal data is subjected to automatic processing and where there is a significant risk of unlawful access to that data (judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraphs 54 and 55 and the case-law cited).

92    Furthermore and above all, protection of the fundamental right to respect for private life at EU level requires derogations and limitations in relation to the protection of personal data to apply

only in so far as is strictly necessary (judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraph 52 and the case-law cited).

93    Legislation is not limited to what is strictly necessary where it authorises, on a generalised basis, storage of all the personal data of all the persons whose data has been transferred from the European Union to the United States without any differentiation, limitation or exception being made in the light of the objective pursued and without an objective criterion being laid down by which to determine the limits of the access of the public authorities to the data, and of its subsequent use, for purposes which are specific, strictly restricted and capable of justifying the interference which both access to that data and its use entail (see, to this effect, concerning Directive 2006/24/EC of the European Parliament and of the Council of 15 March 2006 on the retention of data generated or processed in connection with the provision of publicly available electronic communications services or of public communications networks and amending Directive 2002/58/EC (OJ 2006 L 105, p. 54), judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraphs 57 to 61).

94    In particular, legislation permitting the public authorities to have access on a generalised basis to the content of electronic communications must be regarded as compromising the essence of the fundamental right to respect for private life, as guaranteed by Article 7 of the Charter (see, to this effect, judgment in *Digital Rights Ireland and Others*, C‑293/12 and C‑594/12, EU:C:2014:238, paragraph 39).

95    Likewise, legislation not providing for any possibility for an individual to pursue legal remedies in order to have access to personal data relating to him, or to obtain the rectification or erasure of such data, does not respect the essence of the fundamental right to effective judicial protection, as enshrined in Article 47 of the Charter. The first paragraph of Article 47 of the Charter requires everyone whose rights and freedoms guaranteed by the law of the European Union are violated to have the right to an effective remedy before a tribunal in compliance with the conditions laid down in that article. The very existence of effective judicial review designed to ensure compliance with provisions of EU law is inherent in the existence of the rule of law (see, to this effect, judgments in *Les Verts* v *Parliament*, 294/83, EU:C:1986:166, paragraph 23; *Johnston*, 222/84, EU:C:1986:206, paragraphs 18 and 19; *Heylens and Others*, 222/86, EU:C:1987:442, paragraph 14; and *UGT-Rioja and Others*, C‑428/06 to C‑434/06, EU:C:2008:488, paragraph 80).

96    As has been found in particular in paragraphs 71, 73 and 74 of the present judgment, in order for the Commission to adopt a decision pursuant to Article 25(6) of Directive 95/46, it must find, duly stating reasons, that the third country concerned in fact ensures, by reason of its domestic law or its international commitments, a level of protection of fundamental rights essentially equivalent to that guaranteed in the EU legal order, a level that is apparent in particular from the preceding paragraphs of the present judgment.

97    However, the Commission did not state, in Decision 2000/520, that the United States in fact 'ensures' an adequate level of protection by reason of its domestic law or its international commitments.

98    Consequently, without there being any need to examine the content of the safe harbour principles, it is to be concluded that Article 1 of Decision 2000/520 fails to comply with the requirements laid down in Article 25(6) of Directive 95/46, read in the light of the Charter, and that it is accordingly invalid.

Article 3 of Decision 2000/520

99    It is apparent from the considerations set out in paragraphs 53, 57 and 63 of the present judgment that, under Article 28 of Directive 95/46, read in the light in particular of Article 8 of the Charter, the national supervisory authorities must be able to examine, with complete independence, any claim concerning the protection of a person's rights and freedoms in regard to the processing of personal data relating to him. That is in particular the case where, in bringing such a claim, that person raises questions regarding the compatibility of a Commission decision adopted pursuant to Article 25(6) of that directive with the protection of the privacy and of the fundamental rights and freedoms of individuals.

100   However, the first subparagraph of Article 3(1) of Decision 2000/520 lays down specific rules regarding the powers available to the national supervisory authorities in the light of a Commission finding relating to an adequate level of protection, within the meaning of Article 25 of Directive 95/46.

101   Under that provision, the national supervisory authorities may, '[w]ithout prejudice to their powers to take action to ensure compliance with national provisions adopted pursuant to provisions other than Article 25 of Directive [95/46], … suspend data flows to an organisation that has self-certified its adherence to the [principles of Decision 2000/520]', under restrictive conditions establishing a high threshold for intervention. Whilst that provision is without prejudice to the powers of those authorities to take action to ensure compliance with national provisions adopted pursuant to Directive 95/46, it excludes, on the other hand, the possibility of them taking action to ensure compliance with Article 25 of that directive.

102   The first subparagraph of Article 3(1) of Decision 2000/520 must therefore be understood as denying the national supervisory authorities the powers which they derive from Article 28 of Directive 95/46, where a person, in bringing a claim under that provision, puts forward matters that may call into question whether a Commission decision that has found, on the basis of Article 25(6) of the directive, that a third country ensures an adequate level of protection is compatible with the protection of the privacy and of the fundamental rights and freedoms of individuals.

103   The implementing power granted by the EU legislature to the Commission in Article 25(6) of Directive 95/46 does not confer upon it competence to restrict the national supervisory authorities' powers referred to in the previous paragraph of the present judgment.

104   That being so, it must be held that, in adopting Article 3 of Decision 2000/520, the Commission exceeded the power which is conferred upon it in Article 25(6) of Directive 95/46, read in the light of the Charter, and that Article 3 of the decision is therefore invalid.

105   As Articles 1 and 3 of Decision 2000/520 are inseparable from Articles 2 and 4 of that decision and the annexes thereto, their invalidity affects the validity of the decision in its entirety.

106   Having regard to all the foregoing considerations, it is to be concluded that Decision 2000/520 is invalid.

**Costs**

107  Since these proceedings are, for the parties to the main proceedings, a step in the action
pending before the referring court, the decision on costs is a matter for that court. Costs incurred
in submitting observations to the Court, other than the costs of those parties, are not
recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

1.  **Article 25(6) of Directive 95/46/EC of the European Parliament and of the Council of
24 October 1995 on the protection of individuals with regard to the processing of
personal data and on the free movement of such data as amended by Regulation
(EC) No 1882/2003 of the European Parliament and of the Council of 29 September
2003, read in the light of Articles 7, 8 and 47 of the Charter of Fundamental Rights
of the European Union, must be interpreted as meaning that a decision adopted
pursuant to that provision, such as Commission Decision 2000/520/EC of 26 July
2000 pursuant to Directive 95/46 on the adequacy of the protection provided by the
safe harbour privacy principles and related frequently asked questions issued by the
US Department of Commerce, by which the European Commission finds that a third
country ensures an adequate level of protection, does not prevent a supervisory
authority of a Member State, within the meaning of Article 28 of that directive as
amended, from examining the claim of a person concerning the protection of his
rights and freedoms in regard to the processing of personal data relating to him
which has been transferred from a Member State to that third country when that
person contends that the law and practices in force in the third country do not
ensure an adequate level of protection.**

2.  **Decision 2000/520 is invalid.**

[Signatures]

---

* Language of the case: English.