Stephen G. Grygiel (*admitted pro hac vice*)
**SILVERMAN THOMPSON**
**SLUTKIN WHITE LLC**
201 N. Charles Street, 26TH Floor
Baltimore, MD 21201
Tel.:   (410) 385-2225
Fax:   (410) 547-2432
*sgrygiel@mdattorney.com*

Frederic S. Fox (admitted *pro hac vice*)
David A. Straite (admitted *pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel.:   (212) 687-1980
Fax:   (212) 687-7714
*dstraite@kaplanfox.com*

Laurence D. King (206423)
Mario Choi (243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, 4th Floor
San Francisco, CA 94104
Tel.:   (415) 772-4700
Fax:   (415) 772-4707
*lking@kaplanfox.com*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. INTERNET TRACKING LITIGATION | No. 5:12-md-02314-EJD<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING APPLICATION OF NEW SUPREME COURT DECISION IN *SPOKEO, INC. v. ROBINS*** |

## I. INTRODUCTION

Plaintiffs file this brief in accordance with this Court's order permitting supplemental briefing on Article III standing following the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). *See* Order dated May 20, 2016 [ECF No. 126]. On January 14, 2016, Defendant Facebook, Inc. ("Facebook") filed a motion to dismiss plaintiffs' Second Amended Complaint ("SAC") (the "Motion") [ECF No. 101], arguing in part that the SAC failed to allege *economic loss.* A violation of a statutory right is Constitutionally insufficient without it, Facebook argued. Plaintiffs did plead economic loss, but also argued that to establish concrete injury, "[e]conomic loss is not required." Response in Opposition to Motion to Dismiss dated February 18, 2016 at 4 ("Opposition Brief") [ECF No. 104-3, 104-4]. Non-pecuniary damage - for example, loss of privacy- is sufficient.

On May 16, 2016, after oral argument on the Motion, the Supreme Court established a two-part procedural test to determine if a plaintiff has standing to vindicate a statutory right. The Court also agreed with plaintiffs' substantive position. Even non-economic harm is sufficient to confer statutory standing under Article III.

## II. OVERVIEW OF SUPREME COURT'S *SPOKEO* DECISION AND SUBSEQUENT SUPREME COURT AUTHORITY

Spokeo, Inc., runs a "people search engine" that searches the Internet for personal information available on other databases, and aggregates the information in one place. *Id*. at 1544. Plaintiff Robins discovered that Spokeo had inaccurate information, *id*. which, for purposes of the Supreme Court decision, is assumed to be a violation of a duty to ensure "fair and accurate credit reporting" pursuant to FCRA. *See* 15 U.S.C. § 1681 *et seq*. The District Court dismissed plaintiffs' complaint for lack of Article III standing. The Ninth Circuit reversed, holding that plaintiff alleged a violation of his statutory right to fair and accurate credit reporting, and that plaintiff was pursuing interests under FCRA that "are individualized rather than collective." *Spokeo,* 136 S. Ct. at 1544. Plaintiff therefore adequately alleged particularized and concrete injury sufficient to confer Article III standing. *Id*. at 1544-45.

The Supreme Court reversed on procedural grounds. Agreeing that "injury in fact" requires a "particularized and concrete" injury, the Court clarified that "particularized" and "concrete" are two separate requirements. The Ninth Circuit's analysis only addressed the "particularized" requirement.

1  "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must
2  also be 'concrete.' Under the Ninth Circuit's analysis, however, that independent requirement was
3  elided." *Id*. at 1548. The Court therefore vacated and remanded.

4  The Supreme Court did not decide whether Mr. Robins's allegations were sufficient to meet both
5  prongs of the new *Spokeo* Test. *Id*. at 1550. However, the Court provided several "principles" to guide
6  the Ninth Circuit and future courts on the concreteness prong.

7  First and most importantly, harm need not be economic. "'Concrete' is not, however, necessarily
8  synonymous with 'tangible.'" *Id*. at 1549. Examples of intangible but concrete injuries include violation
9  of freedom of speech, *id*. (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)) and violation of
10 the right of free exercise of religion, *id*. (citing *Church of Lukami Babalu Aye, Inc. v. Hialeah*, 508 U.S.
11 520 (1993)). The Court also noted that per se torts like libel and slander necessarily implicate concrete
12 injuries even if the harms are prospective, or difficult to prove or measure. *Id*.

13 Second, the Court did not overturn any prior Supreme Court decisions. Some of the decisions
14 relied upon by plaintiffs in the Opposition Brief and during oral argument last month were also cited in
15 *Spokeo*, including *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) and *Warth v. Selden*, 422 U.S.
16 490 (1975). These remain good law following *Spokeo*.

17 Third, the Court made clear that "[i]n determining whether an intangible harm constitutes injury
18 in fact, both history and the judgment of Congress play important roles." *Spokeo,* 136 S. Ct. at 1549.
19 "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were
20 previously inadequate in law." *Spokeo,* 136 S. Ct. at 1549 (citing *Lujan*). The Court also noted with
21 approval Justice Kennedy's observation that "Congress has the power to define injuries and articulate
22 chains of causation that will give rise to a case or controversy where none existed before." *Id*.

