Stephen G. Grygiel (*admitted pro hac vice*)
**SILVERMAN THOMPSON
SLUTKIN WHITE LLC**
201 N. Charles Street, 26th Floor
Baltimore, MD 21201
Tel. (410) 385-2225
Fax (410) 547-2432
*sgrygiel@mdattorney.com*

Frederic S. Fox (admitted *pro hac vice*)
David A. Straite (admitted *pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*dstraite@kaplanfox.com*

Laurence D. King (206423)
Mario Choi (243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, 4th Floor
San Francisco, CA 94104
Tel.:    (415) 772-4700
Fax:    (415) 772-4707
*lking@kaplanfox.com*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. INTERNET TRACKING LITIGATION | No. 5:12-md-02314-EJD-NC<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR:**<br><br>**I.    BREACH OF CONTRACT**<br><br>**II.    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ....................................................................................................1

II.    JURISDICTION AND VENUE .............................................................................2

III.   THE PARTIES ........................................................................................................3

IV.   FACTUAL ALLEGATIONS..................................................................................4

     A.  The Facebook Statement of Rights and Responsibilities............................. 4

     B.  The Privacy Policy ....................................................................................... 5

     C.  The Help Center ........................................................................................... 6

     D.  How Facebook Tracks Internet Use Through the "Like" Button ................. 7

     E.  Facebook Promised Not to Track Logged-Out Subscribers ...................... 10

     F.  Facebook Breached Its Promise Not To Track Logged-Out Subscribers ................... 13

          1.  Background ...................................................................................... 13

          2.  Facebook Failed to Expire User-Identifying Cookies Upon Logout ................... 16

          3.  ███████████████████████████████
          ███.................................................................................. 16

     G.  Facebook's Post-Logout Tracking Breached Expectations of Good Faith and Fair Dealing .......................................................................... 18

     H.  Facebook's Post-Logout Tracking Revealed ............................................. 19

V.    PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS ......................................23

VI.   STATUTE OF LIMITATIONS ............................................................................24

VII.  CLASS ACTION ALLEGATIONS .....................................................................25

VIII. COUNTS ..............................................................................................................27

COUNT I...........................................................................................................................27

BREACH OF CONTRACT ...............................................................................................27

COUNT II..........................................................................................................................28

BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING..................28

IX.      PRAYER FOR RELIEF..................................................................................................29

X.       JURY TRIAL DEMAND ............................................................................................29

I.     **INTRODUCTION**

1.     On April 22, 2010, defendant Facebook, Inc. ("Facebook" or "Defendant") launched the "Like" button outside of the Facebook domain.  Within weeks it became the single most important social plugin ever created, quickly surpassing Facebook's "Share" button.

2.     Less than five weeks after the Like button launch, 50,000 websites had installed it; less than ten weeks after launch, web site consultants were calling it "ubiquitous."  By June 2012, a quarter of the top 10,000 websites formally integrated Facebook plugins just on their homepages. By November 2013, Facebook claimed on its developer blog that its Like and Share buttons drove more referral traffic than all other social networks combined.

3.     Today, Facebook says that web pages containing the Like button and its other plugins are viewed more than 30 *billion* times each day, and more than 7 million websites now incorporate them.  As the *Huffington Post* summed up, the Like button is now "omnipresent."

4.     When a Facebook subscriber logs into his or her Facebook account, a number of "cookies"—including session cookies and tracking cookies—are written to the user's browser. Several of these cookies can be used to identify the subscriber.  When a subscriber visits a webpage with a Facebook social plugin (such as the Facebook Like button), Facebook and the first-party website cause the user's browser to re-direct the user's communication, via the file path of the referrer URL of the page being requested, along with all available Facebook tracking and session cookies, *to Facebook* in real-time.

5.     The re-directed communications are acquired by Facebook regardless of whether the subscriber actually clicks on a Like or Share button or even knows of its existence.  Thirty billion times per day, Facebook causes computers around the world to report the real-time Internet communications of more than one billion people—including the entire file path of URLs containing sensitive, personal content—to Facebook.  When Facebook's session and tracking cookies link the URLs to specific persons, anonymity disappears.  Facebook can link the web browsing of more than one billion people to their actual identities.

6.     Given the enormous privacy implications of Facebook's ubiquitous insight into web traffic, Facebook promised subscribers that it would not receive user-identifying cookies via

1   its plugins on third-party websites if the subscriber interacts with these websites while logged out

2   of Facebook.  Facebook made this promise from the very first day Facebook launched the Like

3   button.  From the very first day, however, Facebook broke this promise; logging out did not remove

4   all user-identifying cookies ███████████████████████████████████████████████

5   ██████████████████████████████.  Discovery has revealed that from the very first day,

6   █████████████████████████████████████████████████████████████████████████

7   ██████████████████████.

8          7.      On September 25, 2011, an independent researcher in Australia publicly revealed

9   that logging out of a Facebook account failed to remove user-identifying cookies—in particular

10  the *c_user*, *lu* and *datr* cookies.  The following day (September 26, 2011), the story was picked up

11  by the *Wall Street Journal,* and circulated around the world.  Congress demanded (and received)

12  testimony from Facebook, and the FTC investigated.

13         8.      Facebook quickly admitted the problem, and at some point prior to October 3, 2011,

14  issued fixes with respect to the *c_user* and *lu* cookies.  But Facebook continued to use the *datr*

15  cookie to track subscribers post-logout after October 3, 2011.

16         9.      The plaintiffs are four Facebook subscribers whose Internet use was tracked by

17  Facebook after April 22, 2010 while the plaintiffs were logged out of their Facebook accounts.

18  They bring claims for breach of contract and breach of the implied covenant of good faith and fair

19  dealing on behalf of themselves and other similarly-situated Facebook subscribers in the United

20  States (the "Class").

21  **II.    JURISDICTION AND VENUE**

22         10.     This Court has personal jurisdiction over Defendant Facebook because Facebook

23  is headquartered in this District.

24         11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

25  ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy

26  exceeds $5,000,000, and at least one member of the class is a citizen of a state other than California

27  or Delaware.

28

12.     This Court also has discretionary supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to two previously asserted but dismissed federal claims under the Federal Wiretap Act, 18 U.S.C. § 2511 (the "Wiretap Act") and the Stored Communication Act, 18 U.S.C. § 2701 ("SCA").

