Stephen G. Grygiel (admitted *pro hac vice*)
**SILVERMAN THOMPSON SLUTKIN WHITE LLC**
201 N. Charles Street, 26th Floor
Baltimore, MD 21201
Tel. (410) 385-2225
Fax (410) 547-2432
*sgrygiel@mdattorney.com*

*Interim Co-Lead Counsel*

Frederic S. Fox (admitted *pro hac vice*)
David A. Straite (admitted *pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*dstraite@kaplanfox.com*

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, 4th Floor
San Francisco, CA 94104
Tel.:    (415) 772-4700
Fax:    (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

*Interim Co-Lead Counsel*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. INTERNET TRACKING LITIGATION | No. 5:12-md-02314-EJD-NC<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIRD AMENDED CONSOLIDATED COMPLAINT**<br><br>Judge:    Hon. Edward J. Davila<br>Ctrm:    4<br>Hearing: November 16, 2017<br>Time:    9:00am |

## TABLE OF CONTENTS

**PAGE(S)**

I. INTRODUCTION ...................................................................................................1

II. SUMMARY OF THE ARGUMENT.....................................................................2

III. LEGAL STANDARDS...........................................................................................3

IV. ARGUMENT ..........................................................................................................4

A. Plaintiffs Have Pled a Plausible Claim For Breach of Contract........................ 4

    1. Plaintiffs Specifically Allege the Relevant Contract Provisions
       and Attach Them to the Complaint ............................................................ 4

    2. The SRR Includes the Privacy Policy and Help Center Pages................... 4

       a. The Privacy Policy was Part of the Contract .................................... 4

       b. The Help Center Pages are Part of the SRR...................................... 5

       c. The Help Center is Known and Easily Available to the Parties .......... 8

    3. Facebook Breached The Privacy Policy and Help Center Pages.............. 9

    4. Plaintiffs Have Properly Pled Damages.................................................. 11

B. Plaintiffs Have Pled a Plausible Claim For Breach of the Duty of Good
   Faith and Fair Dealing........................................................................................ 13

    1. Plaintiffs' Breach of Covenant Claim Differs from the Contract Claim ................ 13

    2. Plaintiffs' Covenant Claim Creates No Requirements Not in the Contract............ 15

    3. Plaintiffs Plausibly Alleged Facebook's Conduct that Prevented
       Them from Receiving the Benefit of their Bargain with Facebook...................... 17

    4. Plaintiffs Plausibly Allege Damages from Covenant Breach .................. 19

C. Plaintiffs' New Allegations in the TAC are Timely........................................... 19

    1. Overview of Defendant's Objections to New Allegations....................... 19

    2. Plaintiff May Propose a Longer Class Period in the TAC ...................... 20

       a. Facebook Had Adequate Notice ...................................................... 21

b.   Additional Plaintiffs Have Identity of Interests with Initially Identified Plaintiffs ............................................................... 21

c.   Facebook Demonstrates No Prejudice from Amendment ................................. 22

3.   Plaintiffs May Support Their Claims With the New Evidence ................................ 22

V.   CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. S.E. Wholesale Corp.*,
   978 F. Supp. 2d 615 (E.D. Va. 2013)......................................................................... 12

*Allen v. Similasan Corp.*,
   96 F. Supp. 3d 1063 (S.D. Cal. 2015)................................................................. 21, 22

*Am. Express Bank, FSB v. Kayatta*,
   190 Cal. App. 4th 563 (2010)....................................................................... 16, 17, 18

*Amtower v. Photon Dynamics, Inc.*,
   158 Cal. App. 4th 1582 (2008)................................................................................ 6, 7

*Architectural Res. Grp., Inc. v. HKS, Inc.*,
   No. C 12-5787 SI, 2013 WL 568921 (N.D. Cal. Feb. 13, 2013) ................................ 13, 14, 15

*ASARCO, LLC v. Union Pac. R.R. Co.*,
   765 F.3d 999 (9th Cir. 2014).................................................................................... 20

*Ascon Props., Inc. v. Mobil Oil Co.*,
   866 F.2d 1149 (9th Cir. 1989).................................................................................. 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................. 3, 11

*Avidity Partners, LLC v. State*,
   221 Cal. App. 4th 1180 (2013).................................................................................. 15

*Avila v. Countrywide Home Loans*,
   No. 10-CV-05485-LHK, 2010 WL 5071714 (N.D. Cal. Dec. 7, 2010) ................................ 19

*Baker v. Osborne Dev. Corp.*,
   159 Cal. App. 4th 884 (2008)...................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................. 3, 12

*BF&W Assocs. v. Motorola, Inc.*,
   No. C 05-02381 JF, 2006 WL 1156381 (N.D. Cal. May 2, 2006) .......................................... 24

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
   222 Cal. App. 3d 1371 (1990).............................................................................. 14, 15

*Carlsson v. McGraw-Hill Cos., Inc.*,
   No. C 10-0323 RS, 2010 WL 3036487 (N.D. Cal. July 30, 2010) ............................... 7

*Chan v. Drexel Burnham Lambert, Inc.*,
   178 Cal. App. 3d 632 (1986)......................................................................................... 7

*Clipper Express v. Rocky Mtn. Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982)...................................................................................... 20

*Collins v. eMachines, Inc.*,
   202 Cal. App. 4th 249 (2011)................................................................................... 9, 16

*Commercial Union Assurance Companies v. Safeway Stores, Inc.*,
   26 Cal. 3d 912 (1980) .................................................................................................. 17

*Czuchaj v. Conair Corp.*,
   No. 3:13-cv-01901-BEN-RBB, 2016 WL 4272374 (S.D. Cal. Aug. 15, 2016) ...................... 22

*DCD Programs, Ltd. v. Leighton*,
   833 F.2d 183 (9th Cir. 1987)........................................................................................ 24

*DeMalherbe v. Int'l Union of Elevator Constructors*,
   449 F. Supp. 1335 (N.D. Cal. 1978) ............................................................................ 24

*Dunkel v. eBay Inc.*,
   No. 5:12-CV-01452-EJD, 2013 WL 415584 (N.D. Cal. Jan. 31, 2013)...................... 4

*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809 (1979) .................................................................................................. 18

*Exxon Mobil Corp. v. Tredegar Corp.*,
   891 F. Supp. 2d 559 (S.D.N.Y. 2012)........................................................................... 12

*Fisher v. Biozone Pharm., Inc.*,
   No. 12-CV-03716-LB, 2017 WL 1097198 (N.D. Cal. Mar. 23, 2017) ...................... 13

*Foley v. Interactive Data Corp.*,
   47 Cal. 3d 654 (1988) .................................................................................................. 15

*Founding Members of the Newport Beach Country Club v.*
   *Newport Beach Country Club, Inc.*,
   109 Cal. App. 4th 944 (2003)....................................................................................... 10

*GHK Assocs. v. Mayer Grp., Inc.*,
   224 Cal. App. 3d 856 (1990)........................................................................................ 13

*Guidotti v. Global Client Sols., LLC*,
No. 11-1219 (JBS/KMW), 2017 WL 1528693 (D.N.J. Apr. 26, 2017).....................................7

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................................ 21

*In re Anthem, Inc. Data Breach Litig.*,
No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016)..........................5, 6, 9

*In re Dominguez*,
51 F.3d 1502 (9th Cir. 1995).......................................................................................... 23

*In re Facebook Privacy Litig.*,
192 F. Supp. 3d 1053 (N.D. Cal. 2016) ............................................................................ 13

*In re Facebook, Inc., PPC Advert. Litig.*,
282 F.R.D. 446 (N.D. Cal. 2012) ...................................................................................... 8

*In re Google Inc. Gmail Litig.*,
No. 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ................................ 8

*In re iPhone Application Litig.*,
No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011).............................. 18

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996)........................................................................................ 20, 21

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ..................... 9, 11, 16

*Job v. Simply Wireless, Inc.*,
160 F. Supp. 3d 891 (E.D. Va. 2015)................................................................................ 12

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015) ............................................................................... 8

*Love v. United States*,
915 F.2d 1242 (9th Cir. 1989)........................................................................................... 3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................................................... 19

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008)........................................................................................... 3

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)................................................................................................ 6

*Miller v. United States*,
363 F.3d 999 (9th Cir. 2004)............................................................................................. 7

*Mitsui Mfgrs. Bank v. Superior Court*,
   212 Cal. App. 3d 726 (1989) ................................................................................. 15

*Newland N. Am. Foods, Inc. v. Zentis N. Am. Operating, LLC*,
   No. 2:13-CV-074, 2013 WL 1870652 (N.D. Ind. May 3, 2013) ............................ 12

