

**EDWARD W. ORR**
122 Ridge Road
Terryville, CT 06786

## SENT TO THE COURT VIA NEXT-DAY
# PRIORITY MAIL EXPRESS:

# EI 475 346 165 US

Class Action Clerk
United States District Court for the Northern District of California
280 South 1st Street
San Jose, California 95113

**SUBJECT:** **OBJECTION AND COMMENTARY OF EDWARD ORR REGARDING THE PROPOSED SETTLEMENT:** *In Re Facebook Internet Tracking Litigation*, Case No. 5:12-MD-02314-EJD (N.D. Cal.)

**(ADDITIONAL REQUISITE DETAILS, INCLUDING, BUT NOT LIMITED TO, NAME, ADDRESS, CONTACT INFORMATION, REASONS FOR OBJECTION, ETC., ARE SHOWN BELOW)**

# OBJECTION AND NOTICE OF INTENT TO APPEAR AT THE FINAL APPROVAL HEARING (of Edward W. Orr; 122 Ridge Road; Terryville, CT 06786 [Telephone: 203-658-4977] [Email eanddorr2@gmail.com])[1]

---

[1] Objector Orr suffers from both auditory and visual handicaps (in addition to being in a wheelchair and suffering from mobility handicaps resulting from spinal cord injuries associated with two fractured cervical vertebrae and four fractured lumbar vertebrae caused by an intoxicated driver who, travelling at 120 MPH, collided with Orr's automobile). The undersigned intends to appear at the Final Fairness Hearing, and respectfully requests permission from the Court to speak and/or communicate via telephone, as his physical handicaps prevent both travel and the usage of Zoom and/or related technologies. Orr brings this Objection in good faith, and in order to avoid doubt about his motives, Orr is more than willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of this Objection; see generally Brian T. Fitzpatrick, "The End of Objector Blackmail?" 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). In other words, Orr wants nothing more than constructive action, and is advocating for those injured by Facebook's actions (and/or the actions of its affiliates West Penn Power, et al), and/or for those who have been unfairly treated by Facebook (and/or its affiliates West Penn Power, et al), to receive proper relief, and to be treated equitably – thus the filing of this Objection, as the undersigned received Notice from Facebook itself and/or its agents, along with an invitation to object if the undersigned did not agree with the conditions provided to him in the Notice that the undersigned received from Facebook and/or its agents.

As mentioned above, the undersigned intends to appear at the Final Fairness Hearing, and respectfully requests permission from the Court to speak and/or communicate via telephone, as his physical handicaps prevent both travel and the usage of Zoom and/or related technologies. Grounds for objection are contained in this Next-Day Delivery mailing; and all pages and exhibits and/or legal and evidentiary support herein are submitted with the request that the Court consider them. It is requested that all pages and/or exhibits of this submission (please note that, in addition to the objection cover letter and the hard-copy exhibits, there is a 32 GB USB drive containing photos, etc., which is attached as part of Exhibit "A") be submitted into evidence immediately. In addition, the Objector intends to utilize all pages and/or exhibits of this submission as evidence at the Settlement Fairness Hearing. The undersigned also hereby states that, as a result of the current and/or prior State of National Emergency (and/or concomitant events in the Objector's current state of residence, the State of Connecticut), Orr has prepared and proofread this Objection to the best of his ability (owing to the physical handicaps of the undersigned, several friends and family members have assisted and/or acted in agency as required in the preparation of this document, with such disability-related assistance including the assistance of one or more persons holding power of attorney, persons who have also assisted with voice machinery/substitution and/or related, and who may also do so in the future if necessary) under the constraints at hand, including, but not limited to, time constraints, et al. It is

\*    \*    \*    \*    \*    \*    \*    \*

Dear Sir or Madam:

The Jewish Federation recommended that the undersigned continue to pursue the matter of inequities in regard to Facebook's actions in this case, and therefore – as a follow-up to the FBI's involvement, and to Attorney Steven Winick's pro bono representation (per the Jewish Federation of Northern California) of the Orr family in regard to Facebook and several Facebook-related matters (see Exhibit "H," Exhibit "M," Exhibit "S," Exhibit "T," Exhibit "U," Exhibit "V," Exhibit "W," and Exhibit "X," et al,

---

hoped that all page and/or exhibit references and/or related are correct, and the undersigned has proofread this document (referring here to the Orr Objection) a minimum of four times, with multiple reviewers/proofreaders assisting. The undersigned is not an attorney, and has prepared this Objection to the best of his ability; Orr has submitted this document in good faith. Please note that -- in regard to the herein-described security breaches, hacking activities, and/or related (many such breaches and/or activities have been related to Facebook's activities and/or certain personnel [described and/or referenced herein: see especially ] affiliated with Facebook or its divisions, affiliates, et al), non-compliance issues on the part of server and/or related systems were sometimes so egregious that attempts to utilize ADA-compliant and/or related software sometimes resulted in the unfortunate compromise of data/screen integrity, etc., thereby exacerbating matters by then concomitantly compromising additional factors (including, but not limited to, compromises of security and/or related, with one or more examples [including, but not limited to, multiple compromised/accessed/entered and/or related files thereof] shown in one or more exhibits or portions herein). It is hoped that all page references and/or related are correct, and the undersigned has proofread this document (referring here to the Orr Objection) a minimum of four times, with multiple reviewers/proofreaders assisting. The undersigned has submitted this document in good faith.

including FBI case documents related to Facebook and its associates et al)

– this Objection is respectfully submitted.

"Class-action settlements are different from other settlements." In re Dry Max Pampers Litig., 724 F.3d 713, 715 (6th Cir. 2013). "[T]he district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class." Id. at 718. Instead, "[c]areful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members." Holmes v. Cont'l Can Co., 706 F.2d 1144, 1147 (11th Cir. 1983) (quotation omitted). "[T]he district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." Piambino v. Bailey, 757 F.2d 1112, 1139 (11th Cir. 1985) ("Piambino II"). This duty is "akin to the high duty of care that the law requires of fiduciaries." Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (quoting Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 652 (7th Cir. 2006)).

Ultimately, "[b]oth the class representative and the courts have a duty to protect the interests of absent class members." <u>Silber v. Mabon</u>, 957 F.2d 697, 701 (9th Cir. 1992).

Orr objects because the proposed settlement is unfair, in regard to numerous issues (including, but not limited to, an inappropriately low amount of recovery in juxtaposition to the gravity many of the grievous offenses perpetrated by Facebook (resulting in very great damages). Accordingly, the proposed Settlement Agreement and/or related should not be approved.

As a matter of continued introduction to the reasons for Objection, please see the following twenty-four exhibits (which are hereby attached, and for which an overview of the contents thereof is shown below), after which the crux of the Objection will be presented within the context of the exhibits and the legal and/or evidentiary support:

## Exhibit "A"

THIS EXHIBIT INCLUDES A LETTER WRITTEN BY RENOWNED ATTORNEY SHANIN SPECTER (OF KLINE & SPECTER, PC, ATTORNEYS AT LAW), ON BEHALF OF EDWARD W. ORR AND HIS FAMILY, IS SHOWN IN EXHIBIT "A," IN REGARD TO VARIOUS OF FACEBOOK'S INFRACTIONS **(VIA FACEBOOK-TRACKING ACTIVITIES AND INTERACTION WITH FIRSTENERGY-AFFILIATED INDIVIDUALS SUCH AS THOMAS MACRI, HAO GU, ET AL, OVER A MULTI-YEAR TIME PERIOD: PLEASE SEE ATTACHED FBI CASE FILES AS WILL BE DESCRIBED HEREIN)** AND/OR RELATED.

THE AFOREMENTIONED FACEBOOK-TRACKING ACTIVITIES (AND INTERACTION WITH FIRSTENERGY-AFFILIATED INDIVIDUALS SUCH AS THOMAS MACRI, HAO GU, ET AL), WERE THE SUBJECT OF VARIOUS HACKED COMMUNICATIONS THAT RESULTED IN FIRSTENERGY-CAUSED DAMAGE

(VIA FACEBOOK LINKS, ETC.), PART OF WHICH IS DISCUSSED BY KLINE & SPECTER IN THIS EXHIBIT.

SEE ALSO EXHIBITS "H" AND "V" ET AL, WHICH INCLUDE PORTIONS OF FBI CASE FILES RELATED TO THE ABOVE, IN WHICH NUMEROUS FACEBOOK LINKS (VIA TRACKING ETC.) TO FIRSTENERGY, ADT, ET AL, ARE NOTED, ONE EXCERPT OF WHICH IS SHOWN BELOW (FROM LOG NOTES AND COMMUNICATIONS OF AN INDIVIDUAL AFFILIATED WITH FACEBOOK, ET AL / SEE ALSO FBI CASE FILES [EMPHASIS AND UNDERLINING SUPPLIED IN THE EXCERPT BELOW]):

```
Hao  Gu  [AFFILIATED  WITH  FACEBOOK,
FIRSTENERGY, ADT, MACRI, ET AL] 10-7-
15:  HG  (to  TA)  Where  are  you  now,
Telesforo? Did you get the prev mess?
```

I have asked Alfred to fix the fl/ln-Eliseo and fl/ln-page-number repeat issues, too. Pronto. Telesforo, your surveillance on Amanda Phillips via ADT and Rodan or whatever she's affil with must stop. Pronto. But all the Facebook/Apple server skimming - via URL[2] masking and erasing and all those other tricks from Alfred — that you did on Orr's Facebook account and his Firstenergy contacts and so forth for years, from 2010 to today, was real good. It paid off big time. Via ADT it linked us to the files Orr has on Thomas Macri, so continue those activities as we discussed at Hamm's restaurant in the Nobelstown area. Then go ahead and check out taylor Madison. The third-party servers skimmed the meds and financials on Orr pretty good at least twice, too, so proceed to next step before Barlow gets back to us if you can. Either encrypt 2-layer, or use 2-3 proxy addresses/links. END42
TA (TO HG): OK.
LINK76 HG5523425-cnt-
J. Eliseo, rec
S-17
Initial 963424146209re-direct

Kline & Specter's letter was very soon after a resident (Carrie Goretzka) nearby to Orr had been burned and killed in an environment of disrepair and equipment misplacement that came about because of FirstEnergy/West-Penn Power's gross

---

[2] See up to in excess of 147,382 possible Orr-related and/or masked/altered or related URL permutations (via Thomas-Macri/Hao-Gu and/or related Facebook tracking sets / SEE FBI FILES) of https://www.facebook.com/edward.orr[xxxxxx and/or related], et al.

negligence (AFFILIATED WITH FACEBOOK LINKS AS DESCRIBED HEREIN). After the Goretzka incident, the firm eventually had to spend up to hundreds of millions in remedial repairs and related, in addition to a $105,000,000 settlement for death and related damages. Nevertheless, the firm was slow to react in regard to <u>both</u> Goretzka and Orr, which was very unfortunate.