23 Fourth, Justice Ginsberg authored a dissent (joined by Justice Sotomayor) in which she agreed
24 with the majority's opinion establishing the two-part test. On the facts alleged, however, Justice
25 Ginsberg believed that the new "concreteness" prong articulated by the majority had so clearly been met
26 that remand was unnecessary. The majority did not respond to Justice Ginsberg's point.

27 Finally, the Supreme Court, in a ruling that went largely unreported, last week applied *Spokeo* in
28 vacating a Fifth Circuit decision that equated Article III harm with economic harm. *See Pundt v.*

*Verizon Comm., Inc.*, No. 15-785, 2016 WL 2945235 (S. Ct., May 23, 2016), *vacating Lee v. Verizon Comm., Inc.*, 623 Fed. Appx. 132, 146-49 (5th Cir. 2015). The plaintiffs were beneficiaries of a pension plan that Verizon had maintained as an ERISA fiduciary. For a group of retirees, Verizon elected to purchase a group annuity contract from Prudential, which the plaintiffs alleged was a violation of ERISA fiduciary duties. The Fifth Circuit, affirming the district court, found that plaintiffs failed to allege any economic harm – pension benefits would be identical under the new annuity contract, and no retiree had alleged the loss of a single penny. The plaintiffs argued that Verizon's actions nevertheless amounted to fiduciary misconduct under the statute. The Fifth Circuit did not agree or disagree, but held that such alleged misconduct was not concrete harm if a retiree's monetary benefits remained unchanged, and there was no "imminent risk" of the plan failing. *Id*. at 148. The Supreme Court vacated this ruling "for further consideration in light of *Spokeo, Inc. v. Robins*." *See Pundt v. Verizon Communications, Inc*., No. 15-785, 2016 WL 2945235 (S. Ct., May 23, 2016).

## III. ARGUMENT – THE SECOND AMENDED COMPLAINT ALLEGES FACTS SUFFICIENT TO DEMONSTRATE ARTICLE III STANDING

### A. *The Plaintiffs Have Alleged Particularized Injury*

The parties' earlier briefing in this case addresses "particularized" injury, and *Spokeo* does not alter the earlier analyses. Plaintiffs allege that Facebook wrote tracking cookies to their specific computers, and purposefully failed to remove them upon logout. Plaintiffs specifically identify which cookies were written, what each one does, and which ones included user-identifying information. Plaintiffs also allege that each plaintiff visited websites with Facebook functionality during the class period while they were logged out of their Facebook accounts, Facebook intercepted each and every one of the corresponding URLs without consent, and that at least some of these URLs contained "contents" beyond mere IP addresses. Plaintiffs also allege that Facebook associated the intercepted URLs with the tracking cookies and other personal information specific to each plaintiff to create a comprehensive picture of each plaintiffs' web browsing. The plaintiffs also allege whether they used a shared computer, and what Internet browser was used. *See generally* SAC ¶¶ 113-128.

Furthermore, the SAC alleges in detail, using materials obtained in discovery, an overarching business practice of secretly obtaining all URLs containing contents of communications between

- 3 -

Facebook-enabled websites and Facebook subscribers, without exception. *See* SAC ¶¶ 113-128. These allegations are also sufficient factual foundation at the pleading stage to support the inference that plaintiffs' URLs were obtained and associated with each other, *see Obama v. Klayman*, 800 F.3d 559, 563-64 (D.C. Cir. 2015), and therefore Facebook violated plaintiffs' statutorily-recognized rights.

These facts demonstrate Facebook's violations of statutory rights particular to each named plaintiff. For example, the Wiretap Act, 18 U.S.C. § 2510 *et seq*., prohibits the intentional interception of communications without consent or a court order. *See* SAC, Count I. The Stored Communications Act, 18 U.S.C. § 2510 *et seq*., provides similar protection to communications accessed in storage. *See* SAC, Count II. California similarly protects communications under the California Invasion of Privacy Act, Cal. Criminal Code §§ 631 and 632. *See* SAC, Count III. And the California Computer Crime Law, California Penal Code § 502, prohibits unauthorized and knowing access to a person's computer. *See* SAC, Count X. The SAC demonstrates particularized injury for each plaintiff under each statute.

Facebook argues that plaintiffs must provide additional factual proof at the pleading stage to establish standing. In short, Facebook argues that plaintiffs are required to provide the precise list of URLs intercepted by Facebook. That argument converts Rule 8(a) into Rule 56. Plaintiffs also should not have to forfeit their privacy just because they brought these claims. As Judge Cousins recently noted in an unrelated case (and mentioned briefly at oral argument), "[t]here is an Orwellian irony to the proposition that in order to get relief for a theft of one's personal information, a person has to disclose even more personal information." *In re: Anthem, Inc. Data Breach Litig*., 15-md-2617-LHK-NC, order denying motion to compel (N.D. Cal.) (Anthem ECF No. 502). Thus, at the pleading stage, plaintiffs offered to disclose URLs in camera until the parties can determine whether Facebook has retained copies of these particular intercepted URLs. *See, e.g.,* SAC ¶ 113.