13.     Venue is proper in this District because Defendant Facebook is headquartered in this District.  In addition, the Facebook Statements of Rights and Responsibilities in force since April 22, 2010, which governs the relationship between Facebook and its subscribers—including the plaintiffs—provides for exclusive venue in state or federal courts located in Santa Clara County, California.

## III.    THE PARTIES

14.     Plaintiff Mrs. Perrin Davis ("Davis') is an adult domiciled in Illinois.  Davis has had an active Facebook account since before April 22, 2010.

15.     Plaintiff Prof. Cynthia Quinn ("Quinn") is an adult domiciled in Hawaii.  Quinn has had an active Facebook account since before April 22, 2010.

16.     Plaintiff Dr. Brian Lentz ("Lentz") is an adult domiciled in Virginia.  Lentz has had an active Facebook account since before April 22, 2010.

17.     Plaintiff Mr. Matthew Vickery ("Vickery") is an adult domiciled in Washington State.  Vickery has had an active Facebook account since before April 22, 2010.

18.     Defendant Facebook is a Delaware corporation which maintains its headquarters at 1 Hacker Way, Menlo Park, California 94025.  Facebook is a "social network" that permits its members to interact with one another through a web site located at www.facebook.com.  Facebook has surpassed 2 billion monthly active users, more than 200 million of whom reside in the United States.

IV.     **FACTUAL ALLEGATIONS**

A.      **The Facebook Statement of Rights and Responsibilities**

19.     The agreement governing Facebook's relationship with subscribers starts with the "Statement of Rights and Responsibilities" or "SRR." The SRR incorporates a number of other documents by reference and hyperlinks.[1] The oldest relevant SRR is dated April 22, 2010, and is attached to this complaint as Exhibit A.

20.     Updated SRRs produced in discovery are dated August 25, 2010 (see Exhibit B), October 4, 2010 (see Exhibit C) and April 26, 2011 (see Exhibit D).

21.     Each of these SRRs, regardless of date, provides that "[t]he laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions." *See, e.g.*, SSR dated April 22, 2010 at ¶ 15, Ex. A, FB_MDL_00000014.

22.     Subscribers agree to the terms of the SRR upon initial creation of the account.

23.     In the preamble, the SRR also provides that the agreement renews each and every time a subscriber uses the website: "By using or accessing Facebook, you agree to this Statement." Ex. A, FB_MDL_00000012.

24.     The very first section of the SRR governs privacy, stating:

> Your privacy is very important to us. We designed our Privacy Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Privacy Policy, and to use it to help make informed decisions.

Ex. A. at ¶ 1, FB_MDL_00000012.

25.     In the language excerpted above, the words "Privacy Policy" were hyperlinked on the Facebook website and linked directly to the Privacy Policy.[2]

26.     The SRR dated April 22, 2010 includes six documents incorporated by reference and hyperlinked at the end of the document:  (1) the Privacy Policy (later called the Data Use

---

[1]  A hyperlink electronically provides direct access from one internet location/file to another, typically by clicking a highlighted word or icon.

[2]  As of April 26, 2011, the name of this policy was changed to the "Data Use Policy."

Policy), (2) the Payment Terms, (3) the Platform Policy, (4) Developer Principles and Policies, (5) Advertising Guidelines, and (6) Promotions Guidelines (together, the "Additional Documents"). *See* Ex. A, FB_MDL_00000014. Later SRRs include additional links.

27. Immediately to the right of "Privacy Policy:" Facebook states: "The Privacy Policy is designed to help you understand how we collect and use information." Ex. A, FB_MDL_00000014.

28. Each of the Additional Documents is an agreement with terms agreed to by Facebook and subscribers. For example, the Payment Terms use the phrase "you agree" more than a dozen times.

29. Each of the Additional Documents are incorporated by reference and hyperlink into the SRR, and together form a single agreement.

30. Each of the Additional Documents contains hyperlinks back to the SRR, and each contains at least one hyperlink to the Privacy Policy.

31. Some of the Additional Documents also link to each other; for example, the Payment Terms hyperlink to the Advertising Policy.

32. The SRR states that "[t]his Statement makes up the entire agreement between the parties regarding Facebook[.]" *See, e.g.*, SSR dated April 22, 2010 at ¶ 18.1, Ex. A. FB_MDL_00000014.

33. Facebook did not intend paragraph 18.1 to render all Additional Documents legal nullities but rather to confirm that the SRR includes the hyperlinked Additional Documents—they function as a single agreement.

**B.**  **The Privacy Policy**

34. Historical versions of the Privacy Policy produced in discovery to date are provided as Exhibits E through H to this complaint.

35. The Privacy Policy is incorporated by reference and hyperlink into the SRR.

36. Several terms in the Privacy Policy are defined with reference to the SRR, see e.g., Ex. E, ¶ 4 ("Facebook Platform"), FB_MDL_00000008, and changes to the Privacy Policy can only be made in accordance with the SRR. *See, e.g.*, Ex. G, ¶ 9, FB_MDL_00000036.

37.     The Privacy Policy is an agreement.  For example, in the September 7, 2011 version, under the "Change of Control" section, Facebook states, "If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. ***But they will still have to honor the commitments we have made in this privacy policy.***" Ex. H, Section VI (Change of Control) (emphasis added), FB_MDL_00000048.

38.     Additionally, in earlier versions of the Privacy Policy, the terms were referred to as "promises" rather than "commitments."  *See, e.g.*, Ex. G, ¶ 6, Transfer in Event of Sale or Change of Control ("In such a case, your information would remain subject to the promises made in any pre-existing Privacy Policy"), FB_MDL_00000035.

39.     Likewise, in the December 22, 2010 version, Facebook states, "By using or accessing Facebook, you agree to our privacy practices outlined here."  *See* Ex. G, ¶ 1 (Scope), FB_MDL_00000032.  This language is nearly identical to the binding language in the SRR.  *See also id.* ¶ 9 ("By using Facebook, you consent to having your personal data transferred to and processed in the United States."), FB_MDL_00000036.

**C.     <u>The Help Center</u>**

40.     Relevant portions of Facebook's Help Center produced in discovery are attached to this complaint as Exhibits I through S and MM through PP.

41.     The Privacy Policy is long, dense, and complicated.  A December 8, 2011 inquiry from the United States House of Representatives noted that Facebook's privacy policy was "longer than that of all other social networks and exceed in length the United States Constitution . . . . We are concerned . . . that long, complex privacy policy statements make it difficult for consumers to understand how their information is being used."  *See* Ex. T., p. 8, FB_MDL_00000247.