*Noll v. eBay, Inc.*,
   282 F.R.D. 462 (N.D. Cal. 2012) ........................................................................... 9

*Oja v. U.S. Army Corps of Eng'rs*,
   440 F.3d 1122 (9th Cir. 2006) ......................................................................... 23, 24

*Pension Ben. Guar. Corp. v. Divin*,
   No. 4:08-CV-151(CDL), 2010 WL 2196114 (M.D. Ga. May 27, 2010) .................. 4

*Ruffu v. California Physicians Serv.*,
   No. A094979, 2002 WL 1352449 (Cal. Ct. App. June 20, 2002) ............................ 6

*Rural Fire Prot. Co. v. Hepp*,
   366 F.2d 355 (9th Cir. 1966) ................................................................................ 20

*Sandquist v. Lebo Auto., Inc.*,
   1 Cal. 5th 233 (2016) .............................................................................................. 7

*Shaw v. Regents of Univ. of Cal.*,
   58 Cal. App. 4th 44 (1997) ........................................................................ 2, 5, 6, 9

*Smolinski v. Oppenheimer*,
   No. 11 C 7005, 2012 WL 2885175 (N.D. Ill. July 11, 2012) ........................... 11, 12

*St. Paul Mercury Ins. Co. v. Am. Safety Indemnity Co.*,
   No. 12-CV-05952-LHK, 2014 WL 2120347 (N.D. Cal. May 21, 2014) .................. 8

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ................................................................................ 3

*Stoval v. Basin Street Properties*,
   No. 12-cv-04661-JST, 2013 U.S. Dist. LEXIS 161265 (N.D. Cal. Nov. 12, 2013) ................ 19

*Svenson v. Google Inc.*,
   No. 13-cv-04080-BLF, 2015 WL 1503429 (N.D. Cal., Apr. 1, 2015). .................... 17

*Swinerton Builders v. Am. Home Assur. Co.*,
   No. C-12-6047 EMC, 2013 WL 1122022 (N.D. Cal. Mar. 15, 2013) ............... 12, 13

*Tilbury Constructors, Inc. v. State Comp. Ins. Fund*,
   137 Cal. App. 4th 466 (2006) ............................................................................... 15

*Troyk v. Farmers Grp., Inc.*,
   171 Cal. App. 4th 1305 (2009) ............................................................................... 6

*United States v. Webb*,
   655 F.2d 977 (9th Cir. 1981)...........................................................................24

*Ward v. Nat'l Entm't Collectibles Ass'n, Inc.*,
   No. CV 11-06358 MMM (CWx), 2012 WL 12885073 (C.D. Cal. Oct. 29, 2012) .................12

*Weber Mfg. Techs., Inc. v. Plasan Carbon Composites, Inc.*,
   No. 14-CV-12488, 2016 WL 4073545 (E.D. Mich. Aug. 1, 2016) ...........................................7

*Wolschlager v. Fidelity Nat. Title Ins. Co.*,
   111 Cal. App. 4th 784 (2003)...........................................................................5

*Young v. Facebook, Inc.*,
   790 F. Supp. 2d 1110 (N.D. Cal. 2011) ...............................................................4

**Statutes**

Cal. Civ. Code § 1654 ...............................................................................7

Cal. Civ. Code § 3301 ...........................................................................12, 19

Cal. Civ. Code § 3330 ..............................................................................12

Cal. Civ. Code § 3360 ..............................................................................13

**Rules**

Fed. R. Civ. P. 8(a)................................................................................3

Fed. R. Civ. P. 12(b)(6)............................................................................3

Fed. R. Civ. P. 15 ................................................................................24

Fed. R. Civ. P. 15(c).....................................................................20, 21, 22, 23

Fed. R. Civ. P. 15(c)(1)(B)........................................................................24

Fed. R. Civ. P. 54(c)..............................................................................12

**Other Authorities**

6 Charles Alan Wright, et al.,
   Federal Practice and Procedure § 1471 (3d ed. 1998) ....................................................21

PLAINTIFFS' OPPOSITION TO MOTION TO
DISMISS THIRD AMENDED COMPLAINT
    vii
    5:12-MD-02314-EJD-NC

Lead Plaintiffs (the "Plaintiffs") file this memorandum of law in opposition to Defendant Facebook, Inc.'s Motion to Dismiss Plaintiffs' Third Amended Consolidated Class Action Complaint ("MTD," ECF No. 162).

## I. INTRODUCTION

On April 22, 2010, Facebook launched the "Like" social media plugin outside of the Facebook domain. TAC ¶ 1.[1]  The plugin was quickly integrated by millions of websites and became "ubiquitous." *Id*. ¶¶ 2-3.  Because "the Like button is a little piece of Facebook embedded on another website," *see* TAC, Ex. M, Facebook could now track the private browsing history of its subscribers – approximately half of the country's Internet users – *in real time*.  Privacy advocates were alarmed, *see id*. ¶ 90, but Facebook wrote its user contract ("Statement of Rights and Responsibilities" or "SRR") so that logged-in subscribers ostensibly consented to the tracking. Facebook repeatedly promised that only logged-in subscribers would be tracked.

As revealed later, Facebook broke its promise.  Facebook's cavils about the meaning of "tracking" aside, Facebook indisputably used cookies to gather user-identifiable Internet browsing history from logged-out subscribers through some point on or after September 26, 2011.  Facebook broke its promises in two ways.  First Facebook failed to expire cookies that explicitly identified the unique user ID or unique browser ID of users who had logged out of Facebook.  These undisclosed tracking cookies accompanied the referrer headers sent to Facebook each time the subscriber visited one of the millions of Facebook partner webpages.  Second, Facebook wrote new tracking cookies to the browsers of logged-out users, enabling the same tracking.

When Facebook's post-logout tracking was revealed publicly, public outrage was swift. Within days, Congress, the FTC and numerous privacy advocates registered their objections. Facebook moved to stop the post-logout tracking.  Not revealed at the time, however (but outlined in detail in the under-seal TAC with the benefit of limited discovery), was that Facebook's post log-out tracking was purposeful and its promises to the contrary knowingly false.

---

[1] "TAC" refers to the Third Amended Consolidated Class Action Complaint, filed August 25, 2017 (ECF No. 157).

Facebook now asks this Court to hold as a matter of law that more than 100 million Americans have no legal recourse. Even though Facebook's practices were clearly improper (*see*, *e.g.*, TAC ¶ 91), and even though the FTC considered Facebook's commitments to be "promises" (*see id.* ¶ 112), Facebook argues that it was never bound to its promises in the contracts Facebook itself wrote, assent to which Facebook required of every user. Facebook breached its contracts, and the MTD should be denied.

## II.   SUMMARY OF THE ARGUMENT

During the proposed class period, Facebook made privacy the core value in its primary contract, the SRR. TAC ¶¶ 19-23. On the first page, in the first sentence of the first substantive paragraph of the SRR, Facebook assures users "Your privacy is very important to us." *Id.* ¶ 24. But Facebook's business centrally depends on invading that "very important" user privacy to collect an immense store of private information on a scale achieved by no other company on Earth. This is not information voluntarily posted to Facebook pages. Rather, it is subscribers' most intimate web browsing habits *on other websites*, quietly sent billions of times a day to Facebook. Facebook's MTD boils down to the proposition that the "very important" privacy value Facebook touts in its primary contract is not, actually, even a part of that contract.

The SRR incorporates the Privacy Policy (later, the Data Use Policy) by textual reference, and explicitly by hyperlink. TAC ¶¶ 25-29. Whether one considers the Privacy Policy to be a second, stand-alone contract or simply as a document incorporated into the SRR, the Privacy Policy's promises were intended to be *promises* and are contractually binding.[2] Facebook styled the Privacy Policy's commitments as "promises," *id.* ¶ 37, and requires users to agree to it. *Id.* ¶ 39. Similarly, whether the promises contained in Facebook's Help Center are stand-alone contracts or rather are incorporated by reference into the Privacy Policy, they are intended to be *promises*. The Privacy Policy in turn incorporates the entirety of the Help Center both by text reference and by hyperlink. Facebook migrated language between the help Center and the Privacy Policy as if they were one document. *Id.* ¶¶ 45-46.

---

[2] *See Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 55 (1997) ("Documents which are not contracts may be incorporated into a contract.") (citing cases).

Facebook does not dispute the central contention of the TAC – that Facebook promised in the Help Center (and, as of September 7, 2011, in the body of the Privacy Policy itself, see TAC ¶ 60) not to track its subscribers after they logged out, and promised in the SRR and the Privacy Policy to respect user privacy generally. Facebook nowhere addresses the discovery-produced admissions by Facebook employees describing and worrying about Facebook's tracking logged out users in direct violation Facebook's promises. These documents plainly reflect Facebook's own belief that it had contractually promised not to do such tracking, but was, in fact, doing such tracking.