Please note that, in addition to the hard-copy items in Exhibit "A," there is also enclosed a 32-GB USB drive containing numerous photos, videos, additional documents, etc. These USB-contained items are not shown in hard-copy format, and are only on the USB drive; said USB drive is to be construed as part of Exhibit "A."

\*　\*　\*　\*　\*　\*　\*　\*

**Exhibit "B"**

State of Pennsylvania letter to FirstEnergy (AFFILIATED WITH FACEBOOK LINKS AS DESCRIBED HEREIN), in a literal life-and-death plea for FirstEnergy to prevent death and/or serious injury because of a misplaced and defective transformer owned by FirstEnergy (mislocated in the midst of over six hundred gas and oil wells situated over a coal mine fire, etc.).[3]

\* \* \* \* \* \* \* \*

## Exhibit "C"

Electrical Engineer's plea to FirstEnergy (AFTER FACEBOOK-RELATED LINKS HAD RESULTED IN DAMAGE / SEE ALSO FBI FILES HEREIN) to save the life of Edward and Darlene Orr and family.

\* \* \* \* \* \* \* \*

---

[3] In addition, certain Facebook employees and/or associates and agents et al were involved in illegal hacking, theft and related activities -- many activities of which of which were integrally related to the oil/gas/coal/electrical matters, etc.

**Exhibit "D"**

Electrician's letter to the Fire Code Official. (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN)

\*　\*　\*　\*　\*　\*　\*　\*

**Exhibit "E"**

Correspondence with the State of Pennsylvania Consumer Advocate regarding FirstEnergy-caused fires / injuries / damages, etc.; additional documents and cross-references

(SEE ALSO FACEBOOK LINKS AND FBI FILES HEREIN).

\*   \*   \*   \*   \*   \*   \*   \*

## Exhibit "F"

Correspondence with the State of Pennsylvania Consumer Advocate regarding FirstEnergy-caused fires / injuries / damages, etc.; additional documents and cross-references, etc. (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).

\*   \*   \*   \*   \*   \*   \*   \*

## Exhibit "G"

Partial timeline of FirstEnergy-related fires/damages/etc., including, but not limited to, dozens of appliances (SEE

ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).

\*  \*  \*  \*  \*  \*  \*  \*

**Exhibit "H"**

<u>Anti-Semitic threats related to Facebook/First/Energy/ADT and also to Apple/FE third-party servers, etc.</u>

<u>Such threats were so serious that my family and I were literally forced to move away from the state</u>.

Please note that the aforementioned emphasis on <u>FirstEnergy's colleagues' illegally utilizing such things as Apple third-party servers (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI</u>

**CASE FILES HEREIN; PLEASE NOTE ALSO THE CONCOMITANT LINKS VIA APPLE, GOOGLE, ET AL, IN ADDITION TO FACEBOOK), is very important; and was the emphasis of the concomitant filing of an Objection in a case involving said servers – pertinent excerpts of which are shown below:**

11. The full ramifications of Apple's Breach of Contract *(keeping in mind the aforementioned FACEBOOK/ FIRSTENERGY LINKS AND FBI CASE FILES HEREIN)* are NOT apparent until one takes into account information from numerous sources, including --- but not limited to --- the Department of Justice, et al.

12. Unfortunately, though, the Plaintiffs' attorneys have simply not done their homework.

13. As a result, the Class definition is ill-defined, and patently unfair.

14. The Class Representatives are not representative of a significant portion of the class.

15. The reason why the Class Representatives are not representative of a significant portion of the class is very simple:

16. When Apple *(keeping in mind the aforementioned Facebook/Apple link to FirstEnergy's personnel* / (SEE ALSO FACEBOOK/FIRSTENERGY AND ADT LINKS IN THE FBI CASE FILES HEREIN) breached its contract, for instance — the iCloud Terms and Conditions — BY STORING ICLOUD USER DATA VIA THE UTILIZATION OF THIRD-PARTY SERVERS, it opened the door to certain very experienced hackers who took advantage of the lax security measures observed by such third-party servers.

17. As a result, therefore, many Class Members in the Williams v Apple case *(once again, please keep in mind the aforementioned FACEBOOK AND RELATED LINKS TO FIRSTENERGY'S PERSONNEL / see records)* suffered very significant losses which were ten times greater, a hundred times greater, or perhaps even more so, than those of other class members.

18.   The Department of Justice became involved, and overtly suggested that my family – and other families also – submit Victim Impact Statements and related documents, portions of which are shown in various parts of the Objection, including – but not limited to – the following pages:

ECF-169:   Page 54 of 128, for instance, plus attachments and related, regarding at least two hackers, one by the name of Mr. Aviles, spelled A – V – I – L – E – S, and the other by the name of Mr. Baratov, spelled B – A – R- A – T – O – V.

<u>Both were sent to prison.</u>

And much damage was done to many people who were users of the Apple iCloud service via FE links, etc.

19.   Such Apple iCloud breaches were also interrelated with other data breaches and/or infractions involving multiple security firms and/or other firms and entities such as ADT Security, **<u>(once again, please keep in mind the aforementioned Facebook/Apple link to FirstEnergy's personnel / see records)</u>** Comcast,    Google, even Harvard University, and dozens of other entities.

20. Certain breaches even impacted academic and related platforms utilized by physically handicapped individuals such as Edward Orr, who pointed out certain problems, and whose efforts were complimented by multiple Courts and related entities.

21. Many of the Apple-related breaches **(once again, please keep in mind the aforementioned Facebook/Apple link to FirstEnergy's personnel / see records)** were quite egregious, even going so far as to progress to anti-Semitic and racial threats, sometimes resulting in property damage, personal injury, and related.

**22. At one point, the Jewish Federation of Northern California contacted Attorney Steven Winick (spelled W – I – N – I – C – K), who agreed to represent the Orr family pro bono in relation to the very harmful aftermath of several such breaches and infractions.**

**23. For the record, please note that cross-references to Attorney Winick are contained in**

multiple cases --- including, but not limited to --- in the present case, on pages 45, 57, and 58 of ECF-169.

24. The Honorable Jon S. Tigar, of the United States District Court for the Northern District of California was, in open Court, very complimentary of Attorney Winick's involvement; and pages 81, 82, 83, 84, 97, and 98 of ECF-169 in the present case include such things as mention of and/or cross-references to damages from third-party servers utilized by Apple, et al.

(Once again, please keep in mind the aforementioned **Facebook/Apple link to FirstEnergy's personnel / see records**)

25. The Jewish Federation of Northern California's involvement was all the more remarkable given the fact that Edward Orr and his family lived <u>not</u> in Northern California, but thousands of miles away, in New England, in Connecticut, to be more exact, <u>after having been forced to move away from their former residence in the Pittsburgh, Pennsylvania area, because of numerous anti-Semitic and racial threats (once again, please keep in mind the aforementioned links to Facebook/FirstEnergy's personnel / see records) that had resulted in both serious personal injury and considerable property loss.</u>

26. Human life was at stake and the issues involved not only third-party servers from ADT, but also third-party-servers from Apple, and precisely the issues involved with the related Williams versus Apple case. (Once again, please keep in mind <u>the aforementioned Facebook/Apple link to FirstEnergy's personnel</u> / see records)

27. The stand taken by Attorney Winick and the Jewish Federation may have been both an <u>unpopular</u> one,

AND

an <u>uncomfortable</u> one,

but nevertheless <u>it was necessary under the circumstances,</u>

and – FURTHERMORE – as referenced in the documents mentioned in the second paragraph of page 50, in ECF-169, such luminaries as Nobel Prize winner Elie Wiesel, had advised and assisted Edward Orr and his family in the midst of the anti-Semitic and racial threats, and their destructive aftermath.

**28. A SECOND JEWISH ATTORNEY, MR. SHANIN SPECTER --- SPELLED -- - S – H – A – N – I – N  [WORD SPACE[ S – P – E – C- T – E – R -- , SON OF THE RENOWNED, AND LATE, U. S. SENATOR --- THE HONORABLE ARLEN SPECTER --- ALSO REPRESENTED THE ORR FAMILY IN REGARD TO MULTIPLE RELATED MATTERS *(PARTICULARLY IN REGARD TO FIRSTENERGY AND***

## *AFFILIATES; SEE FACEBOOK / FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).*

29. (SEE ALSO CROSS-REFERENCES TO 2011 – 2022, INCLUDING IN EXCESS OF FOURTEEN CASES, ETC. MULTIPLE CASES INCLUDED ANTI-SEMITIC AND RACIAL THREATS.)

30. (MULTIPLE INSTANCES ALSO INVOLVED PERSONAL INJURY; PROPERTY DAMAGE; THEFT [OF OBJECTS, INFORMATION, AND EVEN REGULAR MAIL, CERTIFIED MAIL, AND/OR OTHER COMMUNICATIONS, ETC.]; AND OTHER LOSSES.)

31. SEE ALSO ESPECIALLY FACEBOOK, ADT, APPLE, GOOGLE, AND ALL AFFILIATED CASES, AND ALSO THE HACKED, INTERRUPTED

AND/OR UNFINISHED ADT/JAMIE-HAENGGI --

SPELLED --- H – A – E – N – G – G – I ---

CORRESPONDENCE / FED-EX / ET AL.

32. SUCH MATTERS ARE INTEGRALLY RELATED TO FACEBOOK AND TO THE APPLE THIRD-PARTY SERVERS, ET AL, AND ALSO TO RODAN / LB --- SPELLED --- R – O – D – A – N --- / - L - B --- AND OTHER CASES.

33. PLEASE NOTE THAT HAENGGI-RELATED MATTERS WERE AN INTEGRAL COMPONENT OF AVILES/BARATOV MATTERS AS HANDLED BY THE DEPARTMENT OF JUSTICE, ET AL, WITH ADT STILL OWING DAMAGES TO THE ORR FAMILY IN RELATION TO THE ANTI-SEMITIC AND RACIAL THREATS AND THEIR DESTRUCTIVE AFTERMATH, ETC.

34. <u>FACEBOOK /APPLE / FIRST ENERGY SERVERS OFTEN PLAYED AN INTEGRAL PART</u>

<u>IN RELATION TO THE DAMAGES</u>. IT IS IMPORTANT TO NOTE THAT ADT, FOR INSTANCE, MADE WRITTEN OFFERS, AS SHOWN IN MULTIPLE RECORDS, AND HAS NOT FOLLOWED UP.

35. In addition, it is notable that <u>at least one of the perpetrators of the threats was affiliated with Mr. Robert Bowers, spelled B – O – W – E – R – S, the very same individual who later shot and killed eleven people in the Tree of Life Synagogue in Pittsburgh</u>.

36. In other words, this was a very serious matter, and it was very much related to the aforementioned third-party server problems with Apple / FirstEnergy et al.