### B. *The Plaintiffs Have Alleged <u>Concrete</u> Injury*

Finally, loss of privacy is one of the "intangible" but "concrete" harms the *Spokeo* Court contemplated. Privacy is a foundation of freedom, and its loss is a harm by itself even if unaccompanied by any pecuniary or bodily injury. Facebook violated statutory rights designed to protect privacy. Each plaintiffs' loss of privacy is the concrete harm the statutes were designed to avoid.

The right to privacy is enshrined in the Fourth Amendment. In the early Republic, when the Post Office was mired in a scandal involving snooping on private correspondence, Thomas Jefferson (aware of these "infidelities"), self-censored his writings out of fear that the mail was not private: "The circumstances of the times are against my writing fully and freely . . . I do not know which mortifies me most, that I should fear to write what I think, or my country bear such a state of things." Letter from Thomas Jefferson to John Taylor, Nov. 26, 1798. The link between privacy and freedom was made again two generations later by Francis Lieber, advisor to President Lincoln: "No one can imagine himself free if his communion with his fellows is interrupted or submitted to surveillance." Francis Lieber, *On Civil Liberty and Self-Government* at 87 (1853).

In 1967, the Supreme Court recognized that Constitutional notions of privacy were no longer bound to the concept of "trespass" but are now defined by the public's "reasonable expectations of privacy." *Katz v. United States*, 389 U.S. 347 (1967). The first wiretap law was passed in 1968 to protect this pre-existing reasonable expectation, in response to *Katz*. 42 U.S.C. § 3711. When Congress debated the ECPA amendments in 1985, again it recognized that the right of privacy existed prior to the statute. *See, e.g*., Senate Hearing before the Committee on the Judiciary, 99th Congress, 1st Session, on S.1667 (November 18, 1985). Like Jefferson did 200 years earlier, one of the bill's supporters (Rep. Kastenmeier) linked privacy and freedom; the loss of privacy necessarily implies the loss of freedom. *Id*. at 33. Representative Kastenmeier quoted Jefferson's letter at the end of his remarks.

The loss of privacy caused by Facebook's willful violation of federal and California statutes is a grave and concrete harm. Thomas Jefferson's fear of surveillance and resulting self-censorship has returned in the Internet age as Americans no longer believe their communications are private. Just this month, the National Telecommunications and Information Administration released a study of 41,000 households showing that forty-five percent of online households stopped engaging in online activities such as "expressing opinions on controversial or political issues" due to privacy concerns, and the NTIA called this conclusion its "most troubling finding." Rafi Goldberg, "Lack of Trust in Internet Privacy and Security May Deter Economic and Other Online Activities" (May 13, 2016) (available at www.ntia.doc.gov). Thomas Jefferson's words ring as true today as they did in 1798. The loss of privacy is harm.

| | | |
|---|---|---|
| 1 | Dated: May 31, 2016 | Respectfully submitted, |
| 2 | | |
| 3 | **SILVERMAN, THOMPSON, SLUTKIN & WHITE LLC** | **KAPLAN, FOX & KILSHEIMER LLP** |
| 4 | | |
| 5 | By: /s/ *Stephen G. Grygiel* <br> Stephen G. Grygiel (admitted *pro hac vice*) | By: /s/ *David A. Straite* <br> Frederic S. Fox (admitted *pro hac vice*) |
| 6 | 201 N. Charles St., #2600 | David A. Straite (admitted *pro hac vice*) |
| 7 | Baltimore, MD 21201 <br> Telephone (410) 385-2225 | 850 Third Avenue <br> New York, NY 10022 |
| 8 | Facsimile: (410) 547-2432 | Telephone: (212) 687-1980 <br> Facsimile: (212) 687-7714 |
| 9 | *sgrygiel@mdattorney.com* | *dstraite@kaplanfox.com* |
| 10 | *Interim Co-Lead Counsel* | Laurence D. King (206423) |
| 11 | | Mario Choi (243409) |
| 12 | | 350 Sansome Street, 4th Floor <br> San Francisco, CA 94104 |
| 13 | | Tel.: (415) 772-4700 <br> Fax: (415) 772-4707 |
| 14 | | *lking@kaplanfox.com* |
| 15 | | *Interim Co-Lead Counsel* |

**ATTESTATION OF E-FILED SIGNATURE**

I, David A. Straite, court-appointed interim lead counsel for the proposed Class, am the ECF User whose ID and password are being used to file the foregoing. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that Stephen Grygiel has concurred in this filing.

*/s/ David A. Straite*