42.     In its January 6, 2012 response to the Congressional inquiry, Facebook agreed:

> We also agree that long and complex privacy policies can make it difficult for consumers to understand how their information is being used. . . . we use a layered approach, summarizing our practices on the front page and then allowing people to click through the Policy for more details.

*Id.* at 9, FB_MDL_00000248.

1    43.    The Privacy Policy repeatedly hyperlinked to Facebook's Help Center (consisting

2    of a series of "frequently asked questions") as a part of this "layered approach," and the Help

3    Center is thus incorporated into the Privacy Policy by reference and hyperlink.  It is impossible to

4    understand the Privacy Policy without the Help Center.

5    44.    The Privacy Policy repeatedly directs subscribers, via reference and hyperlink, to

6    the Help Center for more information.  The April 22, 2010 Privacy Policy, for example, linked to

7    the Help Center 18 times.  *See generally* Ex. A.

8    45.    Sometimes, Facebook would migrate language between the Help Center and the

9    body of the Privacy Policy, underscoring the unified nature of these pages.

10   46.    For example, in its description of "cookies," the Privacy Policy discloses that "we

11   use them to store your login ID . . . to make it easier for you to login whenever you come back to

12   Facebook. We also use them to confirm that you are logged into Facebook."  Ex. F, ¶ 2 (Cookie

13   Information), FB_MDL_00000028.  Near exact language also appears in the Help Center page,

14   "How does Facebook use cookies?"  *See* Ex. N, FB_MDL_00064915.

15   **D.    How Facebook Tracks Internet Use Through the "Like" Button**

16   47.    When signing up for a Facebook account, subscribers fill out an electronic form,

17   sending communications to Facebook which personally identifies them:

5:12-MD-02314-EJD-NC
THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

48.     Each Facebook subscriber manually enters his or her first and last name, email address, a password, gender, and birthdate before signing-up.

49.     Facebook then creates a database entry for the new user in an internal database called ███████ and assigns a unique user ID to the subscriber.  Facebook also writes a number of cookies to the user's web browser that Facebook correlates with the information in the ███████ database.  As each user encounters more Facebook partner websites while logged into Facebook, Facebook adds the information to the user's database entry.

50.     When an Internet user lands on a webpage with an integrated Facebook social plugin, the user's browser is instructed to redirect the communications, along with several Facebook cookies, to Facebook, which can then be added to the ███████ database.  Facebook acquires this information before the communications are completed.

51.     Cookies are small text files that web-servers can place on a person's web-browser and computing device when that person's web-browser interacts with a website server.  Different cookies perform different functions.  Some cookies were designed to track and record an individual Internet user's communications with and activities on websites across the Internet.

52.     The process for logged-in users differs from that of logged-out users.  When a Facebook subscriber is logged into Facebook at the time he visits a third-party website that contains a Facebook plugin, the user's browser will contain several Facebook cookies.

53.     In 2010 and 2011, Facebook wrote cookies to the browsers of logged-in users as illustrated in the chart below.  As can be seen below, ███████████████████████ ████████████████████████████, in addition to the *c_use*r (or *a_user*) cookie:

///

///

///

| Cookie | Sample Value | Information Contained |
|--------|--------------|----------------------|
| c_user[3] | 50001111 | User's Facebook ID |
| datr | tdnZTOt21HOTpRkRzs-6tjKP | Unique Browser ID |
| lu | ggIZeheqTLbjoZ5Wgg | Encrypted ID of the last user |
| p | 101045999 | User's channel partition |
| presence | EM426705095EuserFA21B0911298286 A2EstateFDutF1426705095426Et2F | ███████████████ |
| xs | 2%3A99105e8977f92ec5869cf73dd4a32f7 | Session number and other information |
| sct | 1316000000 | Insecure indicator |
| act | 1311234574586%2F0 | Timestamp and counter of user actions |

54.    The sample values above come from a report published by Nik Cubrilovic, an independent researcher in Australia, on September 25, 2011 (████████████████████████████████████████████████████████████████████████████████████████).

a.    The *c_user* cookie (sometimes the *a_user* cookie), which is the user ID, identifies the subscriber because Facebook assigned that ID to the user upon creating an account.

b.    The *lu* ("last user") cookie contains the user ID (encrypted) of the last user to use that browser, which would precisely identify the current user if the computer is not a shared computer. *See, e.g.*, Ex. U, FB_MDL_00005503 (███████████████████████████████████████████████████████ ████████████████████████████ ███).

c.    ████████████████████████████████████. *See, e.g.*, Ex. V, p. 5, FB_MDL_00005420 (███████████████████████████ ██████████████).

d.    ██████████████████████████████████████ ████████████████. *See, e.g.*, Ex. U, FB_MDL_00005502 (█ ███████████████████████████████).

---

[3]  During 2010 and 2011, Facebook used several cookies to identify users, including the *a_user*, *c_user*, and *m_user* cookies.

e.  Facebook also assigns each browser a unique identifier (the *datr* cookie) which can and does identify actual current users when a computer is not a shared computer. ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████ *See* Ex. U, FB_MDL_00005501.

f.  Indeed, Facebook publicly confirmed in its response to Mr. Cubrilovic (available on his blog): "We also maintain a cookie association between accounts and browsers."

g.  Finally, ███████████████████████████████████ ███████████████████████████████████

55.  When a logged-in subscriber visits a webpage with a Facebook Like button, a copy of the referrer URL is acquired by Facebook along with the cookies noted above.

56. Facebook acquires an enormous amount of individualized data for each communication.  Facebook receives the full referral URL (including the exact subpage of the precise items being purchased or viewed), and through the use of cookies, correlates that URL with the user ID, time stamp, browser settings, and even the type of browser used.  Facebook not only acquires an exact copy of the user's communication with, for example, Walmart, but can put the communication in the precise context of the time of day and other user actions on the same website.  Facebook acquires all of this information before the communications between the user and the third-part website is completed.

**E.      Facebook Promised Not to Track Logged-Out Subscribers**

57.  The very first section of the SRR governs privacy, stating:

> Your privacy is very important to us. We designed our Privacy Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Privacy Policy, and to use it to make informed decisions.