Instead, Facebook hyper-technically parses its own contract to argue that its promises were not explicit enough, and that the Privacy Policy only linked to the Help Center *generally* and not specifically to the pages containing the no-tracking promises at issue. But California law shows Facebook's strained deconstruction of its contract fails. Plaintiffs' contract and covenant of good faith and fair dealing claims are based on the plain language of Facebook's own contract, and Facebook's admittedly knowing breach of that contract, respectively.

## III.   LEGAL STANDARDS

The TAC is governed by the notice pleading standards of Fed. R. Civ. P. 8(a). Specific details are not necessary, and allegations need only be detailed enough to "raise a reasonable expectation that discovery will reveal evidence" of the illegality alleged. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). For Rule 12(b)(6) purposes, the Court must accept as true all well-pled factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and construe those facts in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). Dismissal at the pleading stage is thus only appropriate "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *see also Starr v. Baca*, 652 F.3d 1202, 1212-16 (9th Cir. 2011) (following *Twombly* and *Iqbal*, plaintiffs may no longer "simply recite the elements of the cause of action," but otherwise Fed. R. Civ. P. 8(a) remains unchanged).[3]

---

[3] The MTD is a classic example of what one judge called "a recurring pattern in the 'Rule 12(b)(6) Revival Era'" in which defendants "seek dismissal of Plaintiff's Complaint for failure to state a

## IV.   ARGUMENT

### A.   Plaintiffs Have Pled a Plausible Claim For Breach of Contract

#### 1.   *Plaintiffs Specifically Allege the Relevant Contract Provisions and Attach Them to the Complaint*

Contrary to Facebook's contention (MTD at 7), the TAC specifically alleges the contractual provisions in which Facebook promised, implicitly and later expressly, not to track logged out users.  *See, e.g.*, TAC ¶¶ 24, 57, 60,[4] 62-67.  No "guess[ing]" about the provisions at issue is required.  *See* MTD at 7.[5]  Facebook's arguments themselves show Facebook understands the provisions Plaintiffs say Facebook breached.  The TAC also alleges **when** the contract terms came into force (compare MTD at 14).  Indeed, the effective date is printed on each SRR, Privacy Policy and Help Center page attached to the TAC.

#### 2.   *The SRR Includes the Privacy Policy and Help Center Pages*

Facebook admits that the SRR is a contract.  Its primary argument, therefore, is that the SRR does not sufficiently incorporate the Privacy Policy and Help Center Pages containing the relevant contractual provisions.

#### a.   The Privacy Policy was Part of the Contract

Section 1 of the SRR, which Facebook agrees is the primary governing contract (MTD at 8), says not only "[y]our privacy is very important to us" (*see* TAC ¶¶ 24, 57) but that the Privacy

---

claim when their arguments are best suited for summary judgment."  *Pension Ben. Guar. Corp. v. Divin*, No. 4:08-CV-151(CDL), 2010 WL 2196114, at *1 (M.D. Ga. May 27, 2010).

[4] Plaintiffs use "Privacy Policy" to also include its post-September 7, 2011 iteration, styled "Data Use Policy."  *See* TAC ¶ 57.

[5] *Dunkel v. eBay Inc.*, No. 5:12-CV-01452-EJD, 2013 WL 415584 (N.D. Cal. Jan. 31, 2013), and *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110 (N.D. Cal. 2011), cited in the MTD at 7, are inapposite.  Unlike Plaintiffs here, *Dunkel's* plaintiffs "failed to sufficiently allege the existence of a contract between themselves and Defendant" and did not attach any Exhibits to their Complaint showing just what documents comprised the alleged contract.  *Id.*, 2013 WL 415584, at *8.  Unlike Plaintiffs here, *Dunkel's* plaintiffs did not even allege which provisions of the supposed contract were breached.  In *Young,* on which *Dunkel* relied, the *pro se* plaintiff challenging Facebook's termination of her account simply generally alleged that Facebook "'did not perform in accordance with the terms of agreement in their [SRR].'"  *Young*, 790 F. Supp. 2d at 1117.  Plaintiffs in our case cited to the exact contractual provisions promising no post-logout tracking that Facebook breached.

---

Policy is "important," "encourage[s]" users to read it, and explicitly hyperlinks to it. TAC ¶¶ 27, 54; *see also* TAC, Ex. A (Apr. 2, 2010 SRR: Sec. 1; Sec. 2(3) ("To learn more about Platform, read our Privacy Policy…."); Ex. B (Aug. 25, 2010 SRR: Sec. 1; Sec. 2(3); and containing additional section: "**You may also want to review the following documents:** Privacy Policy: the Privacy Policy is designed to help you understand how we collect and use information."); *see also Shaw*, 58 Cal. App. 4th at 54 (finding incorporation by reference of "patent policy" into "patent agreement" where latter directed employee to read the former). Facebook's inclusion of the Privacy Policy in the SRR is factually incontrovertible. *See In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *10 (N.D. Cal. May 27, 2016) (finding a contractual privacy promise in documents the "core message" of which was "the same: to take reasonable security measures to protect customers PII.").

The SRR expressly refers to the Privacy Policy, says that Policy is important, links to that Policy and tells users to read it to make important decisions about their privacy. *See* TAC ¶¶ 24, 57. That more than suffices for the SRR's incorporation of the Privacy Policy. *Wolschlager v. Fidelity National Title Insurance Company*, 111 Cal. App. 4th 784 (2003), which Facebook does not cite, shows why. *Wolschlager* found an arbitration provision in an insurance policy was incorporated by reference where the foundational agreement, a Preliminary Report, referred to the Policy "a number of times" and said it "should be read." *Id.* at 791. The Preliminary Report told the plaintiff where to get the policy, and the Preliminary Report referred to a specific document, the Policy. *Id.* All of these factors are present in our case and support the same conclusion, that incorporation was "clear and unequivocal." *Id.*

### b. The Help Center Pages are Part of the SRR

The TAC pleads precisely how the Privacy Policy repeatedly hyperlinks to the Help Center to assist subscribers understand Facebook's Privacy Policy better. TAC ¶¶ 43-46. Facebook does not dispute this fact, and instead argues that only those provisions specifically hyperlinked are incorporated by reference. But a mainstay of Internet contract law teaches that customers are often contractually bound to individual provisions (say, for example, an arbitration clause) even when

the hyperlink only links to the broader document.  *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-80 (2d Cir. 2017).  Each case involving a dispute over what is and what is not incorporated in a contract must turn "on its facts."  *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1331 (2009).  Here, the TAC demonstrates clearly how that the Help Center generally (not just specific pages) are incorporated into the SRR.

That the Help Center pages are the third link in the contractual chain does not defeat incorporation.  *See Ruffu v. California Physicians Serv.*, No. A094979, 2002 WL 1352449, at *5 (Cal. Ct. App. June 20, 2002) (unpub.) ("the Agreement expressly incorporated the application, and the application incorporated the Summary of Benefits").  Contrary to Facebook's implication, "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'"  *Shaw*, 58 Cal. App. 4th at 54 (internal citations omitted).[6] Here, the Privacy Policy linked to the Help Center pages and directed users to them, without exclusion.  *See* TAC ¶¶ 43, 44; *Shaw*, 58 Cal. App. 4th at 54 (plaintiff's contract directed the plaintiff to read the university's patent policy and specifically referred to its significance).

Similarly, in *In re Anthem Data Breach Litigation*, the Court found the defendant's "Notice of Privacy Practices" was incorporated by reference in the users' contracts where – less directly than the linking of the SRR, Privacy Policy and Help Center pages here – the contract gave users the right "to request" a copy of the Notice of Privacy Practices by calling customer service or going to Anthem's website.  *Anthem*, 2016 WL 3029783, at *8-9.

---

[6] *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582 (2008), cited in the MTD at 8, is inapposite.  *Amtower* was decided at trial, not on a dismissal motion, and also emphasized that the incorporation by reference issue must be resolved on each case's individual facts.  *Id.* at 1607. *Amtower* involved a Merger Agreement, which included an attorneys' fee provision, and an Affiliate Agreement, which did not.  The contracts were separate and between different parties, unlike the SRR, Privacy Policy and Help Center pages, which are all between Plaintiffs and Facebook.  *Id.* at 1609.  The Merger Agreement was not appended to the Affiliate Agreement, and the Affiliate Agreement did not say anywhere that that the Merger Agreement provided any rights or remedies to the plaintiff.  *Id.*  The Affiliate and Merger Agreements at issue in *Amtower* lacked the clear connections contained within Facebook's SRR and its constituent Privacy Policy and Help Center pages.  *Id.*  In *Amtower,* the references to Merger Agreement in the Affiliate Agreement "serve[d] more to separate the two agreements than to incorporate one into the other." *Id.* at 1608-09.