37. It was also a matter involving considerable conflict, but neither Attorney Winick nor the Jewish

Federation was intimidated by the existence of such conflict.

38. Documents from numerous Courts have been involved, and absolutely no attempt will be made to re-summarize all of the events and happenings here.

39. Nevertheless, the aforementioned AN ABBREVIATED OVERVIEW OF THE BACKGROUND of my family's Objection, and of the RATIONALE behind precisely why the Class Representatives are NOT representative of a significant portion of the class, WAS VERY IMPORTANT TO MENTION HERE TODAY in the related Williams v. Apple case (SEE ALSO FACEBOOK / FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).

40. Multiple cases are indeed related; and the Justice Department's involvement, along with the involvement of the Jewish Federation, Attorney Winick, et al, has been very important.

41. IN CONCLUSION, THEREFORE --- When Apple (once again, please keep in mind the aforementioned Apple link to Facebook/FirstEnergy's personnel / see records / SEE ALSO (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN) breached its contract by storing iCloud user data VIA THE UTILIZATION OF THIRD-PARTY SERVERS, IT CREATED A SITUATION IN WHICH MANY CLASS MEMBERS SUFFERED VERY SIGNIFICANT LOSSES WHICH WERE TEN TIMES GREATER, A HUNDRED TIMES GREATER, OR PERHAPS EVEN MORE SO --- THAN THE LOSSES OF OTHER CLASS MEMBERS.

42. It is also notable that physically handicapped individuals were more vulnerable to the hacking --- for a variety of reasons --- one of which being the utilization of special -- and more vulnerable -- software and/or reader programs (or related,

including, but not limited to, special hardware integrated with the software) compensating for visual and/or auditory handicaps, etc.

43. Accordingly, at least one class representative should be chosen from those members who were hacked, and who suffered disproportionately high damages.

44. Whether or not said class representative is handicapped or not makes no difference.

45. In addition, there should be multiple tiers of damages.

46. The main point is that the class as presently constructed --- is not at all homogeneous in nature, and therefore, as a result of that lack of homogeneity, approval of the proposed settlement should be NOT be granted.

47. IT IS VITALLY IMPORTANT FOR THE PLAINTIFFS' ATTORNEYS TO ENGAGE WITH THE FULL FACTS OF THE CASE, AND THEY HAVE NOT DONE THAT.

\*     \*     \*     \*     \*     \*     \*     \*

**Exhibit "I"**

Court transcript involving, among other things, <u>FirstEnergy-related fires, appliance damages, etc</u>. (**SEE FACEBOOK / FIRSTENERGY LINKS AND FBI CASE FILES HEREIN**).

\* \* \* \* \* \* \* \*

**Exhibit "J"**

# <u>Orr v. Intercontinental</u>:

Involving Facebook/FirstEnergy-related damages (via WP/West Penn Power subsidiary, etc), and related to **third-part hacking via FirstEnergy contacts – Mr.**

**<u>Aviles, Mr. Baratov, Mr. Macri, et al,[4] two of whom are in prison, and the third of whom was killed (SEE FACEBOOK / FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).</u>**

**THEY WERE ALSO INVOLVED IN ANTI-SEMITIC THREATS AGAINST THE ORR FAMILY; SOME OF THEIR COLLEAGUES AND/OR COHORTS ARE <u>STILL ACTIVE,</u> AND STILL HACKING THE ORR FAMILY AND/OR CAUSING YET ADDITIONAL DAMAGES, ETC.**

\*    \*    \*    \*    \*    \*    \*    \*

---

[4] See also Blackbaud, Chicago LR, et al.

## Exhibit "K"

Jewish Federation / Attorney Steven Winick and FirstEnergy / ADT / <u>Part 1</u> of the Objection therein; numerous details (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).

\*     \*     \*     \*     \*     \*     \*     \*

## Exhibit "L"

Jewish Federation / Attorney Steven Winick and FirstEnergy / Facebook / ADT / <u>Part 2</u> of the Objection therein; numerous details.

\*     \*     \*     \*     \*     \*     \*     \*

## Exhibit "M"

The Jewish Federation of Northern California's involvement in trying to assist Edward and Darlene Orr in the midst of damages from Facebook / FirstEnergy and ADT resulted in the pro bono representation of the family by Attorney Steven Winick; and part of a transcript is shown here, with reference to over 1,100 pages of documentation, etc.

\*   \*   \*   \*   \*   \*   \*   \*

## Exhibit "N"

Facebook / FirstEnergy --- affiliated with hackers (see above Aviles/Baratov/Macri/ et al; SEE ALSO FACEBOOK/FIRSTENERGY

LINKS AND FBI CASE FILES HEREIN) and other illegitimately operating personnel --- was involved in perpetrating also attacks, theft, and/or tampering with U. S. Mail, and other communications, resulting in stolen and/or tampered mailings, communications, etc. Registered mail and/or other communications options sometimes became necessary.

\*  \*  \*  \*  \*  \*  \*  \*

## Exhibit "O"

Facebook / FirstEnergy-related hacker (Baratov and/or other affiliates) who caused damages to Orr; also shown is a letter from the Department of Justice to Orr, one of the victims.

See also mail tampering, and a handwritten note from the post office, etc.

\*   \*   \*   \*   \*   \*   \*   \*

Exhibit "P"

7-15-2022 article by Alison Frankel / "FirstEnergy settlement [SEE ALSO

FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN]

be damned, judge orders new plaintiffs' lawyers," an excerpt of which is

shown below:

> Wednesday's order is the latest bizarre development in one of the weirdest shareholder derivative cases I've ever run across.

> In May, as I've told you, U.S. District Judge Algenon Marbley of Columbus granted preliminary approval to a proposed $180 million global derivative settlement with FirstEnergy defendants. Lead counsel from Saxena White, Bernstein Litowitz Berger & Grossmann and Cohen Milstein Sellers & Toll moved for final approval of the $180 million global deal – and attorneys' fees of about $48.6 million – on July 7. So far, the docket shows no

objectors to the proposed settlement, which is scheduled for a fairness hearing on August 4.

That all seems perfectly normal and routine. But Adams, who is presiding over a parallel derivative case that he previously refused to transfer to Marbley, has declined to step aside despite the purported global settlement.

The Akron judge has contended since plaintiffs' lawyers first filed their proposed settlement before Marbley in February that the parties are engaged in forum shopping to avoid his skepticism about the deal, which was reached before any FirstEnergy executives were deposed. (The derivative suit stems from a bribery scandal in which the utility paid Ohio lawmakers for favorable legislation. The company paid $230 million to resolve a U.S. Justice Department investigation last summer.)

In the months after moving for preliminary approval, shareholder lawyers, counsel for individual FirstEnergy defendants and the board's special litigation committee counsel have unsuccessfully attempted to persuade Adams that the settlement is in the best interests of FirstEnergy, reminding him repeatedly that derivative litigation is conducted on behalf of the company.

Adams, as I've reported, has focused on the public interest in exposing corporate misconduct. In March, he forced shareholder lawyers to disclose the identity of the FirstEnergy executives who allegedly paid the bribes to Ohio politicians. (Lawyers for the accused executives, who have not been criminally charged, have denied wrongdoing.)

Adams has also castigated plaintiffs' lawyers for failing to attempt to claw back compensation from FirstEnergy's highest-paid executives. In response to arguments by proponents of the $180 million settlement – and, to repeat, that includes all of the parties in the litigation – Adams has said the recovery from FirstEnergy directors hardly begins to recoup the myriad costs of the bribery scandal, from reputational harm and stock price declines to the $230 million FirstEnergy paid to resolve the Justice Department's case.

The Akron judge has been actively agitating for new lawyers to pick up the litigation since June, despite the parties' protestations that the proposed global settlement before Marbley specifically precludes continued litigation during the settlement approval process.

In an attempt to curtail Adams' interference with that process, the parties filed a joint motion last month to dismiss the lone case

before him. Their brief offers a helpful summary of all the arguments they've presented – unsuccessfully – to Adams in the last few months. The settlement, they said, was the product of vigorous litigation and mediation before the well-regarded onetime judge Layn Phillips. The deal would mark the biggest-ever cash recovery in an Ohio derivative suit, the motion said, and would additionally benefit FirstEnergy by imposing corporate governance reforms, including retirement of board members in service during the bribery scandal. Moreover, they said, continued litigation would drain company resources, doing more harm than good to FirstEnergy.

Finally, the parties countered Adams' public interest assertions by reminding the judge that the 6th U.S. Circuit Court of Appeals has emphasized the benefits of resolving disputes – including shareholder derivative litigation -- through arms-length, non-collusive settlements.

Adams denied the dismissal motion on July 5, holding that the derivative suit before him was the first to have been filed in federal court. Under 6th Circuit rules, he said, shareholder lawyers should have filed their motion for settlement approval in his court. (The parties have said that they sought approval in the consolidated cases before Marbley because Adams never formally appointed lead counsel.) Adams once again accused the parties of forum-

shopping, asserting that they seem to have gone to Marbley because Adams "expressed grave doubts about the [settlement] process."

Shareholders laid out the whole long, strange trip in their July 7 motion for final approval in Marbley's court, recounting all of the times Adams has blasted them for settling too quickly and evading his scrutiny. Plaintiffs' lawyers denied that they'd engaged in forum-shopping, telling Marbley that they sought his approval of the deal because he was overseeing consolidated litigation and had formally appointed lead counsel.

"The settlement," they said, "is properly before this court."

Shareholder counsel Joseph White of Saxena White declined to comment. Defense counsel for FirstEnergy board members did not respond to my query. I also did not receive a response from special litigation committee counsel at Debevoise & Plimpton.

Marbley, as I mentioned, has set a fairness hearing date of August 4, less than two weeks after Adams' deadline for applications from prospective new counsel. It's going to be really interesting to see what happens if the Columbus judge approves the global deal just as new

shareholder lawyers dig into the case before Adams.

In a prior article (entitled "One judge approved a $180 million settlement with FirstEnergy (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN). Another won't let it go"/6-3-2022), Ms. Alison Frankel emphasized other rather unique aspects of the suit, including such things as one judge's (Adams, for instance) adding more to public knowledge of the depth of FirstEnergy's (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN) serious wrongdoings by his particular stance.

Objector Orr also wishes to state that it IS UNFAIR FOR THE PUBLIC TO BE DENIED SUCH KNOWLEDGE. Justice must be served, and the proposed settlement agreement is unfair as it currently stands; and not enough discovery has been performed. In addition, the payout of damages to the class members is not large enough. Accordingly, the proposed agreement should be denied.

I've told you already about the extremely peculiar circumstances of this litigation, in which shareholders contend that FirstEnergy directors breached their duties by failing to avert a scheme to bribe Ohio politicians in exchange for favorable legislation. (FirstEnergy has already paid $230 million to the U.S. government in a 2021 deferred prosecution agreement.)