Ex. A. at ¶ 1, FB_MDL_00000012.  The words "Privacy Policy" above were hyperlinked to the Privacy Policy on the Facebook website, and starting September 7, 2011, linked to the Data Use Policy.

58.     The Privacy Policy is incorporated into and is a part of the Facebook – user contract.

59.     Implicitly, Facebook agrees in its contract with users that it would respect user privacy and not collect data in ways not agreed to in the Privacy Policy.  It is therefore an implicit term of the SRR that Facebook would not track users post-logout using user-identifying cookies.

60.     The Data Use Policy dated Sept. 7, 2011 states:

> We receive data whenever you visit a . . . site with a Facebook feature (such as a social plugin). This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.

Ex. H, FB_MDL_00000043.  This provision, explaining that Facebook will receive a user-identifying cookie when "you are logged in to Facebook," implicitly promises to the average user that Facebook will not receive such a cookie when the user is not logged in.

61.     The Help Center pages are incorporated by reference into the Privacy Policy and are a part of the contract.

62.     In the Help Center page, "Does Facebook use cookies if I don't have an account or have logged out of my account?" Facebook promised:  "When you log out of Facebook, we remove the cookies that identify your particular account[.]"  Ex. I, FB_MDL_00064918.

63.     In the Help Center page, "What information does Facebook receive about me when I visit a website with a Facebook social plugin?" Facebook explained that it receives "technical information" about IP addresses, browsers, and operating systems to help "optimize your experience . . . or let[] us know that you are logged into Facebook."  Ex. J, FB_MDL_00064922. Facebook implicitly promised in this section that it would not receive user-identifying information if the user logged out of Facebook.

64.     In a later version of the same Help Center page, Facebook explicitly added:  "If you are logged into Facebook, we *also* see your user ID number and email address."  Ex. K,

FB_MDL_00064913 (emphasis added).  Because Facebook limited this language to logged-in users, Facebook promised that if the user were not logged in, Facebook would not "see your user ID number and email address."

65.     In an even later version of the same Help Center page, Facebook made its promise more explicit, adding:

> If you're logged out or don't have a Facebook account and visit a website with the Like button or another social plugin, your browser sends us a more limited set of information. **For example, because you're not logged in to Facebook, we don't receive your user ID.**

Ex. M, FB_MDL_00064920 (emphasis added).  This exact language also appeared in a second Help Center page.  *See* Ex. L, FB_MDL_00064919.

66.     In Help Center "Does Facebook have the ability to see what I'm doing on non-Facebook sites?" Facebook reminded users that it would not be able to see what users do on other websites unless the user logs in:

> **Does Facebook have the ability to see what I'm doing on non-Facebook sites?**
>
> Facebook cannot track your actions on external sites unless you decide to connect your Facebook account to that site and/or explicitly decide to publish a story to your Wall via the Like button. For example, if you are on Digg, and digg an article or comment on an article, Facebook will only be notified of the actions for which Digg wants to create a story. Facebook will have no access to other actions you have taken or other information involving your Digg account.
>
> To take advantage of the ability to generate stories from another site, you must "connect" your Facebook account to that site, *or otherwise be logged into Facebook while you interact with one of these sites*.

Ex. MM, FB_MDL_00064926 (emphasis added); *see also* Ex. NN, FB_MDL_00064927 (same); Ex. OO, FB_MDL_00064928 (same); Ex. PP, FB_MDL_00064929 (same).

67.     In the Help Center page, "How do social plugins work?", Facebook promised:

> *You only see a personalized experience with your friends if you are logged into your Facebook account*. If you are not already logged in, you will be prompted to log in to Facebook before you can use a plugin on another site.
>
> At a technical level, social plugins work when external websites put an iframe from Facebook.com on their sites, as if they were agreeing to give Facebook some real estate on their sites. *When you visit one of these sites, the Facebook iframe*

*can recognize if you are logged into Facebook. If you are logged in, it'll show personalized content within the plugin as if you were on Facebook.com directly.* Even though the iframe is not on Facebook, it is designed with all the privacy protections as if it were.

Ex. R, FB_MDL_00064901 (emphasis added); *see also* Ex. S, FB_MDL_00064905 (same).

Implicit in this Help Center page is the promise that Facebook would remove any user-identifying cookies from browsers of users who had logged out.

> **F.**    **Facebook Breached Its Promise Not To Track Logged-Out Subscribers**
>
> **1.**    ***Background***

68.    As soon as the Like button was rolled out on April 22, 2010, Facebook found it had a problem— ████████████████████████████████████████████████████████. If user identities were disaggregated from web history, the value of the Like button would diminish substantially.

69.    Facebook product manager Austin Haugen noted in an internal email, dated October 28, 2010, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Ex. W, p. 1, FB_MDL_00007340.

70.    A few months later, after reviewing detailed cookie data, Mr. Haugen determined that only approximately ██████████████████ *See* Ex. X, p. 4, FB_MDL_00005394.

71.    The genesis for these discussions was pressure coming directly from ████████ ████████████████████. In an email dated September 21, 2010, Mr. Haugen wrote: ████████ █████████████████████████████ *See* Ex. Y, p. 2, FB_MDL_00002731.

72.    As an alternative to convincing subscribers to stay logged in, Facebook came up with an easy interim solution:  break Facebook's promise and track users post-logout.  This was done by failing to delete cookies containing User IDs (such as *lu*), by continuing to use the *datr* cookie and associating that cookie with User IDs, ██████████████████████████████████████ ████████████████.

73.     At the same time, three Facebook employees filed a patent application (later assigned to Facebook), facilitating the *post-logout* tracking of Facebook users on other websites.

74.     On February 8, 2011, Kent Matthew Schoen, Gregory Luc Dingle, and Timothy Kendall (Facebook's "Director of Monetization") filed a patent application entitled "Communicating Information in a Social Network System about Activities from Another Domain."[4] As the first claim in the Patent Application explains, the applicants were seeking to patent:

> A method for tracking information about the activities of users of a social networking system while on another domain, the method comprising: maintaining a profile for each of one or more users of the social networking system . . .; receiving one or more communications from a third-party website having a different domain than the social network system, each message communicating an action taken by a user of the social networking system on the third-party website; logging the actions taken on the third-party website in the social networking system . . .; and correlating the logged actions with one or more advertisements presented to one or more users.

Patent Application at 2.