Any ambiguity about the components of Facebook's adhesive "layered" contract must be construed against Facebook. *See Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016) (construing ambiguity against drafter "applies with peculiar force in the case of a contract of adhesion"); *Miller v. United States*, 363 F.3d 999, 1006 (9th Cir. 2004) (noting that California Civil Code § 1654 requires construing ambiguity against its creator). If applying that rule still leaves ambiguity, the question is one of fact, for discovery and trial. *See, e.g.*, *Guidotti v. Global Client Sols., LLC*, No. 11-1219 (JBS/KMW), 2017 WL 1528693, at *2 (D.N.J. Apr. 26, 2017) (although incorporation by reference "is generally a question of law," finding "factual issues" existed and denying Plaintiff's motion *in limine* to exclude question from factfinder); *Weber Mfg. Techs., Inc. v. Plasan Carbon Composites, Inc.*, No. 14-CV-12488, 2016 WL 4073545, at *3 n.1 (E.D. Mich. Aug. 1, 2016) (where "[contract's] reference to the [defendant's] website does not state 'incorporated by reference herein' or other such buzz words of incorporation, whether or not the terms and conditions are part of the contract is a factual question for the jury to decide"); *Carlsson v. McGraw-Hill Cos., Inc.*, No. C 10-0323 RS, 2010 WL 3036487, at *4 (N.D. Cal. July 30, 2010) (finding ambiguity and stating, "[a]t the motion to dismiss stage, of course, the Court cannot conclusively interpret the contract").

Facebook argues that the SRR neither references nor "even hint[s] at" any of the Help Center pages cited in the TAC. MTD at 8-9.[7] But, as discussed, the SRR incorporates the Privacy Policy, and, in turn, the Help Center pages. The SRR need not mention the Help Center pages for those pages to form part of Facebook's "layered" contract. TAC ¶ 42. No SRR language excludes either the Privacy Policy or Help Center pages. Likewise, Facebook falsely says that Plaintiffs fail to plead the series of links from the SRR to the Privacy Policy that "guide" the user to the Help

---

[7] Facebook's reliance (MTD at 9) on *Amtower*, 158 Cal. App. 4th at 1608, for this point is unavailing. As discussed above, *Amtower* is easily distinguishable. *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632 (1986), is similarly off the mark. There, the defendants sought to compel arbitration of the plaintiff's claim, arguing that the plaintiff's employment agreement incorporated a stock exchange rule requiring arbitration. *Id.* at 635-36. Unlike the SRR's direct reference to the Privacy Policy, which in turn directly includes and links to the Help Center pages, the employment agreement nowhere mentioned arbitration and the court refused to compel arbitration. The employment agreement simply said the employee agreed to abide by the "Statute(s), Constitution(s), Rule(s) and By-Laws" of the NASD, AMEX and NYSE, with no hyperlink or other reference to the specific document. *Id.* at 636.

Center.  MTD at 9-10.  The SRR expressly guides the user to the Privacy Policy and the Privacy Policy guides the user to the Help Center.  Incorporation by reference encompasses documents linked to the contract, and it is not necessary for the SRR to link directly to the Help Center.  *See, e.g.*, *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, at *6 (N.D. Cal. Mar. 18, 2014) ("The TOS also incorporates by reference the Privacy Policy in effect at the time, by linking to Google's Privacy Policy Page, which contained the latest Privacy Policy."); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 958 (N.D. Cal. 2015) (finding that "the AAA rules were clearly incorporated by reference and linked by hyperlink in the 2014 TOS").[8]

### c.    The Help Center is Known and Easily Available to the Parties

Finally, the MTD argues that the Help Center is not "known and easily accessible to the parties."  MTD at 10-11.  Without meaning to be disrespectful, such argument cannot be made in good faith.  Less than four months after news broke of the post-logout tracking, Facebook represented to Congress that its Help Center, like its Data Use Policy, was "easily available":

> By adopting this layered approach to privacy, our goal was to make comprehensive and detailed information available to people who wanted it, while making shorter summaries about how we use the data we receive ***easily available***.  We believe that this layered and graphical approach is the best way to provide people with clear information about our data use practices.  We also sought to provide the information in a more accessible layout, using graphics and offering a format similar to the way content is present to users online.  The content is organized by topic, ***similar to our Help Center***, which lets users find exactly what they are looking for ***quickly and easily***.

Letter from Facebook, Inc. to United States House of Representatives Bi-Partisan Privacy Caucus dated Jan. 6, 2012, at 9, attached as Ex. T to the TAC (emphasis added).  Facebook also noted: "We provide links to our Help Center in the dropdown menu ***at the top of every page of our site***." *Id*. at 10 (emphasis added) (also noting that the Help Center can be used "to search for answers to privacy-related questions").  Facebook concluded by claiming that the "compendium of resources"

---

[8] *In re Facebook, Inc., PPC Advertising Litigation*, 282 F.R.D. 446 (N.D. Cal. 2012), *aff'd sub nom. Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014) is also misstated.  *See* MTD at 10.  There, the "Click Agreement" at issue hyperlinked to the SRR and Facebook Advertising Guidelines, but not to the Glossary of Ad Terms that plaintiffs argued were incorporated in the contract.  *Facebook*, 282 F.R.D. at 456.  That Glossary "was not referenced in or linked to the 'Place Order' page or to the SRR."  *Id*. at 457.  In contrast, the SRR here links directly to the Privacy Policy, which, in turn, links directly to the Help Center pages.

(including the Data Use Policy and the Help Center) "demonstrates our commitment to ensuring Facebook users understand the collection and use of their information." *Id.*  The Court will find instructive all of Facebook's comments on this topic on pages 8 through 10 of the letter.  *See also Anthem*, 2016 WL 3029783, at *10 (online availability of document demonstrates "'easily available'" (quoting *Shaw*, 58 Cal. App. 4th at 54)); *Noll v. eBay, Inc.*, 282 F.R.D. 462, 467 (N.D. Cal. 2012) ("Whether the document purportedly incorporated by reference was 'readily available' is a question of fact" (citing *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 895 (2008)).

### 3. *Facebook Breached The Privacy Policy and Help Center Pages*

Facebook argues that even if the Privacy Policy and Help Center pages are part of the SRR, the cited Help Center pages contain no promises that Facebook breached.  MTD at 12-15.  If that were true, Facebook needs to explain in a way it has not – depositions are the appropriate venue – why its own employees believed Facebook *had* made express "no tracking" promises and *had* broken those promises.  *See, e.g.*, TAC ¶¶ 80-82, 84-88, 105-106.  Facebook nowhere explains away its admission that it promised not to, but did, track logged out users.  *See id.* ¶ 91 ("We've said that we don't do it, *and we couldn't do it without some form of consent and disclosure.*").   If no contrary promise existed, Facebook would not have admitted, when the tracking hit the news, that it would "be fixing that [tracking] today."  *Id.* ¶ 99.

Facebook ignores that the TAC must be construed as a whole, that Plaintiffs are entitled to all inferences from well pleaded facts, that ambiguities must be construed against Facebook, and that omissions can be contractually actionable where the specific disclosures are misleading.  *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *29 (N.D. Cal. Aug. 30, 2017) (California law imposes disclosure duty when "'the defendant has exclusive knowledge of a material fact not known or reasonably accessible to the plaintiff … the defendant actively conceals a material fact from the plaintiff … [or] when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.'" (quoting *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011)).

Facebook essentially argues it did not intend to include the Help Center in the SRR.  But the objective theory of contract interpretation, "evidenced by the words of the contract," controls. *See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) (citation omitted).  Reading the Help Center pages as an ordinary subscriber shows Facebook promised not to track logged-out users, especially when read together, as they should be.  For example:

**Ex. I**:  "When you log out of Facebook, we remove the cookies that identify your particular account."  For logged out users, Facebook would only employ cookies that helped "protect Facebook and the people who use it from malicious activity."  And: "We do not use these cookies to create a profile of your browsing behavior on third-party sites."  Exhibit I cannot be understood as promising anything other than "we will not track logged out users on third party sites."

**Ex. J**:  Facebook receives only "a limited amount of data when you visit a site with a social plug-in."  Facebook specified the "technical information" received, none of which included User IDs and other personally identifiable information.  In emphasizing its circumscribed data collection from users on sites with social plugins, Facebook did not disclose what Plaintiffs did not know, that Facebook was hoovering up much more than the anodyne "technical information" it specified.