Shareholders initially filed derivative suits in federal court in Columbus and Akron and in state court in Summit County. The federal cases in Columbus were consolidated before U.S. District Judge Algenon Marbley, who moved quickly to appoint Saxena White, Bernstein Litowitz Berger & Grossmann and Cohen Milstein Sellers & Toll as lead counsel and then to deny defendants' dismissal motion.

Adams, meanwhile, denied shareholders' motion to transfer the lone case before him to Marbley's courtroom, though he allowed lead counsel to intervene in the Akron case to oppose defendants' dismissal motions. He also denied dismissal.

Several months later, when the two sides reached a proposed settlement, they moved for preliminary approval before Marbley. They asked Adams to stay the case before him

because its claims were encompassed in the proposed settlement.

Adams refused. He also made it clear – in quite dramatic fashion – that he expected shareholders' lawyers to conduct depositions of key FirstEnergy defendants, some of whom had been scheduled to be deposed in the Akron case before the two sides reached a settlement. Adams suggested that shareholders couldn't possibly assess the strength of their case without on-the-record testimony about the bribery scheme.

Adams has also said he wants shareholders' lawyers to continue litigating their derivative claims as a matter of public interest. "This bribery scheme has undoubtedly shaken whatever trust that Ohioans may have had in the political process used by their elected officials," he wrote in a March 22 order. "The public has a right to know how it is that the political process was so easily corrupted."

## **The judge's persistence has unquestionably added to public knowledge of the bribe scheme.**
[Emphasis and underlining supplied]

In March, under a threat of sanctions from Adams, plaintiffs' lawyers disclosed the identity

of the FirstEnergy executives who allegedly "devised and orchestrated" the bribery scheme. (The two men have denied wrongdoing and have not been charged by the Justice Department in its ongoing investigation.)

But Adams' vision of derivative litigation as a vehicle for public accountability is unusual.

In derivative suits, as you know, shareholders step into the shoes of the corporation to assert claims against directors who have allegedly caused harm to the company. The idea, broadly speaking, is that board members can't be trusted to evaluate whether they have failed in their duties, so shareholders must intervene to protect the company's interest.

Derivative settlements are typically funded by insurance companies that have issued D&O policies to the corporation's directors. (Individual defendants sometimes pay a share of derivative settlements out of their own pockets but those cases are rare.) At the same time, however, defendants in derivative suits rely on their D&O policies to pay legal fees. Litigation costs, in other words, drain money from the pool of insurance funds that can be used to pay for a settlement. More money for defense counsel means less recovery for the corporation.

The Columbus judge who granted preliminary approval to the FirstEnergy proposed settlement acknowledged that conundrum in his order. "The company's insurance policies, which are the main source of recoverable assets, are being eroded by legal costs as this derivative action continues," Marbley said. "The ultimate recovery might be higher now than at the end of a case tried to verdict."

Unlike Adams' rulings, Marbley's order focused on the purported benefits of the proposed settlement to FirstEnergy – which is, after all, the entity that was allegedly harmed by the board's conduct. In addition to the cash recovery, Marbley noted the proposed deal's corporate governance reforms, including the departure of six board members who held seats during the execution of the bribery scheme.

Those changes would be good for FirstEnergy, the judge said, because they would begin to repair the company's tarnished reputation. FirstEnergy might also be best served, Marbley said, by moving forward, instead of being weighed down by ongoing derivative litigation.

The Columbus judge did caution that he's only granting preliminary approval, with final approval not to be decided until after a fairness hearing in August. Marbley also denied the

parties' request to enjoin continued litigation before Adams until he decides whether to grant final approval of the settlement, concluding that he did not have authority, even in the "unique posture" of this litigation, to stay another judge's case.

So now the parties will have to try to convince Adams not to relaunch discovery in a case whose settlement they have all said they believe to be in the best interests of FirstEnergy.

I reached out to lawyers for shareholders, FirstEnergy, individual defendants and the board's special committee. No one got back to me.

Please note that Exhibit "P" also contains a a portion of the "Notice of Further Development in the Related Northern District Action" document (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN).

\* \* \* \* \* \* \* \*

## Exhibit "Q"

FirstEnergy 5-16-22 / Part of Form 8-K and/or mailers, etc., including, but not limited to, 8-K-contained "Notice" for distribution, via FirstEnergy (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN), et al, to persons such as Orr, etc.

\* \* \* \* \* \* \* \*

## Exhibit "R"

Shares / 4; see stock 4/3/reduced stock price FirstEnergy 14/4/3 — C.R. Orr/J. White.

\* \* \* \* \* \* \* \*

**Exhibit "S"**

FBI Correspondence to the Orr family regarding

Facebook / FirstEnergy and ADT damages; etc.

\* \* \* \* \* \* \* \*

**Exhibit "T"**

Additional FBI Correspondence to the Orr family

regarding Facebook/ FirstEnergy and ADT

damages; etc.

\*   \*   \*   \*   \*   \*   \*   \*

**Exhibit "U"**

FBI Agent Ryan Weydeck: Email to the Orr Family regarding the sentencing of FirstEnergy (SEE ALSO FACEBOOK / FIRSTENERGY LINKS AND FBI CASE FILES HEREIN) affiliate Telesforo Aviles et al / see also Baratov, and others; see hacking, plus theft of mail; tampering with mail; copious personal and property damages; etc.

## See also anti-Semitic threats to Orr; interference with stock documents; etc.

\*   \*   \*   \*   \*   \*   \*   \*

---
**Exhibit "V"**
---

FirstEnergy (SEE ALSO FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN) interference with stock documents; and FirstEnergy anti-Semitic threats; etc.

Department of Justice and the FBI, et al.

\*   \*   \*   \*   \*   \*   \*   \*

1
2
3
4

5
## Exhibit "W"

6
7
8
9
FirstEnergy (SEE ALSO FACEBOOK / FIRSTENERGY LINKS AND

10
FBI CASE FILES HEREIN) interference with mail (both U.S. Mail and

11
12
email, et al); FirstEnergy interference with stock documents; and

13
FirstEnergy anti-Semitic threats; etc.

14
15
16
Department of Justice and the FBI, et al.

17
18
19
## Exhibit "X"

20
21
22
23
Appearance of Steven Winick / FirstEnergy (SEE ALSO

24
FACEBOOK/FIRSTENERGY LINKS AND FBI CASE FILES HEREIN)

25
26
interference with mail (both U.S. Mail and email, et al); FirstEnergy

27
28

interference with stock documents; and FirstEnergy anti-Semitic threats; etc.

Department of Justice and the FBI, et al.

\*   \*   \*   \*   \*   \*   \*   \*

## FURTHER DISCUSSION AND CONCLUSIONS

Within the context of the above grievous offenses perpetrated by Facebook, FirstEnergy, et al the settlement is not fair, and should <u>not</u> be approved, as "Class-action settlements are different from other settlements." <u>In re Dry Max Pampers Litig.</u>, 724 F.3d 713, 715 (6th Cir. 2013). "[T]he district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class." Id. at 718. Instead, "[c]areful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at

the expense of the absent class members." <u>Holmes v. Cont'l Can Co.</u>, 706 F.2d 1144, 1147 (11th Cir. 1983) (quotation omitted).

"[T]he district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." <u>Piambino v. Bailey</u>, 757 F.2d 1112, 1139 (11th Cir. 1985) ("Piambino II").

This duty is "akin to the high duty of care that the law requires of fiduciaries." <u>Figueroa v. Sharper Image Corp.</u>, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (quoting <u>Synfuel Techs., Inc. v. DHL Express (USA), Inc.</u>, 463 F.3d 646, 652 (7th Cir. 2006)).

Ultimately, "[b]oth the class representative and the courts have a duty to protect the interests of absent class members." <u>Silber v. Mabon</u>, 957 F.2d 697, 701 (9th Cir. 1992).

<u>Orr objects because the proposed settlement is unfair, in regard to</u> <u>numerous issues (including, but not limited to, an inappropriately low</u> <u>amount of recovery in juxtaposition to the gravity many of the grievous</u>

offenses perpetrated by Facebook, FirstEnergy, et al (resulting in very great damages). Accordingly, the proposed Settlement Agreement and/or related should not be approved.

In a prior article (entitled "One judge approved a $180 million settlement with FirstEnergy. Another won't let it go"/6-3-2022), Ms. Alison Frankel emphasized other unique aspects of the suit, including such things as one judge's (Adams, for instance) adding more to public knowledge of the depth of FirstEnergy's (see also Facebook connection thereto) serious wrongdoings by his particular stance.

Objector Orr also wishes to state that it is unfair for the public to be denied such knowledge. Justice must be served, and the proposed settlement agreement is unfair as it currently stands; and not enough discovery has been performed. In addition, the payout of damages to the class members is not large enough. Accordingly, the proposed agreement should be denied.

I request permission to appear at the Final Approval Hearing.

This is also my Notice of Intention to Appear.

Accordingly, the undersigned intends to appear (if the Court permits) at the Final Fairness Hearing, and hereby respectfully requests permission from the Court to speak and/or to communicate via telephone, as his physical handicaps prevent appearance either in person or via Zoom (or related).

PLEASE NOTE <u>THE AFOREMENTIONED NOTICE OF INTENTION TO APPEAR, ALONG WITH THE SPECIAL PHYSICAL HANDICAPS OF THE UNDERSIGNED.</u>[5]

---

[5] At this juncture, Orr wishes to describe his background, within the context of making it perfectly clear to any and all that:

(1) his intentions are fully honorable in all respects,

(2) he is not here to ask for money, or to be hurtful. All Orr wants is what is best for the Class, and especially for handicapped and/or injured individuals, whether such individuals suffer from auditory handicaps, visual handicaps, mobility handicaps, and/or other handicaps/injuries..

Orr suffers from both auditory <u>and</u> visual handicaps (in addition to being in a wheelchair and suffering from mobility handicaps resulting from spinal cord injuries associated with two fractured cervical vertebrae and four lumbar vertebrae caused by an intoxicated driver who, travelling at 120 MPH, collided with Orr's automobile).

Exhibit "W" (and also certain portions of various other attached exhibits [such as Exhibit "O," et al] herein concerning Facebook, FirstEnergy, and related) consists of court documents, background materials, and/or related, some of which are related to the Orr family's advocacy on behalf of the handicapped and injured; see also various additional associated documents (for instance, regarding the Jewish Federation of Northern California and Orr; etc.).

Orr's involvement with the rights of the handicapped and/or injured began because of a very unfortunate (and exceedingly complex) series of circumstances involving inter-connected security, internet, and communications facilities, equipment, websites, etc., <u>with disability/injury-related occurrences that unfortunately were associated with, and/or compounded by, such things as both theft and physical injury damages --- along with numerous other damages to Orr and/or to his family</u>.