75.     The detailed description of this tracking method reveals that it enables Facebook to capture and log actions taken by Facebook users on websites other than Facebook, ***even when the user is not logged in:***

> [0054] As described above, in particular embodiments, the social network system 100 also logs actions that a user takes on a third party website 140. The social network system 100 may learn of the user's actions on the third party website via any of a number of methods. In particular embodiment, in response to certain actions such as, a user registering with a third-party website 140, purchasing a product from a third-party website 140, downloading a service from a third-party website 140, or otherwise making a conversion, the third-party website 140 transmits a conversion page, such as a confirmation or "thank you" page to the user at the user's client device. In particular embodiment, this page includes an embedded call or code segment (e.g., JavaScript) in the HTML or other structured document code (e.g., in an HREF (Hypertext REFerence) that, in particular embodiments, generates a tracking pixel that, when executed by the client's browser or other rendering application, generates a tracking pixel or image tag that is then transmitted to the social network system (***whether the user is logged into the social network system or not).*** The tracking pixel or image tag then communicates various information to the social network system about the user's action on the third-party website. By way of example, the tracking pixel or call may transmit parameters such as the user's ID (user ID as registered with the social network system), a product ID, information about the third-website, timestamp

---

[4]  *See* U.S. Patent Application No. 20110231240, filed February 8, 2011 and published September 22, 2011 (the "Patent Application") at 1.

information about the timing of the purchase or other action, etc. In one example, if the third party website 140 is a commercial website on which users may purchase items, the third party website 140 may inform the social network system 100 in this manner when a user of the social network system 100 buys an item on the third party website 140.

Patent Application at 5.

76.     In certain circumstances, Facebook has to hack its way past data protection software to do this:  Facebook deposits a cookie that deliberately and without a user's consent bypasses security settings on the user's browser for the purpose of gathering intelligence about what the user does on the Internet in real time, such as what sites are visited, whether purchases are made, or whether information is downloaded or a link forwarded to a friend.  This information is instantly relayed back to Facebook, substantially enhancing the value of Facebook's vast repository of personal data.  This is all done whether the Facebook user is logged onto Facebook *or logged off.*

77.     Technically, this is how the Patent Application describes the bypass:

[0099] In one embodiment, the third party website 140 and/or the social network system 100 determine whether the user is a user of the social network system 100. For example, the third party website 140 may access a cookie on the user's computer, where the cookie is associated with the social network system 100. Since the social network system 100 and the third party website 140 are on different domains, the user's browser program may include security features that normally prevent a website from one domain from accessing content on other domains. To avoid this, the third party website 140 may use nested iframes, where the third party website 140 serves a web page that includes a nested iframe in the social network website's domain, thereby allowing the nested iframe to access the user information and send the information back to the third party website 140. Repeated nesting of iframes further allows the social networking site 100 to communicate information back to the third party website 140.  By using this technique, the third party website 140 and the social network system 100 can communicate about the user without sharing any of the user's personal information ***and without requiring the user to log into the social network system 100.***

Patent Application 10-11 (emphasis added).

78.     Although Facebook's name does not appear in the Patent Application, the Patent Application is listed in the U.S. Patent & Trademark Office database as assigned to Facebook. Tellingly, Mr. Kendall, Facebook's "Director of Monetization," is not an inventor nor a computer scientist.  According to his LinkedIn profile, Mr. Kendall's job description at Facebook is "Product Strategy & Development for Facebook's revenue generating products."  Essentially, Mr. Kendall is charged with devising creative ways to sell user information to advertisers and third-party websites.

### 2. *Facebook Failed to Expire User-Identifying Cookies Upon Logout*

79.     To comply with its promise to remove user-identifying cookies upon logout, Facebook reset the *c_user* cookie from the browser.  This is the basic user ID cookie, but as noted by Mr. Cubrilovic, it didn't actually <u>clear</u> until the session expired.  Facebook only changed its state from a persistent cookie to a session cookie—meaning it never actually was removed post-logout unless and until the user actually closed and restarted the browser.

80.     Far worse, Facebook knowingly kept two other user-identifying cookies in place for the explicit purpose of tracking users post-logout, even after the expiration of the session. ███████████████████ noted on February 7, 2011:  ███████████████████ ████████████████████████████████████████████████ ████████████████████████████ *See* Ex. V (emphasis added), FB_MDL_00005416.

81.   Two weeks later, on February 19, 2011, Facebook employee Douglas Purdy drafted a table ████████████████████████████████████████ ███████████████ which acknowledged that the ████████████ were still present for logged out users.  *See* Ex. U, FB_MDL_00005503-04.  Facebook engineer Matt Jones made a number of revisions and comments, and said ████████████████ ████████████████████████████████████ *Id.* at 2 (emphasis added), FB_MDL_00005502.

82.   Mr. Himel concluded by saying: ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████  *See* Ex. U, p. 1, FB_MDL_00005501.

### 3. ████████████████████████████

83.  ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████.

84.     On June 5, 2010, an engineering task was created called ████████████████████

███████████████ Facebook engineering director Alex Himel commented, ████████

████████████████████████████████████████████████████████████████████

███████ *See* Ex. Z, FB_MDL_00000734.

85.     On June 7, 2010, Mr. Himel created a task with the tag ████████ and assigned it to engineer Chuck Rossi.  The task noted:

███████████████████████████████████████████████

*See* Ex. AA, FB_MDL_00005470 (underlining added).

86.     The following month, July 2010, Mr. Himel █████████████████████ ██████████████████████ but noted later in an August 19, 2010 email that changes still had not been made:

██████████████████████████████████████████████

Ex. BB, FB_MDL_00002992.

87.     Even after Mr. Himel's August 19 email above, ████████████████ ███████████████████████████████. For example, on January 28, 2011, Alex Himel noted that ████████████████████████████ ████████████ *See* Ex. CC, FB_MDL_00000622.   An unknown Facebook employee responded, ████████████████████████████████████ ████████████████████████████████████████ *Id.* (emphasis added).

88.     ████████████████████████████████████████

For example, Facebook engineering director Alex Himel assigned ███████████

███████████ to engineer Adam Wolff on January 27, 2011:

████████████████████████████████████████████████

See Ex. DD, FB_MDL_00005356.