**Ex. K**:  This page includes much of the wording of Exhibit J, but goes even farther.  Exhibit K expressly distinguishes between the "technical data" Facebook received from visits to sites with social plugins, and the "User ID number and email address" that Facebook also received "[i]f you are logged into Facebook."  Distinguishing in numerous places between logged in and logged out users, Facebook here clearly promised it would not collect user-identifying personal information from logged out subscribers.  That was false, as Facebook's own employees repeatedly acknowledged. *See, e.g.*, TAC ¶¶ 80-82; 84-88, 102, 105-106.

**Exs. L and M**:  These pages also make much of the difference between the "limited set of information" Facebook receives from logged out users and the more extensive information, such as User ID, that Facebook received from logged in users on third party sites.  A reasonable user

would understand Facebook was not tracking personally identifying information for logged out users.

**Ex. N**:  Facebook expressly promised: "We do not use cookies to create a profile of your browsing behavior on third-party sites."  Nothing murky there – exactly the promise Plaintiffs claim, and Defendants internally admitted, that Facebook breached.

**Ex. O**:  This page begins "How does Facebook use cookies?"  None of the six described ways in which Facebook used cookies included the use of cookies to track logged-out users.  That disclosure was necessitated by Facebook's partial and deeply misleading of how it uses cookies. *See In re Yahoo! Inc.*, 2017 WL 3727318, at *29 (omissions can be false statements).

**Exs. P and Q**:  These pages begin, "What does Facebook do with my cookies?"  Exhibit P listed the same six reasons that Exhibit O did, and similarly failed to mention Facebook's use of cookies to track logged out users.

**Exs. R and S**:  These pages describe "[h]ow social plugins work."  Noting that only logged-in users would see "personalized content," Facebook implied that logged out users would not see the personalized content driven by User IDs and that Facebook was not getting information to associate logged out users with their doings on third party sites.

**Exs. MM, NN, OO, and PP**:  answering the key question "Does Facebook have the ability to see what I'm doing on non-Facebook sites?", these pages all falsely promised, "Facebook cannot track your actions on external sites unless you decide to connect your Facebook account to that site … or otherwise [are] … logged into Facebook while you interact with one of those sites."

#### 4.   *Plaintiffs Have Properly Pled Damages*

Facebook's argument that Plaintiffs have not properly pled contract damages is wrong as a matter of law.  *See* MTD at 15-18.  Nowhere in *Ashcroft* does it require that Plaintiffs plead the amount, as opposed to the fact, of damages.  *See Ward v. Nat'l Entm't Collectibles Ass'n, Inc.*, No. CV-11-06358 MMM (CWx), 2012 WL 12885073, at *6 (C.D. Cal. Oct. 29, 2012) (allegation that plaintiff suffered "actual damages" from fraud satisfied pleading burden (citing *Smolinski v. Oppenheimer*, No. 11 C 7005, 2012 WL 2885175, at *3 (N.D. Ill. July 11, 2012) (damages "need

not be pled with specificity to make out a plausible case that he is entitled to relief, which is all that *Twombly* requires")); *Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 900 n.10 (E.D. Va. 2015) (citing *Twombly* for proposition "there is no requirement to plead precise damages," and stating that "at the motion to dismiss stage the general allegation that plaintiffs have suffered damage is sufficient" and whether alleged damages were "cognizable in contract [] is an issue for the merits stage"); *Exxon Mobil Corp. v. Tredegar Corp.*, 891 F. Supp. 2d 559, 566 (S.D.N.Y. 2012) (applying *Twombly* and, denying dismissal where plaintiff pleaded contract damages "in an amount to be proven at trial"); *Newland N. Am. Foods, Inc. v. Zentis N. Am. Operating, LLC*, No. 2:13-CV-074, 2013 WL 1870652, at *4 (N.D. Ind. May 3, 2013) (citing *Smolinski* and finding counterclaimant "alleged it did suffer damages and that is all that is required at this stage").[9]

Determining the amounts of damages for breaches of privacy promises is a jury's province, aided, in a case like this, by expert testimony.[10]  California Civil Code § 3330 underscores the jury's role: damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in ordinary course of things, would be likely to result therefrom".  The jury's job is especially central where, as here, the contract does not specify the measure of damages.

Contrary to Facebook's assertion (MTD at 15), Plaintiffs plead damages "clearly ascertainable in their nature and origin."  Cal. Civ. Code § 3301.  Their nature: loss of the benefit of the privacy bargain with Facebook.  Their origin: Facebook's breach of its privacy promise. Ascertainable does not mean "specific dollar amount."  No case Facebook cites says otherwise.[11]

---

[9]  *See also Twombly*, 550 U.S. at 569 n.14 ("we do not require heightened fact pleading of specifics;" "we do not apply any 'heightened' pleading standard"); *cf.* Fed. R. Civ. P. 54(c) (prevailing party may obtain any relief to which entitled, "even if . . . not demanded in the pleadings"); *Alexander v. S.E. Wholesale Corp.*, 978 F. Supp. 2d 615, 624 (E.D. Va. 2013) (demand for relief need not "be for a particular amount, and can be made in general terms") (citations omitted).

[10]  Verdict forms typically ask the jury to decide (a) whether the defendant breached the contract; (b) was such breach the cause of plaintiff's damages; and (c) what amount of damages is necessary to give the plaintiff the benefit of the contractual bargain (i.e. put the plaintiff in the position in which plaintiff would have been had defendant not breached).

[11]  *Swinerton Builders v. American Home Assurance Company*, No. C-12-6047 EMC, 2013 WL 1122022 (N.D. Cal. Mar. 15, 2013), cited in the MTD at 15, does not support the argument that

Where the fact of breach and resulting loss of the benefit of the bargain is proven, the jury has latitude to award damages based on trial proof. "Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations omitted.] The law requires only that some reasonable basis of computation of damages be used … even if the result reached is an approximation." *GHK Assocs. v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990) (emphasis in original).

Finally, Facebook's argument that nominal damages are unavailable for a contractual breach (MTD at 16) ignores the most recent and well-reasoned case law. Facebook does not cite *Fisher v. Biozone Pharmaceuticals, Inc.*, No. 12-CV-03716-LB, 2017 WL 1097198 (N.D. Cal. Mar. 23, 2017). *Fisher* agreed with *In re Facebook Privacy Litigation*, 192 F. Supp. 3d 1053 (N.D. Cal. 2016), which canvassed the cases, and "looked the matter over closely and decided that nominal damages *do* support a contract claim in California." *Fisher*, 2017 WL 1097198, at *5 (emphasis in original). *Fisher* concluded: "in the end, the better view is that nominal damages will support a contract claim in California, 'even in the absence of actual damages.'" *Id.* (quoting *Facebook*, 192 F. Supp. 3d at 1061-62; citing Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages.")).

### B. Plaintiffs Have Pled a Plausible Claim For Breach of the Duty of Good Faith and Fair Dealing

#### 1. *Plaintiffs' Breach of Covenant Claim Differs from the Contract Claim*

Contrary to Facebook's claim (MTD at 19-20), actions supporting a contract breach claim can also support a covenant claim. The difference is that, for purposes of the contract claim, the

---

Plaintiffs' damages allegations are insufficient. *Swinerton* involved allegations by the plaintiff builders, who were being sued for defective construction, that their insurers wrongly denied coverage. *Swinerton's* plaintiffs alleged damages from "lost business reputation" but provided "no specific details." *Id.*, at *1, n.1. *Swinerton's* plaintiffs were much better postured specifically to plead business losses than Plaintiffs are to plead the amounts of their damages from Facebook's breach. *Architectural Resources Group, Inc. v. HKS, Inc.*, No. C 12-5787 SI, 2013 WL 568921 (N.D. Cal. Feb. 13, 2013), cited in the MTD at 15, is also distinguishable. There the counter-complaint alleged unspecified damages, but the facts showed the price to be paid to the counter-complainant had increased and the counter-complainant offered no explanation – something within the counter-complainant's own knowledge - how a revised design plan, within the agreed-upon budget, produced losses of hundreds of thousands of dollars. *Id.* at *5.

motive for and nature of the breaching conduct is irrelevant.  In contrast, for a covenant claim, the defendant's conduct:

> [W]hether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence, but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

*Architectural Resources*, 2013 WL 568921, at *6 (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)).  The "something beyond a breach of the contract terms themselves" that Facebook says is necessary, *see* MTD at 19, can be the *manner* in which the defendant breached the contract.  Facebook quotes *Careau's* language making that very point.  *Id.*

Facebook incorrectly says Plaintiffs fail to plead that "something extra" the covenant claim requires, claiming the covenant claim is "substantively identical" to the contract claim.  MTD at 19.  Not so.  For their contract claim, plaintiffs need only plead that Facebook tracked users' post-logout in violation of the agreement prohibiting that tracking.  But Plaintiffs also plead Facebook's intentional breach of the contract, Facebook's bad faith in its "conscious and deliberate act[s]," *Careau*, 222 Cal. App. 3d at 1395, breaching the contract's privacy promise, over many months, that support the covenant claim.  *See, e.g.*, TAC ¶¶ 68-71 (motive); ¶ 72 (purposeful method); ¶¶ 73-78 (intent); ¶ 79 (purposeful method and intent); ¶ 80 (purposeful method and intent); ¶ 81 (purposeful method and intent); ¶ 81 (intent and knowledge of breach); ¶ 82 (knowledge of breach and purposeful method); ¶ 84 (knowledge of breach); ¶ 85 (knowledge of breach); ¶ 86 (knowledge of breach and purposeful method); ¶ 87 (knowledge of breach and purposeful method); ¶ 88 (knowledge of breach and purposeful method).