The above has had the effect of sensitizing Orr to the plight of the handicapped and the injured in general.

As a matter of additional background information about Orr, he first had SCI injuries, then visual handicaps, and later received damage to his auditory system.

Before the occurrence of the auditory damage, the Jewish Braille Institute featured the following description of him in their Winter 2004 "Focus on JBI" newsletter:

> "Mr. B is confined to a wheelchair (like the one Christopher Reeve uses) after a broken back and neck robbed him of his ability to perform the simplest tasks.

> "His wife writes: 'When one is confined to a special 170-degree-recline wheelchair (more like a cosmos on wheels), something as simple as an audio tape, a 'plastic band with a bit of iron oxide on it,' can make all the difference in the world. In fact, it can allow one to cross the line between 'vegetating' and living....[My husband's] favorite books are those by Shalom Aleichem, and he listens to them whenever possible. He just loves the feeling and emotion that JBI's narrators put into their recordings....JBI tapes literally keep him going."

> [Note: Fifteen years after 2004, Mr. B has regained some degree of control over movement and functionality, but he remains totally disabled.]

Because Orr does not photograph well, Ms. Pearl Lam, Director of Library Operations, described him as "Mr. B" on page three of the Winter 2004 newsletter (shown as part of Exhibit "M," with an excerpt therefrom shown above).

Mr. Stephen Solender, who served as President and CEO of United Jewish Communities, is pictured on the same page on which Mr. B's description appears.

This particular issue of the newsletter focused on a "Fundraising Gala Emceed by Master of Ceremonies Larry King," and Mr. B was, in essence, one of the JBI's "poster kids."

Incidentally, the aforementioned Mr. Solender also assisted Orr on multiple occasions after numerous of the aforementioned security-related problems occurred in Pennsylvania, several of which were the focus of subsequent class action and/or related suits, especially as both physical location and account information (regarding numerous different accounts, including, but not limited to, FirstEnergy (especially), ADT, Yahoo, Comcast, Apple, et al), and/or other parameters were affected for numerous years (to the present in some instances). The FirstEnergy/ADT/Yahoo/Comcast/Apple systems were on a residence in Pennsylvania -- Orr and his family were forced to move away because of anti-Semitic threats, injuries, etc.; and therefore the family returned to Connecticut, where they had previously resided for over twenty years.

In 2017, the Jewish Federation of Northern California contacted, on behalf of the Orr family, Attorney Steven H. Winick, who represented the Orr family in regard to an associated ADT[5] class-action suit (Michael Edenborough v. The ADT Corporation and ADT, LLC d/b/a ADT Security Services, Case No. 16-cv-02233-JST; USDC ND California, hereinafter referred to as ADT).

Separately, Attorney Shanin Specter (the son of former Senator Arlen Specter, and cofounder of Kline & Specter, P.C., the leading personal injury firm in the state of Pennsylvania) represented the Orr family in regard to various FirstEnergy/ADT/Yahoo/Comcast/Apple/West Penn and/or related matters, especially as such matters included, but were not limited to, incidents involving physical injuries and/or threat thereof; property damages, and other damages.

Additional information is overviewed below:

1.     Shanin Specter, Esq., of Kline & Specter, P.C., represented the undersigned, and wrote to five Commissioners of the Pennsylvania Public Utility Commission (PUC) on May 6, 2016, regarding a Comcast-related matter. (See also ADT, Yahoo, Apple, Comcast, West Penn, et al.)

2.     A member of the Board of the Jewish Braille Institute (JBI), along with a member of Wellesley-in-Philadelphia (WIP), assisted in recommending the undersigned to Mr. Specter's firm.

3.     Attorney Specter referenced one or more alleged equipment failures and/or malfunctions (see also associated data breaches and/or related) which were then confirmed by Darryl Lawrence, an attorney and Consumer Advocate for the Commonwealth of Pennsylvania.

4.     The aforementioned failures involved multiple firms, one of which was FirstEnergy (also Comcast, ADT, Yahoo, Apple, West Penn, et al).

5.     Attorney Specter's letter clarified numerous very serious problems and misunderstandings that had persisted for many years.

6.     According to Stanford University, "Shanin Specter is a preeminent American trial lawyer.  Beyond winning substantial monetary compensation for his clients, many of Specter's cases have prompted changes that provide a societal benefit...." Source: Stanford University (where Attorney Specter has taught for several years) website: https:// law.stanford.edu/directory/shanin-specter/(as accessed on June 20, 2019). "Since 2000, Specter has served as an Adjunct Professor of Law at the University of Pennsylvania Law School.  Since 2015, Specter has also taught at UC Hastings College of Law, UC Berkeley School of Law and Stanford Law School."

7.     As a result of Attorney Specter's letter of May 6, 2016 – and the changes it brought forth – the Jewish Federation of Northern California contacted Steven H. Winick, Esq., who then went on to represent pro bono the Orr family as Objectors in the aforementioned ADT class-action suit.  (See also interrelated Comcast, Yahoo, Apple, and West Penn actions, etc.; the Department of Justice [DOJ] also became involved in regard to certain matters, in regard to protecting the Orr family.)

9.     The Honorable Jon S. Tigar overtly discussed, with Attorney Winick, and in open court, issues of societal benefit and the Jewish Federation's having contacted Mr. Winick (ECF 153 in ADT) in regard to representing the undersigned

in the Comcast/Yahoo/Apple/West-Penn-related <u>ADT</u> matter. (As mentioned above, additional firms were also involved.)

10.     Judge Tigar engaged Attorney Winick in extensive dialogue in Court (the aforementioned ECF 153), in which the Court was very complimentary of both Mr. Winick and the rights of handicapped clients such as the undersigned Mr. Orr.

11.     In <u>ADT</u>, the undersigned submitted, as a sub-set of the overall documentation, well over 200 pages of records concerning interrelated Comcast-ADT infractions. (See also Yahoo, Apple, Comcast, West Penn, et al.)

12.     In <u>ADT</u>, the undersigned began pro se, but then the Jewish Federation of Northern California contacted Steven H. Winick, Esq., who evaluated the merits of the interrelated case, and represented the Orr family in court before the Honorable Jon S. Tigar.

13.     Judge Tigar made it exceedingly clear that claims such as those arising from actions perpetrated against the Orr family (one of whom is physically handicapped) are indeed important. They should not be overlooked or underestimated.

And, furthermore, they should be heard fully in court. In fact, Judge Tigar made several additional – and very pertinent – statements to Orr's Counsel, as shown below (please note that all of Judge Tigar's comments are excerpted from ECF 153 in <u>ADT</u>):

THE COURT: Are you representing Mr. Orr on a pro bono basis because the Jewish Federation thought you might do that?

They just called you?

MR. WINICK: Yes.

THE COURT: You take all the time you need.

SOURCE: Judge Jon S. Tigar to the Orr family's Counsel [2-1-18/p. 7 of the ADT transcript].

It is also instructive to mention the fact that, far from being a so-called "Plaintiffs' Attorney," Mr. Winick was the precise opposite, and therefore made an exception in Mr. Orr's case because of the egregious conduct of the Defendants:

MR. WINICK: ...Let me start by just giving you a quick introduction as to how I got here. I'm usually on the defense side of class actions.

THE COURT: Weren't you a partner at Sheppard Mullin at one point?

MR. WINICK: I was.

SOURCE: ADT transcript [2-1-18/p. 5 - 6].

THE COURT: Mr. Winick, let me say something. It's in part for your benefit, but it's also for the benefit of everyone else if in the courtroom, including the member of the public who is sitting there.

I don't know what's going to happen with this objection. But I admire you for taking this case on pro bono after getting a phone call from an organization you trust…"

SOURCE: Judge Jon S. Tigar to the Orr family's Counsel [2-1-18/p. 46 of the ADT transcript].

Not only did electronic equipment (referring here to the set-top box in the handicapped customer's household) independently malfunction (because of FirstEnergy et al) inside the dwelling, but related equipment exterior to the dwelling was negligently located next to a malfunctioning transformer in a gas field (see also physical injuries and property damages).

Stray gas burned (in conjunction with FirstEnergy's inappropriate wiring, and related) down Comcast's communications pedestal at least twice – after which time Comcast promptly lost all records of the handicapped person's account. Records, including, but not limited to, numerous billing and related official transaction records proving the existence of the Orr household's account, were shown in the following exhibits contained in the attachments to the separately filed Comcast Objection (not shown here) (In re: Comcast Corp. Set-Top Cable Television Box

Antitrust Litigation, Case No. 2:09-md-02034-AB Eastern District of Pennsylvania;

hereafter referred to as Comcast) (shown also elsewhere are records proving the

timely "Opt-Out of Arbitration" [see especially Exhibit "S" thereof, et al] duly

submitted by the Orr household. In spite of the State of Pennsylvania's confirmation

of the undersigned's Comcast account, and in spite of billing records, etc., the

Claims Administrator in the Comcast case informed the undersigned that the

undersigned were not Class members, as Comcast's so-called "records" were "not

complete" regarding the undersigned's customer data and/or potential customer data.

As a part of the admitted "incompleteness of Comcast's records," Comcast's

admittedly inaccurate records did not contain the duly submitted opt-out and/or

related communications, etc. Nor did Comcast's admittedly incomplete and

inaccurate records contain the majority of the 2011 – 2014 records about the

undersigned's Comcast account. The objective of including mention of the above is

that of illustrating several points, one of which is the fact that the Comcast Claims

Administrator was indeed apparently applying the unfair Notice language. This

means that bona fide claimants were being denied the benefits of Class

membership): The aforementioned Comcast exhibits filed separately elsewhere

(please note that, obviously, the exhibit designators here refer to exhibits as

enumerated in the Comcast case records) included: "1," "2," "3," "4," "5," "6," "7,"

"8," 9," "10," "11," "12," "14," "15," "16," "17," "18," "19," "20," "A," "B," "C,"

"D," "E," "F," "G," "H," "I," "J," "K," "L," "M," "N," "O," "P," "Q," "R," "S,"

"T," "U," "LL," "MM," "TT," "UU," "VV," "WW," et al. Subsequently to

Comcast's losing all records (please note that such loss occurred more than once, and was not always linked to equipment loss), Comcast was then able to sporadically locate one or more records, but still remained unable to reconstruct the full file.

After Comcast (a firm integrally related to FirstEnergy's activities in regard to the issues at hand) lost records of the undersigned's account, Darryl Lawrence, an attorney and Consumer Advocate for the Commonwealth, wrote a letter confirming not only the existence[5] of the undersigned's Comcast account, but also various problems with equipment, its location, etc. Attorney Lawrence <u>went so far as to contact a supervisor for Comcast, and stated as follows</u>:

> There comes a time when one must simply start replacing equipment. After independently confirming the repeat failures of appliances/equipment within the Orr's home (through direct conversations with service technicians who repaired/replaced these items), <u>and now repeat failures of Comcast equipment</u> that is situated completely outside of the Orr's home (through direct contact and discussion with <u>a supervisor for Comcast</u>), the OCA believes the time has come for FirstEnergy to act....