### G.   Facebook's Post-Logout Tracking Breached Expectations of Good Faith and Fair Dealing

89.    The Facebook Privacy Policy, which includes the Help Center pages, is consistent with all public representations made by Facebook.  For example, on April 26, 2010, Facebook explained how the social plug-ins affect Facebook users on its "Facebook Notes" blog.  Facebook was clear that "you only see a personalized experience with your friends if you are logged into your Facebook account."  This is identical language to the Help Center page shown in Exhibit R, FB_MDL_00064901.

90.    In 2010, when privacy rights and civil liberties organizations raised a number of privacy concerns associated with social plug-ins and other changes to the Facebook Privacy Policy, it was believed and understood that Facebook was only tracking logged in users via the Like button.  So, for example, the ACLU, Center for Democracy and Technology, Center for Digital Democracy, Consumer Action, Consumer Watchdog, Electronic Privacy Information Center, Electronic Frontier Foundation, and the Privacy Rights Clearinghouse jointly wrote to Facebook CEO Mark Zuckerberg regarding a number of "outstanding privacy problems."  *See* Open Letter dated June 16, 2010, attached as Ex. EE.  The authors objected that the Like buttons "provide Facebook with information about every visit to the site *by anyone who is underlined logged in to Facebook*[.]"  *Id.* at 2 (emphasis added).  Not one of these well-respected and tech-savvy privacy groups understood or believed that Facebook was also tracking logged out as well as logged in users, which would have been a far more serious concern.

91.    From the start of the rollout of the Like button and thereafter, Facebook consistently told the public that it was not tracking users post-logout.  In a series of interviews with USA Today

1   in mid-November, 2011, for example, Facebook said it did not log any personal information

2   associated with Internet surfing by logged out users—all logging would be done only by an

3   anonymous browser cookie.  When asked if even the anonymous data could somehow be re-

4   associated with the browsing history, Facebook reiterated:  "We've said that we don't do it, *and*

5   *we couldn't do it without some form of consent and disclosure*."[5]

6          **H.        Facebook's Post-Logout Tracking Revealed**

7          92.     In 2010, Australian researcher and blogger Nik Cubrilovic discovered that

8   Facebook cookies were tracking users' Internet communications even after users had logged out

9   of Facebook.

10         93.     Cubrilovic's investigation revealed that several personally identifiable cookies

11  remained on users' browsers post logout, and that some cookies (for example, the *lu* and *datr*

12  cookies) even remained after the browser was closed and restarted.  Despite its representations to

13  the contrary, Facebook was in fact secretly tracking its users' Internet communications after logout

14  via these cookies that Facebook had promised it had removed.

15         94.     Mr. Cubrilovic contacted Facebook on November 14, 2010 to report his findings

16  and ask Facebook to fix the problem.  He received no response.  Again, on January 12, 2011, Mr.

17  Cubrilovic wrote to Facebook alerting it to his findings.  Again, Facebook refused to respond.  Mr.

18  Cubrilovic of course had no way of knowing that Facebook ████████████████████████████

19  ████████████████████.

20         95.     On September 25, 2011, Mr. Cubrilovic made his findings public.  He wrote, "Even

21  if you are logged out, Facebook still knows and can track every page you visit."  He explained that

22  "[t]his is not what 'logout' is supposed to mean – Facebook is only altering the state of the cookies

23  instead of removing all of them when a user logs out."  Mr. Cubrilovic had revealed what ████████

24  ████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26

27  ───────────────────
    [5] *See* Acohido, Byron, *How Facebook Tracks you across the Web*, USA TODAY, Nov. 16, 2011.

28  http://www.usatoday.com/tech/news/story/2011-11-15/facebook-privacy-tracking-
    data/51225112/1.

1    ████████████████████████████████████████████████   *See* Ex. V

2    (emphasis added), FB_MDL_00005416.

3        96.    Mr. Cubrilovic's blog post spread globally and was picked up the next day by the

4    *Wall Street Journal*, in addition to dozens of other news outlets.[6] Journalist Erik Sherman, writing

5    for *CBS News*, for example, succinctly expressed Facebook users' feelings:

6          Many who use Facebook who don't like the idea of other sites reporting information
          back have typically logged out of the system before going elsewhere. (I know I
7          have.) What Cubrilovic argues is that this does no good[.][7]

8        97.    Facebook told the *Wall Street Journal* that the user-identifying data was not

9    "logged" and the information is "quickly deleted" anyway.

10       98.    These statements to the *Wall Street Journal* were incorrect ███████████████

11   ████████████████████████████████████████████████████████████ included

12   as Exhibit FF, FB_MDL_00053202, the story was corrected to remove Facebook's assurances

13   regarding logging and deletion.

14       99.    On the same day, Facebook engineer Gregg Stefancik contacted Mr. Cubrilovic and

15   admitted that Cubrilovic raised "important issues."  Mr. Stefancik, however, never disclosed that

16   ███████████████████████████████████████████. Instead, he misleadingly told Mr.

17   Cubrilovic only that a "bug" caused a particular user-identifying cookie—the *a_user* cookie—not

18   to clear on logout, advising, "We will be fixing that today."

19       100.   Facebook further admitted that the Company had not "done as good a job as we

20   could have to explain our cookie practices. Your post presents a great opportunity for us to fix

21   that."

22       101.   Mr. Stefancik also told Mr. Cubrilovic that "if you log out, [the lu] cookie does not

23   contain your user ID" and is used to protect people using public computers.  However, the *lu*

24   _____

25   [6]  *See* Jennifer Valentino-DeVries, "Facebook Defends Getting Data from Logged Out Users,"
     Wall Street Journal (Sept. 26, 2011).

26

27   [7]  *See* Erik Sherman, *Facebook's New Policy Bust: Users Log In but They Can't Log Out*, CBS
     News (Sept. 26, 2011).  https://www.cbsnews.com/news/facebooks-new-privacy-bust-users-log-
28   in-but-they-cant-log-out-update/.

1    cookie actually did contain the encrypted user ID of the last user, so Mr. Stefancik's comment was

2    deeply misleading.  Mr. Stefancik's comment would only be true if an intervening Facebook user

3    were to use the shared computer and then the original user returned without logging into Facebook.

4    For anyone else, the *lu* cookie continued to identify logged out users, and continued to do so for

5    some time thereafter.

6          102.    Within hours of the publication of Mr. Cubrilovic's report, employees at Facebook

7    realized that the company had been violating promises made in the Privacy Policy.  In an email,

8    ████████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████.  *See* Ex. LL, p. 1,

10   FB_MDL_00017708.  The referenced Help Center page is the same page included as Exhibit K to

11   this complaint.