Facebook's intentional, bad-faith breach was a "conscious and deliberate act [that] unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  *Careau*, 222 Cal. App. 3d at 1395.  Plaintiffs allege facts showing Facebook purposefully breached its contractual privacy promise to keep its user data gathering machine humming and advertising revenues pouring in.

*See* TAC, ¶¶ 68-78.   Plaintiffs alleged "unfair dealing," not merely "mistaken judgment" in Facebook's post-logout tracking.  *See Architectural Resources*, 2013 WL 568921, at *6 (quoting *Tilbury Constructors, Inc. v. State Comp. Ins. Fund*, 137 Cal. App. 4th 466, 474 (2006)).

These cases – all of which Facebook cited – teach that the very same act that breaches a contract can also breach the covenant of good faith and fair dealing.  Where the nature of the breach shows deliberate misconduct, the covenant claim can rest on exactly the same breach as the contract claim.  *Careau* cited *Mitsui Mfgrs. Bank v. Superior Court*, 212 Cal. App. 3d 726 (1989), for its recitation of factors supporting recognition of a claim for breach of the duty of good faith and fair dealing.  Such a claim is cognizable where the contract "'reflects unequal bargaining strength between the parties, an inadequacy of ordinary contract damages or other remedies, adhesiveness of contract provisions adversely impacting the damaged party which are either neutral toward or benefit the other, public concerns that parties to certain types of contracts conduct themselves in a reasonable manner, the reasonable expectations of the parties … in which the … personal security by the damaged party has been entrusted to the other'" and other factors.  *Careau,* 222 Cal. App. 3d at 1399-1400 (quoting *Mitsui*, 212 Cal. App. 3d at 731).  Each factors applies here.

**2.     *Plaintiffs' Covenant Claim Creates No Requirements Not in the Contract***

Facebook argues that Plaintiffs failed "to identify implied-covenant obligations that are not derived from the contract."  MTD at 19-20.  Plaintiffs need not do so.  The covenant obligations must rest "'upon the existence of some specific contractual obligation.'"  *Avidity Partners, LLC v. State*, 221 Cal. App. 4th 1180, 1204 (2013) (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683–84, 689–90 (1988)).  The covenant itself "is a contract term."  *Foley*, 47 Cal. 3d at 684.  Here, the covenant obligated Facebook not to act purposefully to frustrate the contract's privacy promise.  Plaintiffs have identified Facebook's violation of those obligations in spades.  Facebook's argument that plaintiffs "fail to locate a contractual obligation for disclosure" (MTD at 20) also fails.  A disclosure duty arises when "'the defendant has exclusive knowledge of a material fact not known or reasonably accessible to the plaintiff … the defendant actively conceals

a material fact from the plaintiff … [or] when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.'"   *In re Yahoo!*, 2017 WL 3727318, at *29 (quoting *Collins*, 202 Cal. App. 4th at 255).   The TAC alleges that Plaintiffs neither knew about, nor, in light of Facebook's express promises to the contrary, had reason to suspect, Facebook's post-logout tracking.   *See* TAC ¶¶ 79-82, 84-89, 90-91, 99-112.   Similarly, the TAC addresses concealment of post-logout tracking from users.   *See, e.g.*, TAC ¶¶ 81, 86, 87, 91.   Facebook expressly stated: "Your privacy is very important to us" (TAC ¶¶ 24, 57) and made numerous representations directly implying that Facebook would only track logged-in users (*see* TAC ¶¶ 59-67), and would only collect limited "technical information" from logged out users as opposed to the more robust personal information Facebook gathered from logged-in users.   *See* TAC ¶¶ 63-67.   To correct that untruth, Facebook was obligated to tell the full truth, that Facebook was in fact tracking logged out users.   Breaching this disclosure duty breaches the covenant of good faith and fair dealing claim.   Anyway, Facebook admitted away this "no disclosure duty" argument.   *See* TAC ¶ 91 ("We've said that we don't do it, *and we couldn't do it without some form of consent and disclosure.*" (emphasis in original)).

   Facebook itself acknowledged the materiality of its undisclosed tracking.   In declaring that the importance of user privacy (TAC ¶¶ 24, 57), Facebook underscored privacy's materiality. Facebook's internal emails emphasizing the privacy impetus for stopping the undisclosed tracking reflects Facebook's own belief that "'a reasonable [user] would deem it important.'"   *In re Yahoo!*, 2017 WL 3727318, at *29 (quoting *Collins*, 202 Cal. App. 4th at 256 (citation omitted)).   The "privacy people" were hounding Facebook over the issue (*see* TAC ¶¶ 85, 105), and Facebook had made public statements directly denying what Facebook was actually doing.   *See* TAC ¶ 91. Further confirming materiality, Facebook agreed to 20 years of FTC privacy audits for similar misconduct (*see* TAC ¶¶ 110-112), and Congress had written Facebook about "serious privacy concerns" resulting from post-logout tracking. *See* TAC ¶¶ 107-109. [12]

---

[12] *American Express Bank, FSB v. Kayatta*, 190 Cal. App. 4th 563 (2010), cited in the MTD at 20, is readily distinguishable.   *Kayatta* involved a credit card holder's claim that the issuer wrongfully failed to disclose the bad credit history of an additional named cardmember on the account, who ran up unauthorized charges.   For *Kayatta* to be analogous to this case, the issuer would have had

**3.** *Plaintiffs Plausibly Alleged Facebook's Conduct that Prevented Them from Receiving the Benefit of their Bargain with Facebook*

Facebook's argument that "Plaintiffs fail to point to any specific contractual benefit they were entitled to that was frustrated by Facebook's conduct" (MTD at 21) ignores the TAC's plain language. Plaintiffs factually allege that Facebook deprived them of the contractual privacy benefit inherent in Facebook's promise not to track logged-out users across third party sites. *See, e.g.,* TAC ¶¶ 6, 60, 62, 64, 65, 66, 67. *See also* TAC ¶ 90 (not one of eight listed "well-respected and tech-savvy privacy groups understood or believed that Facebook was also tracking logged out as well as logged in users").

Facebook's own employees understood *before* this case began what Facebook's lawyers now deny: that Facebook had pledged not to employ user-identifying cookies to collect information from logged out users. *See, e.g.,* TAC ¶¶ 81 (under seal); ¶ 82 (under seal); ¶ 84 (under seal); ¶ 85 (under seal); ¶ 86 (under seal); ¶ 87 (under seal); ¶ 88 (under seal). Facebook did not believe its contract permitted tracking of logged out users. Otherwise Facebook would not have said "We've said that we don't do it *and we couldn't do it without some form of consent and disclosure.*" TAC ¶ 91 (emphasis in original).

The covenant of good faith and fair dealing protects "the legitimate expectations of the parties which arise from the contract." *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918 (1980). Facebook promised users "[y]our privacy is very important to us," encouraged users to read the Privacy Policy and linked the SRR to that Policy. Facebook's contract unambiguously created users' legitimate expectation that Facebook would not eviscerate that fundamental privacy promise.

---

to have said something to the effect of "your additional named cardmembers have good credit according to our investigation." Besides, the cardholder in *Kayatta* could himself have investigated his additional cardmember's credit history. Plaintiffs here relied, very differently, on Facebook's own false representation that "[y]our privacy is very important to us" and numerous disclosures reflecting that Facebook would compile personal information from logged-in users but not logged-out users. Likewise, *Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2015 WL 1503429 (N.D. Cal. Apr. 1, 2015), cited in the MTD at 20, does not support Defendant. Although the court was skeptical of supporting the implied covenant claim with a failure to disclose, it ultimately allowed the implied covenant claim to proceed in parallel with the contract claim. *Id.* at *5-6.