> I will not belabor the five points above here. My primary objective in writing this letter to you at this time is because I truly believe there is a risk of <u>serious personal injury</u> if this situation is not rectified with all due speed.

I look forward to your swift resolution of this matter.

SOURCE: Exhibit "A" as attached to Attorney Specter's 5-6-16 letter (EXCERPT SHOWN BELOW, and also contained on Page 39 of 106; also Page 13 of 106; in ECF 132-2 of *ADT*; underlining supplied) to the following five commissioners.

Chair Gladys M. Brown
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner Pamela A. Witmer
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Vice Chairman Andrew G. Place
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner Robert F. Powelson
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner John F. Coleman
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Attorney Specter, of Kline & Specter, P.C., stated, in his letter of May 6, 2016:

The situation identified by Attorney Lawrence has been exacerbated by the more recent discovery of stray methane gas on the same site…There are at least forty (40) oil/gas wells in very close proximity…meaning that stray methane gas comes up from the soil and ignites...

Seven nearby families may be at risk…

[Please see also the following Comcast-case attachments filed separately elsewhere: Exhibits "1," "2," "3," "4," "5," "6," "7," "8," 9," "10," "11," "12," "14," "15," "16," "17," "18," "19," "20," "A," "B," "C," "D," "E," "F," "G," "H," "I," "J," "K," "L," "M," "N," "O," "P," "Q," "R," "S," "T," "U," "LL," "MM," "TT," "UU," "VV," "WW," et al. (Please note that an "Abbreviated Roster of Attachments and/or Exhibits" is contained as an "Addendum" to the cover letter to the separate Comcast objection.)]

In other words, the severely handicapped Mr. Orr and his wife, Darlene, were not alone – either in regard to the risk of physical injury, or the risk of the loss of account information.

Furthermore, it is important to note that there were countless more than seven families involved in regard to the risk of loss of account information (as related to equipment malfunction alone, and independent of all other sources of "missing account information" and/or related). As discussed in a presentation by the Pennsylvania DEP (Department of Environmental Protection), there exist literally hundreds of thousands of abandoned oil and gas wells (many of which with communications equipment next to them) in Pennsylvania alone, meaning that quite possibly tens of thousands of Comcast Account Records have been deleteriously affected and/or lost. Please see page 9 of "MINUTES: CITIZENS ADVISORY COUNCIL MEETING: June 21, 2016," as contained in ECF 132 (in the "four 'USB' in support of re 132" of ADT); also as contained in Exhibit "14" in the attachments

to the Comcast Objection.  (See also related materials regarding Kline & Specter's letter at the publicly available website of the PA Department of Environmental Protection's website: http://files.dep.state.pa.us/PublicParticipation/ Citizens%20Advisory%20Council/CACPortalFiles/Meetings/2016_10/6.21.16%20 MINUTES.pdf)

In the interlinked *ADT* case, the Honorable Jon S. Tigar went on to state:

> THE COURT: Well, let's freeze right there for a moment.  Because as I'm taking in this information, one of the things I'm thinking is:
>
> What am I going to do next?
>
> And I -- I have been surprised -- pleasantly, in some ways, because of course it's nice to lead a life that isn't filled with boring redundancy -- but I was surprised by the complexity and density of the objection that I received today.
>
> **It also seems to me that Mr. Orr may exercise his right to seek appellate review of whatsoever decision I make.**
>
> And so it's important that whatever decision I make be not only correct, but sufficiently well-supported that a reviewing court can look at the decision and determine for itself whether it was correctly made and adequately supported....
>
> What are the obligations on me, as the judge, who sits as a quasi-fiduciary for the class?

Should I give Mr. Winick a chance to put in something that summarizes in writing the presentation that he made today?

Will the lawyers for the parties think, oh, now I'm embroiled, and I have stepped in and I have given the objector an additional chance to put his oar in the water that he didn't have?

But if I don't do that, how am I going to decide this issue?

I have now had my attention directed to specific exhibits within the objector's materials that are supposed to be helpful.

So if I ask you: Is it going to show this? And you say: Well, if you look at that, it's not going to be not clear, "not clear" is not good for me.

MR. LEVINE [Counsel for Defendant]: I guess –

THE COURT: Let me finish.

MR. LEVINE: Sorry, Your Honor.

THE COURT: If all the parties leave me with at the end of this process is: You go back in chambers and you figure it out, and then you sign an order that is likely to be appealed, I'll do it. But I'm looking for clarity.

SOURCE: *ADT* transcript [2-1-18/p. 28 – 29; underlining and emphasis supplied].

Mr. Winick, in describing certain claims of the handicapped, stated to the *ADT* Court.

MR. WINICK [Counsel for the Objectors]: …[G]iven the evidence that's been presented to you, you can reach

the conclusion that the settlement is not fair, reasonable, or adequate, and that the class representatives are not typical of the handicapped, disabled members....

What's particularly missing from the evidence that class counsel and defendants have given you?

One, there's no mention that they even attempted to evaluate handicapped members' claims.

Secondly, they never attempted to evaluate profits and revenues that were enjoyed by [the Defendant] from handicapped members.

It doesn't appear that they looked at this analysis at all.

And I don't believe that they evaluated whether or not [the Defendant] -- whether or not the handicapped members would even have purchased the system, given their vulnerability, had they known that the systems were subject to lots of problems.

SOURCE: *ADT* transcript [2-1-18/p. 20; underlining supplied].

MR. WINICK: Mr. Orr will tell you that he would never have purchased a system that he knew was vulnerable [**to not functioning correctly; and/or to not being accessible enough for the disabled customer to utilize the product; etc. --- as was the case in both *ADT* and *Comcast***]

In fact, he had personal problems, himself. You're in a wheelchair [and you're vulnerable, and the product does not operate properly, etc.].

SOURCE: *ADT* transcript [2-1-18/p. 15; underlining and emphasis supplied].

MR. WINICK: But, but I can tell you a couple of different things about the handicapped population.

Number one is, at Document 141 at Page 35, there's a study from the University of New Hampshire 2016 Disability Statistics Report, that says that 12.6 percent of the United States is disabled.

And the Census Department, which is Document 141-1 at Page 20, estimates it at 19 percent.

Twelve point six, 19 percent. Let's assume 10 percent.

SOURCE: *ADT* transcript [2-1-18/p. 17; Underlining supplied].

And I appreciate, by the way, that from ADT's standpoint and the Plaintiffs' standpoint, you've been to court a few times.

Today was final approval.

You're experiencing the expectations delta that comes with a last-minute wrinkle.

So we can all just acknowledge that, and let that go.

That train left the station.

SOURCE: Judge Jon S. Tigar to the Defendant [2-1-18/p. 37 of the *ADT* transcript. [Underlining supplied.]

At this juncture, Orr wishes to describe his background, within the context of making it perfectly clear to any and all that:

(1) his intentions are fully honorable in all respects,

(2) he is not here to ask for money, or to be hurtful. All Orr wants is what is best for the class, and especially for handicapped and/or injured individuals, whether such individuals suffer from auditory handicaps, visual handicaps, mobility handicaps, and/or other handicaps, etc.

Orr suffers from both auditory _and_ visual handicaps (in addition to being in a wheelchair and suffering from mobility handicaps resulting from spinal cord injuries associated with two fractured cervical vertebrae and four lumbar vertebrae caused by an intoxicated driver who, travelling at 120 MPH, collided with Orr's automobile).

Exhibit "W" (and also certain portions of other attached exhibits [such as Exhibit "O," et al] herein concerning FirstEnergy, and related) consists of various court documents, background materials, and/or related, some of which are related to the Orr family's advocacy on behalf of the handicapped (from the Jewish Federation, etc.); various additional associated documents (Jewish Federation of Northern California, etc.).

Orr's involvement with the rights of the handicapped began because of a very unfortunate (and exceedingly complex) series of circumstances involving inter-connected security, internet, and communications facilities, equipment, websites,

etc., with <u>disability-related occurrences that resulted in both theft and physical injury</u> <u>damages, along with numerous other damages to Orr and/or to his family</u>.

The above has had the effect of sensitizing Orr to the plight of the handicapped in general.

As a matter of additional background information about Orr, he first had visual handicaps, and then later received damage to his auditory system. Before the occurrence of the auditory damage, the Jewish Braille Institute featured the following description of him in their Winter 2004 "Focus on JBI" newsletter:

> "Mr. B is confined to a wheelchair (like the one
> Christopher Reeve uses) after a broken back and neck
> robbed him of his ability to perform the simplest tasks.

> "His wife writes: 'When one is confined to a special
> 170-degree-recline wheelchair (more like a cosmos on
> wheels), something as simple as an audio tape, a
> 'plastic band with a bit of iron oxide on it,' can make
> all the difference in the world. In fact, it can allow one
> to cross the line between 'vegetating' and living....[My
> husband's] favorite books are those by Shalom
> Aleichem, and he listens to them whenever possible.
> He just loves the feeling and emotion that JBI's

narrators put into their recordings....JBI tapes literally keep him going."

[Note: Fifteen years after 2004, Mr. B has regained some degree of control over movement and functionality, but he remains totally disabled.]

Because Orr does not photograph well, Ms. Pearl Lam, Director of Library Operations, described him as "Mr. B" on page three of the Winter 2004 newsletter (shown as part of Exhibit "M," with an excerpt therefrom shown above).

Mr. Stephen Solender, who served as President and CEO of United Jewish Communities, is pictured on the same page on which Mr. B's description appears.

This particular issue of the newsletter focused on a "Fundraising Gala Emceed by Master of Ceremonies Larry King," and Mr. B was, in essence, one of the JBI's "poster kids."

Incidentally, the aforementioned Mr. Solender also assisted Orr on multiple occasions after numerous of the aforementioned security-related problems occurred in Pennsylvania, several of which were the focus of subsequent class action and/or related suits, especially as both physical location and account information (regarding numerous different accounts, including, but not limited to, FirstEnergy (especially), ADT, Yahoo, Comcast, Apple, et al), and/or other parameters were affected for numerous years (to the present in some instances). The

FirstEnergy/ADT/Yahoo/Comcast/Apple systems were on a residence in Pennsylvania -- Orr and his family were forced to move away because of anti-Semitic threats, injuries, etc.; and therefore the family returned to Connecticut, where they had previously resided for over twenty years.

In 2017, the Jewish Federation of Northern California contacted, on behalf of the Orr family, Attorney Steven H. Winick, who represented the Orr family in regard to an associated ADT [also FirstEnergy-related][6] class-action suit (Michael Edenborough v. The ADT Corporation and ADT, LLC d/b/a ADT Security Services, Case No. 16-cv-02233-JST; USDC ND California, hereinafter referred to as ADT).