12         103.    Independently of ███████████████████████████, upon seeing

13   Mr. Cubrilovic's report, ███████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████

15   █████████████████████████████████ Ex. GG, FB_MDL_00058738.

16   ████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████

18         104.    ███████████████████████████████████████████████

19   ████████████████████████████ (the Help Center page attached as Exhibit

20   K), ███████████████████████████████████████████ Ex. GG,

21   FB_MDL_00058739.  This Help Center page ███████████████████████████

22   ████████ just several hours earlier, as noted above.

23         105.    Also on the same day, September 25, 2011, ████████████████████

24   ████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████:

26        ████████████████████████████████████████████████████

27   ████████████████████

28

Ex. HH, FB_MDL_00043989 (underlining added).

106.    Not everyone at Facebook was happy about the removing of the User ID from the *lu* cookie upon logout.

Ex. II, FB_MDL_00043461.

*Id.*

*Id.*, FB_MDL_00043460.

107.    Three days after the Cubrilovic revelations, on September 28, 2011, U.S. Representatives Edward Markey[8] and Joe Barton, then Co-Chairmen of the Congressional Bi-Partisan Privacy Caucus, submitted a joint letter to the Chairman of the Federal Trade Commission urging the FTC to expand its investigation of Facebook.  *See* Ex. JJ.  The FTC had already commenced an investigation related to the Like button rollout and changes to Facebook's Privacy Policy in 2010, prior to discovery of the secret and pervasive post-logout tracking.

108.    The letter also expressed concern that Facebook told the *Wall Street Journal* on September 26, 2011 that correcting the problem "will take a while."

109.    Congressmen Markey and Barton stated in a press release accompanying the FTC letter, "[I]n this instance, Facebook has admitted to collecting information about its users even *after its users had logged out of Facebook.*"  They continued, "*We believe that tracking users without their knowledge or consent raises serious privacy concerns.* When users log-out of Facebook, they are under the impression that Facebook is no longer monitoring their activities. We believe this impression should be the reality."

---

[8]  Congressman Markey is now Senator Markey.

110. The FTC sued Facebook under Section 5 of the FTC Act for multiple counts of misrepresenting its Privacy Policy, alleging that Facebook engaged in deceptive trade practices. *In the Matter of Facebook Inc.*, FTC File No. 0923184.

111. On November 29, 2011, Facebook settled with the FTC, agreeing to an unprecedented 20 years of independent privacy audits. No fine was levied because a civil fine is not an available remedy absent a violation of a prior Commission order.

112. Marc Rotenberg, Executive Director of the Electronic Privacy Information Center, wrote to the FTC submitting an official comment and asking for clarification of a number of points, including whether the settlement covered Facebook's post-logout tracking revealed two months prior. In response, the FTC confirmed it did. The complaint "does allege that Facebook violated Section 5 of the FTC Act by falsely representing to users the protections provided by their privacy settings, [and] *by making other false promises regarding privacy*[.]" *See* Letter from FTC to EPIC dated July 27, 2012 at p. 3, Ex. KK (emphasis added).

## V. PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

113. Plaintiff Davis is an adult domiciled in Illinois and has an active Facebook account and has had an active account since before April 22, 2010.

114. She accessed the Internet and visited websites containing Facebook social plugins from at least one computer that was not a shared computer.

115. On this same computer, Facebook installed user-identifying cookies while she was logged into her Facebook account.

116. Facebook failed to expire the user-identifying cookies on these computers when Mrs. Davis logged out of her Facebook account. Facebook was thus able to—and in fact did—track her internet use when visiting Facebook-enabled websites.

117. Plaintiff Quinn is an adult domiciled in Hawaii and has an active Facebook account and has had an active account since before April 22, 2010.

118. She accessed the Internet and visited websites with Facebook social plugins from at least one computer that was not a shared computer.

119. On this same computer, Facebook installed user-identifying cookies while she was logged into her Facebook account.

120. Facebook failed to expire the user-identifying cookies on these computers when Prof. Quinn logged out of her Facebook account.  Facebook was thus able to—and in fact did—track her internet use when visiting Facebook-enabled websites.

121. Plaintiff Lentz is an adult domiciled in Virginia and has an active Facebook account and has had an active account since before April 22, 2010.

122. He accessed the Internet and visited websites containing Facebook social plugins from a computer he shared with his wife.

123. On this same computer, Facebook installed user-identifying cookies while Dr. Lentz was logged into his Facebook account.

124. Facebook failed to expire the user-identifying cookies on these computers when Dr. Lentz logged out of his Facebook account.  Facebook was thus able to—and in fact did—track his internet use when visiting Facebook-enabled websites.

125. Plaintiff Vickery is an adult domiciled in Washington State and has an active Facebook account and has had an active account since before April 22, 2010.

126. He accessed the Internet and visited websites containing Facebook social plugins from at least one computer that is not a shared computer.

127. On this same computer, Facebook installed user-identifying cookies while Mr. Vickery was logged into his Facebook account.

128. Facebook failed to expire the user-identifying cookies on these computers when Mr. Vickery logged out of his Facebook account.  Facebook was thus able to—and in fact did—track his internet use when visiting Facebook-enabled websites.

129. None of these four plaintiffs consented to the tracking and interception of their logged-off communications.

## VI. **STATUTE OF LIMITATIONS**

130. The following claims (since dismissed) were brought on a class basis within days of the public reports of post-logout tracking, and the statutes of limitations are thus tolled:

(1) Violation of Federal Wiretap Act; (2) Violation of the Stored Communications Act; (3) Violation of CIPA § 631; (4) Invasion of Privacy; (5) Intrusion Upon Seclusion; (6) Trespass to Chattels; and (7) the California Computer Crime Law.

131.    The two claims asserted in this Third Amended Complaint were first asserted on November 30, 2015 in the Second Amended Complaint, but relate to the identical "conduct, transaction or occurrence" set out in the First Amended Complaint and thus relate back to the date of filing of the First Amended Complaint.  All relevant statutes of limitations have therefore also been tolled.

## VII.    CLASS ACTION ALLEGATIONS

132.    This is a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons who had active Facebook accounts and used Facebook between April 22, 2010 and a later date to be determined upon the completion of discovery, and whose personally identifiable Internet use was tracked at times when not logged into their Facebook accounts.