Facebook cites *Egan v. Mutual of Omaha Insurance Company*, 24 Cal. 3d 809 (1979), for the proposition that a breach of the implied covenant exists where "a party acts in such a way as to unfairly deprive a party of an explicit benefit provided by the contract, or fails to exercise discretion granted under the contract in good faith."  MTD at 20.[13]  Both covenant-triggering conditions apply here.  Plaintiff's allegations of Facebook's purposeful use of the *c user, lu* and and *datr* cookies to track logged out users (*see* TAC ¶¶ 7, 9, 52-56, 72, 79-88) wrongly deprived plaintiffs of the privacy benefit of SRR's promise not to do so.  With total control over its cookie setting and other operations, Facebook did not exercise its discretionary power over contractual administration in good faith.

*In re iPhone Application Litigation*, No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011), gives Facebook no help.  There, the plaintiffs failed to identify the contract at issue, dooming the implied covenant claim.  *Id.* at *9 ("Plaintiffs do not actually identify the contract upon which they are relying for their breach of covenant of good faith and fair dealing claim.").  Plaintiffs here have fully identified the contract and its component parts.  *See* TAC ¶¶ 19-33 (SRR); 24-39 (Privacy Policy); 40-46 (Help Center pages).  Facebook's citation to *Kayatta*, 190 Cal. App. 4th 563, similarly gets Facebook nowhere.[14]  *See* MTD at 21.  There the Defendant had made no contractual promises about the creditworthiness of additional cardholders, so the covenant was unavailable to enforce a promise not actually made.  In contrast, Facebook promised –Facebook's internal emails confirm those promises – not to track logged out users and the covenant is available to enforce that contractual pledge.

---

[13] *Egan's* analysis of the rationale for applying the covenant of good faith and fair dealing in insurance contracts supports the same result here.  *Egan* noted the insurer's "status as purveyors of a vital service labelled quasi-public in nature."  *Id.*, 24 Cal. 3d at 820.  Facebook might not be a "vital" service in the way insurance, or a gas and electric utility is.  But Facebook's ubiquity and control of so much Internet traffic renders it quasi-public in nature.  *Egan* cited the "inherently unbalanced" relationship between insurers and insureds, and "the adhesive nature" of the insurance contract giving the insurer "a superior bargaining position."  *Id.*  Just so with Facebook and its users.  Facebook alone sets the contractual terms, absent a change receiving comments from more than 7,000 users, in which case users are given the right to vote on the change, binding Facebook to the vote's result if "more than 30% of all active registered users as of the date of the notice vote."  *See* SRR, § 13(4).

[14] *See* n.12, *supra* for additional discussion.

---

#### 4.    *Plaintiffs Plausibly Allege Damages from Covenant Breach*

Facebook claims that Plaintiffs' damages allegations are "conclusory" and fail for the same reason Plaintiffs' contract damages claims fail.[15]  As the cases discussed above show, that argument fails.  Plaintiffs need only plausibly allege the fact of damages from their loss of privacy caused by Facebook's breach, the damages' "nature" and "origin" (Cal. Civ. Code § 3301), not their amount.  *See also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[a]t the *pleading* stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim") (quotation and citation omitted) (emphasis added).

### C.    Plaintiffs' New Allegations in the TAC are Timely

#### 1.    *Overview of Defendant's Objections to New Allegations*

In the Second Amended Complaint filed under seal on November 30, 2015 (the "SAC"), Plaintiffs added, among others, claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Plaintiffs alleged that these new claims related back to the original complaint because they related to the identical conduct, transaction or occurrence set forth in the original complaint.  *See* SAC ¶ 145.  Defendant did not disagree, and raised no statute of limitations defense in its motion to dismiss the SAC.  The TAC adds no new claims, but simply amends the earlier contract and implied covenant claims.  Defendant still does not raise a general statute of limitations defense.   Defendant only argues that Plaintiff is time-barred from proposing an enlarged class period, and likewise is barred from offering new evidence (three newly produced Help Center pages) that post-date the original class period.

---

[15] *Avila v. Countrywide Home Loans*, No. 10-CV-05485-LHK, 2010 WL 5071714 (N.D. Cal. Dec. 7, 2010), cited in the MTD at 21, says only that plaintiffs must allege "damages resulted from the defendant's actions" in breaching the covenant.  *Avila*, 2010 WL 5071714, at *5.  Plaintiffs do.  *See* TAC ¶ 161.  *Stoval v. Basin Street Properties*, No. 12-cv-04661-JST, 2013 U.S. Dist. LEXIS 161265 (N.D. Cal. Nov. 12, 2013), cited in the MTD at 21, says only that covenant claims "are based on contract principles and are therefore limited to contract damages."  *Stoval*, 2013 U.S. Dist. LEXIS 161265, at *21 (citation omitted).  And as discussed above, nominal damages are available for contract breaches and are, therefore, available for implied covenant claims.

1

2.      *Plaintiff May Propose a Longer Class Period in the TAC*

2          The original proposed class period was April 22, 2010 to September 26, 2011.  SAC ¶ 172

3    ("Class Period I" in the MTD).  The TAC expanded this period and proposed its ending on "a later

4    date to be determined upon completion of discovery."  TAC ¶ 132 ("Class Period II" in the MTD).

5    The reason for the change: Plaintiffs learned new information in discovery.  Based on Facebook's

6    public statements to the press, Plaintiffs only had evidence of Facebook's breaches through

7    September 25, 2011.  *See* SAC ¶ 105 ("We'll be fixing that today.").  But in confidential documents

8    produced on April 17, 2014, Plaintiffs discovered that the problem may not have been fixed until

9    some date thereafter.  *See* TAC ¶ 106.  As recognized by the very authority Facebook cites, the

10   statute of limitations with respect to new class members only begins to run when the Lead Plaintiffs

11   discovered or should have discovered the basis for the enlarged class period.  *In re Syntex Corp.*

12   *Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996).  The Lead Plaintiffs could only have discovered a

13   basis for extending the class period on or after April 17, 2014, so the 4-year statute of limitations

14   has not expired.

15         Even if the limitations period governing an extended class period did expire prior to the

16   TAC's filing, the Plaintiffs have met the Ninth Circuit's three-factor test under *Syntex* for "relation

17   back" under Fed. R. Civ. P. 15(c): 1) the prior Complaint provided sufficient notice of the new

18   claims; (2) Facebook would not be unfairly prejudiced by the extension of the class period; and

19   (3) the new plaintiffs have the requisite identity of interests with the original class members.  *Id.*

20   Ninth Circuit authority instructs district courts to apply the three-factor *Syntex* test liberally.  *See*

21   *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004-05 (9th Cir. 2014).[16]   Liberal

22   application of Fed. R. Civ. P. 15(c) is necessary to fulfill the rule's purpose: "'to provide maximum

23   opportunity for each claim to be decided on its merits rather than on procedural technicalities'"

24   because "[g]one are the code pleading days when a party was 'irrevocably bound to the legal or

25

26

[16]   Even cases pre-dating *Syntex* emphasize that that "relation back" is liberally applied.  *See, e.g.*,
27   *Clipper Express v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n.29 (9th Cir.
     1982); *Rural Fire Prot. Co. v. Hepp*, 366 F.2d 355, 362 (9th Cir. 1966).
28

factual theory of the party's first pleading'"  *Id.* (quoting 6 Charles Alan Wright, *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1471 (3d ed. 1998)).

### a.     Facebook Had Adequate Notice

The first *Syntex* factor requires that Facebook be on notice of the potential new claims. Facebook argues that it lacked notice of potential claims for breaking a promise "that post-dated the events described in the earlier complaints."  MTD at 24.  But Facebook knew that the original proposed class period ended on the date Plaintiffs incorrectly understood the offending conduct had ended.  Facebook already knew better, and cannot now claim to lack notice of a potential expansion of the class period.

Further underscoring Facebook's adequate notice, the SAC clearly stated that Plaintiffs sought to represent all persons "similarly situated" to the named Plaintiffs.  SAC ¶ 5. Class members who would be added through the longer class period are, for all material purposes, similarly situated to the initial class members and assert the same core claim against Facebook for its breach of its promise not to track logged out users.  *See Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1069 (S.D. Cal. 2015) (finding relation back where amendment added plaintiffs alleging the "same theories on the same [p]roducts . . . Specifically, courts examine whether the original complaint clearly stated that the plaintiff sought to represent others.").[17]

### b.     Additional Plaintiffs Have Identity of Interests with Initially Identified Plaintiffs

The second *Syntex* factor requires "similarity of interests," meaning, "the circumstances giving rise to the claim remain[ ] the same under the amended complaint as under the original complaint."  *Similasan*, 96 F. Supp. 3d at 1069 (quotation and citation omitted).   Those circumstances here are, for Fed. R. Civ. P. 15(c)'s purposes, identical.  The original plaintiffs and any added plaintiffs all claim that Facebook promised not to track them after they logged out.