Separately, Attorney Shanin Specter (the son of former Senator Arlen Specter, and cofounder of Kline & Specter, P.C., the leading personal injury firm in the state of Pennsylvania) represented the Orr family in regard to various FirstEnergy/ADT/Yahoo/Comcast/Apple/West Penn and/or related matters, especially as such matters included, but were not limited to, incidents involving physical injuries and/or threat thereof; property damages, and other damages.

Additional information is overviewed below:

1.      Shanin Specter, Esq., of Kline & Specter, P.C., represented the undersigned, and wrote to five Commissioners of the Pennsylvania Public Utility Commission (PUC) on May 6, 2016, regarding a Comcast-related matter. (See also ADT, Yahoo, Apple, Comcast, West Penn, et al.)

---

[6] See also FIRSTENERGY, Comcast, Yahoo, Apple, West Penn, et al.

2.    A member of the Board of the Jewish Braille Institute (JBI), along with a member of Wellesley-in-Philadelphia (WIP), assisted in recommending the undersigned to Mr. Specter's firm.

3.    Attorney Specter referenced one or more alleged equipment failures and/or malfunctions (see also associated data breaches and/or related) which were then confirmed by Darryl Lawrence, an attorney and Consumer Advocate for the Commonwealth of Pennsylvania.

4.    The aforementioned failures involved multiple firms, one of which was FirstEnergy (also Comcast, ADT, Yahoo, Apple, West Penn, et al).

5.    Attorney Specter's letter clarified numerous very serious problems and misunderstandings that had persisted for many years.

6.    According to Stanford University, "Shanin Specter is a preeminent American trial lawyer. Beyond winning substantial monetary compensation for his clients, many of Specter's cases have prompted changes that provide a societal benefit...." Source: Stanford University (where Attorney Specter has taught for several years) website: https:// law.stanford.edu/directory/shanin-specter/(as accessed on June 20, 2019). "Since 2000, Specter has served as an Adjunct Professor of Law at the University of Pennsylvania Law School. Since 2015, Specter has also taught at UC Hastings College of Law, UC Berkeley School of Law and Stanford Law School."

7.      As a result of Attorney Specter's letter of May 6, 2016 – and the changes it brought forth – the Jewish Federation of Northern California contacted Steven H. Winick, Esq., who then went on to represent pro bono the Orr family as Objectors in the aforementioned ADT class-action suit.   (See also interrelated Comcast, Yahoo, Apple, and West Penn actions, etc.; the Department of Justice [DOJ] also became involved in regard to certain matters, in regard to protecting the Orr family.)

9.      The Honorable Jon S. Tigar overtly discussed, with Attorney Winick, and in open court, issues of societal benefit and the Jewish Federation's having contacted Mr. Winick (ECF 153 in ADT) in regard to representing the undersigned in the Comcast/Yahoo/Apple/West-Penn-related ADT matter. (As mentioned above, additional firms were also involved.)

10.      Judge Tigar engaged Attorney Winick in extensive dialogue in Court (the aforementioned ECF 153), in which the Court was very complimentary of both Mr. Winick and the rights of handicapped clients such as the undersigned Mr. Orr.

11.      In ADT, the undersigned submitted, as a sub-set of the overall documentation, well over 200 pages of records concerning interrelated Comcast-ADT infractions.  (See also Yahoo, Apple, Comcast, West Penn, et al.)

12.      In ADT, the undersigned began pro se, but then the Jewish Federation of Northern California contacted Steven H. Winick, Esq., who evaluated the merits

of the interrelated case, and represented the Orr family in court before the Honorable

Jon S. Tigar.

13.    Judge Tigar made it exceedingly clear that claims such as those

arising from actions perpetrated against the Orr family (one of whom is physically

handicapped) are indeed important. They should not be overlooked or

underestimated.

And, furthermore, they should be heard fully in court.  In fact, Judge Tigar

made several additional – and very pertinent – statements to Orr's Counsel, as shown

below (please note that all of Judge Tigar's comments are excerpted from ECF 153

in ADT):

> THE COURT: Are you representing Mr. Orr on a pro bono basis because the
> Jewish Federation thought you might do that?
>
> They just called you?
>
> MR. WINICK: Yes.
>
> THE COURT: You take all the time you need.
>
> SOURCE:  Judge Jon S. Tigar to the Orr family's Counsel [2-1-18/p. 7 of the
> ADT transcript].

It is also instructive to mention the fact that, far from being a so-called "Plaintiffs' Attorney," Mr. Winick was the precise opposite, and therefore made an exception in Mr. Orr's case because of the egregious conduct of the Defendants:

MR. WINICK: …Let me start by just giving you a quick introduction as to how I got here. I'm usually on the defense side of class actions.

THE COURT: Weren't you a partner at Sheppard Mullin at one point?

MR. WINICK: I was.

SOURCE: ADT transcript [2-1-18/p. 5 - 6].

THE COURT: Mr. Winick, let me say something. It's in part for your benefit, but it's also for the benefit of everyone else if in the courtroom, including the member of the public who is sitting there.

I don't know what's going to happen with this objection. But I admire you for taking this case on pro bono after getting a phone call from an organization you trust…"

SOURCE: Judge Jon S. Tigar to the Orr family's Counsel [2-1-18/p. 46 of the ADT transcript].

Not only did electronic equipment (referring here to the set-top box in the handicapped customer's household) independently malfunction (because of FirstEnergy et al) inside the dwelling, but related equipment exterior to the dwelling

was negligently located next to a malfunctioning transformer in a gas field (see also physical injuries and property damages).

Stray gas burned (in conjunction with FirstEnergy's inappropriate wiring, and related) down Comcast's communications pedestal at least twice – after which time Comcast promptly lost all records of the handicapped person's account. Records, including, but not limited to, numerous billing and related official transaction records proving the existence of the Orr household's account, were shown in the following exhibits contained in the attachments to the separately filed Comcast Objection (not shown here) (In re: Comcast Corp. Set-Top Cable Television Box Antitrust Litigation, Case No. 2:09-md-02034-AB Eastern District of Pennsylvania; hereafter referred to as Comcast) (shown also elsewhere are records proving the timely "Opt-Out of Arbitration" [see especially Exhibit "S" thereof, et al] duly submitted by the Orr household. In spite of the State of Pennsylvania's confirmation of the undersigned's Comcast account, and in spite of billing records, etc., the Claims Administrator in the Comcast case informed the undersigned that the undersigned were not Class members, as Comcast's so-called "records" were "not complete" regarding the undersigned's customer data and/or potential customer data. As a part of the admitted "incompleteness of Comcast's records," Comcast's admittedly inaccurate records did not contain the duly submitted opt-out and/or related communications, etc. Nor did Comcast's admittedly incomplete and inaccurate records contain the majority of the 2011 – 2014 records about the

undersigned's Comcast account. The objective of including mention of the above is that of illustrating several points, one of which is the fact that the Comcast Claims Administrator was indeed apparently applying the unfair Notice language. This means that bona fide claimants were being denied the benefits of Class membership):   The aforementioned Comcast exhibits filed separately elsewhere (please note that, obviously, the exhibit designators here refer to exhibits as enumerated in the separate Comcast-case records) included: "1," "2," "3," "4," "5," "6," "7," "8," 9," "10," "11," "12," "14," "15," "16," "17," "18," "19," "20," "A," "B," "C," "D," "E," "F," "G," "H," "I," "J," "K," "L," "M," "N," "O," "P," "Q," "R," "S," "T," "U," "LL," "MM," "TT," "UU," "VV," "WW," et al.  Subsequently to Comcast's losing all records (please note that such loss occurred more than once, and was not always linked to equipment loss), Comcast was then able to sporadically locate one or more records, but still remained unable to reconstruct the full file.

After Comcast (a firm integrally related to FirstEnergy's activities in regard to the issues at hand) lost records of the undersigned's account, Darryl Lawrence, an attorney and Consumer Advocate for the Commonwealth, wrote a letter confirming not only the existence[7] of the undersigned's Comcast account, but also various problems with equipment, its location, etc.  Attorney Lawrence <u>went so far as to contact a supervisor for Comcast, and stated as follows:</u>

---

[7] Subsequently to Comcast's losing all records (please note that such loss occurred more than once, and was not always linked to equipment loss), Comcast was then able to sporadically locate one or more records, but still remained unable to reconstruct the full file.

There comes a time when one must simply start replacing equipment. After independently confirming the repeat failures of appliances/equipment within the Orr's home (through direct conversations with service technicians who repaired/replaced these items), <u>and now repeat failures of Comcast equipment</u> that is situated completely outside of the Orr's home (through direct contact and discussion with <u>a supervisor for Comcast</u>), the OCA believes the time has come for FirstEnergy to act....

I will not belabor the five points above here. My primary objective in writing this letter to you at this time is because I truly believe there is a risk of <u>serious personal injury</u> if this situation is not rectified with all due speed.

I look forward to your swift resolution of this matter.

SOURCE: Exhibit "A" as attached to Attorney Specter's 5-6-16 letter (EXCERPT SHOWN BELOW, and also contained on Page 39 of 106; also Page 13 of 106; in ECF 132-2 of *ADT*; underlining supplied) to the following five commissioners.

[Please note that five addressees --- <u>relating to the five Commissioners addressed in the renowned Attorney Specter's letter to save the Orr family</u> --- are shown below in regard to the letter content that follows the addresses.

Attorney Specter, quite notably garnered a $105,000,000 settlement against FirstEnergy in regard to Carrie Goretzka, who was often facing similar challenges as compared to the Orr family.

Unfortunately, she was eventually killed by FirstEnergy, though.

Attorney Specter wanted to avoid deaths in the Orr family, thus the letter below...; of course, if he had known Ms. Goretzka in time, he would have written a letter for her, too, but, unfortunately, he did not find out about her plight in time.]

Chair Gladys M. Brown
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner Pamela A. Witmer
Pennsylvania Public Utility   Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Vice Chairman Andrew G. Place
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner Robert F. Powelson
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Commissioner John F. Coleman
Pennsylvania Public Utility Commission
Bureau of Consumer Services
P.O. Box 3265
Harrisburg, PA 17105-3265

Attorney Specter, of Kline & Specter, P.C., stated, in his letter of May 6, 2016:

The situation identified by Attorney Lawrence has been exacerbated by the more recent discovery of stray methane gas on the same site...There are at least forty (40) oil/gas wells in very close proximity...meaning that stray methane gas comes up from the soil and ignites...

Seven nearby families [six in addition to the Orr family] may be at risk...