133.    Excluded from the Class are the Court, Facebook, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

134.    The members of the Class are so numerous that joinder of all members is impracticable.

135.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class include:

    a.    whether the SRR is a legally binding contract;

    b.    whether the SRR incorporates by reference the Privacy Policy;

    c.    whether the Privacy Policy incorporates by reference the Help Center pages;

    d.    whether the claims in this action are governed by California law;

    e.    whether the *lu* cookie in fact included a User ID;

    f.    whether Facebook in fact failed to expire the *lu* cookie upon logout;

g.  when Facebook in fact caused the User ID contained in the *lu* cookie to collapse to a zero value upon logout;

h.  the length of time Facebook continued to track logged-out subscribers even after the *lu* cookie was fixed;

i.  whether Facebook in fact ████████████████████████████████ ████████████████████████████████████████████;

j.  whether Facebook in fact failed to expire the *datr* cookie upon logout;

k.  whether Facebook in fact could link *datr* cookies to User IDs;

l.  whether Facebook's tracking of the Internet use of logged out subscribers was done in bad faith; and

m.  whether Facebook's tracking of the Internet use of logged out subscribers was unfair dealing.

136.  Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Facebook's wrongful conduct in violation of federal law as complained of herein.

137.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that is competent and experienced in class action litigation.  Plaintiffs have no interest that is in conflict with, or otherwise antagonistic to, the interests of the other Class or Subclass members.

138.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and Subclass to individually redress the wrongs done to them.  There will be no difficulty in management of this action as a class action.

VIII. <u>COUNTS</u>

**COUNT I**

**BREACH OF CONTRACT**

139. Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

140. Facebook entered into a contract with each Plaintiff consisting of the SRR, Privacy Policy, and relevant Help Center pages.

141. The contract contains enforceable promises that Facebook made to the Plaintiffs and the Class.

142. Facebook promised that it would not track user's web browsing after log-out except on an anonymous basis. If a subscriber were logged out and visited a website with Facebook functionality, Facebook promised it would only receive technical information. Instead, Facebook received personally-identifiable information which it directly integrated into Facebook's database entries of the very User ID that Facebook promised only to track for logged-in users.

143. Under the contract, Plaintiffs and Class members transmitted personally identifiable information to Facebook in exchange for use of Facebook and Facebook's promise that it would not track users' communications or access their computing devices or web-browsers while the users were logged-off of Facebook.

144. Plaintiffs did all, or substantially all, of the things that the contract required them to do.

145. By reason of the conduct described herein, Facebook materially and uniformly breached its contract with Plaintiffs and each of the Class members by tracking their personally identifiable Internet communications while they were logged-off of Facebook.

146. Facebook collects revenues in large part because the personal information submitted by its users and the tracking of their Internet communications across a wide variety of websites increases the value of Facebook's advertising services. As a result of Facebook's breach of the contract, it was unjustly enriched.

147. Facebook is liable for at least nominal damages as a result of the breach.

148.     As a further result of Facebook's breach, Plaintiffs and the class sustained non-monetary privacy damages in an amount to be proven at trial.

## COUNT II

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

149.     Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

150.     In every contract or agreement there is an implied promise of good faith and fair dealing under California law.

151.     In dealings between Facebook and its users, Facebook has power affecting the rights of its users.

152.     Facebook entered into a contract with each Plaintiff consisting of the SRR, Privacy Policy, and relevant Help Center pages.

153.     Facebook promised to respect and protect its users' privacy.

154.     Facebook promised to abide by the terms of its Privacy Policy and the promises in any relevant Help Center pages.

155.     In assurances given outside of the contractual context—for example in the Facebook Pages blog and in comments made the press—Facebook assured its customers that it would not track the Internet use of users who were not logged into their Facebook accounts.

156.     Plaintiffs did all, or substantially all, of the things that the contract required them to do.

157.     Despite its contractual privacy promises not to track users while they were logged-off, Facebook took actions in breach of those contractual promises, tracking users while they were logged-off thereby depriving Plaintiffs and the Class of the privacy benefits agreed to in their contract with Facebook.

158.     Facebook's tracking of the Internet communications of logged-off users was objectively unreasonable given Facebook's privacy promises.

159.     Facebook's conduct in tracking the Internet communications of logged-off users evaded the spirit of the bargain made between Facebook and the Plaintiffs.

160.    Facebook's conduct in this case abused its power to specify terms—in particular, Facebook failed to accurately disclose its tracking of users while they were logged-off Facebook.

161.    As a result of Facebook's misconduct and breach of its duty of good faith and fair dealing, Plaintiffs and the Class suffered damages.  Plaintiffs and the Class members did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of their personal information and privacy, which, as alleged above, has ascertainable value to be proven at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Award compensatory and nominal damages to Plaintiffs and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Permanently restrain Defendant, and its officers, agents, servants, employees, and attorneys, from installing cookies on its users' computers that could track the users' computer usage after logging out of Facebook or otherwise breaching its contracts with subscribers;

D.    Award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Grant Plaintiffs such further relief as the Court deems appropriate.

## X.    JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury of all issues so triable.

///

///

///

Dated:  August 25, 2017                                Respectfully submitted,

**KAPLAN, FOX & KILSHEIMER LLP**          **SILVERMAN, THOMPSON, SLUTKIN & WHITE LLC**

By:  _/s/ David A. Straite_                      By:  _/s/ Stephen G. Grygiel_
Frederic S. Fox (admitted _pro hac vice_)        Stephen G. Grygiel (admitted _pro hac vice_)
David A. Straite (admitted _pro hac vice_)       201 N. Charles St., #2600
850 Third Avenue                                 Baltimore, MD  21201
New York, NY  10022                              Telephone (410) 385-2225
Telephone: (212) 687-1980                        Facsimile: (410) 547-2432
Facsimile:  (212) 687-7714                        _sgrygiel@mdattorney.com_
_dstraite@kaplanfox.com_

                                                 _Interim Co-Lead Counsel_
Laurence D. King (206423)
Mario Choi (243409)
350 Sansome Street, 4th Floor
San Francisco, CA 94104
Tel.:    (415) 772-4700
Fax:    (415) 772-4707
_lking@kaplanfox.com_

_Interim Co-Lead Counsel_

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, David A. Straite, attest that concurrence in the filing of this document has been obtained from the other signatory.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of August, 2017, at New York, New York.

                                          _/s/ David A. Straite_
                                          DAVID A. STRAITE