---

[17] *In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005), cited in the MTD at 24, does not support Facebook's "no notice" argument.  In *Alcatel*, the original complaint was based on entirely different occurrences (an IPO Prospectus, Registration Statement and corresponding press releases) than the events at issue in the later claims (certain products, acquisitions and associated accounting).  *Id.* at 528.

Facebook's argument that Class Period I plaintiffs rely on "implied" statements and Class Period II plaintiffs on "explicit" statements is no basis for denying relation back. Facebook's contractual promise, and Plaintiffs' central theory of the claims, are functionally the same for both sets of plaintiffs. Facebook's assertion that "the alleged promises" and the resulting "contract claims" "are fundamentally different" (MTD at 24) is, as a matter of Fed. R. Civ. P. 15(c) law, incorrect.

### c.   Facebook Demonstrates No Prejudice from Amendment

The final *Syntex* factor requires lack of prejudice, which only means that the contract-based claims asserted by any newly added class members are functionally identical to the earlier claims. Whether based on an express or implied promise, plaintiffs are alleging the same theory: Facebook promised not to, but did, track post-logout subscribers. No prejudice results from modifying the claim to include additional instances of the same promise. *See Czuchaj v. Conair Corp.*, No. 3:13-cv-01901-BEN-RBB, 2016 WL 4272374, at *5 (S.D. Cal. Aug. 15, 2016) ("[l]iberally applying Rule 15(c)," and noting "Defendant is not prejudiced by the addition of a plaintiff who asserts the same general claim" (citing *Similasan*, 96 F. Supp. 3d at 1069 ("[t]he [addition] of new plaintiffs forwarding the same theories on the same [p]roducts does not prejudice Defendant."))).

Facebook argues prejudice based on the addition of claims of "six additional years of putative plaintiffs." But no basis now exists to determine whether Class Period II is simply one week, one month, or one year longer than Class Period I. Discovery is still ongoing to determine when the post-logout tracking ended. Unless Facebook is admitting that its contractual violation *never* ended, Facebook cannot base its prejudice argument on a theoretical 6-year extension to the putative class period.

### 3.   *Plaintiffs May Support Their Claims With the New Evidence*

Facebook also objects to the use of three newly identified Help Center pages as additional bases for the contract and implied covenant claims. *See* TAC, Exs. I, L and M. Facebook argues that any claims based on the new Help Center pages would be time-barred because the Help Center pages post-date the original class period asserted in the SAC. Facebook's objection is entirely

based on the arguments against the enlarged class period, and fail for the same reasons discussed above.

Facebook's promises contained in Exhibits I, L and M are not substantively new.  They are just new versions of the same promise Facebook repeatedly made that it would not track users' post-logout.  All these pages were incorporated by reference into the same Privacy Policy.  For example, Exhibit J is a Help Center page dated May 24, 2011, well within Class Period I.  As alleged in the TAC, in response to the question "What information does Facebook receive about me when I visit a website with a Facebook social plugin?", Facebook lists a number of data points but omits user-identifying browser history in the list.  TAC ¶ 63.  That omission clearly implies that Facebook would not receive such information.  On September 9, 2011, also within Class Period I, Facebook added, "if you are logged into Facebook, we also see your user ID number and email address."  *Id.* ¶ 64.  This language confirmed the common-sense understanding that the earlier list did not include user IDs of logged-out users.  Finally, on September 27, 2011, two days after the news of Facebook's post-logout tracking broke, Facebook added yet more language, emphasizing, "we don't receive your user ID."  *Id.* ¶ 65; *see also id.*, Exs. L & M.

The later language in Exhibits L and M connects the dots more explicitly than the earlier language in Exhibits I and J, which explains why Facebook wants to exclude them.  But the promise in each of these Help Center pages is functionally the same, and the TAC alleges that Facebook breached that promise, and continued to breach even beyond the end date of Class Period I.  Because the class period is properly extended in light of discovery, the new Help Center pages properly serve as additional bases for the claims.  Even if the Court were to deem a breach of each promise in each Help Center page to be separate "claims," the Ninth Circuit allows such new claims under Fed. R. Civ. P. 15(c) where "the claim to be added will likely be proved by the same kind of evidence offered in support of the original pleading."  *See In re Dominguez,* 51 F.3d 1502, 1510 (9th Cir. 1995).

Facebook relies on *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122 (9th Cir. 2006), in support of its untimeliness argument.  MTD at 23.  But in *Oja*, both the original and amended

complaints were untimely. *See Oja*, 440 F.3d at 1133. No timely complaint existed to which a later complaint could "relate back." *Oja* differs materially from our case where the contract and implied covenant claims in the SAC were timely when filed.

Facebook also cites *BF&W Associates v. Motorola, Inc.*, No. C 05-02381 JF, 2006 WL 1156381 (N.D. Cal. May 2, 2006),[18] for the proposition that notice is a "key test" under Fed. R. Civ. P. 15(c)(1)(B). *See* MTD at 23. But Facebook has been on notice of the unchanged gravamen of Plaintiffs' contract and implied covenant claims (*i.e.*, illicit tracking of logged out users) since the SAC was filed.[19] In fact, *BF&W Associates* supports relation back here. *BF&W* emphasized that relation back is appropriate when "the original and amended pleadings share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question" *Id.*, 2006 WL 1156381, at *3 (internal quotations and citation omitted). Supporting relation back here, *BF&W* continued: "When 'there is some doubt as to whether the cause is clearly barred, the rule should be liberally construed, and especially is this so where the defendant is put to no disadvantage.'" *Id.* at *3 (quoting *DeMalherbe v. Int'l Union of Elevator Constructors*, 449 F. Supp. 1335, 1353 (N.D. Cal. 1978)); *accord*, *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (Ninth Circuit law that has "stressed Rule 15's policy of favoring amendments"); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) ("In exercising its discretion [concerning amendments], 'a court must be guided by the underlying purpose of Rule 15 – to facilitate decision on the merits rather than on the pleadings or technicalities'" (quoting *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). Finally, *BF&W* did find a basis to relate back a breach of fiduciary duty claim because it was based on the same "underlying allegation" in the original claim asserting "improper domination and control." *Id.*, 2006 WL 1156381, at *7.

---

[18] *BF&W* is denoted "Not for Citation."

[19] Facebook also waited until April 4, 2016 (***three weeks after*** briefing concluded on Facebook's Motion to Dismiss the SAC last year) to produce these three Help Center pages in discovery, see MTD at 3; others were not produced until two months ago. *Id.* It would be manifestly unjust to disallow modified claims based on withheld evidence not available to the Plaintiffs at the time of the prior complaint.

1

## V.    CONCLUSION

Facebook breached its contractual promises not to track logged out users.  Beyond that, Facebook acted in bad faith, deliberately breaching its contract, violating the covenant of good faith and fair dealing.  The claims of additional plaintiffs relate back to the previous Complaints and are timely.  The Court should deny Facebook's motion to dismiss in its entirety and permit the Plaintiffs to prosecute their claims with the benefit of proper discovery.

Dated: October 13, 2017

**KAPLAN, FOX & KILSHEIMER LLP**

By:  ___/s/ David A. Straite___
Frederic S. Fox (admitted *pro hac vice*)
David A. Straite (admitted *pro hac vice*)
850 Third Avenue
New York, NY  10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*dstraite@kaplanfox.com*

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, 4th Floor
San Francisco, CA 94104
Tel.:    (415) 772-4700
Fax:    (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

*Interim Co-Lead Counsel*

Respectfully submitted,

**SILVERMAN, THOMPSON, SLUTKIN & WHITE LLC**

By:  ___/s/ Stephen G. Grygiel___
Stephen G. Grygiel (admitted *pro hac vice*)
201 N. Charles St., #2600
Baltimore, MD  21201
Telephone (410) 385-2225
Facsimile: (410) 547-2432
*sgrygiel@mdattorney.com*

*Interim Co-Lead Counsel*

### ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, David A. Straite, attest that concurrence in the filing of this document has been obtained from the other signatory.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of October, 2017, at San Francisco, California.

___*s/David A. Straite*___
DAVID A. STRAITE

2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28