[Please see also the following Comcast-case attachments filed separately elsewhere: Exhibits "1," "2," "3," "4," "5," "6," "7," "8," 9," "10," "11," "12," "14," "15," "16," "17," "18," "19," "20," "A," "B," "C," "D," "E,"

"F," "G," "H," "I," "J," "K," "L," "M," "N," "O," "P,"
"Q," "R," "S," "T," "U," "LL," "MM," "TT," "UU,"
"VV," "WW," et al. (Please note that an "Abbreviated
Roster of Attachments and/or Exhibits" is contained as
an "Addendum" to the cover letter to the separate
<u>Comcast</u> objection.)]

In other words, the severely handicapped Mr. Orr and his wife, Darlene, were not

alone – either <u>in regard to the risk of death, physical injury, or the risk of the loss of</u>

<u>account information (also theft, hacking, etc., in various instances)</u>

Furthermore, it is important to note that there were countless more than seven

families involved in regard to the risk of loss of account information (as related to

equipment malfunction alone, and independent of all other sources of "missing

account information" and/or related). As discussed in a presentation by the

Pennsylvania DEP (Department of Environmental Protection), there exist literally

hundreds of thousands of abandoned oil and gas wells (many of which with

communications equipment next to them) in Pennsylvania alone, <u>meaning that quite</u>

<u>possibly tens of thousands of Comcast Account Records have been deleteriously</u>

<u>affected and/or lost</u>. (See also FirstEnergy.) Please see page 9 of "MINUTES:

CITIZENS ADVISORY COUNCIL MEETING: June 21, 2016," as contained in

ECF 132 (in the "four 'USB' in support of re 132" of ADT); also as contained in

Exhibit "14" in the attachments to the Comcast Objection. (See also related

materials regarding Kline & Specter's letter at the publicly available website of the

PA       Department       of       Environmental       Protection's       website:

http://files.dep.state.pa.us/PublicParticipation/

Citizens%20Advisory%20Council/CACPortalFiles/Meetings/2016_10/6.21.16%20

MINUTES.pdf)


In the interlinked *ADT* (and FirstEnergy-related case), the Honorable Jon S. Tigar went on to state:


> THE COURT: Well, let's freeze right there for a moment. Because as I'm taking in this information, one of the things I'm thinking is:
>
> What am I going to do next?
>
> And I -- I have been surprised -- pleasantly, in some ways, because of course it's nice to lead a life that isn't filled with boring redundancy -- but I was surprised by the complexity and density of the objection that I received today.
>
> **It also seems to me that Mr. Orr may exercise his right to seek appellate review of whatsoever decision I make.**
>
> And so it's important that whatever decision I make be not only correct, but sufficiently well-supported that a reviewing court can look at the decision and determine for itself whether it was correctly made and adequately supported....
>
> What are the obligations on me, as the judge, who sits as a quasi-fiduciary for the class?

Should I give Mr. Winick a chance to put in something that summarizes in writing the presentation that he made today?

Will the lawyers for the parties think, oh, now I'm embroiled, and I have stepped in and I have given the objector an additional chance to put his oar in the water that he didn't have?

But if I don't do that, how am I going to decide this issue?

I have now had my attention directed to specific exhibits within the objector's materials that are supposed to be helpful.

So if I ask you: Is it going to show this? And you say: Well, if you look at that, it's not going to be not clear, "not clear" is not good for me.

MR. LEVINE [Counsel for Defendant]: I guess –

THE COURT: Let me finish.

MR. LEVINE: Sorry, Your Honor.

THE COURT: If all the parties leave me with at the end of this process is: You go back in chambers and you figure it out, and then you sign an order that is likely to be appealed, I'll do it. But I'm looking for clarity.

SOURCE: *ADT* transcript [2-1-18/p. 28 – 29; underlining and emphasis supplied].

Mr. Winick, in describing certain claims of the handicapped, stated to the *ADT* Court.

> MR. WINICK [Counsel for the Objectors]: …[G]iven the evidence that's been presented to you, <u>you can reach the conclusion that the settlement is not fair, reasonable, or adequate,</u> and that the class representatives are not typical of the handicapped, disabled members….
>
> What's particularly missing from the evidence that class counsel and defendants have given you?
>
> One, there's no mention that they even attempted to evaluate handicapped members' claims.
>
> Secondly, they never attempted to evaluate profits and revenues that were enjoyed by [the Defendant] from handicapped members.
>
> It doesn't appear that they looked at this analysis at all.
>
> <u>And I don't believe that they evaluated whether or not [the Defendant] -- whether or not the handicapped members would even have purchased the system, given their vulnerability, had they known that the systems were subject to lots of problems.</u>
>
> SOURCE: *ADT* transcript [2-1-18/p. 20; underlining supplied].
>
> MR. WINICK: Mr. Orr will tell you that he would never have purchased a system that he knew was vulnerable [**to not functioning correctly; and/or to not**

**being accessible enough for the disabled customer to utilize the product; etc. --- as was the case in both _ADT_ and _Comcast_]**

In fact, he had personal problems, himself. You're in a wheelchair [and you're vulnerable, and the product does not operate properly, etc.].

SOURCE: _ADT_ transcript [2-1-18/p. 15; underlining and emphasis supplied].

MR. WINICK: But, but I can tell you a couple of different things about the handicapped population.

Number one is, at Document 141 at Page 35, there's a study from the University of New Hampshire 2016 Disability Statistics Report, that says that 12.6 percent of the United States is disabled.

And the Census Department, which is Document 141-1 at Page 20, estimates it at 19 percent.

Twelve point six, 19 percent. Let's assume 10 percent.

SOURCE: _ADT_ transcript [2-1-18/p. 17; Underlining supplied].

And I appreciate, by the way, that from ADT's standpoint and the Plaintiffs' standpoint, you've been to court a few times.

Today was final approval.

You're experiencing the expectations delta that comes with a last-minute wrinkle.

So we can all just acknowledge that, and let that go.

That train left the station.

SOURCE: Judge Jon S. Tigar to the Defendant [2-1-18/p. 37 of the *ADT* transcript. [Underlining supplied.]

\* \* \* \* \* \* \* \*

Thank you.

Sincerely,

Edward W. Orr[8]

---

[8] Objector Orr suffers from both auditory and visual handicaps (in addition to being in a wheelchair and suffering from mobility handicaps resulting from spinal cord injuries associated with two fractured cervical vertebrae and four fractured lumbar vertebrae caused by an intoxicated driver who, travelling at 120 MPH, collided with Orr's automobile). The undersigned intends to appear at the Final Fairness Hearing, and respectfully requests permission from the Court to speak and/or communicate via telephone, as his physical handicaps prevent both travel and the usage of Zoom and/or related technologies. Orr brings this Objection in good faith, and in order to avoid doubt about his motives, Orr is more than willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of this Objection; see generally Brian T. Fitzpatrick, "The End of Objector Blackmail?" 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). In other words, Orr wants nothing more than constructive action, and is advocating for those injured by FirstEnergy's actions (and/or the actions of its affiliates West Penn Power, et al), and/or for those who have been unfairly treated by FirstEnergy (and/or its affiliates West Penn Power, et al), to receive proper relief, and to be treated equitably — thus the filing of this Objection, as the undersigned received Notice from FirstEnergy itself and/or its agents, along with an invitation to object if the undersigned did not agree with the conditions provided to him in the Notice that the undersigned received from FirstEnergy and/or its agents. As mentioned

122 Ridge Road
Terryville, CT 06786


Telephone: 203-658-4977
Email Address:  eanddorr2@gmail.com
Telefax Number: (860) 582-4857


CRS/DDO:fw7269313957r


Enc.: As described and/or referenced herein

---

above, the undersigned intends to appear at the Final Fairness Hearing, and respectfully requests permission from the Court to speak and/or communicate via telephone, as his physical handicaps prevent both travel and the usage of Zoom and/or related technologies. Grounds for objection are contained in this Certified, Next-Day Delivery mailing; and all pages and exhibits and/or legal and evidentiary support herein are submitted with the request that the Court consider them. It is requested that all pages and/or exhibits of this submission (please note that, in addition to the objection cover letter and the hard-copy exhibits, there is a 32 GB USB drive containing photos, etc., which is attached as part of Exhibit "A") be submitted into evidence immediately. In addition, the Objector intends to utilize all pages and/or exhibits of this submission as evidence at the Settlement Fairness Hearing. The undersigned also hereby states that, as a result of the current and/or prior State of National Emergency (and/or concomitant events in the Objector's current state of residence, the State of Connecticut), Orr has prepared and proofread this Objection to the best of his ability (owing to the physical handicaps of the undersigned, several friends and family members have assisted and/or acted in agency as required in the preparation of this document, with such disability-related assistance including the assistance of one or more persons holding power of attorney, persons who have also assisted with voice machinery/substitution and/or related, and who may also do so in the future if necessary) under the constraints at hand, including, but not limited to, time constraints, et al. It is hoped that all page and/or exhibit references and/or related are correct, and the undersigned has proofread this document (referring here to the Orr Objection) a minimum of four times, with multiple reviewers/proofreaders assisting. The undersigned is not an attorney, and has prepared this Objection to the best of his ability; Orr has submitted this document in good faith. Multiple documents herein reference mail and/or security problems, etc. In one instance, a member of the post office even wrote a note to one of the courts about prior problems (please see the attached Exhibit "O," which also shows patents held by Orr, in addition to other technical data; Orr wrote numerous publications and a textbook; hackers also accessed much patent background information, trade secret, and other data sources held by Orr that were private and very valuable).It is hoped that all page references and/or related are correct, and the undersigned has proofread this document (referring here to the Orr Objection) a minimum of four times, with multiple reviewers/ proofreaders assisting. Please note that -- in regard to the herein-described security breaches, hacking activities, and/or related (many such breaches and/or activities have been related to FirstEnergy's activities and/or to certain personnel [described and/or referenced herein] affiliated with FirstEnergy and or its divisions, affiliates, et al), non-compliance issues on the part of server and/or related systems were sometimes so egregious that attempts to utilize ADA-compliant and/or related software sometimes resulted in the unfortunate compromise of data/screen integrity, etc., thereby exacerbating matters by then concomitantly compromising additional factors (including, but not limited to, compromises of security and/or related, with one or more examples [including, but not limited to, multiple compromised/ accessed/entered and/or related files thereof] shown in one or more exhibits or portions herein). It is hoped that all page references and/or related are correct, and the undersigned has proofread this document (referring here to the Orr Objection) a minimum of four times, with multiple reviewers/ proofreaders assisting. The undersigned has submitted this document in good faith.

cc:    S. Winick (per regular mail/prm)

        S. Solender (per regular mail/prm)

        S. Specter (per regular mail/prm)

        DC File/351292381033f/re (per regular mail/prm)

        Social Security Administration (per regular mail/prm)

        Yale Medical School/DK (per regular mail/prm)

        Reliance Standard (per regular mail/prm)

        University of Conn. Medical School/J.Cannon Ref. EWO/3063(per regular mail/prm)

        SBI/DC Trust (per regular mail/prm)